# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-_____ ( ) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THEM TO PAY PRE-PETITION WAGES AND SALARIES AND TO PAY AND HONOR PRE-PETITION EMPLOYEE BENEFITS AND RELATED OBLIGATIONS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned attorneys, hereby file this motion (the "Motion") for interim and final orders, pursuant to Bankruptcy Code §§ 105(a), 363(b), and 507(a),

---

[1] The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp, LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc (4757); Charlie Brown's of West Windsor, Inc (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc. (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc (4776); Jonathan Seagull Property Corp (7248); Jonathan Seagull, Inc (9160); The Office at Bridgewater, Inc (3132); The Office at Cranford, Inc (3131); The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc (3126); and What's Your Beef V, Inc (4719)

authorizing them to pay, in their discretion, pre-petition wages and salaries and to pay and honor pre-petition employee benefits and related obligations, as described in greater detail below. In support of the relief requested in this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105(a), 363(b), and 507(a).

## INTRODUCTION

2.  On November 17, 2010 (the "Petition Date"), the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors have sought an order directing that their Chapter 11 cases be jointly administered by this Court, and they have filed additional motions (some of which seek emergency relief) in the proposed lead case of CB Holding Corp.

3.  The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee has been appointed in these cases.

The Debtors and Their Business

4.  CB Holding Corp., a Delaware corporation, is the direct or indirect corporate parent of all of the other Debtors. All of CB Holding Corp.'s outstanding common and preferred stock is privately held.

5.  The Debtors own and operate the *Charlie Brown's Steakhouse* ("Charlie Brown's"), *Bugaboo Creek Steak House* ("Bugaboo Creek"), and *The Office Beer Bar & Grill* ("The Office"). Charlie Brown's and Bugaboo Creek are steakhouses, offering their customers

2

exceptional service, value, and fresh food, along with seasonal specialties, while The Office is more casual, offering over 60 bottled beers, seasonal draft beers, and classic pub appetizers and dining options.

6.      There are currently 20 Charlie Brown's restaurants in New York, New Jersey, and Pennsylvania; 12 Bugaboo Creek restaurants in Massachusetts, Delaware, Maryland, New Hampshire, and Maine; and seven The Office restaurants in New Jersey. Shortly before the Petition Date, the Debtors closed 29 Charlie Brown's and 18 Bugaboo Creek restaurants.

7.      The Debtors have approximately 185 full-timed salaried employees and more than 2,200 full-time and part-time hourly employees. None of the Debtors' employees are members of a union.

Capital Structure

*Secured Debt*

8.      On June 21, 2007, in connection with the acquisition of Bugaboo Creek by Charlie Brown's, the Debtors entered into a financing agreement with Ableco Finance LLC ("Ableco"); Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) ("Wells"); and GMAC Commercial Finance LLC (n/k/a Ally Commercial Finance LLC) ("Ally" and collectively with Wells and Ableco, the "Senior Secured Lenders"), providing for a revolving line of credit, under which the Debtors may borrow up to an aggregate amount equal to the lesser of $15 million and a defined borrowing base with a letter of credit sublimit, and two tranches of term loans, all of which are secured by liens on substantially all of the Debtors' assets. As of the Petition Date, the Debtors had approximately $70 million outstanding under this facility.[2]

---

[2]      Specifically, the Debtors had approximately $6 million outstanding under the revolver, $12 million outstanding under Term Loan A, and $52 million outstanding under Term Loan B

9. On September 28, 2008, the Debtors issued $10 million in senior subordinated second lien notes pursuant to a note purchase agreement to Trimaran Fund II, L.L.C.; Trimaran Parallel Fund II, L.P.; Trimaran Capital, L.L.C.; CIBC Employee Private Equity Fund (Trimaran) Partners; and CIBC Capital Corp. (collectively, the "Second Lien Lenders"). As of the Petition Date, approximately $14 million, including accrued and unpaid interest, was outstanding under these second lien notes.

*Mezzanine Debt*

10. Also as part of the Bugaboo Creek acquisition, on June 21, 2007, the Debtors issued $20 million in unsecured, senior subordinated notes pursuant to four note purchase agreements to Kohlberg Capital Corporation; Archer Capital Master Fund, L.P.; Camofi Master LDC; Camhzn Master LDC; and Raven Credit Opp Master Fund Ltd. (collectively, the "Subordinated Lenders"). As of the Petition Date, the Debtors had approximately $30 million of mezzanine debt obligations, including accrued and unpaid interest, outstanding to the Subordinated Lenders.

Circumstances Leading to Filing

11. A variety of external factors have led to a decline in the Debtors' revenue over the last several years, at the same time that costs have increased. For instance, the restaurant industry has grown more competitive, the fast-food industry has improved their product offerings and increased its market share to the detriment of casual dining restaurants, such as the Debtors, and consumers have changed their ordering habits. In addition, the "Great Recession" has led to a decline in discretionary spending among the Debtors' former and current customers, and fewer families are frequenting restaurants while food and labor costs have increased, compounding the Debtors' distress.

4

12.     Accordingly, for some time, the Debtors have been in discussions with their lenders and other parties regarding a financial restructuring, and they have entered into several amendments to their various credit and related facilities, but the Debtors' need for additional liquidity has not been resolved, and the economy has not improved. At this time, the only party willing to provide the Debtors with any funding is Ally, which has informed the Debtors that it is only willing to do so as a DIP loan in Chapter 11 cases where the Debtors market their assets in anticipation of a global asset sale.

13.     Thus, in an effort to maximize their value, the Debtors have entered into a DIP arrangement with Ally, and along with other first-day motions designed to ensure a smooth transition into Chapter 11, the Debtors intend to file a motion to approve a DIP financing arrangement and to attempt to sell substantially all of their assets expeditiously pursuant to Bankruptcy Code § 363.

## FACTUAL BACKGROUND

14.     The Debtors generally participate in, or are obligated under, a number of different salary, wage, and benefit structures, programs, and plans. They are also obligated to pay bonuses, provide certain medical, short-term and long-term disability, life insurance and similar insurance, workers' compensation, and other related benefits to their employees. The Debtors have different payroll policies and benefits for their employees, and under various structures, programs, and plans described below, the Debtors' employees are owed and have accrued various pre-petition payments and benefits that have not yet been paid or otherwise realized.[3]

---

[3]     Many of the Debtors' restaurant employees earn less in wages than is required to satisfy all of their withholdings because their employees' major source of income is from tips. In such situations, the Debtors fund the deficiencies and then bill the employees.

15. For purposes of processing payroll, the Debtors treat their employees as if they are employed by either Charlie Brown's or by Bugaboo Creek. The Debtors pay their employees either by check or by direct deposit.

16. Those employees considered to be employed by Charlie Brown's for payroll purposes, which include all employees of Charlie Brown's and The Office, are either corporate-level and manager employees ("Charlie Corporate Employees") or hourly-wage restaurant workers or office employees ("Charlie Restaurant Employees"). Those employees considered to be employed by Bugaboo Creek for payroll purposes, which include all employees of Bugaboo Creek and corporate-level employees that came over from Bugaboo Creek after it was acquired by Charlie Brown's, are either corporate-level employees ("Bugaboo Corporate Employees"), management employees ("Bugaboo Management Employees"), or other hourly-wage restaurant employees ("Bugaboo Restaurant Employees").

17. In order to even out the effect of payroll on their cash flow, the Debtors pay their employees in one of two staggered, bi-weekly payroll cycles, except for employees in New York and Rhode Island, which states require employees to be paid weekly. Paychecks are issued every Thursday for the period ending the prior Sunday.

18. The Debtors utilize an external payroll processing service company, Ceridian Corporation ("Ceridian"), to facilitate their payroll. The yearly cost for this service is approximately $490,000, and as of the Petition Date, the Debtors owed approximately $25,000 to Ceridian.

<u>Salaries and Wages</u>

19. The Debtors owe their employees salaries and wages for work performed pre-petition, including overtime that the Debtors are legally obligated to pay. As of the Petition Date, salaries and wages have accrued for pre-petition services on account of either seven or

6

seventeen days, depending on the payroll cycle. The Debtors believe that, as of the Petition Date, the aggregate amount of salaries and wages (including such amounts owed to former employees that were terminated in the week prior to the Petition Date) that has accrued, but has not yet been paid or has not yet been presented for payment or cleared through the banking system, is approximately $1.847 million.[4]

Withholdings

20. In each payroll cycle described above, the Debtors withhold certain funds for the benefit of third parties. Specifically, the Debtors withhold federal, state, and/or local taxes, medical and health deductions, and other withholdings from the wages and salaries of their employees, as requested by their employees or required by federal, state, and local laws. The Debtors transfer these withheld funds to the appropriate parties or government agencies according to the payment schedules established thereby. The Debtors believe that, as of the Petition Date, the aggregate amount of funds withheld, and not yet transferred, is approximately $644,491.[5]

21. As of the Petition Date, under applicable orders requiring the withholding of child support, back-tax payments, or other garnishments, the Debtors expect to have withheld approximately $6,700 from employees' paychecks that has not yet been transferred or that has not yet been presented for payment or cleared through the banking system.

---

[4] Contemporaneously with the filing of this Motion, the Debtors filed an emergency motion (the "Emergency Motion") for an order (i) authorizing payment of pre-petition payroll obligations, (ii) authorizing and directing all banks to honor pre-petition checks for payment of such pre-petition payroll obligations, and (iii) prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers to employee accounts for pre-petition payroll amounts. The Debtors requested authority to pay a portion of such amount in the Emergency Motion, and to the extent such relief is not granted, request authority to pay such amount herein.

[5] The Debtors requested authority to pay a portion of such amount (and all other similar withholdings) in the Emergency Motion, and to the extent such relief is not granted, request authority to pay such amount herein.

Performance-Based Bonus Plans

22. As part of their compensation package, the Debtors maintain, subject to individual approval by their chief executive officer, performance-based bonus plans for, general managers and managers of Charlie Brown and Bugaboo Creek restaurants (the "Manager Bonus Plan").

23. To reward general managers and managers for superior performance, the Debtors offer monthly bonuses of 3% of actual controllable profit split between the management team if controllable profit exceeds the prior year by $1.00. In addition, if restaurant sales increase over the prior year, an additional .25% of controllable profit is added to the pool for each percentage point increase. These bonuses are payable within 35 days of the end of each month. As of the Petition Date, the Debtors estimate that $12,000[6] of payments on account of the Manager Bonus Plan has accrued but has not yet been paid.

24. Additionally, the Debtors provide referral bonuses of varying amounts, including manager recruiting bonuses of $1,000 and hourly employee recruiting bonuses of $100. These bonus amounts rarely exceed $3,000 per week, and as of the Petition Date, the Debtors estimate that there is approximately $3,000 of such bonuses that accrued pre-petition have not yet been paid.

25. The Debtors also maintain a discretionary bonus plan for high-level Charlie Corporate Employees, high-level Bugaboo Corporate Employees, and regional managers, which is designed to provide annual incentive bonuses to management. This bonus plan is tied to the Debtors' financial and sales performance, and these bonuses have not been paid in several years. The Debtors do not anticipate that any payments under this bonus plan

---

[6] The Debtors requested authority to pay a portion of such amount in the Emergency Motion, and to the extent such relief is not granted, request authority to pay such amount herein

would become due during these cases, and to the extent any do, the Debtors will seek separate authority from the Court before making such payments.

Contests

26. From time to time, the Debtors hold contests at their restaurants, whereby hourly team members and employees, such as waiters, kitchen staff, and managers, can win prizes based on sales, and the Debtors believe that some of these contests may be ongoing. These prizes generally do not exceed $2,000 in value, and occasionally, restaurant managers will run contests in individual restaurants where prizes are generally less than $100.

Severance

27. The Debtors have certain severance agreements with various employees, but they do not have a formal severance policy. As of the Petition Date approximately $16,485 of severance amounts had accrued but has not yet been paid.[7]

401(k) Plan

28. The Debtors sponsor and administer a 401(k) savings plan (the "401(k) Plan"). Full-time employees that are over 21 years of age are eligible to participate after completing six months of continuous employment. Employees wishing to participate may enroll the immediate January or July after they become eligible. The Debtors withhold, at an eligible employee's request, up to 100% of such employee's annual, pre-tax pay for contribution to the 401(k) Plan (subject to applicable limitations imposed by the Internal Revenue Code). Historically, the Debtors matched employees' contributions, but the Debtors suspended their matching program in April 2008.

29. The 401(k) Plan is administered by The Newport Group, with assets held by Mid Atlantic Trust Company ("Mid Atlantic Trust"). The Debtors send a payroll report to

---

[7] At this time the Debtors are not seeking authority to pay severances.

RLF1 3630037v 1

Mid Atlantic Trust weekly, and when appropriate, Mid Atlantic Trust makes an ACH withdrawal from the Debtors' payroll account. For these services, and others, the Debtors pay The Newport Group and Mid Atlantic Trust fees funded by employee withholdings. As of the Petition Date, the Debtors believe that there are no amounts outstanding on account of such fees.

30.     The Debtors believe that the aggregate amount of funds withheld under the 401(k) Plan prior to the Petition Date that have not been withdrawn by Mid Atlantic Trust should not exceed \$38,949,[8] including funds withheld for repayment of permitted loans made to employees under the 401(k) Plan.

Reimbursement of Expenses

31.     In the ordinary course of business, the Debtors reimburse employees for payment of out of pocket expenses attributable to their employment with the Debtors. Employees are required to submit expense reimbursement forms and copies of applicable receipts for review and approval.

32.     As of the Petition Date, certain employees may not yet have submitted expense reimbursement requests, or such requests may have been made but not yet processed. The Debtors estimate that the amount of employee expenses accrued prior to the Petition Date but not yet reimbursed is approximately \$25,000.

Vacation and Sick Days

33.     Certain employees are eligible for paid sick days, based upon their employment status and subject to the Debtors' policy. Employees also accrue paid vacation based on their length of continuous service with the Debtors and based on their employment classification (i.e., whether one is a Charlie Corporate Employee, a Charlie Restaurant

---

[8]     The Debtors requested authority to pay such amount in the Emergency Motion, and to the extent not paid, request authority to pay such amount herein.

Employee, a Bugaboo Corporate Employee, a Bugaboo Management Employee, or a Bugaboo Restaurant Employee). Unused vacation time at the end of the fiscal year September 30 may not be carried over into the following year.

34. Charlie Corporate Employees, Bugaboo Corporate Employees, and Bugaboo Management Employees earn paid vacation after their first full year of employment, as follows:

> a. employees with one to four years of service are entitled to two weeks of vacation;
>
> b. employees with five to nine years of service, are entitled to three weeks of vacation;
>
> c. employees with 10 to 20 years of service are entitled to four weeks of vacation; and
>
> d. employees with more than 21 years of service are entitled to five weeks of vacation.

During the first year of employment, after six months of continuous service, Charlie Corporate Employees, Bugaboo Corporate Employees, and Bugaboo Management Employees are entitled to certain paid vacation, up to a maximum of two weeks.

35. Charlie Restaurant Employees are eligible for up to two weeks of paid vacation after completing a full year of continuous service, and Bugaboo Restaurant Employees are eligible for one week of paid vacation after completing two years of continuous service. The first year of vacation is earned based on when the employee commenced his or her employment.

36. As of the Petition Date, the Debtors have accrued approximately $2.0 million on account of unused sick and vacation days for their employees. Approximately $640,000 is outstanding for unpaid sick days, which are lost by employees if they are not used (or cease employment), and the remainder is for unpaid vacation days, which amounts are generally paid to employees when they cease employment with the Debtors.

11

37. The prorated amount of accrued but unpaid vacation days for employees that were terminated prior to the Petition Date is approximately $135,000 (including certain related taxes).[9]

Employee Insurance Plans and Programs

38. As described below, the Debtors offer various insurance plans and programs. For instance, the Debtors provide various health insurance plans and programs for their employees:

a. *Medical Insurance*: the Debtors provide medical benefits and prescription drug coverage for their employees through a medical insurance plan (the "Medical Plan") with Horizon Blue Cross Blue Shield of New Jersey ("Blue Cross"). Full-time employees that are regularly scheduled to work at least 30 hours per work week and their dependents are eligible for enrollment in the Medical Plan, and eligible employees contribute based on their status as employees and the coverage they elect (i.e., single, spouse, or family coverage). Charlie Corporate Employees, Bugaboo Management Employees, and Bugaboo Corporate Employees are eligible to purchase additional medical coverage at their own expense. In connection with the Medical Plan, the Debtors pay a monthly premium to Blue Cross of approximately $400,000, with a portion of such amount funded through employee contributions, the last payment having been made on October 26, 2010, for coverage for the month of October 2010.

b. *Alternate Medical Coverage*: the Debtors also offer medical benefits through Aetna SRC ("Aetna SRC") for Charlie Restaurant Employees and Bugaboo Restaurant Employees that do not qualify for the Medical Plan because they are not full-time employees. This plan is funded entirely by electing employees, and as of the Petition Date, approximately $7,000 has been withheld but not paid to Aetna SRC on account of this plan and all other plans provided by Aetna SRC, as described below.

c. *Dental Insurance*: the Debtors also provide dental insurance to their employees through an employer-sponsored plan with Aetna Life Insurance Company ("Aetna"). The Debtors pay Aetna approximately $25,000 per month as a premium for this coverage,

---

[9] The Debtors requested authority to pay such amount in the Emergency Motion, and to the extent relief is not granted, request authority to pay such amount herein.

and eligible employees contribute based on their status and the coverage they elect. Approximately $44,750 accrued prior to the Petition Date, but has not yet been paid.

d.　*Vision Plan*: the Debtors provide vision insurance to electing employees through an employer-sponsored "Eye Care" plan underwritten by Fidelity Life Insurance Company ("Fidelity"). The Debtors pay Fidelity approximately $3,500 per month as a premium for this coverage, and eligible employees contribute based on their status and the coverage they elect, approximately $6,500] has been withheld but not paid to Fidelity on account of the Eye Care plan.

e.　*Travel Insurance*: the Debtors have special travel accident insurance for Charlie Corporate Employees that are injured or may need medical coverage on an emergency basis while traveling. The Debtors pay approximately $4,000 annually for this coverage.

f.　*COBRA Benefits*: pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "COBRA"), the Debtors offer eligible former employees the opportunity to continue insurance coverage under the Debtors' then-existing medical and dental plans. Eligible former employees who elect to participate in COBRA are entitled by law to insurance coverage for up to 18, 29, or 36 months. COBRA participation is managed by Cobraserve through Ceridian, which charges a 2% service fee that is collected from the participating former employee (along with the cost of the COBRA coverage). COBRA payments vary based on the number of former employees electing coverage. The last payment made by the Debtors was for $719.40 in October 2010.

g.　*Flexible Spending Plan*: the Debtors offer a flexible spending plan that allows participating employees to have the Debtors withhold, on a pre-tax basis, amounts for reimbursement of eligible medical care expenses and dependent care expenses, up to limits set by the Internal Revenue Service. Approximately 52 employees participate in the Debtors' flexible spending plan. As of the Petition Date, the Debtors believe that approximately $21,070 has been withheld from employees that has not yet been reimbursed.[10]

h.　*Employer-Funded Flexible Spending*: as part of certain employees' compensation package, the Debtors contribute to their flexible spending account, which is treated as part of such employees' gross compensation. As of the Petition Date, the Debtors believe

---

[10]　Ceridian administers the Debtors' flexible spending plan as part of the payroll services it provides to the Debtors.

that approximately $1,600 in company contributions to flexible spending accounts accrued prior to the Petition Date but has not yet been paid.

39. In addition, the Debtors provide various life and disability insurance plans for their employees and mandatory workers' compensation coverage:

a. *Life Insurance*: the Debtors provide all employees with life and accidental death and dismemberment insurance with coverage up to twice their compensation, with a maximum benefit of $500,000, at no cost. The Debtors also offer their employees the opportunity to purchase supplemental and dependent life insurance. This coverage is provided through Metropolitan Life Insurance Company ("Met Life") and Boston Insurance Employee Benefit Trust ("BIEBT"), and each employee's share of the costs, when applicable, is based on the status of the employee and the coverage elected. The aggregate average monthly premium that the Debtors pay to Met Life and BIEBT to provide these benefits (as well as all other benefits provided by Met Life and BIEBT described below) is approximately $6,500 and $7,700 respectively.

b. *Short-Term Disability Insurance*: the Debtors provide short-term disability insurance to all of their employees in New York, New Jersey, and Pennsylvania through Zurich American Insurance Company ("Zurich") funded by monthly payroll deductions. The average quarterly premium that the Debtors pay to Zurich is approximately $4,000 for coverage in New York and approximately $41,000 for coverage in New Jersey and Pennsylvania. Because there are Bugaboo Creek Restaurants located outside of New York, New Jersey, and Pennsylvania, the Debtors provide all employees of Bugaboo Creek other than those employed in the tri-state area required short-term disability insurance through Met Life or Aetna SRC, at the employees' election, funded by monthly payroll deductions. All of the Debtors' employees may purchase additional short-term disability insurance through Aetna SRC.

c. *Long-Term Disability Insurance*: the Debtors offer long-term disability insurance coverage through Met Life to Charlie Corporate Employees, Bugaboo Corporate Employees, and Bugaboo Management Employees. Charlie Corporate Employees are automatically enrolled, and Bugaboo Corporate Employees and Bugaboo Management Employees are given the option to elect coverage, except where required by state law. Premiums for this policy are funded by payroll deductions.

14

d.   *Workers' Compensation*: under the laws of the various states in which they operate, the Debtors are required to provide their employees with workers' compensation coverage for injuries occurring in the course of their employment with the Debtors. The Debtors are self insured for workers' compensation, and they maintain a policy (the "Workers' Compensation Policy"), which has a $250,000 retention limit for catastrophic claims through ACE American Insurance Company. The Workers' Compensation Policy has a six-month term that expires, unless renewed, on December 18th and June 18th of each year. The Debtors' current estimated annual premium is approximately $300,000 under the Workers' Compensation Policy, and as of the Petition Date, there were no premiums outstanding. The Debtors provide letters of credit that act as a "back stop" to the insurer to secure unpaid losses under the Workers' Compensation Policy should the Company be unable to fund these losses.

Other Benefits

40.    The Debtors provide eligible employees with various other benefits that may have accrued prior to the Petition Date but have not yet been paid by the Debtors. Such benefits include paid time off for jury duty, military leave, and bereavement periods; tuition reimbursement;[11] participation in the "Shoes for Crews" program;[12] and discount cards for eligible employees.[13] As of the Petition Date, the Debtors estimate that they owe approximately $19,456 for such other benefits that accrued prior to the Petition Date but that were not paid.

41.    Certain of the Debtors' executive and management level employees are entitled to leased cars under the terms of their employment. The Debtors currently lease 25 cars, with aggregate monthly lease payments of approximately $13,750. To offset the costs of these leased cars, the Debtors withhold a certain amount from eligible employees' pay as an "auto fringe" based on personal use and magnitude of the lease payment, allowing the Debtors to

---

[11]    At this time, no employees are participating in the Debtors' tuition reimbursement program.

[12]    The Shoes for Crews program allows Charlie Restaurant Employees to purchase appropriate kitchen shoes through payroll deductions. The employee orders shoes, and the Debtors are billed, and for any amount over $30, the Debtors withhold payments from the applicable employee's paycheck.

[13]    Discount cards allow certain employees to purchase food at the Debtors' restaurants at a 30%-50% discount.

RLF1 3630037v 1

recoup approximately $750 per month. Instead of receiving a leased car from the Debtors, 5 corporate and management level employees receive monthly car allowances, totaling approximately $2,950 per month.

## RELIEF REQUESTED

42. The Debtors seek authorization, pursuant to Bankruptcy Code §§ 105(a) and 363(b), in their discretion, to pay from any available funds, including from those provided pursuant to the terms of any post-petition financing and/or cash collateral order, and honor all pre-petition obligations to employees and other related parties, as described above, including, but not limited to their obligations: (a) to pay pre-petition wages, salaries, bonuses, expense reimbursement, and related benefits, as well as all payroll withholding taxes and other amounts related to these payments; (b) amounts due on account of the 401(k) Plan; (c) to pay amounts associated with the Debtors' pre-petition medical, dental, vision, and flex-spending programs; (c) to pay all pre-petition premiums for life insurance, workers compensation insurance, travel insurance, short-term and long-term disability insurance, and other insurance premiums or costs due;[14] (d) to pay all costs and expenses due for the administration, servicing, and processing of employee benefits described in this Motion; and (e) to satisfy all other pre-petition employee benefits, including honoring all pre-petition sick and vacation pay policies.

43. On an emergency basis, the Debtors are only requesting that the Court approve the following, to the extent they become due in the next 21 days: (a) payments of salaries, wages, and bonuses up to a total of $11,725 per employee; (b) amounts due on account of the 401(k) Plan; (c) any payments of employee benefits and plans, as described above; (d) any payments relating to insurance policies, as described above, (e) payment of any employee

---

[14] At this time, the Debtors do not request authority to assume any agreements, policies, or procedures relating to any employee obligations under Bankruptcy Code § 365 or otherwise, and accordingly, the Debtors reserve all rights related thereto

16

withholdings held by the Debtors, and (f) payment of any administrative or third party processing fees. The Debtors also request that the Court schedule a further hearing (the "Follow-Up Hearing") on this Motion to consider all other requested relief. The Debtors would file and serve a proposed form of order approving such remaining relief prior to the date of the Follow-Up Hearing.

44. Furthermore, the Debtors request that financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to wages, salaries, bonuses, reimbursements, and other benefits described in this Motion, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors also request that financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion.

## BASIS FOR RELIEF REQUESTED

45. There are several justifications for the relief requested in this Motion. For instance, Bankruptcy Code § 105(a) empowers the court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The purpose of Bankruptcy Code § 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy, ¶ 105.01, at 105-5 (15th rev. ed. 1997); see also In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710,843 (S.D.N.Y. 1991).

46. Under the "necessity of payment rule" or the "doctrine of necessity,"[15] derived from Bankruptcy Code § 105(a), courts often allow the immediate payment of pre-

---

[15] This doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport, C&S W. R. Co., 106 U.S. 286, 311-312 (1882), recognizes the existence of judicial power to authorize a debtor to pay pre-petition claims in appropriate situations

17

petition claims. In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981); In re Just for Feet, Inc., 242 B.R. 821, 824 (Bankr. D. Del. 1999); In re Columbia Gas System, Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that a debtor may pay a class of pre-petition creditors in advance of a confirmed plan if essential to the continued operation of the business); H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 220, reprinted in 1978 U.S. Code Cong. & Admin. News 6179.

47.    Courts have long recognized that invocation of the "necessity of payment rule" is particularly appropriate when a debtor's employees must be paid on time to assure their continued service and loyalty during a Chapter 11 proceeding. See Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-86 (S.D.N.Y. 1987), appeal dismissed 838 F.2d 59 (2d Cir. 1988) (approving lower court order authorizing payment of pre-petition wages, salaries, expenses, and benefits).

48.    In addition, Bankruptcy Code § 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.". Courts permit debtors to use property of the estate outside the ordinary course of business if doing so is an exercise of their sound business judgment. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

49.    Indeed, courts in this district have routinely approved similar payments of pre-petition claims for compensation, benefits, and expense reimbursements. See, e.g., In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); In re Remy Worldwide Holdings, Inc., Case No. 07-11481 (KJC) (Bankr. D. Del. Oct. 10, 2007); In re Amp'd Mobile, Inc., Case No. 07-10739 (BLS) (Bankr. D. Del. Jun. 6, 2007); In re Pac-West Telecomm., Case No, 07-10562 (BLS) (Bankr. D. Del. May 2, 2007); In re New Century TRS Holdings Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 12, 2007) (Interim Order entered on Apr. 3, 2006); In

18

re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006) (Interim Order entered on Oct. 31, 2006); In re Sea Containers Ltd., Case No. 06-11156 (KJC) (Bankr. D. Del. Oct. 17, 2006); In re J.L. French Auto. Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 3, 2006) (Interim Order entered on Feb. 13, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re Ultimate Elecs., Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Jan. 13, 2005).

   50. Here, failure to grant the relief requested would severely undermine the morale of the Debtors' employees, which is at a very sensitive stage, and employees are being asked to commit much of their time and energy to the Debtors' efforts in Chapter 11, including their attempt to conduct an orderly sale process to maximize value for all parties. Accordingly, allowing the Debtors to pay their employees and to continue to honor employee obligations for all continuing employees will not harm the Debtors or their estates, but will instead bolster the morale of their employees and contribute to a smooth transition to Chapter 11 and the sale process.

   51. Many of the Debtors' employees are the sole source of support for their families and are dependent upon their weekly wages, salaries, reimbursements, and benefits. Several of the Debtors' restaurants are located in geographic regions that offer few alternative sources of employment. If the amounts owed to employees are not received, insurance premiums are not paid in the ordinary course, or other benefits delayed or terminated, the employees would suffer extreme personal hardship and, in many cases, would be unable to pay their basic living and related expenses, causing serious harm to them and their families and potentially making it difficult or impossible to continue their employment with the Debtors. This would severely disrupt and irreparably impair the Debtors' relationships with their employees, may cause many to terminate their employment with the Debtors at the very time when their

RLF1 3630037v 1

expertise, dedication, confidence, and cooperation are most critical, and seriously jeopardize the Debtors' ability to operate.

52.     In addition, employees, and possibly to a greater extent, the former employees terminated in the week prior to the Petition Date, may assert that Debtors and certain officers and directors of the Debtors may be held personally liable for the failure to pay some or all of the accrued payroll obligations described herein on a timely basis. Such potential claims or lawsuits could prove extremely distracting for the Debtors, for the named individuals whose attention to the Debtors' bankruptcy cases is required, and for this Court, which might be asked to entertain various motions seeking injunctions with respect to potential state court actions. It is in the best interests of the Debtors' estates and the underlying policies of the Bankruptcy Code to eliminate the possibility of such distractions.

53.     Finally, Bankruptcy Code § 507(a) grants a priority claim for wages, salaries, and commissions, including vacation, and sick leave pay, earned by an employee within 180 days before filing of a bankruptcy petition, of up to $11,725 for each individual. In addition, Bankruptcy Code §507(a)(4) grants a priority claim for contributions to employee benefit plans arising from services rendered within 180 days before the filing of a bankruptcy petition, to the extent that the $11,725 limit per employee on priority wage claims is not reached.

54.     Because some amounts of potential claims under Bankruptcy Code § 507(a)(3) and (4) are unknown at this time, it is difficult for the Debtors to set forth the exact amount due and owing to each employee for the pre-petition period. The Debtors believe that none of their employees have priority claims totaling more than $11,725. Therefore, if the Court granted the relief requested in this Motion, it would not materially prejudice the rights of other unsecured creditors that are not entitled to priority treatment.

20

55. For the reasons set forth above, the Debtors submit that authorization of the payments sought in this Motion is in their best interests and the best interests of their estates, their creditors, and all other parties-in-interest.

## SATISFACTION OF BANKRUPTCY RULE 6003

56. Pursuant to Bankruptcy Rule 6003, the Court may grant a request of a debtor to pay all or part of a pre-petition claim in the first 21 days of a case only if that relief is necessary to avoid immediate and irreparable harm. For the reasons set forth above, payment of the above described obligations to the employees that may become due during this 21-day period is necessary to avoid the immediate and irreparable harm that could occur if the Debtors are unable to do so. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 with respect to the relief requested in this Motion that they seek to pay prior to the Follow-Up Hearing.

## REQUEST FOR WAIVER OF STAY

57. As set forth above, any delay in paying the obligations and fees addressed herein would be detrimental to the Debtors, their creditors, and their estates. Accordingly, to the extent applicable, the Debtors seek a waiver of the 14-day stay of any order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

58. Notice of this Motion has been given via overnight delivery service, e-mail, facsimile, telephone, and/or hand delivery, as appropriate, to the United States Trustee, the 20 largest unsecured non-insider creditors of the Debtors on a consolidated basis, the Senior Secured Lenders, the Second Lien Lenders, the Subordinated Lenders, the Debtors' equity sponsor, the Securities and Exchange Commission, the United States Attorney's Office for the District of Delaware, the United States Attorney General, and the Internal Revenue Service. As

21

this Motion is seeking first-day relief, notice hereof and of any order entered hereon will be served in accordance with Local Bankruptcy Rule 9013-1(m). Due to the urgency of the circumstances, the Debtors submit that no other or further notice of this Motion is required.

## NO PRIOR APPLICATION

59. No previous request for the relief sought in this Motion has been made to this or to any other Court.

RLF1 3630037v 1

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the form attached hereto as Exhibit A and the form to be subsequently filed, granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated: November 18, 2010          Respectfully submitted,
     Wilmington, Delaware

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Julie Finocchiaro (No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Joel H. Levitin
Richard A. Stieglitz Jr.
Maya Peleg
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Proposed Attorneys for the Debtors and
Debtors-in-Possession*

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-_____ (    ) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## INTERIM ORDER AUTHORIZING PAYMENT
## OF PRE-PETITION WAGES AND SALARIES AND HONORING
## <u>PRE-PETITION EMPLOYEE BENEFITS AND RELATED OBLIGATIONS</u>

Upon consideration of the motion (the "Motion")[2] of the Debtors for an order,

pursuant to Bankruptcy Code §§ 105(a), 363(b), and 507(a), authorizing them, among other

---

[1] The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc. (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc. (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc. (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc. (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp, LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc. (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc. (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc. (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc. (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc. (4776); Jonathan Seagull Property Corp. (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc. (3131);  The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc. (3126); and What's Your Beef V, Inc. (4719).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

things, to pay pre-petition wages and salaries and to pay and honor other pre-petition employee benefits and related obligations; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and the Court having found that good and sufficient cause exists for granting the Motion; and the relief requested in the Motion being necessary to avoid immediate and irreparable harm, as contemplated by Bankruptcy Rule 6003; and upon consideration of the Declaration of Gary Lembo in Support of First-Day Motions; and upon the record of these Chapter 11 cases and any hearings held to consider the Motion; and it appearing that the relief requested in the Motion is appropriate in the context of these cases and in the best interests of the Debtors and their respective estates, their creditors, and all other parties-in-interest; and it appearing that notice of the Motion was adequate and proper under the circumstances of these cases, and it appearing that no other or further notice need be given; it is hereby

ORDERED that the Motion is granted as set forth herein; and it is further

ORDERED that the Debtors are authorized and empowered, in their discretion, to pay pre-petition wages, salaries, and bonuses up to $11,725 per employee, without prejudice to the Debtors' right to request amounts in excess thereof at the Follow-Up Hearing; and it is further

ORDERED that the Debtors are authorized and empowered, in their discretion, to pay withholdings, taxes, expense reimbursement, and other amounts, including 401(k) contributions and any unpaid service or other fees owed to Ceridian Corporation or other third parties that administer or provide services for any of the Debtors' plans, as described in the Motion, to the extent any such amounts become due prior to the Follow-Up Hearing; and it is further

ORDERED that the Debtors are authorized and empowered, in their discretion, to pay amounts associated with the Debtors' pre-petition medical, dental, vision, flex-spending, and other employee benefit programs, as described in the Motion, and any pre-petition insurance premiums (including life insurance, short-term and long-term disability insurance, and workers compensation insurance), as described in the Motion, to the extent any such premiums and other amounts become due prior to the Follow-Up Hearing; and it is further

ORDERED that the Follow-Up Hearing shall be held on _____ __, 2010, at __:__ _M (Prevailing Eastern Time), in the courtroom of the Honorable _____ _ _____, United States Bankruptcy Court, District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 with notice to be provided by the Debtors or their agent; and it is further

ORDERED that objections, if any, to relief requested in the Motion to be heard at the Follow-Up Hearing must (i) be in writing, state the name of the objector, identify its interest in these cases, and set forth the grounds for the objection and the legal basis therefor and (ii) be filed with this Court and served in a manner so as to be received by the following parties, together with proof of service, on or before _____ __, 2010, at 4:00 PM (Prevailing Eastern Time): (a) proposed counsel to the Debtors, Cahill Gordon & Reindel LLP, Eighty Pine Street, New York, New York 10005 (Attn: Richard A. Stieglitz Jr., Esq. and Maya Peleg, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq. and Christopher M. Samis, Esq.) (b) the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 and (c) counsel to any official committees that may be appointed in these cases; and it is further

ORDERED that the Debtors are authorized and empowered, in their discretion, to make the payments authorized by this Order from any available funds, including from those

provided pursuant to the terms of any post-petition financing and/or cash collateral order; and it is further

ORDERED that all of the Debtors' banks are authorized and directed to honor all checks issued and fund transfers requested in respect of the pre-petition wages, salaries, and benefits requested in the Motion, as approved by this Order, to the extent sufficient funds are on deposit, regardless of whether such checks or fund transfer requests were issued prior to or after the Petition Date of these cases; and it is further

ORDERED that notwithstanding anything to the contrary in this Order, the authorization granted herein to the Debtors in no way requires the Debtors to make any payment; and it is further

ORDERED that neither this Order, the Motion, nor the Debtors' actions shall be deemed to be an assumption or adoption of any agreement, contract, or policy pursuant to Bankruptcy Code § 365 or otherwise; and it is further

ORDERED that the Debtors are authorized and empowered to take any necessary actions to implement and effectuate the terms of this Order; and it is further

ORDERED that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding any applicability of Bankruptcy Rule 6004(h); and it is further

RLF1 3630037v 1

ORDERED that this Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

Dated: _____ ___, 2010
      Wilmington, Delaware

 

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 3630037v 1