# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-_____ ( ) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |

## DEBTORS' MOTION FOR APPROVAL OF STIPULATION AND ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363, AND 364, AND (IV) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

---

[1]  The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc (0966); Bugaboo Creek of Seekonk, Inc (1669); CB Holding Corp (8640); CB VII, Inc (9120); CB VIII, Inc (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc. (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc (8519); Charlie Brown's of Egg Harbor Twp, LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc. (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc (4776); Jonathan Seagull Property Corp (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc (3131); The Office at Keyport, Inc (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc (3126); and What's Your Beef V, Inc (4719).

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned attorneys, hereby file this motion (the "Motion") for approval of the stipulation and interim order (the "Interim Order") (i) authorizing secured post-petition financing (as described below, the "Post-Petition Financing") pursuant to 11 U.S.C. § 364, (ii) authorizing use of Cash Collateral (as defined below) pursuant to 11 U.S.C. § 363, (iii) granting adequate protection (as described below, "Adequate Protection") pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rule 4001(c). In support of the relief requested in this Motion, the Debtors rely on the Declaration of Gary Lembo in Support of First-Day Pleadings (the "Lembo Declaration"), and in further support thereof, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105, 362, 363, and 364, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2.

## INTRODUCTION

2. On November 17, 2010 (the "Petition Date"), the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors have sought an order directing that their Chapter 11 cases be jointly administered by this Court, and they have filed additional motions (some of which seek emergency relief) in the proposed lead case of CB Holding Corp.

2

3. The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee has been appointed in these cases.

The Debtors and Their Business

4. CB Holding Corp., a Delaware corporation, is the direct or indirect corporate parent of all of the other Debtors. All of CB Holding Corp.'s outstanding common and preferred stock is privately held.

5. The Debtors own and operate the *Charlie Brown's Steakhouse* ("Charlie Brown's"), *Bugaboo Creek Steak House* ("Bugaboo Creek"), and *The Office Beer Bar & Grill* ("The Office"). Charlie Brown's and Bugaboo Creek are steakhouses, offering their customers exceptional service, value, and fresh food, along with seasonal specialties, while The Office is more casual, offering over 60 bottled beers, seasonal draft beers, and classic pub appetizers and dining options.

6. There are currently 20 Charlie Brown's restaurants in New York, New Jersey, and Pennsylvania; 12 Bugaboo Creek restaurants in Massachusetts, Delaware, Maryland, New Hampshire, and Maine; and seven The Office restaurants in New Jersey. Shortly before the Petition Date, the Debtors closed 29 Charlie Brown's and 18 Bugaboo Creek restaurants.

7. The Debtors have approximately 185 full-timed salaried employees and more than 2,200 full-time and part-time hourly employees. None of the Debtors' employees are members of a union.

Capital Structure

*Secured Debt*

8.     On June 21, 2007, in connection with the acquisition of Bugaboo Creek by Charlie Brown's, the Debtors entered into a financing agreement with Ableco Finance LLC ("Ableco"); Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) ("Wells"); and GMAC Commercial Finance LLC (n/k/a Ally Commercial Finance LLC) ("Ally" and collectively with Wells and Ableco, the "Senior Secured Lenders"), providing for a revolving line of credit, under which the Debtors may borrow up to an aggregate amount equal to the lesser of $15 million and a defined borrowing base with a letter of credit sublimit, and two tranches of term loans, all of which are secured by liens on substantially all of the Debtors' assets. As of the Petition Date, the Debtors had approximately $70 million outstanding under this facility.[2]

9.     On September 28, 2008, the Debtors issued $10 million in senior subordinated second lien notes pursuant to a note purchase agreement to Trimaran Fund II, L.L.C.; Trimaran Parallel Fund II, L.P.; Trimaran Capital, L.L.C.; CIBC Employee Private Equity Fund (Trimaran) Partners; and CIBC Capital Corp. (collectively, the "Second Lien Lenders"). As of the Petition Date, approximately $14 million, including accrued and unpaid interest, was outstanding under these second lien notes.

*Mezzanine Debt*

10.     Also as part of the Bugaboo Creek acquisition, on June 21, 2007, the Debtors issued $20 million in unsecured, senior subordinated notes pursuant to four note purchase agreements to Kohlberg Capital Corporation; Archer Capital Master Fund, L.P.; Camofi Master LDC; Camhzn Master LDC; and Raven Credit Opp Master Fund Ltd.

---

[2]     Specifically, the Debtors had approximately $6 million outstanding under the revolver, $12 million outstanding under Term Loan A, and $52 million outstanding under Term Loan B.

4

(collectively, the "Subordinated Lenders"). As of the Petition Date, the Debtors had approximately $30 million of mezzanine debt obligations, including accrued and unpaid interest, outstanding to the Subordinated Lenders.

Circumstances Leading to Filing

11. A variety of external factors have led to a decline in the Debtors' revenue over the last several years, at the same time that costs have increased. For instance, the restaurant industry has grown more competitive, the fast-food industry has improved their product offerings and increased its market share to the detriment of casual dining restaurants, such as the Debtors, and consumers have changed their ordering habits. In addition, the "Great Recession" has led to a decline in discretionary spending among the Debtors' former and current customers, and fewer families are frequenting restaurants while food and labor costs have increased, compounding the Debtors' distress.

12. Accordingly, for some time, the Debtors have been in discussions with their lenders and other parties regarding a financial restructuring, and they have entered into several amendments to their various credit and related facilities, but the Debtors' need for additional liquidity has not been resolved, and the economy has not improved. At this time, the only party willing to provide the Debtors with any funding is Ally, which has informed the Debtors that it is only willing to do so as a DIP loan in Chapter 11 cases where the Debtors market their assets in anticipation of a global asset sale.

13. Thus, in an effort to maximize their value, the Debtors have entered into a DIP arrangement with Ally, and along with other first-day motions designed to ensure a smooth transition into Chapter 11, the Debtors intend to file a motion to approve a DIP financing

5

arrangement and to attempt to sell substantially all of their assets expeditiously pursuant to Bankruptcy Code § 363.

## FACTUAL BACKGROUND

14. The Debtors, in an exercise of their business judgment and for the reasons set forth below, have decided to seek authority for the Post Petition Financing in the aggregate amount of up to $2.5 million, pursuant to the terms of the Interim Order, a proposed form of which is attached hereto as <u>Exhibit A</u>.[3] Among other things, the Debtors believe that the Post-Petition Financing will reasonably address their near-term funding requirements and constitutes the best financing option available to them given the circumstances of these cases and their business, as described above.

## SUMMARY OF TERMS OF
## POST-PETITION FINANCING AND REQUIRED DISCLOSURES

15. Bankruptcy Rule 4001 requires that motions requesting authority to incur post-petition financing, such as this Motion, contain a concise statement of the relief requested and a summary of the material terms thereof, setting forth where such material terms can be found in the relevant documents. This required summary is set forth below:[4]

- **The Parties, Other General Terms, and Description of the Facilities.** The Lenders[5] would provide Post-Petition Financing of $2,500,000 to the Debtors in accordance with the terms of the Interim Order and the Lenders' Pre-Petition Agreements, as modified by the Interim Order. Specifically, the Lenders would be authorized to advance funds

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.

[4] To the extent of any discrepancy between the description of the terms of the Interim Order set forth herein and the actual terms of the Interim Order, the Interim Order shall govern

[5] Pursuant to the agreement among Wells, Ally, and Ableco, the Post-Petition Financing would be advanced under the Lenders' Pre-Petition Agreements and the Interim Order by Ally only, and Ally would be entitled to the repayment of an amount equal to any outstanding post-petition advances and interest and fees related thereto on a first out basis prior to any payments to Wells, Ableco, or Agents under the Lenders' Pre-Petition Agreements and the Interim Order

6

constituting the Post-Petition Indebtedness, as limited by the Budget and subject to the terms and conditions of the Lenders' Pre-Petition Agreements, which would continue in full force and effect with respect to the Loans and other advances under the Post-Petition Financing except as otherwise modified in the Interim Order. Interim Order, ¶¶ 2-3.

The Debtors would continue their pre-petition cash management system with the Pre-Petition Lenders, which would include a lockbox/blocked account to which the Lenders will have full dominion and control over Cash Collateral and the cash proceeds of the Collateral pursuant to a lockbox/blocked account agreement. Interim Order, ¶ 12.

- **Priority/Security for Post-Petition Financing.** In accordance with Bankruptcy Code § 364(c)(1), subject to the Carve Out, the Post-Petition Indebtedness would constitute Superpriority Claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code and would at all times be senior to the rights of the Debtors and any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code. Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 507(b), or otherwise, including those resulting from the conversion of any of these Chapter 11 Cases pursuant to Bankruptcy Code § 1112, would be senior to, or pari passu with, the Superpriority Claims. Interim Order, ¶ 4.

  As security for the Post-Petition Indebtedness, the Lenders would be granted (effective upon the date of entry of the Interim Order and without the necessity of the recordation) valid and perfected senior security interests in, and liens on, all assets of the Debtors of any nature whatsoever and wherever located, tangible or intangible, whether now or hereafter acquired, including any avoidance actions under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550 or 553 and the proceeds thereof (provided however, such lien on avoidance actions would only attach upon entry of the Final Order and would be limited to the amount of the Post Petition Indebtedness except for Section 549): pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title, and interest in, to, and under all Collateral that is not otherwise encumbered by any Prior Permitted Liens; pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior perfected Lien upon all of the Debtors' right, title, and interest in, to, and under the Pre-Petition Collateral, provided that such first priority senior Lien would be subject and junior to the Prior Permitted Liens; and pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior perfected Lien upon all of the Debtors' right, title and interest in, to, and under all other Collateral that is subject to Prior Permitted Liens to the extent such perfection in respect of a Pre-Petition Date claim is expressly permitted under the Bankruptcy Code. Interim Order, ¶ 5.

- **Use of Cash Collateral and Adequate Protection.** Upon entry of the Interim Order, the Debtors would be authorized to use Cash Collateral, provided that the Pre-Petition Lenders would be granted adequate protection for any diminution in the value of the Collateral resulting from (i) the liens and security interests granted by the Post-Petition Financing and the Interim Order or otherwise pursuant to Bankruptcy Code § 364(d),

7

(ii) the Debtors' use of Cash Collateral pursuant to Bankruptcy Code § 363(c), (iii) the use, sale, or lease of the Collateral (other than Cash Collateral) pursuant to Bankruptcy Code § 363(c), and (iv) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a): (1) the Pre-Petition Lenders would be granted valid and perfected Replacement Liens on all of the Debtors' right, title, and interest in, to, and under the Collateral, subject only to (x) the Carve-Out, (y) the Liens granted pursuant to the Interim Order and the Pre-Petition Lenders' Pre-Petition Agreements to the Lenders to secure the Post-Petition Indebtedness, and (z) any Prior Permitted Liens (after giving effect to the Interim Order) prior in interest and senior to the Liens granted to the Lenders pursuant to the Interim Order and the Pre-Petition Lenders' Pre-Petition Agreements; and (2) the Pre-Petition Lenders would be granted, pursuant to Bankruptcy Code § 364(c)(1), Superpriority Claims, junior only to the Superpriority Claims granted pursuant to the Interim Order to the Lenders in respect of the Post-Petition Financing and the Carve-Out. Interim Order, ¶ 7.

- **Carve-Out.** The Liens and the Superpriority Claims granted to the Lenders pursuant to the Pre-Petition Lenders' Pre-Petition Agreements and the Interim Order would be subject and subordinate to a Carve-Out for (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, (b) all budgeted operating expenses of the Debtors accrued prior to the termination of the Post-Petition Financing, and (c) following the occurrence and during the pendency of a Default or an Event of Default, an amount which is not otherwise payable from funds which are not the Collateral of the Lenders or proceeds therefrom of (i) the aggregate allowed unpaid fees and expenses payable under Sections 330, 331, and/or 363 of the Bankruptcy Code to the DIP Professionals, including Debtors' Counsel (other than fees and expenses, if any, of such professional persons incurred, directly or indirectly, in respect of, arising from or relating to the investigation, initiation, or prosecution of any cause of action against the Pre-Petition Lenders, the Lenders, or with respect to the Post-Petition Indebtedness and the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Pre-Petition Lenders' Pre-Petition Agreements (the "Prohibited Actions") in an amount not to exceed the amount budgeted on an accrual basis (whenever ultimately allowed by the court or paid) for each such professional, less any amount approved by the Court and paid in the Budget as of the date of such Default or Event of Default, less amounts paid to the DIP Professionals; if the case is not converted to a case under Chapter 7 of the Bankruptcy Code or dismissed on or before the end of the initial Budget period, and the Lenders have not declared an Event of Default, the Budget Cap would be a roll forward in the amount budgeted for the Debtors' Counsel for the final week in the initial Budget on a weekly basis until such Default or Event of Default, the case is dismissed, converted to Chapter 7, or the parties agree on a new budget, (ii) if this case is converted to a case under Chapter 7 of the Bankruptcy Code or on the occurrence of an Event of Default, the Carve-Out for the Debtors' Counsel would also include the amount of $75,000 to pay fees and expenses (other than fees and expenses incurred in connection with the Prohibited Actions) incurred by or on behalf of the Debtors after conversion or an Event of Default, (iii) fees and expenses (other than fees and expenses incurred in connection with the Prohibited Actions) of the Committee Professionals, not to exceed an amount to be negotiated with the Committee Professionals. Interim Order, ¶ 6

8

In order to effectuate the funding of the Carve-Out, upon the sale of all or substantially all of the Debtors' assets, the Lenders would set aside and retain for the benefit of each of the applicable professionals amounts of proceeds from the Collateral (which proceeds would remain subject to Lenders' pre-petition and post-petition Liens) equal to the aggregate unused portion of the applicable Carve-Out amounts allocable to such professionals, and the Lenders would distribute funds (provisionally subject to final approval and allowance by the Court) from the Professional Fee Reserve from time to time to the applicable professionals for unpaid fees and disbursements of such professionals allowed by the Court and constituting part of the Carve-Outs (in the case of each such professional, in an aggregate amount not to exceed the unused portion of such professional's specified Carve-Out amount), and any funds remaining in the Professional Fee Reserve after the disposition of all final fee applications of the DIP Professionals and Committee Professionals would be applied to the outstanding Lenders and Pre-Petition Lenders' indebtedness in accordance with the provisions of this Order. Provided, however, (x) following the earlier of the expiration of the Term or the Termination Date, any Cash Collateral would not be subject to the Carve-Out, but any professional fee incurred after the Petition Date and prior to the Termination Date would remain subject to the Carve-Out, and (y) the Carve-Out would not include professional fees and disbursements incurred in connection with prosecuting or asserting any claims or causes of action against the Pre-Petition Lenders and/or challenging or raising any defense to the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the liens of the Pre-Petition Lenders; provided, however, that a Creditors' Committee would be allowed to investigate the Pre-Petition Lenders' Pre-Petition Loan Indebtedness. Interim Order, ¶ 6.

Notwithstanding anything herein to the contrary, no Loans, Collateral, Cash Collateral, or any portion of the Carve-Out may be used to prosecute, object to, or contest in any manner, or raise any defenses to, the amount, validity, perfection, priority, extent or enforceability of the Pre-Petition Lenders Pre-Petition Loan Indebtedness or Post-Petition Indebtedness or the liens securing the Pre-Petition Lenders' Pre-Petition Loan Indebtedness, or Post-Petition Indebtedness, or to prosecute or assert any claims or causes of action against the Pre-Petition Lenders. Interim Order, ¶ 6.

- **Maturity Date/Term.** The Post-Petition Financing would expire on January 19, 2011, or such earlier date as all Pre-Petition Lenders' Pre-Petition Loan Indebtedness and Post-Petition Indebtedness is paid in full, unless terminated prior to this date upon the occurrence of the Termination Date or otherwise pursuant to the terms of the Pre-Petition Lenders' Pre-Petition Agreements or the Interim Order. Interim Order, ¶ 14.

- **Interest Rates and Fees.** Interest Rates would be Prime plus 4% for all Loans under the Post-Petition Financing. Interim Order, ¶ 3(c).

- **Budget and Reporting.** Attached to the Interim Order as Exhibit A is the Budget for the period from November 17, 2010, through and including January 19, 2011, which has been consented to by the Lenders. The Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Debtors expect to incur during each month of the Budget. The Debtors

9

would be authorized to use the proceeds of the Post-Petition Indebtedness and the Collateral only for payment of such items as is set forth in the Budget and subject to the terms and conditions set forth in the Pre-Petition Lenders' Pre-Petition Agreements and the Interim Order. Interim Order, ¶ 11.

The Budget would be revised by the end of each month and remain subject to the consent of the Lenders each month. Not later than the second business day of each week commencing with the second week of the period covered by the Budget, the Debtors would provide to the Lenders with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance of such actual disbursements and revenues from those reflected in the Budget for that period. Revenues less than 90% of the budgeted amount for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period of the Budget would constitute an Event of Default. Any disbursement by the Debtors other than for budgeted amounts as set forth in the Budget would constitute an Event of Default, unless the Lenders consent to those changes in writing; provided, however, that the Debtors may make payments in excess of the total budgeted disbursements so long as (i) the Variance Percent of the aggregate of all actual disbursements for each week would not exceed 10% of the budgeted disbursements for that week; and (ii) the Variance Percent of the aggregate of all actual disbursements for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period would not exceed 10% of the aggregate of all budgeted disbursements for such four-week period. For the avoidance of doubt, any amount included in the Budget that is not incurred or paid during a particular week would be permitted to be carried over into subsequent weeks. Interim Order, ¶ 11.

- **Loan Payments.** Proceeds or payments received by the Lenders and/or the Pre-Petition Lenders with respect to the Collateral upon which the Lenders had security interests or liens would be applied first, to the payment of all reasonable costs, fees, and expenses, including attorneys' fees of the Lenders; second, to the payment of Pre-Petition Lenders' Pre-Petition Loan Indebtedness consisting of accrued and accruing interest; third, to the payment of Pre-Petition Lenders' Pre-Petition Loan Indebtedness consisting of principal; fourth, to the payment of Post-Petition Indebtedness including all accrued and accruing interest, costs and expenses, including reasonable attorneys' fees; and fifth, to the payment of the Post-Petition Indebtedness consisting of principal; provided, however, that the Court would reserve the right to re-allocate such payments in the event that it is determined by the Court that Pre-Petition Lenders did not maintain valid, perfected, and enforceable liens on any of the Pre-Petition Collateral. Interim Order, ¶ 10

- **Automatic Lifting of the Automatic Stay.** If a Default or an Event of Default occurs, the Lenders would have the right to immediately suspend funding under the Post-Petition Financing, and upon the Lenders' providing five business days written notice to the Debtors, the United States Trustee, and any statutory committees appointed in these Chapter 11 Cases, the Lenders may terminate the Post-Petition Financing and declare the Loans to be immediately due and payable, and the automatic stay pursuant to Bankruptcy Code § 362(a) would be deemed lifted and modified, without further order of this Court,

10

to permit the Lenders to exercise any and all of their rights and remedies under the Pre-Petition Lenders' Pre-Petition Agreements and the Interim Order. Interim Order, ¶ 15.

- **Fees, Admissions, Waivers, and Releases.** The Debtors would reimburse the Lenders and the Pre-Petition Lenders for all reasonable out-of-pocket filing and recording fees, if any, reasonable attorneys' and paralegals' fees, the Lenders' Consultants' fees, and costs and expenses and internal audit fees and expenses incurred by the Lenders: in preparation and implementation of the Interim Order and the various Loans and other Post-Petition Financing, (ii) in the representation of the Lenders and the Pre-Petition Lenders in the proceedings, and (iii) as otherwise provided in the Pre-Petition Lenders' Pre-Petition Agreements. Further, Ally would be paid a Post-Petition Financing fee of $100,000. Interim Order, ¶ 18.

The Lenders' and the Pre-Petition Lenders' obligations under the Interim Order and under the Pre-Petition Lenders' Pre-Petition Agreements would be subject to the following 363 Sale Benchmarks: (a) the Debtors would have an executed Asset Purchase Agreement in form and substance reasonably acceptable to Lenders for the sale of the Office by November 30, 2010, which sale would be approved on or before January 10, 2011; (b) a Bid Procedures Order (in form and substance satisfactory to the Pre-Petition Lenders) for the remaining operating store assets would be entered by the Court on or before December 22, 2010; (c) an auction under the Bid Procedures Order would have been held by the Debtors on or before January 24, 2011; (d) the Debtors would select a Prevailing Bidder (acceptable to Lenders) on or before January 28, 2011; (e) a Sale Hearing would have been held and a Sale Order approving the sale under Section 363 of the Bankruptcy Code (in form and substance acceptable to Lenders) would have been entered on or before February 3, 2011; (f) the Debtors would retain on or before December 2, 2010, an investment banker reasonably acceptable to Lenders to coordinate the above-referenced sale and such advisor would remain engaged; and (g) the Debtors would retain Hilco Real Estate LLC or such other party that is reasonably acceptable to Lenders on or before December 2, 2010, to coordinate the sale of certain liquor licenses. Interim Order, ¶ 20.

The Debtors on behalf of themselves and their successors and assigns, but without prejudice to the rights of an official committee appointed in these Chapter 11 Cases to assert claims on behalf of the Debtors' estates in accordance with the Interim Order, would forever release, discharge, and acquit the Lenders and the Pre-Petition Lenders and their officers, directors, employees, agents, attorneys, and predecessors-in-interest of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness, and obligations of every type, which arose on or prior to the date the Interim Order is entered with respect to the Debtors, the Pre-Petition Lenders' Pre-Petition Loan Indebtedness, the Collateral, the Pre-Petition Lenders' Pre-Petition Agreements, the Post-Petition Indebtedness, or the Post-Petition Financing. Interim Order, ¶ 25.

RLF1 3630054v 1

The findings contained in recital paragraphs of the Interim Order[6] and the releases provided for in the Interim Order would be binding upon all parties-in-interest, including without limitation, the Debtors and any statutory committees appointed in these Chapter 11 Cases, unless (a) a party-in-interest (including any statutory committee appointed in these Chapter 11 Cases) has properly filed an adversary proceeding or commenced a contested matter challenging the amount, validity, enforceability, perfection, or priority of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Pre-Petition Lenders' liens on the Pre-Petition Collateral in respect thereof, no later than 45 days after formation of the official committee of unsecured creditors or (b) otherwise asserts any claims or causes of action against the Pre-Petition Lenders relating to the Pre-Petition Lenders' Pre-Petition Loan Indebtedness on behalf of the Debtors' estates, no later than 90 days after the formation of an official committee of unsecured creditors, and the Court subsequently enters a judgment in favor of the plaintiff in any such timely and properly-filed adversary proceeding or contested matter and all claims other than those claims raised in such challenge would be subject to the release contained in the Interim Order. If such adversary proceeding or contested matter is dismissed or adjudicated in favor of Pre-Petition Lenders, the findings and releases contained in the Interim Order would be effective. Subject only to the rights of set forth above, for all purposes in these Chapter 11 Cases and any subsequent Chapter 7 cases, the Pre-Petition Lenders' liens on the Pre-Petition Collateral would be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination, and otherwise unavoidable, and the Pre-Petition Lenders, the Pre-Petition Lenders' Pre-Petition Loan Indebtedness, and the Pre-Petition Lenders' liens on the Pre-Petition Collateral would not be subject to any other or further challenge by any party-in-interest seeking to exercise the rights of the Debtors' estates, including without, limitation, any successor thereto. Interim Order, ¶ 26

- **Final Hearing.** The Interim Order requests the scheduling of the Final Hearing, at the convenience of the Court.

16.     Local Rule 4001-2 also requires that certain provisions of the Post-Petition Financing be highlighted and that a debtor provide a justification for the inclusion of such highlighted provisions. To the extent not satisfied above by the Debtors' concise statement in

---

[6]     These findings mirror the waivers listed below and include common acknowledgements of outstanding indebtedness that, upon information and belief, the Debtors' believe to be accurate.

accordance with Bankruptcy Rule 4001, set forth below are the provisions of the Post-Petition

Financing that are required to be identified in accordance with Local Rule 4001-2.[7]

| Required Disclosure | Location of Provisions and Justification Therefor |
|---|---|
| **Use of Post-Petition Loans to Pay Pre-Petition Debt.** Local Rule 4001-2(a)(i)(E) requires a description of any provision that contemplate the use of post-petition loans to pay all or part of a secured creditor's pre-petition debt. | As disclosed above, paragraph 10 of the Interim Order provides for the payment of Pre-Petition Indebtedness prior to the payment of Post-Petition Indebtedness, potentially requiring the Debtors to use post-petition loans or proceeds to satisfy pre-petition debt. The Debtors were not yet able to convince the Lenders to modify this provision, which would appear to have the effect of a complete "roll up", but they do not have any other viable source of financing. |
| **Waiver of Claims Against Secured Creditors.** Local Rule 4001-2(a)(i)(B) requires disclosure of any financial provisions that bind the estate with regard to the validity, perfection, or amount of a secured creditors' pre-petition lien or waive claims against a secured creditor without allowing interested parties at least 75 days from the entry of the order, and the creditors' committee at least 60 days from formation, to investigate such matters | As disclosed above, paragraph 26 of the Interim Order provides, in pertinent part, that findings contained in the recital paragraphs of the Interim Order and the releases provided for in the Interim Order would be binding upon all parties-in-interest, unless a party-in-interest files an adversary proceeding or commences a contested matter challenging the amount, validity, enforceability, perfection, or priority of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Pre-Petition Lenders' liens on the Pre-Petition Collateral no later than 45 days after formation of the official committee of unsecured creditors. The Debtors were not yet able to convince the Lenders to extend this period of time, but they do not have any other viable source of financing. |

17.     As discussed herein, the provisions as to which disclosure is required

pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 are all justified under the

circumstances of these cases. Despite their best efforts, the Debtors and their professionals were

unable to obtain financing on more favorable terms from sources other than the Lenders, and the

Debtors submit that the provisions set forth above are necessary and appropriate in the context of

---

[7]     Local Rule 4001-2(a)(i)(F) requires disclosure of "provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carveout." As the Interim Order provides that the Lenders will negotiate with counsel to any creditors' committee appointed in these cases with respect to an appropriate carve-out, the Debtors do not believe this rule is implicated by the Interim Order.

13

these cases and should be authorized by this Court, so that the Debtors and their estates can receive the benefits of the Post-Petition Financing.

## RELIEF REQUESTED

18.     By this Motion, the Debtors seek entry of the Interim Order, among other things, (a) authorizing the Post-Petition Financing pursuant to Bankruptcy Code § 364, (b) authorizing use of Cash Collateral pursuant to Bankruptcy Code § 363, (c) granting Adequate Protection pursuant to Bankruptcy Code §§ 361, 363, and 364, and (d) scheduling the Final Hearing pursuant to Bankruptcy Rule 4001(c).

## BASIS FOR RELIEF

19.     As detailed above, the Debtors have run out of sufficient available cash to operate their business, and they were unable to find any parties willing to provide necessary funding outside of a DIP loan in Chapter 11, without required concessions from various parties that such parties were unwilling to make. It is essential that the Debtors obtain post-petition financing to provide the necessary working capital and liquidity for a smooth transition into Chapter 11 and to enable them to seek to maximize value and conduct an orderly marketing and sale process.

20.     The Post-Petition Financing would allow the Debtors to continue to operate in the ordinary course, administer their estates, and conduct an expeditious and orderly going-concern sale process. Absent an immediate new source of cash and liquidity, not only would the Debtors' ability to maximize the value of their estates for the benefit of their creditors be jeopardized, but the Debtors may also be forced to shut down their operations and potentially need to liquidate their assets immediately.

14

Obtaining Credit Pursuant to Bankruptcy Code § 364

21.     Bankruptcy Code § 364(c) allows a debtor to obtain credit or incur debt on an unsecured superpriority basis and to obtain credit or incur debt secured by liens on unencumbered property and junior liens on encumbered property. The requirement under the Bankruptcy Code for obtaining post-petition credit under Section 364(c) is a finding, made after notice and a hearing, that the Debtors are "unable to obtain secured credit allowable under [Bankruptcy Code] section 503(b)(1)." See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

22.     If a debtor is unable to obtain post-petition financing under Bankruptcy Code § 364(c), the debtor may obtain credit secured by a "priming" senior or equal lien on property of the estate that is already subject to a lien pursuant to Bankruptcy Code § 364(d). Section 364(d) provides that a Court may, after notice and a hearing, authorize a debtor's obtaining or incurring debt secured by a senior or equal lien on property of the estate that is otherwise subject to a lien only if:

(i)     the debtor is unable to obtain such credit otherwise; and

(ii)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which the senior or equal lien is proposed to be granted.

See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631-32 (Bankr. S.D.N.Y. 1992) (permitting priming liens because debtor was unable to obtain financing elsewhere, and debtor's use of proceeds would provide adequate protection to existing secured creditors by increasing value of collateral).

23.     As set forth below, the Debtors are not able to obtain unsecured credit. The Debtors also submit that the Adequate Protection is sufficient to approve the priming of the

15

Senior Secured Lenders' liens under Bankruptcy Code § 364(d), and indeed, the Senior Secured Lenders have consented to the priming of their liens in exchange for the Adequate Protection.

Use of Cash Collateral Pursuant to Bankruptcy Code § 363(c)
And Adequate Protection Pursuant to Bankruptcy Code § 361

24.     Pursuant to Bankruptcy Code § 363(c)(2), a debtor may not use "cash collateral", as that term is defined in Bankruptcy Code § 363(a), unless "each entity that has an interest in such cash collateral consents, or ... the court, after notice and a hearing authorizes such use, sale, or lease in accordance with the provisions of [Bankruptcy Code § 363]."

25.     Furthermore, Bankruptcy Code § 363(e) provides that this Court may authorize the use of cash collateral if holders of secured claims against such cash collateral are afforded adequate protection thereof. See also Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs.), 153 F.3d 61, 67 (2d Cir. 1998) (noting that secured lender's "absolute right to receive payments before any [non-consensual] use of cash collateral by" the debtor).

The Court Should Approve the Post-Petition Financing

26.     After determining that it was necessary to commence these cases to obtain necessary funding to market their business in an attempt to maximize the value of their assets, the Debtors and their professionals considered identifying potential sources of post-petition financing. Based on the circumstances and on discussions with various parties, the Debtors determined that adequate post-petition financing solely on an unsecured or a junior priority basis to the Senior Secured Lenders was not possible, and they are not aware of any significant unencumbered assets that a third-party lender would consider lending on, thereby making it impossible to obtain financing outside of Chapter 11.

16

27. Without access to necessary funding, the Debtors would be unable to operate their business in Chapter 11 and would be forced to liquidate immediately. Such a result would destroy the value of their business enterprise, to the detriment of all parties-in-interest.

28. Through the Post-Petition Financing, including the ability to use Cash Collateral in accordance therewith, the Debtors would be able to transition into Chapter 11 smoothly and begin an orderly marketing process to sell their assets. The Debtors and their professionals believe that the terms of the Post-Petition Financing are fair and reasonable under the circumstances, and entry into the Post-Petition Financing reflects a sound and prudent exercise of the Debtors' business judgment.

No Adequate Alternative to the Post-Petition Financing Is Available

29. As detailed above, in order to receive approval for a proposed priming lien, a debtor is required to demonstrate that, notwithstanding its good-faith and best efforts, credit was unavailable without the protections potential lenders would receive pursuant to Bankruptcy Code § 364(c) and (d). See Bray v. Shenandoah Fed. Savs. and Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming district court's approval of priming lien where "trustee had demonstrated by a good faith effort that credit was not available without the senior lien"); see also Cent. Park Ave., 136 B.R. at 630-31 (although "debtor must make an effort to obtain credit without priming a senior lien, it need not "seek alternate financing from every lender").

30. The vast majority of the Debtors' assets are secured by the Senior Secured Lenders' first-priority liens, and because of the substantial amount of Pre-Petition Debt, obtaining new financing in the form of unsecured debt or by offering prospective lenders an administrative claim is not viable, especially from a third party with no existing interest or

17

position in the Debtors to protect. Moreover, the Senior Secured Lenders would not agree to the Debtors' granting any senior or pari passu liens to a new third-party DIP lender, and any non-consensual attempt to prime the liens of the Senior Secured Lenders would be costly, distracting, and not likely to be successful, with potentially disastrous consequences for the Debtors and their estates.

31.     Nonetheless, the Senior Secured Lenders have consented to the priming of their liens, provided the relief requested herein is granted, and the Interim Order is entered. Accordingly, approval of the Post-Petition Financing is appropriate and justified.

The Post-Petition Financing is Necessary to Preserve the Value of the Debtors' Estates

32.     As discussed herein, the Post-Petition Financing are necessary to preserve and maintain the value of the Debtors' estates and the collateral securing the Pre-Petition Facility to ensure a smooth transition into Chapter 11 and an orderly process to market the Debtors' assets. If the Debtors do not receive the additional liquidity to fund their ongoing operations as provided by the Post-Petition Financing, however, they may be forced to engage in a "fire sale" of their assets, and in such a scenario, the Debtors' assets would in all probability be sold for minimal value, to the detriment of all parties-in-interest and foreclosing the possibility of any successful reorganization or going-concern sale of the Debtors. See In re Sun Healthcare Group, Inc., 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").

33.     Accordingly, approval of the Post-Petition Financing is necessary to preserve the value of the Debtors and their estates.

18

The Terms of the Post-Petition Financing are Fair, Reasonable, and Appropriate

34.     Given the Debtors' current circumstances, the Debtors and their professionals believe that the Post-Petition Financing is fair and reasonable.

35.     The Debtors have made a concerted effort in good faith to obtain credit on the most favorable terms available, and despite the Debtors' and their professionals' extensive efforts, no other lender was willing to provide a stand-alone facility to which the Senior Secured Lenders would consent. Obtaining such financing without consent would, as mentioned above, likely have resulted in an expensive, difficult, and distracting priming fight, as well as a similarly-contentious battle over the use of cash collateral at the outset of these cases.

36.     In view of such a potentially disastrous scenario, and the Debtors' immediate need for liquidity, the Debtors and their professionals concluded that the Post-Petition Financing best suits the Debtors' current and pressing need for new funding.

The Court Should Approve the Use of Cash Collateral

37.     Pursuant to Bankruptcy Code § 363(e), the use of cash collateral by the Debtors is conditioned upon the Adequate Protection proposed to be provided to the Senior Secured Lenders. Moreover, the Debtors' use of cash collateral would not prejudice any party-in-interest because, absent the use of any Cash Collateral, the Debtors' operations would shut down almost immediately.

38.     To the extent their interests in the collateral securing the Pre-Petition Facility constitute valid and perfected security interests and liens as of the Petition Date, the Senior Secured Lenders are entitled to adequate protection of their interests in such cash collateral under Bankruptcy Code §§ 361, 363(e), and 364(d)(1). In compliance therewith, the

19

Debtors have agreed to provide the Senior Secured Lenders with the Adequate Protection provided for by the Post-Petition Financing.

39.     The Bankruptcy Code does not define "adequate protection", but Bankruptcy Code § 361 provides the following three nonexclusive examples:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

Accordingly, adequate protection is determined in most instances on a case-by-case basis. See Bray v. Shenandoah Fed. Sav. v. Loan Assoc. (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); see also In re JKJ Chevrolet, Inc., 190 B.R. 542, 545 (Bankr. E.D. Va. 1995).

40.     The critical purpose of adequate protection is (a) to guard against diminution of a secured creditor's interest in collateral during the period when such collateral is being used by the debtor and (b) to preserve such secured creditors' position as of the date the bankruptcy was filed. Cent. Park Ave. Corp., 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest [during the Chapter 11 process]"); In re Dunes Casino Hotel, 69 B.R. 784, 793 (Bankr. D. N.J. 1986) ("[a]dequate protection is designed to preserve the secured creditor's position at the time of the

bankruptcy"); In re Beker Indus. Corp., 58 B.R. at 736; see also In re Nice, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditors secured claim as of the petition date due to a debtor's continued use of collateral").

41.    The Adequate Protection, as detailed in the Interim Order, is intended to protect the Senior Secured Lenders from any diminution in the value of their collateral securing the Pre-Petition Facility during the period it is proposed to be used by the Debtors post-petition. See, e.g., In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); In re Dunes Casino Hotel, 69 B.R. 784, 793 (Bankr. D. N.J. 1986) ("[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy"); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

42.    The Debtors submit that the Adequate Protection, as proposed in the Interim Order, is fair and reasonable and in accordance with Bankruptcy Code § 361(1) and (2), and the Senior Secured Lenders have agreed that it is sufficient for them to consent to the Debtors' use of Cash Collateral.

Application of the Business Judgment Standard

43.    As described above, after appropriate investigation and analysis, the Debtors and their professionals have concluded that the Post-Petition Financing provides the best alternative available under the circumstances of these Chapter 11 cases to provide the Debtors a "soft landing" and the opportunity to function while marketing their assets for a going-concern sale.

44.    Courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994). In

21

fact, "[m]ore exacting scrutiny [than the business judgment standard] would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

45.     For the reasons set forth herein, the Debtors submit that they have exercised sound business judgment in determining that a post-petition credit facility along the lines of the Post-Petition Financing is appropriate under the circumstances, and they believe that they have satisfied the legal prerequisites to incur debt thereunder.

46.     Accordingly, the Debtors submit that the Court should grant the Debtors the authority to enter into the Post-Petition Financing and obtain funds from the Lenders on the secured and administrative superpriority basis described above and provided for in the Interim Order.

## WAIVER OF BANKRUPTCY RULE 6004(g)

47.     On account of the immediate and pressing need for the Debtors to obtain post-petition financing, the Debtors request a waiver of the 14-day set forth in Bankruptcy Rule 6004(g), and any other similar stays under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable orders of this Court, for approval of the Post-Petition Financing and entry of the Interim Order.

## SATISFACTION OF BANKRUPTCY RULE 4001(b)(2) and (c)(2)

48.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Court may commence a hearing on a motion to use cash collateral and obtain credit and to authorize such use and credit within the first 15 days of a case only if that relief is necessary to avoid immediate

22

and irreparable harm. Permitting the Debtors to obtain post-petition financing and use cash collateral on the terms set forth herein and in the Interim Order is necessary to avoid the immediate and irreparable harm that could occur if the Debtors were unable to obtain post-petition financing and use cash collateral and to continue to operate, even in the short term, in Chapter 11, as described above. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b)(2) and (c)(2) with respect to the relief requested in this Motion.

## NOTICE

49. Notice of this Motion has been given via overnight delivery service, e-mail, facsimile, telephone, and/or hand delivery, as appropriate, to the United States Trustee, the 20 largest unsecured non-insider creditors of the Debtors on a consolidated basis, the Senior Secured Lenders, the Second Lien Lenders, the Subordinated Lenders, the Debtors' equity sponsor, the United States Attorney's Office for the District of Delaware, the United States Attorney General, and the Internal Revenue Service. As this Motion is seeking first-day relief, notice hereof and of any order entered hereon will be served in accordance with Local Rule 9013-1(m). Due to the urgency of the circumstances, the Debtors submit that no other or further notice of this Motion is required.

## NO PRIOR APPLICATION

50. No previous motion for the relief sought herein has been made to this or to any other Court.

RLF1 3630054v 1

# CONCLUSION

**WHEREFORE**, the Debtors request immediate entry of the Interim

Order, substantially in the form attached hereto as <u>Exhibit A</u> and the granting of such other and

further relief as is this Court may deem just and proper.

Dated:  November 18, 2010
        Wilmington, Delaware

Respectfully submitted,

_____

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Julie Finocchiaro (No. 5303)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Joel H. Levitin
Richard A. Stieglitz Jr.
Maya Peleg
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

*Proposed Attorneys for the Debtors and
Debtors-in-Possession*

24

**EXHIBIT A**

**Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          )          Chapter 11
                                                )
CB HOLDING CORP., et al.,[1]                    )          Case No. 10-_____ (   )
                                                )
                                                )          Joint Administration Requested
                                Debtors.        )
                                                )

## STIPULATION AND INTERIM ORDER
## (I) AUTHORIZING SECURED POST-PETITION FINANCING
## PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING USE OF
## CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING
## ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364, AND
## (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

---

[1]     The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc. (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc. (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc. (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc. (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp, LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc. (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc. (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc. (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc (0601); Charlie Brown's of York, LLC (0980); The Office at Bridgewater, Inc. (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc. (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc. (4776); Jonathan Seagull Property Corp (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc. (3131); The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc. (3126); and What's Your Beef V, Inc. (4719)

Upon the emergency motion (the "Motion") dated November 18, 2010, of CB Holding Corp. and the other debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned Chapter 11 cases (collectively, the "Cases") (a) seeking this Court's authorization pursuant to Sections 363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), for the Debtors, inter alia, (i) to obtain secured post-petition financing (the "Post-Petition Financing") up to an aggregate principal amount not to exceed $2,500,000 from GMAC Commercial Finance LLC now known as Ally Commercial Finance LLC ("Ally") and Wells Fargo Capital Finance, Inc. ("Wells"), as the Lenders (Ally and Wells collectively the "Lenders"), (ii) to grant the Lenders, pursuant to Bankruptcy Code § 364(c) and (d), security interests in all of the Debtors' presently owned and after-acquired personal property and Pre-Petition Collateral (as defined below) and (iii) grant the Lenders, pursuant to Bankruptcy Code § 364(c)(1), priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than in respect of the Carve-Out (as defined below); (b) seeking this Court's authorization, pursuant to Bankruptcy Code § 363(c), to use Cash Collateral (as defined below) and, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d), to provide adequate protection to the Pre-Petition Lenders[2] with respect to any diminution in the value of the Lenders' interest in the Pre-Petition

---

[2] As used herein "Pre-Petition Lenders" shall mean collectively the Lenders and Ableco Finance LLC and its participants ("Ableco"). Pursuant to agreement among Wells, Ally and Ableco, the Post-Petition Financing shall be advanced under the Lenders' Pre-Petition Agreements and this Order by Ally only, and Ally shall be entitled to the repayment of an amount equal to any outstanding post-petition advances and interest and fees related thereto on a first out basis prior to any payments to Wells, Ableco, or Agents under the Lenders' Pre-Petition Agreements and this Order. All proceeds of collateral received by the Lenders shall be held by Ally until the earlier of Termination Date or March 17, 2011 (hereafter defined) and thereafter distributed in accordance with the Lenders' Pre-Petition Agreements

Collateral (as defined below) resulting from the priming liens and security interests to be granted herein pursuant to Bankruptcy Code § 364(d) to secure the Post-Petition Financing, the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral (other than Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a); (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001; and (d) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order authorizing on a final basis, inter alia, the Post-Petition Financing and the use of Cash Collateral (this "Order"); the Preliminary Hearing having been held before this Court; due and sufficient notice of the Motion and the Preliminary Hearing under the circumstances having been given; and upon the entire record made at the Preliminary Hearing, and this Court having found good and sufficient cause appearing therefor,

THE DEBTORS, THE LENDERS AND THE PRE-PETITION LENDERS STIPULATE AND THE COURT FINDS AND CONCLUDES THAT:

A. On November ____, 2010 (the "Petition Date"), the Debtors each filed their voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (these "Chapter 11 Cases"). The Debtors are continuing in possession of their property, and operating and managing their businesses as a debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B. This Court has jurisdiction over these Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

3

C.     Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 26), the Debtors acknowledge and stipulate that from time to time prior to the Petition Date, the Pre-Petition Lenders loaned money to or for the benefit of the Debtors, pursuant to the terms and conditions of that certain Financing Agreement dated as of June 21, 2007, as amended, modified or restated from time to time (collectively, the "Loan Agreement"), Pledge and Security Agreement dated as of June 21, 2007, as amended, modified or restated from time to time (collectively, the "Security Agreement") and as further documented, recorded and evidenced by various other agreements, instruments, financing statements and documents entered into in connection with the Loan Agreement and Security Agreement, all as may have been amended, modified or restated from time to time (collectively, including the Loan Agreement and Security Agreement, the "Pre-Petition Lenders' Pre-Petition Agreements").[3]

D.     Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 26), the Debtors acknowledge and stipulate that, in accordance with the terms of the Pre-Petition Lenders' Pre-Petition Agreements, the Debtors are truly and justly indebted to the Pre-Petition Lenders, without defense, counterclaim or offset of any kind, and that as of November 17, 2010, (i) the Debtors were liable to the Pre-Petition Lenders in respect of loans made and letters of credit issued (the balance of the standby letter of credit was $3,952,388) pursuant to the Pre-Petition Lenders' Pre-Petition Agreements in the aggregate principal amount of approximately $70,243,251 (exclusive of interest and fees accrued and unpaid thereon and other costs, expenses and indemnities, and inclusive of the outstanding

---

[3]     Capitalized terms not otherwise defined herein shall have the definitions set forth in the Lenders' Pre-Petition Agreements.

letter of credit and swap exposure) (collectively, inclusive of interest, fees, expenses and all Obligations, the "Pre-Petition Loan Indebtedness"), and (ii) pursuant to the Pre-Petition Lenders' Pre-Petition Agreements, the Debtors were liable to the Pre-Petition Lenders for accrued and unpaid interest, commitment fees, attorneys' and advisors' fees, other out-of-pocket expenses, costs and indemnities (collectively, subsections (i), and (ii) of this paragraph are the "Pre-Petition Lenders' Pre-Petition Loan Indebtedness")[4].

E.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 26), the Debtors acknowledge and stipulate that under the Pre-Petition Lenders' Pre-Petition Agreements and as security for repayment of the Pre-Petition Lenders' Pre-Petition Indebtedness, the Debtors granted to the Pre-Petition Lenders security interests in, and liens upon, substantially all of their assets (including without limitation all Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, General Intangibles, Goods, Instruments, Investment Property, Letters of Credit Rights, Pledged Interests, Supporting Obligations and all other tangible and intangible personal property and proceeds therein, excepting therefrom certain assets), as more fully described in the Pre-Petition Lenders' Pre-Petition Agreements, which are incorporated herein by reference (collectively, including Cash Collateral (as defined below), the "Pre-Petition Collateral").

F.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 26), the Debtors acknowledge and stipulate that the Pre-Petition Lenders' security interests in and liens on the Pre-Petition Collateral were properly

---

[4]     For the avoidance of doubt and for clarification, Ableco are also Pre-Petition Lenders under the Pre-Petition Lenders' Pre-Petition Agreements, however Ableco has declined to participate in the Post-Petition Financing provided hereunder except as Collateral Agent until such time that it is replaced as Collateral Agent; it is anticipated that Ally shall be the successor Collateral Agent.

perfected and are valid and enforceable first priority liens on and security interests in the Pre-Petition Collateral, subject to the Prior Permitted Liens (as defined below). The Debtors further acknowledge that their cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is cash collateral of the Pre-Petition Lenders within the meaning of Bankruptcy Code § 363(a) ("Cash Collateral"). The Pre-Petition Lenders are entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate protection of their interest in the Pre-Petition Collateral, including for the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral other than Cash Collateral, and for the imposition of the automatic stay.

G. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course of business or operate their businesses and maintain their property in accordance with state and federal law and have commenced the orderly sale of their businesses and assets as going concerns to the extent possible. In order to complete their orderly sale process and maximize the value of their assets for the benefit of their creditors and estates, the Debtors' have an immediate need for the financing set forth in this Order. In the absence of the Post-Petition Financing and the use of Cash Collateral, the orderly sale of the Debtors' businesses and assets would not be possible, and would cause serious and irreparable harm to the Debtors and their estates.

H. Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors cannot obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Financing on a post-petition basis is not otherwise available without the Debtors' (i) granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below in respect of the Carve-Out (as

6

defined below), (ii) securing, pursuant to Bankruptcy Code § 364(c) and (d), such indebtedness and obligations with security interests in and liens on all of the Debtors' personal property, real property and the Pre-Petition Collateral as described below, and (iii) providing for adequate protection of the Pre-Petition Lenders' interests as described below.

I.    Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the Lenders, (iii) counsel to the Pre-Petition Lenders, (iv) the creditors holding the 20 largest unsecured claims against the Debtors on a consolidated basis, and all other known parties who filed financing statements, or have liens on or security interests in the Debtors' assets or property. Under the circumstances, such notice of the Preliminary Hearing and the relief requested in the Motion constitutes adequate and sufficient notice under Bankruptcy Code §§ 102(1), 364(c) and 364(d) and Bankruptcy Rules 2002 and 4001(c), and no other or further notice need be given.

J.    At the Preliminary Hearing, the Court considered representations made by counsel, offers of proof, and/or testimony regarding:

(i)     the negotiations pertaining to this Order;

(ii)    the necessity for this Order;

(iii)   the events leading up to the filing of these Chapter 11 Cases by the Debtors;

(iv)    The Debtors' need for credit to the extent necessary to avoid immediate and irreparable harm to their estates, pending a final hearing in accordance with Bankruptcy Rule 4001(c); and

(v)     those expenses necessary to avoid immediate and irreparable harm to their estates.

7

K.     Based on the record presented to the Court by the Debtors at the Preliminary Hearing, the Post-Petition Financing has been negotiated in good faith and at arm's length between the Debtors, the Lenders and the Pre-Petition Lenders, and any credit extended, and any Post-Petition Financing, and post-petition loans, made available to the Debtors pursuant to the Lenders' Pre-Petition Agreements shall be deemed to have been extended, issued or made, as the case may be, in good faith by the Lenders as required by, and within the meaning of, Bankruptcy Code § 364(e).

L.     Based on the record presented to the Court by the Debtors at the Preliminary Hearing, the terms of the Post-Petition Financing appear to be fair and reasonable, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  The permission granted herein to enter into the Post-Petition Financing and obtain funds thereunder, and to use Cash Collateral, on an emergency interim basis is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Order is in the best interest of the Debtors' estates and creditors as their implementation will, among other things, provide the Debtors with the necessary funds to conduct and complete the orderly sale of the Debtors' businesses as going concerns to the extent possible and maximize the value of the Debtors' assets for the benefit of their creditors and estates.

IT  IS  HEREBY  ORDERED,  ADJUDGED  AND  DECREED,  EFFECTIVE IMMEDIATELY, AND AGREED AMONG THE PARTIES HERETO THAT:

1.   The Motion is granted, subject to the terms and conditions set forth in this Order.

2.   The Debtors are hereby authorized to obtain the Post-Petition Financing, use Cash Collateral, and additionally to borrow money and seek other financial accommodations from the Lenders and the Pre-Petition Lenders, as the case may be, after the Petition Date pursuant to the terms and conditions of this Order and the Pre-Petition Lenders' Pre-Petition Agreements, as modified hereby. To avoid immediate and irreparable harm to the Debtors' estates prior to the Court's entry of a Final Order authorizing the Debtors to continue to obtain the Post-Petition Financing set forth herein, the Lenders shall be authorized to advance funds constituting Post-Petition Financing, as limited by the Budget set forth in Paragraph 11 of this Order and subject to the terms and conditions of the Pre-Petition Lenders' Pre-Petition Agreements. The Debtors are authorized to use the proceeds of any loans ("Loans") made under the Post-Petition Financing, to use Cash Collateral and other Collateral (as defined below) as provided and limited in the Budget for operations of the Debtors' businesses and the administration of these Chapter 11 Cases (all such Loans, and use of Cash Collateral and other Collateral (as defined below) to the extent of any diminution in the value thereof after the Petition Date collectively shall constitute, the "Post-Petition Indebtedness"), provided, that (i) the proposed Loans or use of Cash Collateral is consistent with the terms of the Pre-Petition Lenders' Pre-Petition Agreements and this Order and will only be used to pay when due the expenses set forth in the Budget, and (ii) any requested Post-Petition Financing is necessary after the application of available Cash Collateral.

3.   During the term of this Order, the terms of the Pre-Petition Lenders' Pre-Petition Agreements shall continue in full force and effect with respect to the Loans and other advances under the Post-Petition Financing except as otherwise modified herein, including, as follows:

9

The Pre-Petition Lenders' Pre-Petition Agreements shall be amended to reflect the terms and conditions relating thereto in this Order including without limitation, effective on the date that this Order is entered by the Court, as follows:

      (a)    **Out of Formula Loans.** Provided there exist no Events of Default under the DIP Order, the Debtors shall be allowed to borrow on a revolving basis in accordance with the Budget (hereinafter defined) in an amount not to exceed $2,500,000 (the "Over Advance").

      (b)    **Interest Rate.** Interest Rates shall be Prime plus 4.0% for all loans under this Order and the Pre-Petition Lenders' Pre-Petition Agreements.

4.    In accordance with Bankruptcy Code § 364(c)(1), subject to the Carve Out provided in Paragraph 6 hereof, the Post-Petition Indebtedness shall constitute claims (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b) and 726, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code. Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 507(b) or otherwise, including those resulting from the conversion of any of these Chapter 11 Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Superpriority Claims of the Lenders arising out of the Post-Petition Indebtedness.

5.    As security for the Post-Petition Indebtedness, the Lenders shall have and are hereby granted (effective upon the date of this Order and without the necessity of the recordation of mortgages, security agreements, pledge agreements, financing statements or otherwise) valid

10

and perfected senior security interests in, and liens on (collectively, the "Liens"), all assets of the Debtors of any nature whatsoever and wherever located, tangible or intangible, whether now or hereafter acquired, including without limitation, and any and all proceeds of the foregoing, a 100% pledge of any of the Debtors' capital stock in which any of the Debtors have an interest and the stock of all of the Debtors' subsidiaries, causes of action (including without limitation any commercial tort claims), any avoidance actions under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550 or 553 and the proceeds thereof (provided however, such lien on avoidance actions shall only attach upon entry of the Final Order and shall be limited to the amount of the Post Petition Indebtedness except for Section 549), investment property, leases and all substitutions thereto, accessions, rents and proceeds of the foregoing, wherever located, including insurance and other proceeds (collectively, with all proceeds and products of any or all of the foregoing and including the Pre-Petition Collateral, the "Collateral"):

      a.     Pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien senior to the Liens of the Pre-Petition Lenders on the Petition Date (the "Prior Permitted Liens");

      b.     Pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior perfected Lien upon all of the Debtors' right, title and interest in, to and under the Pre-Petition Collateral, provided that such first priority senior Lien shall be subject and junior to the Prior Permitted Liens; and

      c.     Pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior perfected Lien upon all of the Debtors' right, title and interest in, to and under all other

Collateral that is subject to Prior Permitted Liens to the extent such perfection in respect of a Pre-Petition Date claim is expressly permitted under the Bankruptcy Code.

Except to the extent expressly set forth in clauses (b) and (c) of this paragraph and Paragraph 6 hereof, the Liens granted pursuant to this Order and the Pre-Petition Lenders' Pre-Petition Agreements to the Lenders to secure the Post-Petition Indebtedness shall not be subordinated to or made pari passu with any other lien or security interest. The provisions of any intercreditor agreements or subordination agreements that subordinate liens and security interests to the liens and security interests of the Lenders or other indentures that subordinate any claims to the claims of the Lenders shall remain in full force and effect and shall continue with respect to the liens and security interests granted to the Lenders in the Collateral.

6. Any provision of this Order or the Pre-Petition Lenders' Pre-Petition Agreements to the contrary notwithstanding, the Liens and Superpriority Claims granted to the Lenders pursuant to the Pre-Petition Lenders' Pre-Petition Agreements and this Order shall be subject and subordinate to a carve-out (the "Carve-Out") for (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, (b) all budgeted operating expenses of the Debtors accrued prior to the termination of the Post-Petition Financing, and (c) following the occurrence and during the pendency of a Default or an Event of Default (as each such term is defined in the Pre-Petition Lenders' Pre-Petition Agreements or in this Order, an amount which is not otherwise payable from funds which are not the Collateral of the Lenders or proceeds therefrom), of (i) the aggregate allowed unpaid fees and expenses payable under Sections 330, 331 and/or 363 of the Bankruptcy Code to each professional person retained by the Debtors pursuant to an order of this Court (the "DIP Professionals"), including the Debtors' approved attorneys (the "Debtors' Counsel") (other than fees and expenses, if any,

12

of such professional persons incurred, directly or indirectly, in respect of, arising from or relating to the investigation, initiation or prosecution of any cause of action against the Pre-Petition Lenders, the Lenders or with respect to the Post-Petition Indebtedness and the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Pre-Petition Lenders' Pre-Petition Agreements) in an amount not to exceed the amount budgeted on an accrual basis (whenever ultimately allowed by the Court or paid) for each such professional, less any amount approved by the Court and paid (the "Budget Cap") in the Budget described in Paragraph 11 hereof as of the date of such Default or Event of Default less amounts paid to the DIP Professional by order of this Court (the "DIP Professionals' Carve-Out"); if the case is not converted to a case under chapter 7 of the Bankruptcy Code or dismissed on or before the end of the initial Budget period, and the Lenders have not declared an Event of Default, the Budget Cap shall be a roll forward in the amount budgeted for the Debtors' Counsel for the final week in the initial Budget on a weekly basis until such Default or Event of Default, the case is dismissed, converted to chapter 7 or the parties agree on a new budget, (ii) if this case is converted to a case under chapter 7 of the Bankruptcy Code or on the occurrence of an Event of Default, the Carve-Out for the Debtors' Counsel shall also include the amount of $75,000 to pay fees and expenses (other than fees and expenses, if any, of such professional persons incurred, directly or indirectly, in respect of, arising from or relating to the investigation, initiation or prosecution of any cause of action against the Lenders or with respect to the Post-Petition Indebtedness or Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Pre-Petition Lenders' Pre-Petition Agreements) incurred by or on behalf of the Debtors after conversion or an Event of Default, (ii) fees and expenses (other than fees and expenses, if any, of such professional persons incurred, directly or indirectly, in respect of, arising from or relating to the investigation, initiation or prosecution of any cause of action

13

against the Lenders or with respect to the Post-Petition Indebtedness or Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Lenders' Pre-Petition Agreements) of professionals for an official committee of unsecured creditors retained pursuant to court order (the "Committee Professionals") not to exceed an amount to be negotiated with the Committee Professionals (the "Committee Carve-Out," and collectively with the DIP Professionals' Carve-Out, the "Professionals' Carve-Outs"). The Professionals' Carve-Outs may be increased if and only to the extent that the Lenders agree in writing in their respective sole discretion. The DIP Professionals and the Committee Professionals shall submit to the Debtors, with a copy to Lenders, copies of their bills for fees and expenses on a monthly basis. In order to effectuate the funding of the Carve-Out amounts set forth in the definition thereof, upon the sale of all or substantially all of the Debtors' assets, the Lenders shall set aside and retain for the benefit of each of the applicable professionals amounts of proceeds from the Collateral (which proceeds shall remain subject to Lenders' pre-petition and post-petition Liens) equal to the aggregate unused portion of the applicable Carve-Out amounts allocable to such professionals (the "Professional Fee Reserve"), and Lenders shall distribute funds (provisionally subject to final approval and allowance by the Court) from the Professional Fee Reserve from time to time to the applicable professionals for unpaid fees and disbursements of such professionals allowed by the Court and constituting part of the Carve-Outs (in the case of each such professional, in an aggregate amount not to exceed the unused portion of such professional's specified Carve-Out amount), and any funds remaining in the Professional Fee Reserve after the disposition of all final fee applications of the DIP Professionals and Committee Professionals shall be applied to the outstanding Lenders and Pre-Petition Lenders' indebtedness in accordance with the provisions of this Order. Provided, however, (x) following the earlier of the expiration of the

14

Term or the Termination Date (as such terms are defined hereinafter), any Cash Collateral shall not be subject to the Carve-Out, but any professional fee incurred after the Petition Date and prior to the Termination Date shall remain subject to the Carve-Out and (y) the Carve-Out shall not include professional fees and disbursements incurred in connection with prosecuting or asserting any claims or causes of action against the Pre-Petition Lenders and/or challenging or raising any defense to the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the liens of the Pre-Petition Lenders; provided, however, that a Creditors' Committee shall be allowed to investigate the Pre-Petition Lenders' Pre-Petition Loan Indebtedness. Notwithstanding anything herein to the contrary, no Loans, Collateral, Cash Collateral, or any portion of the Carve-Out may be used to prosecute, object to or contest in any manner, or raise any defenses to, the amount, validity, perfection, priority, extent or enforceability of the Pre-Petition Lenders Pre-Petition Loan Indebtedness or Post-Petition Indebtedness or the liens securing the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or Post-Petition Indebtedness, or to prosecute or assert any claims or causes of action against the Pre-Petition Lenders.

7.      Immediately upon entry of this Order, the Debtors are hereby authorized to use Cash Collateral, provided that the Pre-Petition Lenders are granted adequate protection for any diminution in the value of the Collateral resulting from (i) the liens and security interests granted by the Post-Petition Financing and this Order or otherwise pursuant to Bankruptcy Code § 364(d), (ii) the Debtors' use of Cash Collateral pursuant to Bankruptcy Code § 363(c), (iii) the use, sale or lease of the Collateral (other than Cash Collateral) pursuant to Bankruptcy Code § 363(c) and (iv) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a):

>            (i)      the Pre-Petition Lenders shall be and hereby are granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security

15

interests in, and liens on (the "Replacement Liens"), all of the Debtors' right, title and interest in, to and under the Collateral, subject only to (x) the Carve-Out, (y) the Liens granted pursuant to this Order and the Pre-Petition Lenders' Pre-Petition Agreements to the Lenders to secure the Post-Petition Indebtedness and (z) any Prior Permitted Liens (after giving effect to this Order) prior in interest and senior to the Liens granted to the Lenders pursuant to this Order and the Pre-Petition Lenders' Pre-Petition Agreements; and

(ii)     the Pre-Petition Lenders shall be and hereby are granted, pursuant to Bankruptcy Code § 364(c)(1), Superpriority Claims, junior only to (x) the Superpriority Claims granted pursuant to this Order to the Lenders in respect of the Post-Petition Financing and (y) the Carve-Out.

8.      Under the circumstances, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Lenders; provided, however, that nothing herein contained shall affect or impair the Lenders' right to seek additional adequate protection of its interests. Notwithstanding any other provision hereof, the grant of adequate protection to the Pre-Petition Lenders pursuant hereto is without prejudice to the holders of any Prior Permitted Liens to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.

9.      Except as set forth in Paragraphs 5 and 6 hereof, the Liens and Replacement Liens shall be prior and senior to all liens and encumbrances (other than Prior Permitted Liens) of all other secured creditors in and to such Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors). The Liens and Replacement Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens, and the Pre-Petition Lenders shall not be required to file or serve financing statements, notices of lien or similar instruments in respect of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness which otherwise may be required under federal

16

or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Liens or Replacement Liens shall in no way affect the validity, perfection or priority of such Liens or Replacement Liens. If, however, the Pre-Petition Lenders at their sole discretion shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Liens or Replacement Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

10. Without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 26), proceeds or payments received by the Lenders and/or the Pre-Petition Lenders with respect to the Collateral upon which the Lenders had security interests or liens shall be applied as follows:

a. first, to the payment of all reasonable costs, fees and expenses, including attorneys' fees of the Lenders;

b. second, to the payment of Pre-Petition Lenders' Pre-Petition Loan Indebtedness consisting of accrued and accruing interest;

c. third, to the payment of Pre-Petition Lenders' Pre-Petition Loan Indebtedness consisting of principal;

d. fourth, to the payment of Post-Petition Indebtedness including all accrued and accruing interest, costs and expenses, including reasonable attorneys' fees; and

17

e. fifth, to the payment of the Post-Petition Indebtedness consisting of principal;

**provided, however, that the Court reserves the right to re-allocate such payments in the event that it is determined by the Court that Pre-Petition Lenders did not maintain valid, perfected and enforceable liens on any of the Pre-Petition Collateral.** If, in the course of these Chapter 11 Cases, and contrary to the above provisions, the Court grants liens or security interests to others pursuant to Bankruptcy Code § 364(d) or any other provision of the Bankruptcy Code, which liens or security interests are senior or equal to the liens or security interests of the Lenders in the Collateral described above (collectively, "Subsequent Liens"), then any proceeds of loans or extensions of credit secured by such Subsequent Liens shall be applied first to payment of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness, including all attorneys' fees, costs and expenses, and the Pre-Petition Lenders shall retain all liens and security interests held by it on the Collateral until all of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness is paid in full, and then to the Post-Petition Indebtedness.

11. Attached hereto as Exhibit A is a five (5) week Budget (the "Budget") for the period from November 17, 2010 through and including January 19, 2011, which has been consented to by the Lenders. The Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Debtors expect to incur during each month of the Budget. The Debtors shall be authorized to use the proceeds of the Post-Petition Indebtedness and the Collateral only for payment of such items as is set forth in the Budget and subject to the terms and conditions set forth in the Pre-Petition Lenders' Pre-Petition Agreements and this Order. The Budget shall be revised by the end of each month during the period of this Order, and which shall remain subject to the consent of the

18

Lenders each month. Not later than the second (2nd) business day of each week commencing with the second week of the period covered by the Budget, the Debtors shall provide to the Lenders with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Budget for that period. Revenues less than ninety percent (90%) of the budgeted amount for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period of the Budget ("Allowed Revenue Variance") shall constitute an Event of Default in accordance with the provisions of this Order. Any disbursement by the Debtors other than for budgeted amounts as set forth in the Budget shall constitute an Event of Default in accordance with the provisions of this Order unless the Lenders consent to those changes in writing; provided, however, that the Debtors may make payments in excess of the total budgeted disbursements so long as (i) the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10.0%) of the budgeted disbursements for that week; and (ii) the Variance Percent of the aggregate of all actual disbursements for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period shall not exceed ten percent (10.0%) of the aggregate of all budgeted disbursements for such four-week period (subsections (i) and (ii) above are collectively, the "Allowed Disbursement Variance"). For the avoidance of doubt, any amount included in the Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks.

12. The Debtors shall continue their Pre-Petition cash management system with the Pre-Petition Lenders, which shall include a lockbox/blocked account to which the Lenders will

have full dominion and control over Cash Collateral and the cash proceeds of the Collateral pursuant to a lockbox/blocked account agreement and a cash management order requested to be entered at the first day hearing, each in form and substance reasonably acceptable to the Lenders.

13. Immediately upon the entry of this Order, the Debtors shall account to the Lenders for all cash, checks, notes, drafts, instruments, acceptances or other property representing cash or other proceeds of the Pre-Petition Collateral in the Debtors' possession, custody or control. All cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of the Debtors (collectively, "Cash Proceeds") currently in the possession of the Debtors or in any accounts in financial institutions, including any lock box or depository accounts, shall be deemed proceeds of the Collateral unless such proceeds are specifically identified as not being proceeds of Collateral. All Cash Proceeds shall be remitted to the Lenders in accordance with the terms of this Order and subject to Paragraph 10 hereof.

14. The agreement by the Lenders to make any Post-Petition Financing available to the Debtors and the agreement of the Pre-Petition Lenders to allow the use of Cash Collateral and the Collateral shall continue until and shall include January 19, 2011 or such earlier date as all Pre-Petition Lenders' Pre-Petition Loan Indebtedness and Post-Petition Indebtedness is paid in full (the "Term"), unless terminated prior to this date upon the occurrence of the Termination Date or otherwise pursuant to the terms of the Pre-Petition Lenders' Pre-Petition Agreements or this Order.

15. If a Default or an Event of Default (as defined in the Pre-Petition Lenders' Pre-Petition Agreements or in this Order) occurs, the Lenders shall have the right to immediately suspend funding under Post-Petition Financing and upon the Lenders' providing five (5) business

days written notice to the Debtors, the office of the United States Trustee, and any statutory committees appointed in these Chapter 11 Cases ("Default Notice"), the Lenders may terminate the Post-Petition Financing facility (the date of any such termination, the "Termination Date") and declare the Loans to be immediately due and payable, and the automatic stay pursuant to Bankruptcy Code § 362(a) shall be deemed lifted and modified, without further order of this Court, to permit the Lenders to exercise any and all of their rights and remedies under the Pre-Petition Lenders' Pre-Petition Agreements and this Order; provided, however, that the obligations and rights of the Lenders and the Debtors with respect to all transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected by any such termination and shall survive such termination (including the Carve-Out); and provided further that upon such termination the Lenders shall be deemed to have retained all of their rights and remedies, including, without limitation, as provided in the Pre-Petition Lenders' Pre-Petition Agreements and under the Bankruptcy Code. The Debtors' right to use Cash Collateral shall terminate automatically on the Termination Date; provided however that subsequent to the issuance of the Default Notice the Debtors and the Creditors' Committee may seek entry of an Order after notice and hearing allowing use of Cash Collateral and prohibiting the Pre-Petition Lenders from taking the actions contemplated in this paragraph.

16.     An Event of Default under this Order shall include: (i) the entry of an order dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to Chapter 7 cases, (ii) the entry of an order appointing a Chapter 11 trustee in any of these Chapter 11 Cases, (iii) the entry of an order granting any other claim superpriority status or a lien (other than a Prior Permitted Lien) equal or superior to the liens granted to the Lenders (except pursuant to an order under Bankruptcy Code § 506(c)), (iv) the entry of an order staying, reversing, vacating

or otherwise modifying the Post-Petition Financing under this Order (except as modified in a final order acceptable to Lenders) without the Lenders' prior written consent, (v) the entry of an order in any of these Chapter 11 Cases appointing an examiner having enlarged powers beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4), (vi) an Event of Default or Default under the Pre-Petition Lenders' Pre-Petition Agreements other than an existing default or one related to any financial covenants or to the filing of these cases or the consequences thereof, (vii) any material representation or material warranty by the Debtors to the Lenders that is incorrect or misleading in any material respect when made, (viii) there shall occur a material adverse disruption or change in the orderly sale of the Debtors' business and assets as a going concern or a change of control shall occur other than pursuant to a plan of reorganization or sale, (ix) the entry of any order granting any relief from the automatic stay so as to allow a third party to proceed against any material asset or assets of the Debtors, other than relating to assets subject to Prior Permitted Liens which if granted will not materially or adversely affect current operations, (x) the entry of the Final Order shall not have occurred within thirty (30) days after the Petition Date, (xi) the commencement by the Debtors of other actions adverse to the Lenders and the Pre-Petition Lenders or their rights and remedies under this Order, the Final Order approving the Motion, or any other Bankruptcy Court order, (xii) the failure to pay in full the Post-Petition Indebtedness by the last day of the Term, (xii) the Allowed Revenue Variance or the Allowed Disbursement Variance as set forth in Paragraph 11 herein, is exceeded or (xiv) the failure to meet any of the 363 Sale Benchmarks (as defined below). The term "Default" herein means the occurrence of any event which except for the passage of time or the giving of notice or both would constitute an Event of Default (as defined in the Pre-Petition Lenders' Pre-Petition Agreements or in this Order).

22

17. Upon the occurrence of a Default or an Event of Default, the Lenders may exercise their rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code § 362 which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions and without further order of or application to this Court: (a) suspend all Post-Petition Financing and loans to the Debtors, and enjoin and prohibit the Debtors from using Cash Collateral to the extent that such Default or Event of Default would permit such relief under the Pre-Petition Lenders' Pre-Petition Agreements, as amended hereby; (b) suspend amounts in any accounts maintained with the Lenders, or otherwise enforce rights against all or part of any Collateral in the possession of the Lenders to the extent that such Default or Event of Default would permit such relief under the Pre-Petition Lenders' Pre-Petition Agreements, as amended hereby; and/or (c) subject to the provisions of Paragraph 15 above, take any other action or exercise any other right or remedy of the Pre-Petition Lenders under the Pre-Petition Lenders' Pre-Petition Agreements, this Order or by operation of law. Upon the Debtors' receipt of a Default Notice, they shall immediately cease making any disbursements except those already accrued in accordance with the Budget, subject to further order of the Court after notice and a hearing.

18. Without further order of this Court, and in consideration of other accommodations provided by the Lenders and the Pre-Petition Lenders, the Debtors shall reimburse the Lenders and the Pre-Petition Lenders for all reasonable out-of-pocket filing and recording fees, if any, reasonable attorneys' and paralegals' fees, the Lenders' Consultants' (as defined below) fees, and costs and expenses and internal audit fees and expenses incurred by the Lenders: (i) in the preparation and implementation of this Order and the various Loans and other Post-Petition

23

Financing, (ii) in the representation of the Lenders and the Pre-Petition Lenders in the proceedings, and (iii) as otherwise provided in the Pre-Petition Lenders' Pre-Petition Agreements. Subject to the Lenders' discretion, the reimbursement contemplated hereby may be made by deducting such amounts from collections of the Lenders or by adding such amounts to the Post-Petition Indebtedness. Further, Ally shall be paid a Post-Petition Financing fee of $100,000, which shall be earned immediately upon entry of this Order but shall not be payable until the earlier of (a) the sales described in Paragraph 20 hereof and (b) the Termination Date, and shall constitute Post-Petition Indebtedness of the Debtors.

19. The Debtors are hereby required to deliver to the Lenders such other financial and other information concerning the business and affairs of the Debtors as the Lenders shall reasonably request from time to time, including, without limitation, the financial reports and information provided to the Pre-Petition Lenders under the Pre-Petition Lenders' Pre-Petition Agreements, provided however that the Debtors reserve their right to claim that any such documents are protected under attorney-client privilege to the extent permitted under applicable law. The Debtors shall cooperate with and permit the Lenders to perform physical inventories of all assets in the Debtors' facilities at any reasonable times requested by the Lenders. The Debtors shall further provide the Lenders with detailed information as to the extent and composition of the Collateral and any collections thereon.

20. The Lenders' and the Pre-Petition Lenders' obligations hereunder and under the Pre-Petition Lenders' Pre-Petition Agreements shall be subject to the following benchmarks for certain events in these Chapter 11 Cases (each and collectively, the "363 Sale Benchmarks"):

> (i) the Debtors shall have an executed Asset Purchase Agreement in form and substance reasonably acceptable to Lenders for the sale of the seven (7) Office stores by November 30, 2010 which sale shall be approved by

order of the Court, in form and substance reasonably acceptable to Lenders on or before January 10, 2011;

(ii) a Bid Procedures Order (in form and substance satisfactory to the Pre-Petition Lenders) for the remaining operating store assets shall be entered by the Court on or before December 22, 2010;

(iii) an auction under the Bid Procedures Order shall have been held by the Debtors on or before January 24, 2011;

(iv) the Debtors shall select a Prevailing Bidder (acceptable to Lenders) on or before January 28, 2011;

(v) a Sale Hearing shall have been held and a Sale Order approving the sale under Section 363 of the Bankruptcy Code (in form and substance acceptable to Lenders) shall have been entered on or before February 3, 2011;

(vi) the Debtors shall retain on or before December 2, 2010 an investment banker reasonably acceptable to Lenders to coordinate the above referenced sale and such advisor shall remain engaged; and

(vii) the Debtors shall retain Hilco Real Estate LLC or such other party that is reasonably acceptable to Lenders on or before December 2, 2010 to coordinate the sale of liquor licenses which are not otherwise sold in the process described above and such advisor shall remain engaged.

21. Having been found to be extending credit and making Loans to the Debtors in good faith, the Lenders shall be entitled to the full protection of Bankruptcy Code § 364(e) with respect to the Post-Petition Financing and the Liens created or authorized by this Order in the event that this Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any obligation of the Debtors to the Lenders incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all Loans made pursuant to this Order, all use of Cash Collateral and all other Post-Petition Financing incurred by the Debtors pursuant hereto or the Pre-Petition Lenders' Pre-Petition Agreements prior to the effective date of any such stay, modification, reversal or vacation, shall be governed in all

25

respects by the provisions hereof and the Lenders and the Pre-Petition Lenders shall be entitled to all the rights, privileges and benefits of this Order, including without limitation, the Liens, Replacement Liens and Superpriority Claims granted herein.

22. The transactions contemplated by the Post-Petition Financing are not intended to provide the Lenders or the Pre-Petition Lenders with sufficient control over the Debtors so as to subject the Lenders to any liability (including, without limitation, environmental liability as an "owner," "operator," or "responsible person" as those terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorizations Act of 1986) in connection with the management of the Debtors' business or any of the Debtors' properties. By providing the Post-Petition Financing or taking any actions pursuant to this Order, the Lenders shall not: (1) be deemed to be in control of the operations or sale of the Debtors; or (2) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation, management or sale of the Debtors.

23. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order, including without limitation (a) confirming any plan of reorganization in any of these Chapter 11 Cases (and the Post-Petition Financing shall not be discharged by the entry of any such order or pursuant to Bankruptcy Code § 1141(d)(4); (b) converting any of these Chapter 11 Cases to Chapter 7 cases; or (c) dismissing any of these Chapter 11 Cases, and the terms and provisions of this Order as well as the Superpriority Claims, Liens and Replacement Liens granted pursuant to this Order and the Pre-Petition Lenders' Pre-Petition Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, Liens and Replacement Liens shall maintain their priority as provided by this Order until

26

all Pre-Petition Lenders' Pre-Petition Loan Indebtedness and all Post-Petition Indebtedness is indefeasibly paid in full and discharged.

24.     The Lenders may, at their sole discretion, retain additional third party consultants selected by the Lenders to review matters pertaining to the business and properties of the Debtors, each at the Debtors' sole reasonable expense (collectively, the "Lenders' Consultants") which expense shall not affect the payment of any other budgeted items in the Budget. The Debtors will permit the Lenders' Consultants to examine the respective corporate, financial and operating records, and, at the Debtors' sole reasonable expense, make copies thereof, inspect the assets, properties, operations and affairs of the Debtors, visit any or all of the offices of the Debtors to discuss such matters with their officers, independent auditors, accountants or consultants (and the Debtors hereby authorize such independent auditors, accountants and consultant to discuss such matters with the Lenders' Consultants), and the Debtors will cooperate with the Lenders' Consultants in all respects.

25.     In consideration for the Post-Petition Financing, the Debtors on behalf of themselves and their successors and assigns (collectively, the "Releasors"), but without prejudice to the rights of an official committee appointed in these Chapter 11 Cases to assert claims on behalf of the Debtors' estates (subject to Paragraph 26 below), shall forever release, discharge and acquit the Lenders and the Pre-Petition Lenders and their officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "Lenders liability" claims or defenses, which arose on or prior to the date this Order is entered with respect to the Debtors, the Pre-Petition Lenders' Pre-Petition Loan Indebtedness, the

Collateral, the Pre-Petition Lenders' Pre-Petition Agreements, the Post-Petition Indebtedness or the Post-Petition Financing.

26. The findings contained in recital paragraphs of this Order and the releases granted in paragraph 25 of this Order shall be binding upon all parties in interest, including without limitation, the Debtors and any statutory committees appointed in these Chapter 11 Cases, unless (a) a party in interest (including any statutory committee appointed in these Chapter 11 Cases) has properly filed an adversary proceeding or commenced a contested matter (subject to the limitations set forth in Paragraph 6) challenging the amount, validity, enforceability, perfection or priority of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness or the Pre-Petition Lenders' liens on the Pre-Petition Collateral in respect thereof, no later than a date that is forty-five (45) days after formation of the official committee of unsecured creditors or otherwise asserting any claims or causes of action against the Pre-Petition Lenders relating to the Pre-Petition Lenders' Pre-Petition Loan Indebtedness on behalf of the Debtors' estates, no later than the date that is ninety (90) days after the formation of an official committee of unsecured creditors, and the Court subsequently enters a judgment in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is properly commenced as of such respective date, the Pre-Petition Lenders' Pre-Petition Loan Indebtedness shall constitute an allowed fully secured claim, not subject to subordination and otherwise unavoidable respectively. Subject only to the rights of set forth in this paragraph, for all purposes in these Chapter 11 Cases and any subsequent Chapter 7 cases, the Pre-Petition Lenders' liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, and the Pre-Petition Lenders, the Pre-Petition Lenders'

Pre-Petition Loan Indebtedness and the Pre-Petition Lenders' liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including without, limitation, any successor thereto. If any such adversary proceeding or contested matter is properly commenced as of such date, the findings contained in the recital paragraphs of this Order shall nonetheless remain binding on all parties in interest except to the extent that such findings were expressly challenged in such adversary proceeding or contested matter, and all claims other than those claims raised in such challenge shall be subject to the release contained in paragraph 25 of this Order. If such adversary proceeding or contested matter is dismissed or adjudicated in favor of Pre-Petition Lenders, the findings and releases contained herein shall be effective.

27. The provisions of this Order shall be binding upon and inure to the benefit of the Lenders, the Pre-Petition Lenders and their successors and assigns, and the Debtors, and their successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.

28. Pre-Petition Lenders shall have the right to "credit bid" the amount of the Pre-Petition Lenders' Pre-Petition Loan Indebtedness as of the date of such bid during any sale of all or substantially all of the Debtors' assets to the extent it includes the sale of Collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

29. In no event shall the Pre-Petition Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any Collateral.

30. Pre-Petition Lenders shall not be required to file a Proof of Claim in the Debtors' Chapter 11 Cases.

31. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Pre-Petition Lenders' Pre-Petition Agreements, as the Lenders may reasonably require, as evidence of and for the protection of the Post-Petition Financing, or which otherwise may be deemed reasonably necessary by the Lenders and/or the Pre-Petition Lenders to effectuate the terms and conditions of this Order and the Pre-Petition Lenders' Pre-Petition Agreements.

32. To the extent there exists any conflict between the Pre-Petition Lenders' Pre-Petition Agreements and the terms of this Order, this Order shall govern.

33. The Final Hearing will be held on December [____], 2010 at ____ .m. The Debtors shall, on or before November [____], 2010, mail copies of a notice of the entry of this Order and the date of the Final Hearing, together with a copy of this Order to the parties having been given notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notices with this Court and to any counsel for any statutory committee of unsecured creditors appointed pursuant to Bankruptcy Code § 1102. The notice of entry of this Order shall state that any party in interest objecting to the Post-Petition Financing shall file written objections with the Clerk of the United States Bankruptcy Court for the District of Delaware, by no later than 4:00 p.m. on December [____], 2010. Objections shall be served so that the same are received on or before such date and time by: (a) counsel for the Debtors; (b) counsel for the Lenders, and (c) the Office of the United States Trustee.

RLF1 3630055v 1

Dated: November ___, 2010


_____
UNITED STATES BANKRUPTCY JUDGE

Dated: November ___, 2010

STIPULATED AND AGREED:

**CAHILL GORDON & REINDEL LLP**


By:_____

      Joel H. Levitin, Esq.
      Eighty Pine Street
      New York, New York 10005-1702
      Telephone: (212) 701-3770
      Facsimile: (212) 378-2449

      Mark D. Collins
      Richards, Layton & Finger, P.A.
      One Rodney Square
      920 North King Street
      Wilmington, Delaware 19801
      Telephone: (302) 651-7700
      Facsimile: (302) 651-7701

      Proposed Counsel to Debtors

**VEDDER PRICE P.C.**


By:_____

Douglas J. Lipke, Esq. (IL Bar No. 0312457)
Jonathan E. Aberman, Esq. (IL Bar No. 6255541)
222 N. LaSalle Street, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 609-7500
Facsimile: (312) 609-5005

Pepper Hamilton LLP
David B. Stratton, Esq.
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6566
Facsimile: (302) 421-8390


Counsel to Ally Commercial Finance LLC


**BINGHAM McCUTCHEN LLP**


By:_____

Julia Frost-Davies, Esq.
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736

Katherine G. Weinstein, Esq.
399 Park Avenue
New York, New York 10022-4689
Telephone: (212) 705-7000
Facsimile: (212) 752-5378


Counsel to Wells Fargo Capital Finance, Inc.

RLF1 3630055v 1

**SCHULTE ROTH & ZABEL LLP**

By:_____

      Eliot L. Relles, Esq.
      919 Third Avenue
      New York, New York 10022
      Telephone: (212) 746.2199
      Facsimile: (212) 593-5955

      Counsel to Abelco Finance, LLC

# EXHIBIT A

**Weekly Liquidity Model**

| | Week Ending | 1 11/21 | 2 11/28 | 3 12/5 | 4 12/12 | 5 12/19 | 6 12/26 | 7 1/2 | 8 1/9 | 9 1/16 | 10 1/23 | 11 1/30 | 12 2/6 | 13 2/13 | 14 2/20 | 14 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales** | | 2,209 | 1,636 | 1,636 | 1,636 | 1,636 | 1,636 | 1,809 | 1,390 | 1,505 | 1,503 | 1,480 | 1,218 | 1,653 | 1,687 | 22,636 |
| **Operating Receipts** | | | | | | | | | | | | | | | | |
| Customer Receipts | | 3,331 | 1,636 | 1,632 | 1,632 | 1,632 | 1,632 | 1,692 | 1,659 | 1,427 | 1,500 | 1,491 | 1,385 | 1,366 | 1,661 | 23,675 |
| Sales Tax Receipts | | 251 | 115 | 114 | 114 | 114 | 114 | 118 | 116 | 100 | 105 | 104 | 97 | 96 | 116 | 1,675 |
| Gift Cards/Other Receipts | | 278 | (109) | (76) | (53) | (50) | (37) | (22) | (15) | (0) | (0) | (0) | (0) | (0) | (0) | (87) |
| Total | | 3,860 | 1,641 | 1,670 | 1,693 | 1,696 | 1,709 | 1,788 | 1,760 | 1,526 | 1,605 | 1,595 | 1,482 | 1,462 | 1,777 | 25,263 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Payroll | | 1,321 | 666 | 523 | 533 | 523 | 533 | 500 | 428 | 465 | 428 | 465 | 415 | 451 | 415 | 7,665 |
| Benefits | | 140 | 416 | - | - | - | - | 207 | - | - | - | - | 207 | - | - | 969 |
| Sales Tax Remittance | | 609 | - | - | - | 27 | 184 | 47 | - | 50 | 345 | 88 | - | - | 48 | 1,398 |
| Insurance | | - | - | - | 61 | 133 | - | - | 61 | 19 | - | - | - | 61 | 19 | 354 |
| Rent | | - | - | 399 | - | - | - | 399 | - | - | - | - | 399 | - | - | 1,196 |
| Quarterly Real Estate Taxes | | - | - | - | - | - | - | - | - | - | - | 101 | - | - | - | 101 |
| Utilities | | 64 | - | - | - | 89 | 89 | 89 | 89 | 89 | 89 | 96 | 96 | 96 | 96 | 984 |
| Credit Card Fees | | - | - | 53 | - | - | - | - | 91 | - | - | - | 81 | - | - | 226 |
| Food | | 413 | 480 | 477 | 484 | 484 | 484 | 530 | 413 | 410 | 444 | 443 | 430 | 401 | 499 | 6,392 |
| PACA Claims | | - | 93 | 93 | 93 | 93 | - | - | - | - | - | - | - | - | - | 370 |
| Beverage | | 118 | 78 | 69 | 75 | 75 | 75 | 81 | 73 | 59 | 64 | 63 | 85 | 51 | 69 | 1,034 |
| Store Services, Marketing and Other | | 128 | 162 | 162 | 162 | 162 | 162 | 162 | 167 | 167 | 167 | 192 | 186 | 186 | 186 | 2,348 |
| Total | | 2,794 | 1,894 | 1,776 | 1,407 | 1,586 | 1,527 | 2,014 | 1,322 | 1,258 | 1,536 | 1,447 | 1,900 | 1,245 | 1,333 | 23,038 |
| **Operating Cash Flow** | | 1,066 | (252) | (107) | 286 | 111 | 182 | (226) | 437 | 268 | 69 | 148 | (417) | 216 | 444 | 2,225 |
| **Other Disbursements** | | | | | | | | | | | | | | | | |
| Maintenance Capex | | - | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 244 |
| Cash Interest Payments | | 20 | - | - | 41 | 13 | - | - | 144 | 13 | - | - | 44 | - | 13 | 289 |
| Vendor & Other Deposits | | 2,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 2,000 |
| Professional Fees | | 683 | - | - | - | - | - | 261 | 186 | 236 | 214 | 174 | 169 | 169 | 169 | 2,092 |
| CRG | | 240 | - | - | - | - | - | - | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 590 |
| Debtor Counsel | | 403 | - | - | - | - | - | - | 110 | 60 | 60 | 60 | 50 | 50 | 50 | 843 |
| Senior Debt Financial Advisor | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senior Debt Counsel | | - | - | - | - | - | - | - | 50 | 25 | 15 | 15 | 15 | 10 | 10 | 140 |
| UCC Financial Advisor | | - | - | - | - | - | - | - | - | - | 30 | 30 | 10 | 10 | 10 | 90 |
| Claims Agent | | 15 | - | - | - | - | - | - | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 155 |
| UCC Counsel | | - | - | - | - | - | - | - | - | - | 30 | 20 | 10 | 10 | 10 | 80 |
| Investment Banker | | - | - | - | - | - | - | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 44 |
| Other BK related | | 25 | - | - | - | - | - | - | 25 | 25 | 25 | 13 | 13 | 13 | 13 | 150 |
| Total | | 2,703 | 19 | 19 | 59 | 32 | 19 | 19 | 424 | 218 | 255 | 233 | 236 | 188 | 201 | 4,624 |
| **Net Cash Flow** | | (1,637) | (271) | (125) | 226 | 78 | 163 | (245) | 13 | 49 | (186) | (84) | (654) | 29 | 243 | (2,399) |
| **Beginning Cash (Book)** | | (68) | - | - | - | - | - | - | - | - | - | - | - | - | - | (68) |
| Net Cash Flow | | (1,637) | (271) | (125) | 226 | 78 | 163 | (245) | 13 | 49 | (186) | (84) | (654) | 29 | 243 | (2,399) |
| DIP Facility | | 1,705 | 271 | 125 | (226) | (78) | (163) | 245 | (13) | (49) | 186 | 84 | 654 | (29) | (243) | 2,467 |
| **Ending Cash (Book)** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **DIP Facility** | | | | | | | | | | | | | | | | |
| Opening Balance | | - | 1,705 | 1,976 | 2,102 | 1,875 | 1,797 | 1,634 | 1,879 | 1,866 | 1,816 | 2,002 | 2,086 | 2,740 | 2,711 | - |
| Advances / (Repayments) | | 1,705 | 271 | 125 | (226) | (78) | (163) | 245 | (13) | (49) | 186 | 84 | 654 | (29) | (243) | 2,467 |
| Ending Balance | | 1,705 | 1,976 | 2,102 | 1,875 | 1,797 | 1,634 | 1,879 | 1,866 | 1,816 | 2,002 | 2,086 | 2,740 | 2,711 | 2,467 | 2,467 |