# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-_____ ( ) |
| | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF GARY LEMBO
## IN SUPPORT OF DEBTORS' FIRST-DAY PLEADINGS

Gary Lembo declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as

follows:

---

[1] The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc. (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc (7781); Charlie Brown's of Allentown, L.L.C (8420); Charlie Brown's of Alpha, Inc. (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc. (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp, LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc. (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc. (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc. (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc. (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp (7782); Charlie Brown's Steakhouse Fishkill, Inc (9139); Charlie Brown's Steakhouse Woodbridge, Inc (1906); Charlie Brown's, Inc. (4776); Jonathan Seagull Property Corp. (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc. (3131); The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc (3126); and What's Your Beef V, Inc. (4719).

1.    My name is Gary Lembo, and I am over 21 years of age. I am of sound mind and, if called to testify, I will attest to the facts described herein.

2.    I am a Managing Director of CRG Partners Group LLC ("CRG") and in that role, I have represented various companies in refinancing and restructurings, and other employees of CRG have been engaged in similar matters. CRG was retained by the above-captioned debtors and debtors-in-possession (the "Debtors") on or about June 29, 2010, to provide financial and restructuring advisory services to the Debtors, and subject to approval of this Court, I have been retained to serve as Chief Restructuring Officer of the Debtors.

3.    As a result of the work that I have done since CRG was retained, I am familiar with the day-to-day operations, business, and financial affairs of each of the Debtors, and I submit this declaration on behalf of each of the Debtors.

4.    On the date hereof (the "Petition Date"), each of the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee has been appointed in these cases.

5.    I submit this declaration (the "Declaration") in support of the Debtors' petitions for relief under Chapter 11 of the Bankruptcy Code and certain First-Day Pleadings (as defined below). All facts set forth in this Declaration are based upon my personal knowledge, information supplied or verified to me by other members of the Debtors' senior management or my colleagues, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.

6.     I have reviewed the Chapter 11 bankruptcy petitions filed by the Debtors, as well as the attachments thereto, and to the extent necessary and required, I declare under penalty of perjury that the information set forth therein is true and correct to the best of my knowledge, information, and belief.

7.     On the Petition Date, the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors have sought an order directing that their Chapter 11 cases be jointly administered by this Court, and they have filed additional motions (some of which seek emergency relief) in the proposed lead case of CB Holding Corp.

8.     The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee has been appointed in these cases.

The Debtors and Their Business

9.     CB Holding Corp., a Delaware corporation, is the direct or indirect corporate parent of all of the other Debtors. All of CB Holding Corp.'s outstanding common and preferred stock is privately held.

10.     The Debtors own and operate the *Charlie Brown's Steakhouse* ("Charlie Brown's"), *Bugaboo Creek Steak House* ("Bugaboo Creek"), and *The Office Beer Bar & Grill* ("The Office"). Charlie Brown's and Bugaboo Creek are steakhouses, offering their customers exceptional service, value, and fresh food, along with seasonal specialties, while The Office is more casual, offering over 60 bottled beers, seasonal draft beers, and classic pub appetizers and dining options.

11.     There are currently 20 Charlie Brown's restaurants in New York, New Jersey, and Pennsylvania; 12 Bugaboo Creek restaurants in Massachusetts, Delaware, Maryland,

3

New Hampshire, and Maine; and seven The Office restaurants in New Jersey. Shortly before the Petition Date, the Debtors closed 29 Charlie Brown's and 18 Bugaboo Creek restaurants.

12. The Debtors have approximately 185 full-timed salaried employees and more than 2,200 full-time and part-time hourly employees. None of the Debtors' employees are members of a union.

## Capital Structure

### *Secured Debt*

13. On June 21, 2007, in connection with the acquisition of Bugaboo Creek by Charlie Brown's, the Debtors entered into a financing agreement with Ableco Finance LLC ("Ableco"); Wells Fargo Capital Finance, Inc. (f/k/a Wells Fargo Foothill, Inc.) ("Wells"); and GMAC Commercial Finance LLC (n/k/a Ally Commercial Finance LLC) ("Ally" and collectively with Wells and Ableco, the "Senior Secured Lenders"), providing for a revolving line of credit, under which the Debtors may borrow up to an aggregate amount equal to the lesser of $15 million and a defined borrowing base with a letter of credit sublimit, and two tranches of term loans, all of which are secured by liens on substantially all of the Debtors' assets. As of the Petition Date, the Debtors had approximately $70 million outstanding under this facility.[2]

14. On September 28, 2008, the Debtors issued $10 million in senior subordinated second lien notes pursuant to a note purchase agreement to Trimaran Fund II, L.L.C.; Trimaran Parallel Fund II, L.P.; Trimaran Capital, L.L.C.; CIBC Employee Private Equity Fund (Trimaran) Partners; and CIBC Capital Corp. (collectively, the "Second Lien Lenders"). As of the Petition Date, approximately $14 million, including accrued and unpaid interest, was outstanding under these second lien notes.

---

[2] Specifically, the Debtors had approximately $6 million outstanding under the revolver, $12 million outstanding under Term Loan A, and $52 million outstanding under Term Loan B.

*Mezzanine Debt*

15. Also as part of the Bugaboo Creek acquisition, on June 21, 2007, the Debtors issued $20 million in unsecured, senior subordinated notes pursuant to four note purchase agreements to Kohlberg Capital Corporation; Archer Capital Master Fund, L.P.; Camofi Master LDC; Camhzn Master LDC; and Raven Credit Opp Master Fund Ltd. (collectively, the "Subordinated Lenders"). As of the Petition Date, the Debtors had approximately $30 million of mezzanine debt obligations, including accrued and unpaid interest, outstanding to the Subordinated Lenders.

Circumstances Leading to Filing

16. A variety of external factors have led to a decline in the Debtors' revenue over the last several years, at the same time that costs have increased. For instance, the restaurant industry has grown more competitive, the fast-food industry has improved their product offerings and increased its market share to the detriment of casual dining restaurants, such as the Debtors, and consumers have changed their ordering habits. In addition, the "Great Recession" has led to a decline in discretionary spending among the Debtors' former and current customers, and fewer families are frequenting restaurants while food and labor costs have increased, compounding the Debtors' distress.

17. Accordingly, for some time, the Debtors have been in discussions with their lenders and other parties regarding a financial restructuring, and they have entered into several amendments to their various credit and related facilities, but the Debtors' need for additional liquidity has not been resolved, and the economy has not improved. At this time, the only party willing to provide the Debtors with any funding is Ally, which has informed the Debtors that it is only willing to do so as a DIP loan in Chapter 11 cases where the Debtors

market their assets in anticipation of a global asset sale.

18. Thus, in an effort to maximize their value, the Debtors have entered into a DIP arrangement with Ally, and along with other first-day motions designed to ensure a smooth transition into Chapter 11, the Debtors intend to file a motion to approve a DIP financing arrangement and to attempt to sell substantially all of their assets expeditiously pursuant to Bankruptcy Code § 363.

Filing of First-Day Pleadings

19. I understand that the Debtors have filed the following motions and applications (collectively, the "First-Day Pleadings"), some of which seek fairly routine administrative, emergency relief, or "first-day" relief:[3]

*Routine and/or Administrative Relief Requested*:

    a. Debtors' Motion for Joint Administration; and

    b. Debtors' Application to Retain and to Employ the Garden City Group, Inc. as Claims, Notice, and Balloting Agent.

*Emergency Relief Requested*:

    a. Debtors' Emergency Motion for Order (i) Authorizing Payment of Pre-petition Payroll Obligations, (ii) Authorizing and Directing all Banks to Honor Pre-petition Checks for Payment of Pre-petition Payroll Obligations, and (iii) Prohibiting Banks from Placing Holds on, or Attempting to Reverse, Related Transfers.

*"First-Day" Relief Requested*:

    a. Debtors' Motion for Approval of Stipulation And Order (i) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001(C);

---

[3]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable motion or application.

b. Debtors' Motion for Interim and Final Orders Authorizing Them to Pay Pre-Petition Wages and Salaries and to Pay and Honor Pre-Petition Employee Benefits and Related Obligations;

c. Debtors' Motion for Order Authorizing Continued Use of Existing Bank Accounts, Cash Management System, and Checks and Business Forms;

d. Debtors' Motion for Authority to Pay Claims Under Perishable Agricultural Commodities Act;

e. Debtors' Motion for Interim and Final Orders Authorizing Payment of Pre-Petition Taxes and Liquor License Fees and Taxes;

f. Debtors' Motion for Interim and Final Orders Authorizing Them to Honor Certain Pre-Petition Customer Programs;

g. Debtors' Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services; and

h. Debtors' Motion for Interim and Final Orders Authorizing Payment of Pre-Petition Obligations to Critical Liquor Vendors.

**Routine and/or Administrative Relief Requested:**

Motion for Joint Administration

20. I have been advised that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of the Debtors.

21. I believe that joint administration of the Debtors' Chapter 11 cases will further the interests of judicial economy and administrative expediency by, among other things, obviating the need to file duplicate motions, enter duplicate orders, and forward duplicate notices to creditors and other parties-in-interest, which would result in unnecessary cost and expense and potential delay and inefficiency. I also believe that designating CB Holding, Inc., as the main bankruptcy case is appropriate because it is recognizable to the vast majority of creditors and other parties-in-interest, it is the direct or indirect corporate parent of the Debtors.

RLF1 3630063v 1

Debtors' Application to Retain and to
Employ the Garden City Group, Inc. as
Claims, Notice, and Balloting Agent

22.     It is my understanding that the Debtors have thousands of creditors and other potential parties-in-interest. Upon information and belief, the Office of the Clerk of the United States Bankruptcy Court for District of Delaware (the "Office of the Clerk") is not equipped to (a) distribute notices, (b) process all of the proofs of claim filed, and (c) assist in the balloting process. I believe that engaging an independent third party to act as an agent of the Court and the Clerk's Office is the most effective, efficient, and cost conscious manner by which to distribute notices, process proofs of claim, and perform other related administrative tasks for these cases.

23.     The Debtors seek to alleviate the demands placed on the Office of the Clerk by proposing the retention by the Debtors of the Garden City Group, Inc. ("GCG"). I believe that GCG is well qualified to serve in the capacity as claims, notice, and balloting agent and that GCG's retention is in the best interests of the Debtors' estate. I, along with other representatives of the Debtors, chose GCG based on both its experience and the competitiveness of its fees.

24.     Further, I believe that the rates to be charged by GCG for its services in these cases are competitive and are either at or below the rates charged by its competitors.

RLF1 3630063v 1

**Emergency Relief Requested:**

Emergency Motion for Order (i) Authorizing Payment of Pre-petition Payroll Obligations, (ii) Authorizing and Directing all Banks to Honor Pre-petition Checks for Payment of Pre-petition Payroll Obligations, and (iii) Prohibiting Banks from Placing Holds on, or Attempting to Reverse, Related Transfers

25.     Prior to the Petition Date, the Debtors issued (or began processing) checks and direct deposits in the total amount of approximately $1.460 million for payroll obligations (the "Pre-Petition Payroll") to current employees (collectively, the "Employees") and former employees (collectively, the "Former Employees") that were terminated in connection with the Debtors' closing certain restaurants in the week prior to the Petition Date. Many (if not all) of the checks, representing payment to approximately 65% of the Employees and the Former Employees that the Debtors are seeking authority to pay in connection with the Emergency Motion, were issued (or began processing) prior to the Petition Date, but have not yet been distributed to the Employees and the Former Employees because the Debtors typically distribute checks to employees on Thursdays (the day after the Petition Date).

26.     The Debtors are requesting authority to pay the Pre-Petition Payroll (as described in more detail in the Employee Wages Motion) to the Employees and the Former Employees. The Pre-Petition Payroll includes, but is not limited to, (a) all accrued and unpaid salaries, wages, and bonuses to the Employees and the Former Employees of approximately $846,884.13; (b) all withholdings (including amounts relating to taxes, the Debtors' 401(k) program, and any other amounts withheld in accordance with federal, state, or local law) to the applicable third-party of approximately $450,832.75; (c) any amounts included in the Debtors' payroll relating to employee benefits or insurance to the Employees and the Former Employees

9

of approximately $73,047.49; and (d) pro-rata accrued vacation to the Former Employees of approximately $89,469.10.

27.     The Debtors are also requesting that financial institutions be (a) authorized and directed to receive, process, honor, and pay all checks presented for payment and electronic payment related to the payroll obligations set forth above and (b) prohibited from placing any holds on, or attempting to reverse, any automatic transfers to the Employees' or the Former Employees' accounts for such payroll obligations.

28.     I believe that there is a significant risk that the Banks will not honor the pre-petition checks issued to the Employees and the Former Employees without an order of this Court approving at least some of the relief requested in the Employee Wage Motion and the Bank Accounts Motion, each described in more detail below. I further believe that the limited relief sought in the emergency motion is necessary in order to avoid the immediate and irreparable harm that would result if checks were bounced or transfers reversed.

**"First-Day" Relief Requested:**

Debtors' Motion for Approval of Stipulation And Order (i) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001(C)

29.     The Debtors have run out of sufficient available cash to operate their business, and they were unable to find any parties willing to provide necessary funding outside of a DIP loan in Chapter 11, without required concessions from various parties that such parties were unwilling to make. I believe that it is essential that the Debtors obtain post-petition financing to provide the necessary working capital and liquidity for a smooth transition into

10

Chapter 11 and to enable them to seek to maximize value and conduct an orderly marketing and sale process.

30. The Post-Petition Financing would allow the Debtors to continue to operate in the ordinary course, administer their estates, and conduct an expeditious and orderly going-concern sale process. Absent an immediate new source of cash and liquidity, not only would the Debtors' ability to maximize the value of their estates for the benefit of their creditors be jeopardized, but the Debtors may also be forced to shut down their operations and potentially need to liquidate their assets immediately.

31. After determining that it was necessary to commence these cases to obtain necessary funding and to market their business in an attempt to maximize the value of their assets, the Debtors and their professionals considered identifying potential sources of post-petition financing. Based on the circumstances and on discussions with various parties, the Debtors determined that adequate post-petition financing solely on an unsecured or a junior priority basis to the Senior Secured Lenders was not possible, and they are not aware of any significant unencumbered assets that a third-party lender would consider lending on, thereby making it impossible to obtain financing outside of Chapter 11.

32. Without access to necessary funding, I believe that the Debtors would be unable to operate their business in Chapter 11 and would be forced to liquidate immediately. Such a result would destroy the value of their business enterprise, to the detriment of all parties-in-interest.

33. I also believe that through the Post-Petition Financing, including the ability to use Cash Collateral in accordance therewith, the Debtors would be able to transition into Chapter 11 smoothly and begin an orderly marketing process to sell their assets. I believe

11

that the terms of the Post-Petition Financing are fair and reasonable under the circumstances, and entry into the Post-Petition Financing reflects a sound and prudent exercise of the Debtors' business judgment.

34.     I have been informed that the vast majority of the Debtors' assets are secured by the Senior Secured Lenders' first-priority liens, and because of the substantial amount of Pre-Petition Debt, I believe that obtaining new financing in the form of unsecured debt or by offering prospective lenders an administrative claim is not viable, especially from a third party with no existing interest or position in the Debtors to protect. Moreover, the Senior Secured Lenders would not agree to the Debtors' granting any senior or pari passu liens to a new third-party DIP lender, and any non-consensual attempt to prime the liens of the Senior Secured Lenders would be costly, distracting, and not likely to be successful, with potentially disastrous consequences for the Debtors and their estates. Nonetheless, the Senior Secured Lenders have consented to the priming of their liens and the Interim Order is entered.

35.     I believe that the Post-Petition Financing is necessary to preserve and maintain the value of the Debtors' estates and the collateral securing the Pre-Petition Facility to ensure a smooth transition into Chapter 11 and an orderly process to market the Debtors' assets. If the Debtors do not receive the additional liquidity to fund their ongoing operations as provided by the Post-Petition Financing, however, I believe that they may be forced to engage in a forced liquidation ("fire sale") of their assets, and in such a scenario, the Debtors' assets would in all probability be sold for minimal value, to the detriment of all parties-in-interest and foreclosing the possibility of any successful reorganization or going-concern sale of the Debtors.

36.     Given the Debtors' current circumstances, I believe that the Post-Petition Financing is fair and reasonable. The Debtors have made a concerted effort in good faith to

12

obtain credit on the most favorable terms available, and despite the Debtors' and their professionals' extensive efforts, no other lender was willing to provide a stand-alone facility to which the Senior Secured Lenders would consent. Obtaining such financing without consent would likely have resulted in an expensive, difficult, and distracting priming fight, as well as a similarly-contentious battle over the use of cash collateral at the outset of these cases. In view of such a potentially disastrous scenario, and the Debtors' immediate need for liquidity, I believe that the Post-Petition Financing best suits the Debtors' current and pressing need for new funding.

37.     I submit that the Adequate Protection, as proposed in the Interim Order, as it has been explained to me and as I understand it, is fair and reasonable and in accordance with Bankruptcy Code § 361(1) and (2), and I have been informed that the Senior Secured Lenders have agreed that it is sufficient for them to consent to the Debtors' use of Cash Collateral.

38.     After appropriate investigation and analysis, I have concluded that the Post-Petition Financing provides the best alternative available under the circumstances of these Chapter 11 cases to provide the Debtors a "soft landing" and the opportunity to function while marketing their assets for a going-concern sale.

Debtors' Motion for Interim and Final Orders
Authorizing Them to Pay Pre-Petition Wages
and Salaries and to Pay and Honor Pre-Petition
Employee Benefits and Related Obligations

39.     The Debtors generally participate in, or are obligated under, a number of different salary, wage, and benefit structures, programs, and plans. They are also obligated to pay bonuses, provide certain medical, short-term and long-term disability, life insurance and similar insurance, workers' compensation, and other related benefits to their employees. The Debtors have different payroll policies and benefits for their employees, and under various

13

structures, programs, and plans described below, the Debtors' employees are owed and have accrued various pre-petition payments and benefits that have not yet been paid or otherwise realized.[4]

40. For purposes of processing payroll, the Debtors treat their employees as if they are employed by either Charlie Brown's or by Bugaboo Creek. The Debtors pay their employees either by check or by direct deposit.

41. Those employees considered to be employed by Charlie Brown's for payroll purposes, which include all employees of Charlie Brown's and The Office, are either corporate-level and manager employees ("Charlie Corporate Employees") or hourly-wage restaurant workers or office employees ("Charlie Restaurant Employees"). Those employees considered to be employed by Bugaboo Creek for payroll purposes, which include all employees of Bugaboo Creek and corporate-level employees that came over from Bugaboo Creek after it was acquired by Charlie Brown's, are either corporate-level employees ("Bugaboo Corporate Employees"), management employees ("Bugaboo Management Employees"), or other hourly-wage restaurant employees ("Bugaboo Restaurant Employees").

42. In order to even out the effect of payroll on their cash flow, the Debtors pay their employees in one of two staggered, bi-weekly payroll cycles, except for employees in New York and Rhode Island, which states require employees to be paid weekly. Paychecks are issued every Thursday for the period ending the prior Sunday.

43. The Debtors utilize an external payroll processing service company, Ceridian Corporation ("Ceridian"), to facilitate their payroll. The yearly cost for this service is approximately $490,000, and as of the Petition Date, the Debtors owed approximately $25,000 to

---

[4] Many of the Debtors' restaurant employees earn less in wages than is required to satisfy all of their withholdings because their employees' major source of income is from tips. In such situations, the Debtors fund the deficiencies and then bill the employees

Ceridian.

*Salaries and Wages*

44.     The Debtors owe their employees salaries and wages for work performed pre-petition, including overtime that the Debtors are legally obligated to pay. As of the Petition Date, salaries and wages have accrued for pre-petition services on account of either seven or seventeen days, depending on the payroll cycle. I believe that, as of the Petition Date, the aggregate amount of salaries and wages (including such amounts owed to former employees that were terminated in the week prior to the Petition Date) that has accrued, but has not yet been paid or has not yet been presented for payment or cleared through the banking system, is approximately $1.847 million.

*Withholdings*

45.     In each payroll cycle described above, the Debtors withhold certain funds for the benefit of third parties. Specifically, the Debtors withhold federal, state, and/or local taxes, medical and health deductions, and other withholdings from the wages and salaries of their employees, as requested by their employees or required by federal, state, and local laws. The Debtors transfer these withheld funds to the appropriate parties or government agencies according to the payment schedules established thereby. I believe that, as of the Petition Date, the aggregate amount of funds withheld, and not yet transferred, is approximately $644,491.

46.     As of the Petition Date, under applicable orders requiring the withholding of child support, back-tax payments, or other garnishments, I expect that the Debtors to have withheld approximately $6,700 from employees' paychecks that has not yet been transferred or that has not yet been presented for payment or cleared through the banking system.

RLF1 3630063v 1

*Performance-Based Bonus Plans*

47. As part of their compensation package, the Debtors maintain, subject to individual approval by their chief executive officer, performance-based bonus plans for general managers and managers of Charlie Brown and Bugaboo Creek restaurants (the "Manager Bonus Plan").

48. To reward general managers and managers for superior performance, the Debtors offer monthly bonuses of 3% of actual controllable profit split between the management team if controllable profit exceeds the prior year by $1.00. In addition, if restaurant sales increase over the prior year, an additional .25% of controllable profit is added to the pool for each percentage point increase. These bonuses are payable within 35 days of the end of each month. As of the Petition Date, approximately $12,000 of payments on account of the Manager Bonus Plan has accrued but has not yet been paid.

49. Additionally, the Debtors provide referral bonuses of varying amounts, including manager recruiting bonuses of $1,000 and hourly employee recruiting bonuses of $100. These bonus amounts rarely exceed $3,000 per week, and as of the Petition Date, the Debtors estimate that there is approximately $3,000 of such bonuses that accrued pre-petition but have not yet been paid.

50. The Debtors also maintain a discretionary bonus plan for high-level Charlie Corporate Employees, high-level Bugaboo Corporate Employees, and regional managers, which is designed to provide annual incentive bonuses to management. This bonus plan is tied to the Debtors' financial and sales performance, and these bonuses have not been paid in several years. I do not anticipate that any payments under this bonus plan would become due during these cases, and to the extent any do, the Debtors will seek separate authority from the Court before making such payments.

16

*Contests*

51.     From time to time, the Debtors hold contests at their restaurants, whereby hourly team members and employees, such as waiters, kitchen staff, and managers, can win prizes based on sales, and I believe that some of these contests may be ongoing. These prizes generally do not exceed $2,000 in value, and occasionally, restaurant managers will run contests in individual restaurants where prizes are generally less than $100.

*Severance*

52.     The Debtors have certain severance agreements with various employees, but they do not have a formal severance policy. As of the Petition Date approximately $16,485 of severance amounts had accrued but has not yet been paid.

*401(k) Plan*

53.     The Debtors sponsor and administer a 401(k) savings plan (the "401(k) Plan"). Full-time employees that are over 21 years of age are eligible to participate after completing six months of continuous employment. Employees wishing to participate may enroll the immediate January or July after they become eligible. The Debtors withhold, at an eligible employee's request, up to 100% of such employee's annual, pre-tax pay for contribution to the 401(k) Plan (subject to applicable limitations imposed by the Internal Revenue Code). Historically, the Debtors matched employees' contributions, but the Debtors suspended their matching program in April 2008.

54.     The 401(k) Plan is administered by The Newport Group, with assets held by Mid Atlantic Trust Company ("Mid Atlantic Trust"). The Debtors send a payroll report to Mid Atlantic Trust weekly, and when appropriate, Mid Atlantic Trust makes an ACH withdrawal from the Debtors' payroll account. For these services, and others, the Debtors pay The Newport Group and Mid Atlantic Trust fees funded by employee withholdings. As of the Petition Date, I

17

believe that there are no amounts outstanding on account of such fees.

55.   I also believe that the aggregate amount of funds withheld under the 401(k) Plan prior to the Petition Date that have not been withdrawn by Mid Atlantic Trust should not exceed $38,949, including funds withheld for repayment of permitted loans made to employees under the 401(k) Plan.

*Reimbursement of Expenses*

56.   In the ordinary course of business, the Debtors reimburse employees for payment of out of pocket expenses attributable to their employment with the Debtors. Employees are required to submit expense reimbursement forms and copies of applicable receipts for review and approval.

57.   As of the Petition Date, certain employees may not yet have submitted expense reimbursement requests, or such requests may have been made but not yet processed. It is my understanding that the amount of employee expenses accrued prior to the Petition Date but not yet reimbursed is approximately $25,000.

*Vacation and Sick Days*

58.   Certain employees are eligible for paid sick days, based upon their employment status and subject to the Debtors' policy. Employees also accrue paid vacation based on their length of continuous service with the Debtors and based on their employment classification (i.e., whether one is a Charlie Corporate Employee, a Charlie Restaurant Employee, a Bugaboo Corporate Employee, a Bugaboo Management Employee, or a Bugaboo Restaurant Employee). Unused vacation time at the end of the fiscal year September 30 may not be carried over into the following year.

59.   Charlie Corporate Employees, Bugaboo Corporate Employees, and Bugaboo Management Employees earn paid vacation after their first full year of employment, as

18

follows:

    a.    employees with one to four years of service are entitled to two weeks of vacation;

    b.    employees with five to nine years of service, are entitled to three weeks of vacation;

    c.    employees with 10 to 20 years of service are entitled to four weeks of vacation; and

    d.    employees with more than 21 years of service are entitled to five weeks of vacation.

During the first year of employment, after six months of continuous service, Charlie Corporate Employees, Bugaboo Corporate Employees, and Bugaboo Management Employees are entitled to certain paid vacation, up to a maximum of two weeks.

60.    Charlie Restaurant Employees are eligible for up to two weeks of paid vacation after completing a full year of continuous service, and Bugaboo Restaurant Employees are eligible for one week of paid vacation after completing two years of continuous service. The first year of vacation is earned based on when the employee commenced his or her employment.

61.    As of the Petition Date, the Debtors have accrued approximately $2.0 million on account of unused sick and vacation days for their employees. Approximately $640,000 is outstanding for unpaid sick days, which are lost by employees if they are not used (or cease employment), and the remainder is for unpaid vacation days, which amounts are generally paid to employees when they cease employment with the Debtors.

62.    The prorated amount of accrued but unpaid vacation days for employees that were terminated prior to the Petition Date is approximately $135,000 (including certain related taxes).

Employee Insurance Plans and Programs

63.    As described below, the Debtors offer various insurance plans and

programs. For instance, the Debtors provide various health insurance plans and programs for their employees:

a.  *Medical Insurance*: the Debtors provide medical benefits and prescription drug coverage for their employees through a medical insurance plan (the "Medical Plan") with Horizon Blue Cross Blue Shield of New Jersey ("Blue Cross"). Full-time employees that are regularly scheduled to work at least 30 hours per work week and their dependents are eligible for enrollment in the Medical Plan, and eligible employees contribute based on their status as employees and the coverage they elect (i.e., single, spouse, or family coverage). Charlie Corporate Employees, Bugaboo Management Employees, and Bugaboo Corporate Employees are eligible to purchase additional medical coverage at their own expense. In connection with the Medical Plan, the Debtors pay a monthly premium to Blue Cross of approximately $400,000, with a portion of such amount funded through employee contributions, the last payment having been made on October 26, 2010, for coverage for the month of October 2010.

b.  *Alternate Medical Coverage*: the Debtors also offer medical benefits through Aetna SRC ("Aetna SRC") for Charlie Restaurant Employees and Bugaboo Restaurant Employees that do not qualify for the Medical Plan because they are not full-time employees. This plan is funded entirely by electing employees, and as of the Petition Date, approximately $7,000 has been withheld but not paid to Aetna SRC on account of this plan and all other plans provided by Aetna SRC, as described below.

c.  *Dental Insurance*: the Debtors also provide dental insurance to their employees through an employer-sponsored plan with Aetna Life Insurance Company ("Aetna"). The Debtors pay Aetna approximately $25,000 per month as a premium for this coverage, and eligible employees contribute based on their status and the coverage they elect. Approximately $44,750 accrued prior to the Petition Date, but has not yet been paid.

d.  *Vision Plan*: the Debtors provide vision insurance to electing employees through an employer-sponsored "Eye Care" plan underwritten by Fidelity Life Insurance Company ("Fidelity"). The Debtors pay Fidelity approximately $3,500 per month as a premium for this coverage, and eligible employees contribute based on their status and the coverage they elect, approximately $6,500 has been withheld but not paid to Fidelity on account of the Eye Care plan.

RLF1 3630063v 1

e.  *Travel Insurance*: the Debtors have special travel accident insurance for Charlie Corporate Employees that are injured or may need medical coverage on an emergency basis while traveling. The Debtors pay approximately $4,000 annually for this coverage.

f.  *COBRA Benefits*: pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "COBRA"), the Debtors offer eligible former employees the opportunity to continue insurance coverage under the Debtors' then-existing medical and dental plans. Eligible former employees who elect to participate in COBRA are entitled by law to insurance coverage for up to 18, 29, or 36 months. COBRA participation is managed by Cobraserve through Ceridian, which charges a 2% service fee that is collected from the participating former employee (along with the cost of the COBRA coverage). COBRA payments vary based on the number of former employees electing coverage. The last payment made by the Debtors was for $719.40 in October 2010.

g.  *Flexible Spending Plan*: the Debtors offer a flexible spending plan that allows participating employees to have the Debtors withhold, on a pre-tax basis, amounts for reimbursement of eligible medical care expenses and dependent care expenses, up to limits set by the Internal Revenue Service. Approximately 52 employees participate in the Debtors' flexible spending plan. As of the Petition Date, I believe that approximately $21,070 has been withheld from employees that has not yet been reimbursed.[5]

h.  *Employer-Funded Flexible Spending*: as part of certain employees' compensation package, the Debtors contribute to their flexible spending account, which is treated as part of such employees' gross compensation. As of the Petition Date, I believe that that approximately $1,600 in company contributions to flexible spending accounts accrued prior to the Petition Date but has not yet been paid.

64.  In addition, the Debtors provide various life and disability insurance plans for their employees and mandatory workers' compensation coverage:

a.  *Life Insurance*: the Debtors provide all employees with life and accidental death and dismemberment insurance with coverage up to twice their compensation, with a maximum benefit of $500,000, at no cost. The Debtors also offer their employees the opportunity to purchase supplemental and dependent life insurance. This

---

[5]  Ceridian administers the Debtors' flexible spending plan as part of the payroll services it provides to the Debtors.

coverage is provided through Metropolitan Life Insurance Company ("Met Life") and Boston Insurance Employee Benefit Trust ("BIEBT"), and each employee's share of the costs, when applicable, is based on the status of the employee and the coverage elected. The aggregate average monthly premium that the Debtors pay to Met Life and BIEBT to provide these benefits (as well as all other benefits provided by Met Life and BIEBT described below) is approximately $6,500 and $7,700 respectively.

b. *Short-Term Disability Insurance*: the Debtors provide short-term disability insurance to all of their employees in New York, New Jersey, and Pennsylvania through Zurich American Insurance Company ("Zurich") funded by monthly payroll deductions. The average quarterly premium that the Debtors pay to Zurich is approximately $4,000 for coverage in New York and approximately $41,000 for coverage in New Jersey and Pennsylvania. Because there are Bugaboo Creek Restaurants located outside of New York, New Jersey, and Pennsylvania, the Debtors provide all employees of Bugaboo Creek other than those employed in the tri-state area required short-term disability insurance through Met Life or Aetna SRC, at the employees' election, funded by monthly payroll deductions. All of the Debtors' employees may purchase additional short-term disability insurance through Aetna SRC.

c. *Long-Term Disability Insurance*: the Debtors offer long-term disability insurance coverage through Met Life to Charlie Corporate Employees, Bugaboo Corporate Employees, and Bugaboo Management Employees. Charlie Corporate Employees are automatically enrolled, and Bugaboo Corporate Employees and Bugaboo Management Employees are given the option to elect coverage, except where required by state law. Premiums for this policy are funded by payroll deductions.

d. *Workers' Compensation*: under the laws of the various states in which they operate, the Debtors are required to provide their employees with workers' compensation coverage for injuries occurring in the course of their employment with the Debtors. The Debtors are self insured for workers' compensation, and they maintain a policy (the "Workers' Compensation Policy"), which has a $250,000 retention limit for catastrophic claims through ACE American Insurance Company. The Workers' Compensation Policy has a six-month term that expires, unless renewed, on December 18th and June 18th of each year. The Debtors' current estimated annual premium is approximately $300,000 under the Workers' Compensation Policy, and as of the Petition Date, there were no premiums outstanding. The Debtors provide letters of

credit that act as a "back stop" to the insurer to secure unpaid losses under the Workers' Compensation Policy should the Debtors be unable to fund these losses.

*Other Benefits*

65.    The Debtors provide eligible employees with various other benefits that may have accrued prior to the Petition Date but have not yet been paid by the Debtors. Such benefits include paid time off for jury duty, military leave, and bereavement periods; tuition reimbursement;[6] participation in the "Shoes for Crews" program;[7] and discount cards for eligible employees.[8] As of the Petition Date, the Debtors estimate that they owe approximately $19,456 for such other benefits that accrued prior to the Petition Date but that were not paid.

66.    Certain of the Debtors' executive and management level employees are entitled to leased cars under the terms of their employment. The Debtors currently lease 25 cars, with aggregate monthly lease payments of approximately $13,750. To offset the costs of these leased cars, the Debtors withhold a certain amount from eligible employees' pay as an "auto fringe" based on personal use and magnitude of the lease payment, allowing the Debtors to recoup approximately $750 per month. Instead of receiving a leased car from the Debtors, 5 corporate and management level employees receive monthly car allowances, totaling approximately $2,950 per month.

67.    I believe that failure to grant the relief requested would severely undermine the morale of the Debtors' employees, which is at a very sensitive stage, and employees are being asked to commit much of their time and energy to the Debtors' efforts in Chapter 11, including their attempt to conduct an orderly sale process to maximize value for all

---

[6]    At this time, no employees are participating in the Debtors' tuition reimbursement program.
[7]    The Shoes for Crews program allows Charlie Restaurant Employees to purchase appropriate kitchen shoes through payroll deductions. The employee orders shoes, and the Debtors are billed, and for any amount over $30, the Debtors withhold payments from the applicable employee's paycheck.
[8]    Discount cards allow certain employees to purchase food at the Debtors' restaurants at a 30%-50% discount.

23

parties. Accordingly, allowing the Debtors to pay their employees and to continue to honor employee obligations for all continuing employees will not harm the Debtors or their estates, but will instead bolster the morale of their employees and contribute to a smooth transition to Chapter 11 and the sale process.

Debtors' Motion for Order
Authorizing Continued Use of
Existing Bank Accounts, Cash
Management System, and
Checks and Business Forms

68. The Debtors have a number of bank accounts (collectively, as described below, the "Accounts") that they use in the ordinary course of business to enable them to manage their cash and to meet their obligations in a timely and efficient manner. All of the Accounts are in the name of debtor Charlie Brown's Acquisition Corp.

*Depository, Operating, and Local Accounts*

69. Every night, at the close of business, the managers of most of the Debtors' restaurants deposit daily receipts into an account maintained at Bank of America (account number 004146041962, the "Depository Account"). Although the Debtors' restaurants are located throughout the United States, the managers are generally able (with exceptions discussed below) to make nightly deposits at nearby Bank of America branches.

70. The Depository Account is swept daily into an operating account also maintained at Bank of America (account number 003812670395, the "Operating Account"). The balance in the Operating Account is typically less than $1 million, and it rarely exceeds $2 million, on a given day.

71. Due to various restaurant policies, and because certain restaurants are not located in the proximity of a Bank of America branch, the Debtors also maintain local accounts at other banks:

24

a.  account number 2000001210729 with Wachovia/Wells Fargo (the "Wachovia Account");

b.  account number 9012378896 with PNC Bank (the "PNC Account");

c.  account number 4240935796 with TD North Bank (the "TD North Account"); and

d.  account number 0538283334 with Metro Bank (the "Metro Account").[9]

72.     Both the Wachovia Account and the PNC Account are depository accounts. Any balance in the Wachovia Account is swept nightly into the Operating Account, and any balance in the PNC Bank Account is electronically transferred weekly into the Operating Account. The TD North Account is a checking account, and checks are written on a weekly basis to transfer any balance in the TD North Account to the Operating Account. It is my understanding that the deposits in any of these local accounts never exceed $60,000 prior to being moved to the Operating Account.

*AP, Payroll, and Sales Tax Accounts*

73.     To fund its operations, the Debtors write checks and send wires from two accounts: an accounts payable disbursement account (account number 000080252223, the "AP Account") and a payroll account (account number 000080252231, the "Payroll Account"). Both the AP Account and the Payroll Account are maintained at Bank of America, and they are funded from the Operating Account, when necessary. The Debtors maintain a $10,000 balance overnight in the AP Account, and due to prefunding requirements for payroll and other employee benefits, larger balances remain in the Payroll Account, but only for the particular day that funds

---

[9]     The Metro Account has a balance of $0.00, and the Debtors will likely seek to close the Metro Account.

are required. Prior to the Petition Date, approximately $1.460 million[10] was transferred from the Operating Account to the Payroll Account to fund the Debtors' payroll.[11]

74.    The Debtors also maintain a state sales tax trust fund account at Bank of America (account number 381023399239, the "Sales Tax Account"). Funds are transferred to the Sales Tax Account from the Operating Account and are kept in the Sales Tax Account until they become due. Sales tax withholdings are then returned to the Operating Account when due to be submitted to the applicable taxing authority. Prior to the Petition Date, the Debtors transferred $1,442,000 of sales taxes collected to such account.

*Liquor Accounts*

75.    Pennsylvania, Maryland, Maine, New Hampshire, and Delaware require that liquor (whether it be beer, alcohol, or both) be paid for at the time of delivery. Accordingly, the Debtors opened checking accounts with Bank of America (collectively, the "Liquor Accounts") to permit store managers for restaurants in those states to write checks to pay for liquor upon delivery, in satisfaction of these requirements. Each of the Liquor Accounts is funded from the Operating Account, when necessary, and generally does not contain more than $6,000.[12]

76.    I believe that authorizing the Debtors to continue to use their existing Accounts is essential to a smooth transition into Chapter 11 and to avoid disruption to the

---

[10]    Certain of these funds may have already been withdrawn by third-parties in connection with processing of the payroll.

[11]    On the Petition Date, the Debtors filed an emergency motion seeking authority, among other things, to pay all pre-petition wages, salary, and other benefits that accrued pre-petition. Should the Court grant that motion but deny the relief requested in this Motion, the Debtors could be forced to re-issue checks to employees or deal with interruptions to payments the Debtors deposit directly into their employees' accounts.

[12]    On the Petition Date, the Debtors filed an emergency motion seeking authority, among other things to pay their liquor vendors. Should the Court grant that motion but deny the relief requested in this Motion, the Debtors could be forced to re-issue checks to their liquor vendors and may be unable to obtain liquor from such vendors post-petition.

Debtors' business. For instance, the Debtors' employees would suffer great hardship if the Debtors were compelled to substitute a new debtor-in-possession payroll account, which could cause delays, confusion, and disruption of payments (including with respect to checks relating to the current payroll that have been issued but not cashed) that would adversely affect employee morale. Similar consequences could result if the Debtors had to change accounts used by their vendors or suppliers during these cases.

77. It is my understanding that opening all new bank accounts would be specifically burdensome on the restaurant managers in areas where Bank of America branches are not convenient. The cost and burden associated with opening new accounts in such areas and then changing procedures to transfer those funds to the Operating Account greatly outweigh any benefit that could be received therefrom, and any delay in transferring deposits from those accounts could be devastating to the Debtors' business.

78. In addition, it is my understanding that if forced to replace their existing business forms, the Debtors would need to spend a substantial amount of time and money printing new business forms and stationery, which would disrupt the Debtors' ordinary business affairs and interrupt the normal payment of wages, salaries, and necessary supplies.

**Debtors' Motion for Authority to Pay Claims Under Perishable Agricultural Commodities Act**

79. Prior to the Petition Date, certain creditors sold agricultural goods, such as fruits and vegetables, to the Debtors that may be covered by PACA. Specifically, these goods might either (a) constitute "perishable agricultural commodities" under PACA or (b) be protected under similar state statutes.

80. It is my understanding that that certain of the Debtors' produce vendors could file claims under PACA and state statutes and that such PACA Claims could amount to

27

approximately $370,000.

81.    I believe that preservation of the Debtors' relationships with their produce suppliers is critical because of the nature of the Debtors' business (the Debtors are particularly known for the salad bars in their restaurants) and competition among similar restaurants. Any disruption, however minor, in the shipment of fruits and vegetables could cripple, and would at least hinder, the Debtors' transition to Chapter 11 and attempt to conduct an orderly sale process to maximize value for all parties.

**Debtors' Motion for Interim and Final Orders Authorizing Payment of Pre-Petition Taxes and Liquor License Fees and Taxes**

82.    In connection with the normal operation of their business, the Debtors collect and/or accrue sales and use, income, personal property, real estate, and other taxes (including such taxes accrued prior to the Petition Date, as described in detail below, the "Pre-Petition Taxes") either from their customers and other parties on behalf of, and for payment over to, taxing authorities, or for direct payment. Additionally, the Debtors incur local taxes and fees related to their liquor licenses and liquor sales (collectively, the "Liquor License Fees and Taxes") that must be promptly paid by the Debtors to maintain their liquor licenses. For many of the taxes and other fees and charges described herein, it is likely that only a portion are pre-petition obligations of the Debtors.

83.    The Debtors are subject to periodic normal course of business audits to assess any unpaid taxes that they may owe, and accordingly, they need authority to pay any sales and use taxes that accrued pre-petition including any additional amounts determined to be owed at a later time. I am told that in the various states in which the Debtors operate, failure to pay the Pre-Petition Taxes could result in the Debtors' forfeiting necessary business licenses, losing the ability to conduct business, or being subject to tax liens, and similarly, failure to pay the Liquor

28

License Fees and Taxes could result in the suspension or revocation of their liquor licenses.

*Sales and Use Taxes*

84.     The Debtors collect sales and use taxes in all states in which they conduct business, and they pay over such collected taxes when they come due to the appropriate taxing authorities in such states. As discussed in more detail in the Debtors' motion for an order authorizing the continued use of their existing bank accounts, cash management system, and checks and business forms filed contemporaneously herewith, the Debtors maintain a sales tax trust fund, and approximately $1,442,000 of sales taxes collected is currently held in such account. Depending on the state, these taxes are either paid by check or by electronic fund transfer. In most states, the Debtors perform quarterly "true-ups", and occasionally, they owe additional amounts in connection therewith.

*Estimated Income Taxes*

85.     Additionally, certain of the Debtors pay federal estimated income taxes and similar quarterly taxes in New Jersey, New York, Pennsylvania, Connecticut, Georgia, Rhode Island, Massachusetts, Maryland, Maine and New Hampshire, and in the city of Philadelphia.

86.     The Debtors generally pay these estimated taxes quarterly. Approximately $21,500 of the estimated quarterly payment (and extensions) were incurred prior to the Petition Date, but have not yet been paid. In addition, the Debtors occasionally owe additional amounts when they file their actual, year-end tax returns. In certain states, the Debtors do not owe any estimated taxes because they either (a) incurred losses during the applicable period or (b) possess net operating losses to offset any taxable income.

29

*Personal Property Taxes*

87.     Moreover, certain of the Debtors pay personal property taxes to state and local taxing authorities. Approximately $20,830 of the personal property taxes were incurred prior to the Petition Date, but have not yet been paid.

*Real Estate Taxes*

88.     Furthermore, the Debtors pay real estate taxes to state and local taxing authorities in connection with certain of their leases. Approximately $344,000 of the real property taxes may have been incurred prior to the Petition Date, but have not yet been paid.

*Liquor License Fees and Taxes*

89.     The Debtors also incur Liquor License Fees and Taxes in various states, and they periodically remit such taxes and fees to the appropriate state and local authorities. To avoid having their liquor licenses lapse, the Debtors pay the Liquor License Fees and Taxes as they come due. I do not believe that there are any Liquor License Fees and Taxes that accrued prior to the Petition Date that have not yet been paid.

90.     Finally, the Debtors may have incurred other tax obligations, such as yearly minimum corporate taxes and other business licensing fees that are not yet reflected on their books and records.

91.     It is my understanding that if they fail to pay certain of the taxes, the Debtors could potentially be restricted from doing business in certain states, with dire effects on their ability to transition smoothly into Chapter 11 and conduct an orderly sale process to maximize value for all parties. Indeed, if the Debtors were unable to pay the Liquor License Fees and Taxes, appropriate authorities could cancel, revoke, or suspend the Debtors' liquor licenses, which would prevent the Debtors from purchasing and selling liquor, at great harm to the Debtors' estates.

92. I am also told that, failure to pay the Pre-Petition Taxes or Liquor License Fees and taxes when due may result in one or more of the taxing or other governmental authorities auditing the Debtors, commencing a similar investigation, or obtaining a lien on certain of the Debtors' assets or property. Audits and/or investigations would unnecessarily divert the Debtors' attention away from the sale process and their attempts to maximize value. Similarly, if a taxing authority were to obtain a lien on any of the Debtors' assets or properties, it would prevent the Debtors from using that property or asset and could result in a taxing authority attempting to sell such property or asset, causing an unnecessary distraction during these critical times and diverting the Court's attention from these cases.

**Debtors' Motion for Interim and Final Orders Authorizing Them to Honor Certain Pre-Petition Customer Programs**

93. Continuing customer relationships have been a crucial component of the Debtors' restaurant business, especially in this difficult and extremely competitive time. To maintain such relationships and a sufficient level of satisfaction among their customers, and to grow their customer base, the Debtors issued and honored coupons and gift cards, and they established loyalty programs, whereby customers could earn coupons and other discounts.

*Coupons*

94. The Debtors regularly issue and honor coupons that are distributed separately, along with newspaper (and other) advertisements, and via other methods (including those distributed by e-mail and mail) to motivate customers to frequent their various restaurants. These coupons provide for discounted meals, specials on new or existing items, and other discounts, and it is essential that the Debtors be permitted to continue to honor coupons that were issued prior to the Petition Date.

31

*Gift and Other Cards*

95.    The Debtors sell gift cards, which are akin to gift certificates, that individuals can purchase for gifts or for their own use in restaurants. These gift cards, which do not have any set expiration date, are treated the same as cash, and there are many gift cards outstanding that were purchased prior to the Petition Date.

96.    I am told that approximately $3.8 million in gift cards had been issued but not yet processed for payment.

97.    Occasionally, it is necessary for Charlie Brown's to issue to customers "SFG Cards" (or "satisfaction guaranteed cards") in response to complaints or in efforts to increase sales at particular restaurants. Many of these cards, which do not expire and which are akin to coupons, were issued prior to the Petition Date but have not yet been processed.

98.    On average, the Debtors issue approximately $5,000 in SFG cards in any given month. It is my understanding that as of the Petition Date, approximately $10,000 in SFG Cards had been issued but not yet redeemed.

*Loyalty Programs*

99.    Charlie Brown's features three loyalty programs called "The HandShake Club", the "Pub Club", and the "Creek Club" (each a "Club", and collectively, the "Clubs") which award members points for each dollar spent, exclusive of tax and tip. When 300 points are accumulated, the member is sent two $10 coupons, which expire if the member does not use such coupon at least once in a twelve month period. Members of the Clubs also regularly receive special coupons on their birthdays and the anniversaries of joining a Club and receive other updates, information, and specials via mail or e-mail.[13]

---

[13]    Birthday and anniversary coupons are for $10 and expire three months after being issued. In calendar year 2009, approximately 800,000 birthday coupons and approximately 129,000 anniversary coupons were issued.

100.    Many members of the Clubs have accumulated points prior to the Petition Date, and there are coupons issued prior to the Petition Date that will be presented thereafter. I believe that approximately $300,000[14] in coupons are outstanding. For accounting purposes, the Debtors recognize an unredeemed points liability of approximately $705,000.

*Party Deposits*

101.    The Debtors require a small deposit of approximately $100-$200 for large parties and banquets (each a "Party Deposit", and collectively, the "Party Deposits"). The Debtors do not have a formal cancellation policy. However, to ensure customer satisfaction, the Debtors typically return a Party Deposit if an event is cancelled. I believe that, as of the Petition Date, the Debtors hold approximately $16,000 of the Party Deposits.

*Credit Card Processing*

102.    The Debtors are parties to certain agreements with credit card processing companies which enable them to accept credit card and debit card payments, subject to certain adjustments, returns and promotional fees and refunds. On average, a processing fee of approximately 2-5% applies to each credit card and debit card transactions. The Royal Bank of Scotland ("RBS") and JP Morgan Chase & Co. ("Chase") bill the Debtors for processing fees in arrears. RBS bills the Debtors at the end of each month, and Chase bills the Debtors at the end of each day.

103.    As of the Petition Date, approximately $94,000 remains outstanding with respect to RBS and Chase pre-petition credit card processing fees. All other processing fees are retained by the respective credit card or debit card processing company at the time of the transactions, and as such, the Debtors do not owe any pre-petition amounts in respect thereof.

104.    At a time of already diminished sales, many of the Debtors' customers are

---

[14]    For accounting purposes, and based on budgeted food costs, the Debtors recognize this as a liability of only approximately $135,000.

likely evaluating whether the filing of these cases should cause them to stop eating at the Debtors' restaurants or to frequent other restaurants. I believe that it would be in the Debtors' best interest to assuage any fears of their customers by minimizing the effects of these cases on them, and these efforts would be thwarted if they could not honor pre-petition coupons, gift cards, loyalty points, and credit and debit cards. I further believe that, in such a situation, the Debtors' customers could immediately choose to go elsewhere, or could have their coupons, gift cards, or credit and debit cards were rejected, and then later choose to dine at another restaurant, to the obvious detriment of the Debtors and their estates.

Debtors' Motion for Entry of Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured or Payment, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment

105. In connection with the operation of their business and management of their properties, the Debtors obtain electricity, water, sewer, telephone, communications, and other similar services (collectively, the "Utility Services") from the Utility Companies".

106. The Debtors, which currently operate 39 restaurants in the Northeast and the South, depend on the Utility Companies to provide necessary services to keep their restaurants running and operational. Any interruption in the Utility Services undoubtedly would cause the Debtors' restaurants to close until such Utility Services were restored, and the Utility Services are thus clearly essential to the Debtors' business operations and, therefore, must continue uninterrupted during the Debtors' Chapter 11 cases

107. To provide additional assurance of payment for future services to the Utility Companies, the Debtors propose to provide adequate assurance of payment, in the form of

34

a cash deposit in an amount equal to the approximate aggregate cost of two weeks of utility service for the Utility Companies, calculated as a historical average, normalized for the Debtors' current projected operations, which would aggregate to approximately $187,006.86, deposited into a newly-created, segregated account.

108. I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for adequate assurance. Without the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Companies in a disorganized manner at a critical period in these Chapter 11 cases and during a time when the Debtors' efforts could be more productively focused on the continuation of the Debtors' operations for the benefit of all parties-in-interest.

Debtors' Motion for Interim and Final
Orders Authorizing Payment of Pre-Petition
Obligations to Critical Liquor Vendors.

109. Like any restaurant, the Debtors offer diners a wide range of liquor options, not only with their meals, but also in bars located in their restaurants. The Debtors' bar business is not only crucial to its operations because of the favorable margin on alcoholic beverages, but also because the Debtors' bar business increases the sale of other items in their restaurants. I suspect that if the Debtors lost the ability to provide alcoholic beverages with meals, many diners would choose to visit other restaurants.

110. It is my understanding that certain states (upon information and belief, Pennsylvania, Maryland, Maine, New Hampshire, and Delaware) require that liquor (whether it be beer, alcohol, or both) be paid for at the time of delivery, and the Debtors' practice has been to provide sufficient cash to store managers to pay for liquor in cash upon delivery or to pay for liquor by check. If the Debtors cannot continue this practice, including with respect to pre-

35

petition amounts that the Debtors may have inadvertently neglected to pay (or, alternatively, that were paid by pre-petition check that may not have cleared), they would not be able to provide alcoholic beverage options to customers in the particular states.

111.    I am concerned that many of the Debtors' liquor suppliers, may refuse to provide services to the Debtors going forward absent payment of their pre-petition claims, with obvious collateral ramification to the Debtors' business and harm to the Debtors' estates.

112.    I submit that these outstanding amounts, not more than $25,000, are modest in the context of these cases, especially considering the potential harm if the Debtors were not permitted to pay these Critical Liquor Vendor Claims.

[remainder of page intentionally left blank]

RLF1 3630063v 1

Dated: November 18, 2010

/s/ Gary Lembo
Gary Lembo

RLF1 3630063v 1