## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-13683 (MFW) |
| | ) | Jointly Administered |
| Debtors. | ) | **(Proposed) Obj. Deadline: 12/29/10 at 10:00 a.m.** |
| | ) | **(Proposed) Hearing Date: 12/29/10 at 12:30 p.m.** |

## DEBTORS' MOTION FOR ORDERS: (I)(1) APPROVING FORM OF "STALKING HORSE" ASSET PURCHASE AGREEMENT WITH VILLA ENTERPRISES LTD., LLC, FOR SALE OF SUBSTANTIALLY ALL ASSETS COMPRISING THE OFFICE BEER BAR & GRILL AND ASSUMPTION AND ASSIGNMENT OF CERTAIN RELATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (2) APPROVING SALE PROCEDURES AND FORM, MANNER, AND SUFFICIENCY OF NOTICE; AND (3) SCHEDULING AN AUCTION SALE AND A HEARING TO CONSIDER APPROVING HIGHEST AND BEST OFFER; (II) AUTHORIZING THE

---

[1] The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc. (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc. (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc. (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc. (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp, LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc. (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc. (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc. (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc. (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc. (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc. (4776); Jonathan Seagull Property Corp. (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc. (3131); The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc. (3126); and What's Your Beef V, Inc. (4719). The Debtors' address is 1450 Route 22 West, Mountainside, NJ 07092.

**SALE OF SUCH ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE; (IV) AUTHORIZING THE DEBTORS TO CONSUMMATE ALL TRANSACTIONS RELATED TO THE ABOVE; AND (V) GRANTING OTHER RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned attorneys, hereby submit this motion (the "Motion") for entry of orders, pursuant to Bankruptcy Code §§ 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1, for entry of (i) a procedures order, among other things, (a) approving certain bidding and sale procedures and scheduling a competitive auction (the "Auction") in connection with the sale of those of the Debtors' assets (collectively, the "Assets") comprising The Office Beer Bar & Grill business (the "Business") and the assumption and assignment of certain related executory contracts (the "Assumed Contracts") and unexpired leases (the "Assumed Leases," and together with the Assumed Contracts, the "Assumed Agreements"); (b) authorizing the Debtors to enter into an asset purchase agreement (the "Agreement," a copy of the latest draft of which is attached hereto as Exhibit A)[2] with Villa Enterprises Ltd., LLC ("VEM" or the "Proposed Buyer"), in connection therewith and subject to the terms and conditions thereof; (c) authorizing the Debtors to offer certain bid protections to the Proposed Buyer; (d) scheduling a sale hearing (the "Sale Hearing") to consider entry of an order approving the sale of the Assets to the Proposed Buyer or any other party submitting a higher or better offer at the Auction; and (e) approving the form and manner of notice of the Sale Hearing (the "Sale Notice") (the relief requested in items (i)(a), (b), (c), (d), and (e) is referred to herein as the "Initial Relief"), and (ii) an approval order, (1) authorizing and approving the

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. As discussed further below, the Debtors and the Proposed Buyer have not yet finalized the Agreement, but are working to resolve any remaining open issues. The Debtors would file a copy of the Agreement, once executed, as far in advance of the Sale Procedures Hearing as possible.

2

Agreement with the Proposed Buyer or such other purchaser providing a higher or otherwise better offer for the Assets, as approved by this Court at the Sale Hearing; (2) authorizing the Sale free and clear of all liens, claims, encumbrances, and other interests; (3) authorizing the assumption and assignment of the Assumed Agreements in connection with the Sale; (4) authorizing the Debtors to consummate all transactions related to the above; and (5) granting other relief.

In support of the relief requested herein, the Debtors respectfully represent as follows:

## FACTUAL BACKGROUND

1.      As described further below, the Debtors commenced these cases following a lengthy period in which they attempted, but ultimately proved unable, to achieve an internal restructuring of their finances and operations. Ally (as defined below), the Debtors' debtor-in-possession financing lender, has provided the Debtors with funding to enable the Debtors to attempt to sell their assets as a going concern in order to maximize the value thereof, conditioned upon the sales of various assets by certain specific dates.

2.      The relief requested herein -- namely, the approval of the sale of one of their operating divisions, The Office Beer Bar & Grill (the "Sale") -- represents the Debtors first such proposed going-concern sale. Because the order approving the Debtors' DIP financing establishes a deadline for the Debtors to obtain this Court's approval of the Sale, such Sale is crucial not only to preserve and maximize the value of the particular Assets and Business relating to The Office, but also of the Debtors' other assets by avoiding a "fire sale" liquidation thereof as a result of a potential default under their debtor-in-possession financing.

3.      Furthermore, as the Debtors' primary secured and unsecured creditor constituencies have reached an agreement-in-principle regarding the distribution of the net

3

proceeds from the Sale (as embodied in the Final DIP Order (as defined below)), it is supported by both the official committee of unsecured creditors appointed in these cases (the "Committee"), Ally, and the Debtors' other primary secured lenders.

4.     Moreover, the Debtors are concerned that, given their well-documented and ongoing liquidity and other concerns (as described further below) that precipitated the filing of these cases, any delay in consummating a sale of the Assets in a timely manner will lead to a marked decline in the value thereof.   Instead, because the Debtors and their advisors have already marketed the Assets in question (both pre-and post-petition, and indeed have recently conducted an informal "mini-auction" that has already resulted in a substantial increase in the purchase price), the Debtors believe that the Sale (which contemplates a further public auction, after allowing other potential purchasers to conduct due diligence) will serve to maximize the value thereof.

5.     Accordingly, because the Sale represents a sound exercise of their business judgment and is otherwise in the best interests of their estates and creditors, the Debtors hereby request that this Court grant its approval thereof, as well as of the related requested relief.

## JURISDICTION

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.   Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

4

## INTRODUCTION[3]

7.     On November 18, 2010 (the "Petition Date"), the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On November 19, 2010, this Court entered an order directing the joint administration of the Debtors' separate Chapter 11 cases.

8.     The Debtors continue to manage their properties and operate their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in these cases. On December 1, 2010, the United States Trustee appointed the Committee.

9.     The Debtors own and operate the *Charlie Brown's Steakhouse* ("Charlie Brown's"), *Bugaboo Creek Steak House* ("Bugaboo Creek"), and *The Office Beer Bar & Grill* ("The Office"). There are currently 20 Charlie Brown's restaurants in New York, New Jersey, and Pennsylvania; 12 Bugaboo Creek restaurants in Massachusetts, Delaware, Maryland, New Hampshire, and Maine; and seven The Office restaurants in New Jersey.

10.    A variety of external factors have led to a decline in the Debtors' revenue over the last several years, at the same time that costs have increased, and the economy has struggled, greatly impacting the Debtors' customer base. Accordingly, for some time, the Debtors have been in discussions with their lenders and other parties regarding a financial restructuring.

11.    Prior to the Petition Date, the only party willing to provide the Debtors with necessary funding to continue operations and to work toward a restructuring was Ally Commercial Finance LLC (f/k/a GMAC Commercial Finance LLC) ("Ally"), one of the

---

[3]     A more detailed description of the Debtors, their corporate and capital structure, and these cases is set forth in the various motions and other pleadings filed by the Debtors on or about the Petition Date, copies of which can be obtained by visiting www.cbhinfo.com.

5

Debtors' pre-petition senior secured lenders, which was only willing to do so as a DIP loan in Chapter 11. In an effort to maximize their value, the Debtors commenced these cases and entered into a DIP arrangement with Ally, and during these cases, the Debtors intend to attempt to market and sell substantially all of their assets expeditiously pursuant to Bankruptcy Code § 363.

12.    Specifically, this Court approved the Debtors' DIP arrangement with Ally on an interim basis pursuant an order entered on November 19, 2010 (Docket No. 48), and on a final basis pursuant an order entered on December 13, 2010 (Docket No. 177) (the "Final DIP Order"). The Final DIP Order requires that this Court enter an order approving the Sale of the Assets by January 20, 2011.

13.    In addition, as discussed further below, the Final DIP Order also reflects an agreement-in principle between the Committee, Ally, and the other Lenders regarding the allocation of the net proceeds of the Sale, providing that the Debtors' unsecured creditors will be guaranteed a portion thereof (which will increase if the ultimate sale price exceeds that set forth in the Agreement). Thus, the Sale and the Auction process will directly inure to the benefit of both the Debtors' secured and general unsecured creditors, and therefore, they have the support of all primary creditor constituencies.

## SUMMARY OF RELIEF REQUESTED

14.    Pursuant to Bankruptcy Code §§ 105, 363, and 365, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors hereby seek entry of the following orders:

(a)    an order, substantially in the form annexed hereto as <u>Exhibit B</u> (the "Sale Procedures Order") granting the Initial Relief, including, among other things:

(i)    authorizing the Debtors to enter into the Agreement with the Proposed Buyer, subject to the terms and conditions thereof;

6

(ii)     authorizing and approving certain bidding protections, including an expense reimbursement fee, and setting deadlines, requirements, and other procedures for the Sale and Auction process (collectively, and as more fully set forth herein, the "Sale Procedures");

(iii)     scheduling (1) the Auction for the Assets to be held prior to the Sale Hearing and (2) the Sale Hearing;

(iv)     establishing the relevant objection deadlines; and

(v)     approving the form and manner of notice of the Sale, the Auction, and the Sale Hearing, among other things; and

(b)     an order, substantially in the form annexed hereto as <u>Exhibit C</u> (the "Approval Order"), among other things:

(i)     authorizing and approving the Agreement by and between certain of the Debtors, as sellers (in such capacity, the "Sellers"),[4] and the Proposed Buyer or such other entity submitting a higher or otherwise better offer, as purchaser, as approved by this Court at the Sale Hearing;

(ii)     authorizing and approving the Sale of the Assets pursuant to the Agreement to the Proposed Buyer or such other entity submitting a higher or otherwise better offer, free and clear of all liens, claims, encumbrances, and other interests other than the liabilities to be assumed by the Proposed Buyer;

(iii)     authorizing and approving the assumption and assignment of the Assumed Agreements to the Proposed Buyer or such other entity submitting a higher or otherwise better offer; and

(iv)     granting other related relief.

---

[4]     The Sellers are Charlie Brown's Inc.; The Office at Bridgewater, Inc.; The Office at Cranford, Inc.; The Office at Montclair, Inc.; The Office at Morristown, Inc.; The Office at Ridgewood, Inc.; and The Office at Summit, Inc. Charlie Browns Mark Corp. is also a party to the Agreement solely as to any Assigned Intellectual Property.

RLF1 3749758v. 1

**THE PROPOSED SALE AND RELATED TRANSACTIONS,**
**AND SUPPORT FOR APPROVAL OF THE REQUESTED RELIEF**

THE ASSET PURCHASE AGREEMENT[5]

A.      Multiple Effective Transfer Dates and the
        Intellectual Property License Agreement.

15.     To address potential timing issues regarding a buyer's obtaining consent from the various local New Jersey authorities for the transfer of the Liquor Licenses and other related issues, the Agreement is structured as a series of seven potential separate asset transfers -- i.e., one for each of the seven Restaurant properties being sold that comprise the Business. Thus, a transfer with respect to a particular Restaurant and the related leases and assets would occur the day after a Restaurant is classified as a "Transferable Restaurant"[6] (each such date, an "Effective Transfer Date").

16.     The total cash consideration the Proposed Buyer is providing is $3.4 million, consisting of a 10% deposit the Proposed Buyer will provide upon the execution of the Agreement in the amount of $340,000 (the "Deposit"), and the Proposed Buyer's funding the remaining $3.06 million amount into an escrow account (the "Escrow") upon the Effective Transfer Date of the First Transferable Restaurant (the "Initial Effective Transfer Date"). A designated amount of cash would be remitted from the Escrow to the Debtors upon each of the

---

[5]     The following description of the terms of the Agreement is intended solely to provide a brief overview thereof, and to highlight those material terms and provisions required to be so pursuant to Bankruptcy Rule 6004 and/or Local Bankruptcy Rule 6004-1. Parties should refer to the Agreement (both in the form attached hereto as Exhibit A and in its final form when that is filed) for the complete and detailed terms thereof. In the event of any inconsistencies between such summary and the Agreement (as it is finalized), the latter shall govern.

[6]     Under the Agreement, a Transferable Restaurant is "a Restaurant that satisfies all conditions to the obligations of the Parties to consummate the sale and transfer of such Restaurant or has been granted a waiver of such conditions (other than conditions with respect to actions the respective Parties shall take at the Final Effective Transfer Date), including, but not limited to, all necessary approvals of the Bankruptcy Court, and counsel to [the Proposed Buyer] having confirmed that all necessary approvals have been given to the assignment of the Liquor License related to that Restaurant." See the Agreement, § 2.02(a).

seven Effective Transfer Dates. Such amounts range from $2.3 million being remitted following the first such Effective Transfer Date; $200,000 following the second through the sixth Effective Transfer Dates; and the remaining $100,000 would be transferred following the seventh and final Effective Transfer Date (the "Final Effective Transfer Date"). See the Agreement, § 2.02.

17.     The Debtors' ownership of the Intellectual Property would be transferred to the Proposed Buyer upon the first Effective Transfer Date. See the Agreement, § 1.01(h). Also, after the first Effective Transfer Date, the Debtors would continue to operate the remaining six Restaurants in question until they were also individually transferred in accordance with the foregoing schedule, and be entitled to retain all of the profits therefrom until the applicable Restaurant was actually transferred to the Proposed Buyer. Id. at § 6.03. Accordingly, as discussed below, the Debtors and the Proposed Buyer would enter into the Intellectual Property License Agreement, which will provide in substance that (i) following the Initial Closing Date, the Proposed Buyer will grant to the Sellers separate royalty-free licenses for each untransferred Restaurant to all Assigned Intellectual Property (each a "Restaurant Intellectual Property License"), (ii) each Restaurant Intellectual Property License will terminate upon the Closing Date of the Restaurant associated therewith, and (iii) if the Agreement is terminated by the Proposed Buyer, each Restaurant Intellectual Property License then outstanding will last for a term of 16 months following the Final Closing Date, be fully transferable by the Sellers, and be royalty-free. Id. at §§ 1.01(h) and 8.03(c).

B.     The Assets

18.     Pursuant to the terms of the Agreement, the Proposed Buyer would acquire the Assets, which, among other things, consist of the following assets of the Sellers (but excluding

9

the Excluded Assets) for the particular Restaurant in question as of each of the various Effective

Transfer Dates:

(i)  all inventory of food, non-alcoholic beverages, alcoholic beverages (only to the extent transferable under applicable Law), paper products, cooking supplies, and cleaning supplies used or held for use in the operation of each Restaurant on its applicable Effective Transfer Date;

(ii)  all fixtures, furniture, and equipment, used or held for use (whether at each Restaurant, in storage, or in transit) in the operation of each Restaurant on its applicable Effective Transfer Date, including but not limited to tables, chairs, smallwares, signs, lights, ornaments, decor, collectibles, appliances, computers, tools, machinery, display cases, shelves, cabinets, racks, bars, bar equipment, and any desktop and laptop personal computers that are used in the operation of each Restaurant on its applicable Effective Transfer Date. The Sellers will also transfer to the Proposed Buyer all of the unexpired warranties for this equipment when such equipment is transferred;

(iii)  all of the Sellers' interests in and to all the Assumed Leases (which are the Leases set forth in Section 1.01(c) of the Disclosure Schedule to the Agreement) on the applicable Effective Transfer Date of each Restaurant to which the underlying Assumed Lease pertains, including all of the Sellers' interests in any tenant improvements, fixtures, easements, rights of way, and other appurtenances related to such Assumed Lease;

(iv)  all of the Sellers' rights, privileges, and claims under the Assumed Contracts, which are all Contracts of the Sellers relating to each Restaurant to the extent assignable in accordance with their terms and applicable Law, on each applicable Effective Transfer Date of such Restaurant;

(v)  all of the Sellers' Liquor Licenses used in the operation of each Restaurant set forth in Section 1.01(e) of the Disclosure Schedule to the Agreement (the "Assigned Liquor Licenses") transferred on the applicable Effective Transfer Date of such Restaurant;

(vi)  all of the Sellers' Permits relating to each Restaurant that, under applicable Law, the Sellers may transfer to the Proposed Buyer (the "Assigned Permits") on the applicable Effective Transfer Date of such Restaurant;

(vii)  except as set forth in Section 1.01(g) of the Disclosure Schedule to the Agreement, all books, records, correspondence, advertising and promotional materials, marketing information, operating manuals, training manuals, recipes, menus, business reports, customer lists and databases, studies, and pricing information relating exclusively to, or used exclusively in, the operation of the Business, and the right to use, but not exclusively, and a copy of the documentation of, all shared recipes used in connection with the operation of the Restaurants and other businesses of the Sellers; any recipes used exclusively in the Business would be transferred on an exclusive basis and the Sellers will not use such recipes after the last Effective Transfer Date; provided, however, that the Sellers would have the right to retain copies

of any portions of such materials that relate to the Business or any of the Assets as operated and used by the Sellers prior to the applicable Effective Transfer Date.

(viii) all Intellectual Property Rights used by the Sellers exclusively in connection with the Business set forth on Section 1.01(h) of the Disclosure Schedule to the Agreement, including all goodwill associated therewith, to the extent assignable in accordance with applicable Law (the "Assigned Intellectual Property") upon the Initial Effective Transfer Date; provided that the Sellers would be granted a license to use such Intellectual Property in connection with each Restaurant that is not yet transferred to the Proposed Buyer pursuant to the terms and conditions of a licensing agreement which is to be executed at the Initial Closing Date by the Proposed Buyer and the Sellers in accordance with, and as provided for by, the Agreement (the "Intellectual Property License Agreement");

(ix) Cash on hand at each Restaurant on the applicable Effective Transfer Date; and

(x) all assets of every kind and nature related, in whole or in part, to each Restaurant on its applicable Effective Transfer Date.

See the Agreement, § 1.01.

19. In general, the Proposed Buyer would not be acquiring any assets, records, permits, licenses, rights, or contracts of the Debtors that do not relate to the Business. Also, the Agreement details the Excluded Assets that the Proposed Buyer would not be acquiring in connection with the Sale, which include, among other things: all avoidance actions under Chapter 5 of the Bankruptcy Code; all bank accounts and the amounts on deposit therein, and any cash or cash equivalents related to the Business other than the cash on hand at each of the Restaurants on its applicable Effective Transfer Dates; all accounts receivable; all of the Sellers' Permits related exclusively to the Business, but not transferable to the Proposed Buyer under applicable Law; all Liquor Licenses used exclusively in the operation of the Restaurants that, under applicable Law, may not be transferred to the Proposed Buyer; all rights, privileges and claims under shared contracts that (i) are not transferable or (ii) relate to businesses other than the Business; all insurance policies (except as otherwise provided in Section 7.01 of the Agreement with respect to proceeds); all corporate records and other documents, books, records,

11

customer lists and databases not relating exclusively to the Business (except as otherwise provided in Section 1.01(g) of the Agreement), and any books and records related to the Sellers' employees the transfer of which would conflict with any confidentiality or privacy obligation of the Sellers under applicable Law, and all books and records listed in Section 1.01(g) of the Disclosure Schedule to the Agreement; all Tax Returns, Tax records, and any other Tax-related work papers and documentation; all properties, capital stock, claims, Contracts, goodwill, and assets and rights of any nature relating to any extent to any business conducted by the Sellers other than the Business; all rights under the Transaction Documents; all Intellectual Property Rights used in whole or in part in connection with businesses of any Seller or its Subsidiaries, other than the Business, including computer software not used exclusively in connection with the Business and computer software used at the Restaurants to report or communicate with other Seller locations and any licenses of Intellectual Property Rights (including software licenses) that are not assignable pursuant to applicable Law; all employee benefit plans and assets relating thereto; all Leases other than the Assumed Leases; all claims for refunds of Taxes and any other Tax assets; all deposits (other than security deposits covered by Clause 1.01(m) of the Agreement) made exclusively in connection with the Assets or the Business, including escrows relating to liquor purchases, and any prepaid expenses incurred exclusively in connection with the Business including prepaid utilities and any amounts deposited or prepaid with respect to Assumed Contracts, Assumed Leases, Assigned Permits, and Assigned Liquor Licenses; and all Contracts that are not Assumed Contracts. See the Agreement, § 1.02.

  C.  The Consideration to be Provided by the Proposed Buyer; the Good Faith Deposit

  20.  As consideration for the sale of the Assets, the Proposed Buyer has agreed to pay to the Sellers an aggregate purchase price (the "Purchase Price") of $3.4 million, consisting of

12

the Deposit and the remainder payable in cash into the Escrow on the Initial Effective Transfer Date, subject to certain adjustments. Such amounts would be released from the Escrow in the time and manner described above. See the Agreement, §§ 2.01(a) and 2.02.

21.     The Proposed Buyer would also pay to the Sellers (i) the amount of cash on hand at each Restaurant on the applicable Effective Transfer Date that is transferred to the Proposed Buyer pursuant to Section 1.01(k) of the Agreement, payable in cash on such applicable Effective Transfer Date; plus (ii) the cost of all Inventory in the each Restaurant on the applicable Effective Transfer Date, payable in cash seven days following such Effective Transfer Date (collectively, and together with the Purchase Price, the "Consideration"). Id.

22.     The Proposed Buyer has provided the Deposit in the amount of $340,000, representing 10% of the Purchase Price, which is currently being held in the Escrow. The Deposit would be applied to the Purchase Price in the event the Proposed Buyer becomes the Successful Bidder. See the Agreement, § 2.01(e).

23.     The Sellers and the Proposed Buyer would share various payment obligations relating to rent, utility charges, taxes, liquor license renewal fees, and other charges, as described in greater detail in the Agreement (collectively, the "Pro-Rated Payments"). In general, all such payments would be allocated to the Sellers for the period prior to the applicable Effective Transfer Date, and to the Proposed Buyer for the period from and after the applicable Effective Transfer Date. See the Agreement, § 1.05.

24.     In addition, the Proposed Buyer would assume the Assumed Liabilities, which include: all obligations of the Sellers to be performed under each Assumed Lease, other than obligations arising from acts, omissions, and/or breaches prior to the Effective Transfer Date of the underlying Restaurant related to such Assumed Lease, accruing from and after each Effective

13

Transfer Date of the underlying Restaurant related to such Assumed Lease; all obligations of the Sellers to be performed under each Assumed Contract accruing from and after the transfer of such Assumed Contract; all obligations of the Sellers to be performed under each Assigned Liquor Licenses accruing from and after transfer of such Assigned Liquor License; all obligations of the Sellers to be performed under the Assigned Permits accruing from and after the transfer of such Assigned Permit; all obligations remaining under (i) the Gift Cards, (ii) the Pub Club Rewards Program, and (iii) all coupons and promotional offers outstanding as of the Initial Effective Transfer Date; and all obligations of the Proposed Buyer under its pro rata portion of the Pro-Rated Payments set forth in Section 1.05 of the Agreement and the Transfer Taxes under Section 12.06(a) thereof. See the Agreement, § 1.03.

25.    The Excluded Liabilities that the Proposed Buyer would not assume or otherwise become liable for, include, among other things, any liabilities or obligations with respect to Taxes other than any Taxes specifically allocated to the Proposed Buyer under the Agreement; any accrued quarterly bonus associated with any employee benefit plan; any liability under Leases, Contracts, or Permits of the Sellers that are not validly assumed and assigned to the Proposed Buyer or under which the Proposed Buyer is not provided benefits; any intercompany debt or any third-party debt of the Sellers; any liability or obligations relating to, resulting from or arising out of occurrences of or claims by current or former employees or third parties for personal or bodily injury or death or property damage (including any workers' compensation claim) incurred prior to the applicable Effective Transfer Date; any liability arising out of or relating to (i) any products manufactured or sold or any services provided by any Seller prior to the applicable Effective Transfer Date or (ii) the business or operations of any Seller prior to the applicable Effective Transfer Date, including any warranty, product liability, or other claim; any

14

liability arising out of or relating to the Excluded Assets; except as otherwise provided in Section 1.05 of the Agreement, any liability for accounts payable of the Sellers as of the applicable Effective Transfer Date; and any other liabilities or amounts owed to employees pursuant to any 401K or other profit sharing or retirement plans. See the Agreement, § 1.04.

        D.     Termination of the Agreement, the
             Termination Deadline, and Other Deadlines

26.     Section 9.01 sets forth the instances in which the Agreement may be terminated. Among other things, the parties may mutually agree to terminate the Agreement. See the Agreement, § 9.01(a).

27.     The Proposed Buyer would also be able to terminate the Agreement (i) in the event the Sellers have breached any covenant contained therein in any material respect, the Proposed Buyer has notified the Sellers of the breach, and the breach has continued without cure for a period of five business days after such notice, (ii) if the Sale Procedures Order (inclusive of approving the Expense Reimbursement Fee ), or as otherwise acceptable in the sole discretion of the Proposed Buyer, has not been entered by this Court on or before January 3, 2011, (iii) after the Termination Deadline of June 15, 2011, by reason of the failure of any condition precedent under Article VIII of the Agreement (unless the failure results primarily from the Proposed Buyer's breaching any representation, warranty, or covenant contained in the Agreement), or (iv) if the Approval Order as acceptable in the sole discretion of the Proposed Buyer, shall not have been entered by this Court on or before January 20, 2011, except as otherwise extended, or if the effectiveness of the Approval Order shall have been modified, reversed, vacated, stayed, restrained, dissolved, or enjoined. See the Agreement, § 9.01(b).

28.     The Debtors would be able to terminate the Agreement (i) in the event the Proposed Buyer has breached any covenant contained in the Agreement in any material respect,

15

the Sellers have notified the Proposed Buyer of the breach, and the breach has continued without cure for a period of five business days after the notice thereof or (ii) after the Termination Deadline, by reason of the failure of any condition precedent under Article VIII thereof (unless the failure results primarily from a Seller's breaching any representation, warranty, or covenant contained in the Agreement). Id. at § 9.01(c).

29.     In addition, if by the Termination Deadline the approval for the transfer to the Proposed Buyer of all Liquor Licenses and Assumed Leases shall not have been obtained, the Agreement will terminate; provided that the Termination Date will automatically extend for successive 30-day periods if the Proposed Buyer is working in good faith to obtain the approval for the transfer of the Liquor Licenses and the Assumed Leases. At any point following the Termination Deadline, the Proposed Buyer may then terminate the Agreement and its obligations thereunder in respect of each such Restaurant, by giving written notice to the Sellers and to the Escrow Agent. The Escrow Agent would then release from escrow and pay to the Proposed Buyer, in the manner described by the Escrow Agreement, an amount equal to the amounts that would have been transferred under Section 2.02 (g) of the Agreement if the Restaurant(s) had been deemed Transferable Restaurant(s). Id. at § 9.01(d).

E.     Agreements with the Debtors' Management

30.     The Debtors are not presently aware of any specific agreements that the Proposed Buyer has discussed or entered into with the Sellers' current management or key employees regarding compensation or future employment following the Sale. Specifically, the Agreement provides that the Proposed Buyer "will not assume any obligations or liabilities pertaining to the employees' employment with Sellers." See the Agreement, § 6.08.

16

31.     However, the Agreement does provide that the Proposed Buyer "will have the right but not the obligation to hire Sellers' employees after they have been terminated by Sellers." As a result, the Debtors are hopeful that the Proposed Buyer may hire certain of the Sellers' employees and/or current members of management, under whatever terms and conditions these parties may happen to negotiate on an individual basis (which the Debtors presume would be fair and reflect current market rates of compensation in the Debtors' industry).

32.     Moreover, the fact that the Debtors' investment banker advisor, Raymond James & Associates, Inc. ("RJ"), and the Debtors' restructuring advisors, CRG Partners Group, LLC ("CRG") have each been deeply involved in structuring the Sale and the amount and terms of the consideration to be provided by the Proposed Buyer, combined with the fact that such proposed consideration has already been (as evidenced by the fact that the Debtors have, to date, engaged in extensive negotiations with the Proposed Buyer as well as another potential bidder, which has already resulted in a higher Purchase Price) and will further be put to a market test by virtue of any higher and better offers the Debtors may receive at the Auction, ensures the fairness of the Sale, regardless of whether any members of the Sellers' current management or employees are ultimately employed by the Proposed Buyer following the consummation of the Sale.

F.     Use of Proceeds

33.     The Debtors anticipate that the Sale proceeds received from the Proposed Buyer or such other party that submits the highest or otherwise best offer or offers at the conclusion of the Auction, would be utilized in a manner consistent with the terms of the Final DIP Order, as the Approval Order provides that the Debtors' estates will retain the Office Resolution Consideration (as defined in the Final DIP Order) and the remainder of the net Sale proceeds will

be wire transferred to Ally from the Escrow upon each applicable Effective Transfer Date, to satisfy the Debtors' obligations under their DIP financing.

G. Record Retention

34. As noted above, the Assets include all books and records that are used exclusively in the operation of the Business. See the Agreement, § 1.01.(g). However, the Sellers would have the right to retain copies of any portions of such materials that relate to the Business or any of the Assets as operated and used by Sellers prior to the Final Effective Transfer Date, id., and retain one hard copy as well as electronic copies of Business Confidential Information provided to the Proposed Buyer in order to comply with applicable Law or regulation or to comply with policies consistent with past practices. Id. at § 6.10(b)(ii). Also, the Excluded Assets include all corporate records and other books and records not relating exclusively to the Business. Id. at § 1.02(i).

35. Moreover, the Agreement expressly provides that, for a period of three years following the Final Closing Date,[7] the Proposed Buyer "shall permit representatives of [the] Sellers to have reasonable access at reasonable times, and in a manner so as not to interfere with the normal operations of [the Proposed Buyer's] businesses, to any books or records included in the Assets as may reasonably be required by Sellers in connection with any audits, investigations, regulatory filings (including filings with the Securities and Exchange Commission), or other legal compliance." Id. at § 6.04(c).

36. Accordingly, the Debtors submit that they should have reasonable access to their books and records after the Final Closing Date to enable them to administer these cases.

---

[7] The Agreement defines the "Final Closing Date" as "the Closing of the last Transferable Restaurant prior to termination of the Agreement; provided that if the Closing is not for the Seventh Transferable Restaurant, then the Final Closing Date will be considered the Termination Date."

18

H.    Avoidance Actions

37.    The Agreement does not contemplate the sale to the Proposed Buyer of potential avoidance actions under Chapter 5 of the Bankruptcy Code. Instead, such causes of action are amongst the Excluded Assets under Section 1.02(s) of the Agreement that would remain property of the Debtors' estates.

I.    Requested Findings as to Successor Liability

38.    The proposed Approval Order contemplates certain findings as to successor liability. See Approval Order, ¶¶ I, 20, and 21. As set forth in additional detail herein, the Sale contemplates the transfer of the Assets free and clear of all Liens, and the Debtors submit that the Sale satisfies the applicable requirements of Bankruptcy Code § 363(f) or otherwise for being free and clear of such claims, including any claims relating to successor liability. As such, the findings set forth in the Approval Order as to successor liability comply with applicable principles of sales free and clear of such claims pursuant to Bankruptcy Code § 363(f) or otherwise.

J.    Relief Under Bankruptcy Rule 6004(h)

39.    For the reasons set forth herein, the Debtors request relief from the 14-day stay imposed by Bankruptcy Rule 6004(h). As noted above, the Agreement provides that the Proposed Buyer may terminate the Agreement following the Termination Deadline, and the Debtors will need to act as quickly as possible following this Court's entry of the Approval Order to being proceeding towards the various Effective Transfer Dates. See the Agreement, § 9.01(b).

40.    Accordingly, legitimate business reasons justify this Court's approval of an order waiving the requirements of Bankruptcy Rule 6004(h).

19

K.    The Expense Reimbursement Fee and Other Bidding Protections

41.    Since early September 2010, the Debtors, with the assistance of RJ and CRG, have engaged in an extensive campaign to market the Assets and the Business. Specifically, the Debtors and their advisors (a) generated a list of well in excess of 100 possible purchasers/investors, contacted those parties to determine their interest level, and sent all interested parties an information package on the Business, (b) negotiated and arranged for the execution of confidentiality agreements with several of such parties, (c) participated in multiple management conference calls and presentations to several such parties, (d) provided access to additional diligence materials to several such parties upon request, including access to an on-line data room, (e) provided facility and other tours to several of such parties, and (f) responded to questions and additional due diligence requests. It is anticipated that additional parties may also be contacted and, if interested, those parties would also execute confidentiality agreements and commence their due diligence. Notably, Ally and the other Lenders have generally been kept apprised of this process throughout.

42.    The Proposed Buyer has submitted the highest and best offer for the Assets to date. Accordingly, the Debtors elected to pursue the Agreement with the Proposed Buyer, subject to higher and better offers at the Auction and the approval of this Court.

43.    As a result of this lengthy and already highly competitive marketing and bidding process to date,[8] the Debtors believe that the bid of the Proposed Buyer as embodied in the Agreement (the "Initial Bid") represents the highest and otherwise best offer so far received for

---

[8]    In that regard, as noted above, the Debtors and their advisors have also engaged in substantial negotiations with another party prior to executing the Agreement with the Proposed Buyer, which gave rise to a mini-auction that resulted in a material increase in the Purchase Price set forth therein. The Debtors are hopeful that such other party will continue to participate in the Auction process described herein.

the purchase of the Assets. The Debtors thus believe that it is otherwise fair and reasonable and appropriate to proceed with this Initial Bid under the circumstances.

44.     Nonetheless, the Debtors are hopeful that there may be other bidders willing to provide higher or otherwise better offers for the Assets. Thus, and as is customary with transactions of this nature, the Debtors have determined that it is in the best interests of their estates to subject and expose the Proposed Buyer's offer to further competing bids (each, a "Competing Bid") at the Auction pursuant to the Sale Procedures set forth below and on Exhibit D hereto.[9]

45.     The Proposed Buyer has consented to subject the Initial Bid to higher and better offers and to participate in the Auction as the initial bidder or "stalking horse", subject to certain terms and conditions. Such terms and conditions include certain provisions related to bidding protections (collectively, the "Bidding Protections") in favor of the Proposed Buyer. See the Agreement, § 9.04; Exhibit D. The Debtors believe that the Bidding Protections are appropriate under the circumstances, balancing (a) the Debtors' interest in having a baseline minimum price, in order to ensure the highest and best net result for the Debtors' estates, with (b) protecting the substantial investment made and to be made by the Proposed Buyer in eventually entering into the Agreement in terms of both time and money (including, without limitation, the costs of its due diligence, financing, and professional advisors).

---

[9]     The Agreement provides that it is "subject to the approval of the Bankruptcy Court and higher and better offers at the Auction[.]" See the Agreement, p. 1.

(a) <u>Payment of the Expense Reimbursement Fee</u>

46. In the event that this Court authorizes an Alternative Transaction[10] prior to any termination of the Agreement by either party (which transaction may be due to a third party making a higher or better offer than Proposed Buyer's offer), then at the earlier of (i) the point in time in which the Sellers actually receive at least $2.5 million in proceeds from the closing of such Alternative Transaction and (ii) the second closing of such Alternative Transaction, the Sellers would pay to the Proposed Buyer the sum of $200,000, which amount is inclusive of any (a) fees and expenses incurred by the Proposed Buyer in connection with the Agreement or any of the transactions contemplated thereunder, (b) the preparation and negotiation of the Agreement and related documents, (c) legal fees and costs incurred by the Proposed Buyer in connection with the collection of these amounts, and (d) a break-up fee for participating as the "stalking horse bidder" (collectively, the "Expense Reimbursement Fee"). <u>See</u> the Agreement, § 9.04.

47. The Proposed Buyer would not be obligated to document any of its fees or expenses or to establish that its actual fees and expenses are or will be equal to the Expense Reimbursement Fee or any other minimum amount. The Expense Reimbursement Fee would be paid in cash from the proceeds of, and upon the closing of any such Alternative Transaction or as otherwise ordered by this Court. The Expense Reimbursement Fee would be paid as, and constitute an administrative expense of, the Sellers under Bankruptcy Code §§ 503(b)(1) and 507(a)(2). <u>Id.</u>

---

[10] The Agreement defines an "Alternative Transaction" as "any sale or transaction relating to the acquisition of the Business or portion thereof, or the Assets (other than the sale of Inventory in the ordinary course of business); provided that in each case a majority of the Assumed Leases is acquired whether directly or indirectly, through purchase, merger, consolidation, or otherwise."

22

(b)     Other Bidding Protections

48.     As described further below, the Debtors propose that the Sale Procedures Order be required to contain a provision requiring that any party submitting a Competing Bid (such party, a "Competing Bidder") provide an earnest money deposit in the same percentage as the Proposed Buyer's (i.e., 10% of the Competing Bidder's proposed purchase price) and otherwise be on terms substantially similar to the terms of the Proposed Buyer's Deposit.

49.     Similarly, the Debtors request that such order set forth the minimum amount of any Initial Competing Bid (as defined below) of not less than $3,650,000 (including an agreement to pay at least $2.5 million on the Initial Effective Transfer Date). Such minimum amount would consist of the $3.4 million Purchase Price set forth in the Agreement with the Proposed Buyer, plus $200,000 (representing the Expense Reimbursement Fee), plus at least $50,000 (representing an initial minimum overbid).

50.     In addition, any Qualified Bidder's offer may not be subject to any due diligence or financing contingency and would be irrevocable until two business days after the Initial Effective Transfer Date of the sale of the Assets, whether or not to such Qualified Bidder.

L.     The Sale Procedures[11]

51.     In order to evaluate appropriately Competing Bids and ensure an orderly auction process that serves to maximize the value of the Assets, the Debtors submit that it is necessary to establish certain uniform sale and bidding procedures (including, without limitation, the Bidding Protections set forth above). Exhibit D hereto sets forth the Debtors' proposed Sale Procedures

---

[11]     The following description of the Sale Procedures is intended to serve as a summary thereof, in accordance with the requirements of Local Bankruptcy Rule 6004-1(c) that such provisions be highlighted. In the event of any inconsistencies between such summary and the Sale Procedures set forth on Exhibit D hereto, the latter shall govern.

in detail, and the proposed Sale Procedures Order provides that except as otherwise set forth therein, "any competing bid must conform to, and comply with" these procedures.

52. Specifically, the Debtors propose that the Auction of the Assets be conducted generally on the following terms and conditions:

(a) The Debtors, through their investment banker advisor, RJ, would afford any party that executes an appropriate confidentiality agreement and demonstrates, to the satisfaction of the Debtors, the financial wherewithal to consummate a purchase of the Assets and that is interested in making a bid to purchase the Assets, such due diligence access or additional information as may be reasonably requested by such party that RJ determines to be reasonable and appropriate. Notwithstanding anything contained on Exhibit D to the contrary, RJ would decide what, if any, diligence information to make available to a particular potential bidder, and neither RJ nor its representatives would be obligated to furnish any information of any kind whatsoever to any party

(b) No later than 4:00 p.m. (Eastern Time) on or about January 14, 2011 (such date or the date of the last extension as provided below, the "Bid Deadline"), each potential bidder interested in participating in the bidding process must deliver copies of its bid and the supporting materials described below to the Notice Parties (as such term is defined in the Sale Procedures), which consist of the Debtors and their advisors (RJ) and counsel; proposed counsel for the Committee; the respective counsel for the various Lenders; and the United States Trustee.

(c) A Bid received from a bidder that meets the requirements set forth herein and on Exhibit D hereto would be considered a "Qualified Bid" and a party that has delivered the requisite materials would be a "Qualified Bidder." A Qualified Bidder would be required to accompany its bid with: (a) a clean and blacklined version of the Agreement attached as Exhibit A hereto, marked solely to indicate (i) the proposed purchaser's name; (ii) a verified statement that it has not and will not collude with any other party; and (iii) an increase in the purchase price set forth in the Agreement of not less than $250,000 (i.e., a minimum initial overbid of no less than $3,650,000, including an agreement to pay at least $2.5 million on the Initial Effective Transfer Date); and (b) written evidence of a commitment for financing or other evidence of ability to consummate the transaction including the assumption and assignment of the Assumed Agreements (such as a current audited financial statement or copies of a bidder's bank account statement for each of the three months preceding the Auction), and such other evidence of its ability to consummate the transactions as the Debtors may reasonably request.

(d) The Debtors reserve the right, in their reasonable discretion after consultation with the Lenders and the Committee, to waive any non-

24

material noncompliance with any one or more of these requirements and deem any bid to be a Qualified Bid.

(e) The Debtors would, in their reasonable discretion after consultation with the Lenders and the Committee: (i) determine whether any potential bidder satisfies the requirements specified above to become a Qualified Bidder; (ii) coordinate the efforts of Qualified Bidders in conducting their respective due diligence investigations regarding the Assets; (iii) determine whether to remove the Assets from the sale process under the Sale Procedures; (iv) evaluate bids from bidders and determine whether any such bid is a Qualified Bid; (v) negotiate any bid made to purchase the Assets and negotiate any related transaction issues; and (vi) make such other determinations as are provided in the Sale Procedures.

(f) Unless otherwise ordered by this Court for cause shown, only a Qualified Bidder that has submitted a Qualified Bid would be eligible to participate at the Auction. The Debtors, in their reasonable discretion after consultation with the Lenders and the Committee, would select the highest or otherwise best bid (the "Baseline Bid") to serve as the starting point for the Auction. At least 24 hours prior to the Auction, the Debtors would distribute copies of the Baseline Bid to each Qualified Bidder.

(g) If Qualified Bids are received by the Bid Deadline, the Auction would be conducted starting at 10:00 a.m. (Eastern Time) on or about January 18, 2011 at the offices of Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005, or such other place as the Debtors may designate at least one day prior to the Auction. At the Debtors' discretion, Qualified Bidders may appear at the Auction telephonically.

(h) Each Qualified Bidder participating at the Auction would be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

(i) The Lenders reserve their rights to credit bid under Bankruptcy Code § 363(k), and the Lenders are deemed to be a Qualified Bidder.

(j) At the Auction, participants would be permitted to increase their bids and would be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors). The bidding would start at the purchase price and terms proposed in the Baseline Bid, and continue in increments of at least $50,000 in cash or such other increment announced by the Debtors during the Auction. The Debtors would, from time to time, in an open forum, advise Qualified Bidders participating in the Auction of their determination as to the terms of the then highest or otherwise best bid. For purposes of comparing any bids by the Proposed Buyer at the Auction that are higher than the bid set forth in the Agreement (a "Higher VEM Bid") against any other bids that are made by a Qualified Bidder (other than VEM, as the Proposed Buyer) pursuant to these Sale Procedures, each Higher VEM Bid would include the amount of the Expense Reimbursement Fee, and in the event that a Higher VEM Bid is the Successful Bid at the Auction, the purchase price amount finally payable by VEM in respect of the Successful Bid would be reduced by such amount of the Expense Reimbursement Fee.

25

(k)     For the purpose of determining the Baseline Bid and whether a Qualified Bid submitted at the Auction is higher or otherwise better, the Qualified Bid would be valued based upon factors such as: (a) the purported amount of the Qualified Bid; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the ability to consummate any proposed Sale transaction in a timely manner; and (d) any other factors that the Debtors may deem relevant after consultation with the Lenders and the Committee. Upon the submission of any bid at the Auction, the Debtors would announce to all participants whether the bid submitted is higher or otherwise better than the previously-submitted bid and the basis for that determination.

(l)     Immediately prior to the conclusion of any Auction, the Debtors, after consultation with their advisors, the Lenders, and the Committee would: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (b) in their reasonable discretion after consultation with the Lenders and the Committee, identify the highest or best bid for the Assets at the Auction (the "Successful Bid"); and (c) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the name or names of the Qualified Bidder(s) making the Successful Bid for the Assets (the "Successful Bidder"), and the amount and other material terms of the Successful Bid. At the Initial Effective Transfer Date of the transaction contemplated by the Successful Bid, the Successful Bidder would be entitled to a credit for the amount of its Good Faith Deposit. Absent irregularities occurring in the course of the Auction, no further bids would be accepted after the close of the Auction.

(m)     By the Bid Deadline, a bidder must provide its own Good Faith Deposit equal to 10% of such bidder's purchase price. Such Good Faith Deposit must be made by wire transfer to an escrow agent selected by the Debtors. The Debtors will provide wiring instructions to any party making a request therefor in advance of the Bid Deadline. The Good Faith Deposit of a Qualified Bidder would be returned within three business days of the Initial Effective Transfer Date of a Sale transaction for the Assets. If the Successful Bidder does not close the initial asset transfer under the approved Sale by the Initial Effective Transfer Date, the Debtors would have the right to present any other bid, whether made prior to or at the Auction, to the Bankruptcy Court for approval. If the Successful Bidder fails to close the initial asset transfer by the Initial Effective Transfer Date, and such failure is the result of a breach by the Successful Bidder, such Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors and, except to the extent provided in such bidders' marked agreement, the Debtors specifically reserve the right to seek all available damages from such person.

(n)     The Debtors, in their reasonable discretion after consultation with the Lenders and the Committee, may: (1) determine, in their business judgment, which bid or bids, if any, constitute the highest or otherwise best offer for the Assets; and (2) reject, at any time before the entry of an order of this Court approving any bid as the Successful Bid, any bid that, in the Debtors' reasonable discretion, is (a) inadequate or insufficient; (b)

26

not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures; or (c) contrary to the best interests of the Debtors and their estates and creditors.

(o)     The Debtors, in their reasonable discretion after consultation with the Lenders and the Committee, may extend or alter any deadline contained herein or on <u>Exhibit D</u> hereto that would better promote the maximization of value of their estates.

(p)     The Debtors, in their reasonable discretion after consultation with the Lenders and the Committee, may adopt rules for the bidding process at the Auction at or prior to the Auction that, in their reasonable discretion, would best promote the goals of the bidding process and not be inconsistent with any of the provisions of the Sale Procedures described herein or on <u>Exhibit D</u> hereto.

(q)     The Debtors, in their reasonable discretion after consultation with the Lenders and the Committee, may adjourn without further notice the Auction and the Sale Hearing if in their reasonable discretion, such an adjournment would better promote the goals

(r)     **Any objections to either (A) the Sale of the Assets to the Proposed Buyer or the Successful Bidder (as applicable) or (B) to the Debtors' Cure Amount Schedule (which Schedule identifies the Assumed Agreements and the proposed Cure Amounts) or otherwise with respect to the proposed assumption and assignment of an Assumed Agreement to the Proposed Buyer or the Successful Bidder (as applicable), must be in writing, state the basis of such objection with specificity, and be filed with this Court, and served so as to be received actually on or before January 14, 2011 at 4:00 p.m. (Eastern Time) on: (i) the proposed counsel to the Debtors; (ii) the respective counsel to the Lenders; (iii) the proposed counsel to the Committee; (iv) the United States Trustee; and (v) VEM and counsel to VEM. Unless objections to the Cure Amount Schedule are timely filed, all non-debtor parties to the Assumed Agreements would be deemed to have consented to the Cure Amount Schedule and be forever barred from objecting thereto in the future or to the proposed assumption and assignment thereof to the Proposed Buyer or the Successful Bidder (as applicable).**

(s)     The Auction and Sale Procedures would be solely for the benefit of the Debtors and the Proposed Buyer, and nothing contained in the Sale Procedures Order or the Sale Procedures would create any rights in any other person or bidder (including without limitation rights as third-party beneficiaries or otherwise) other than the rights expressly granted to a Successful Bidder under the Sale Procedures Order.

RLF1 3749758v. 1

## PROPOSED FORM OF NOTICE OF THE MOTION AND SALE

A.      The Sale Procedures Hearing, the Auction, and the Sale Hearing

53.      The Debtors request that this Court schedule a hearing to consider the proposed Sale Procedures (the "Sale Procedures Hearing") for on or about December 29, 2010, so that the Debtors may proceed with their efforts to sell the Assets as a going concern in a timely manner. The Agreement provides that the Proposed Buyer may terminate the Agreement in the event that the Sale Procedures Order shall not have been entered by this Court on or before January 3, 2011. See the Agreement, § 9.01(b). Section 2.04(d) of the Agreement also requires the Debtors to obtain the entry of the Sale Procedures Order no later than January 3, 2011.

54.      The Debtors submit that, under the circumstances, approximately 6 days is more than sufficient to give all parties-in-interest herein the opportunity to review and consider the requested Initial Relief (especially because the primary creditor constituencies have previously been provided copies of the proposed Sale Procedures and are fully in support thereof). Because of the essentially administrative nature of the relief sought in the Sale Procedures Order, and because the interests of all parties have been and will be adequately represented by the continuing involvement of the Lenders and the Committee in the process, the Debtors submit that parties-in-interest would not be prejudiced were this Court to hold the Sale Procedures Hearing within such requested time frame. The Debtors understand, however, that the United States Trustee does not consent to the proposed timing for the Sale Procedures Hearing.

55.      The Debtors note that the Agreement is not yet fully finalized, as the parties are working to resolve the few remaining open issues. In the event the parties fail to enter into the Agreement prior to the date of the Sale Procedures Hearing, the Debtors would either seek an adjournment thereof or withdraw the Motion, in order to ensure that the Proposed Buyer would not be entitled to any of the Bidding Protections (including the Expense Reimbursement Fee) before it actually signed the Agreement and committed to become the stalking horse here.

56.      The Debtors have served a copy of this Motion (including all exhibits hereto) via email, overnight mail, or facsimile, on (a) the United States Trustee, (b) the respective counsel to

28

the Lenders, (c) the proposed counsel to the Committee, (e) all other known secured creditors of the Debtors, (f) all parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002, (g) the United States Attorney General, (h) the United States Attorney's Office, and (i) the Internal Revenue Service. In addition, the Debtors have also served, or will hereinafter serve, a copy of this Motion, including all exhibits thereto, via first class mail, telephonically, and/or email in the case of the parties in subsection (3) below, on (1) all parties to the known executory contracts and unexpired leases that would potentially be assumed and assigned in connection with the Sale, (2) all other known taxing authorities and other known governmental agencies whose rights may be affected by the sale of the Assets, (3) the Proposed Buyer and all other parties that have been identified by the Debtors and their advisors as being potentially interested in making an offer to purchase the Assets and participating in the Auction, and (4) the Debtors' 20 largest unsecured creditors (excluding insiders) (all of the parties referred to in this paragraph are collectively referred to as the "Motion Service List").

57.     The Debtors also submit that their proposed time frame for the Auction and the Sale Hearing, requested to be scheduled for on or about January 18 and 20, 2011, respectively, would give all potential competing bidders ample time to review the Assets and the Business and to formulate a Competing Bid (particularly in light of the fact that the Debtors have established a virtual data room for potential bidders that contains detailed documents and other information), and would also provide all parties-in-interest with sufficient time to object to any of the proposed transactions (including, without limitation, the Sale and the assumption and assignment of the Assumed Agreements in connection therewith). These dates are also consistent with the applicable time-periods set forth in the Final DIP Order, which requires that the Debtors' obtain this Court's approval of the Sale by January 20, 2011, as well as the Agreement, which requires that the deadline for the submission of competing bids be no later than January 14, 2011, that the Auction be held no later than January 18, 2011, and that this Court enter the Approval Order no later than January 20, 2011. See the Agreement, § 2.04(c).

58.     The Debtors also believe that any further delays beyond such proposed periods would likely serve to impair the value of the Assets. Indeed, in light of the Debtors' ongoing liquidity and operational concerns described above, the Debtors are concerned that any delay in proceeding with the Sale would serve only to diminish the value of the Assets and threaten their ability to continue fully operating the Business as a going concern, to the detriment of the Debtors' estates and creditors.

59.     In addition, the Debtors believe that an extended auction period beyond the approximately 20 days following the entry of the Sale Procedures Order contemplated herein would serve little purpose in these cases. As set forth above, the Debtors and their professionals have already marketed the Assets over the past several months. The parties they have identified as the most likely to make a bid on the Assets have already had ample time and opportunity to conduct their due diligence and otherwise analyze the Assets in question; indeed, several of these parties have already begun this process. Specifically, the Debtors have already spent a great deal of time engaging in active negotiations with such other parties as described above (including comprehensive discussions and the exchanging of multiple drafts of a form asset purchase agreement with the Proposed Buyer). Accordingly, such parties and others should not need substantial additional time at this point to engage in further analysis, and, instead, should be in a position to make a bid within the time period contemplated by this Motion.

60.     Moreover, based upon the proposed dates for the Sale Hearing and any Auction, all parties-in-interest herein would have approximately 21 days to timely file objections to the remaining relief requested in the Motion, which the Debtors submit constitutes ample time under the circumstances, and satisfies the requirements under the applicable Bankruptcy Rules.

61.     Thus, parties-in-interest in these cases will not be prejudiced if this Court schedules the Sale Procedures Hearing, the Auction, the Sale Hearing, and the relevant objection deadlines on the dates requested herein. Indeed, such parties would only benefit by such scheduling, as it would likely enable the Debtors to achieve a greater sale price for the Assets (as

30

well as avoiding any problems to the Debtors' other assets and businesses stemming from a potential default under the terms of the Final DIP Order were they unable to timely consummate the Sale of the Business at issue in the Agreement).

62. Accordingly, the Debtors request that this Court approve these requested dates.

B. The Proposed Sale Procedures Notice List

63. Pursuant to Bankruptcy Rule 2002(m), bankruptcy courts are empowered to enter any order "designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent except as otherwise provided by these rules."

64. To ensure that adequate notice of the Sale, the Auction, and the Sale Hearing is provided, the Debtors would serve notice of the Auction and of the Sale Hearing substantially in the form annexed hereto as Exhibit E (the "Auction and Hearing Notice") establishing the respective dates, times, and places of the Auction and the Sale Hearing following the entry of the Sale Procedures Order, by first class mail, postage prepaid, to (a) all of the parties identified on the Motion Service List and (b) all other creditors in these cases known to the Debtors as of the Petition Date (the "Auction and Hearing Notice Service List").

65. Given that the complete transaction documents (such as the Agreement and the Disclosure Schedule thereto) may comprise hundreds of pages, the Debtors believe the foregoing notice procedures would provide the most efficient and effective notice possible of the relief requested. Any party-in-interest wishing to receive the transaction documents would be permitted to do so by request to the Debtors' proposed co-counsel or by downloading a copy of same from the Bankruptcy Court's website (which is located at http://www.deb.uscourts.gov), or through the website maintained by the Debtors' noticing agent, which is located at http://www.cbhinfo.com.

66. Moreover, the Debtors would serve a notice of the Cure Amount Schedule on all non-debtor parties to the respective Assumed Agreements, informing them of, among other

31

things, the Proposed Cure Amounts and the possibility that the Debtors may assume and assign such agreements in connection with the Sale.

67. The Debtors submit that such notice as outlined in the preceding paragraphs would constitute good and sufficient notice of the Sale, the assumption and assignment of executory contracts and unexpired leases, the Auction, the Sale Hearing, any other transaction set forth in the Agreement, and all the relief requested herein.

## THE PROPOSED SALE IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND INTEREST HOLDERS

68. The Debtors believe that the Sale according to the Sale Procedures and the Agreement will enable them to obtain the greatest value for the Assets and to maximize the value of their overall estates, in the best interests of the Debtors, their creditors, and all other parties-in-interest.[12] Thus, because the Debtors' decision to sell the Assets pursuant to the Agreement is based upon their sound business judgment, it should be approved.

A. The Standard

69. Ample authority exists for the approval of the Sale. Initially, Bankruptcy Code § 363(b)(1) authorizes a debtor to sell assets of the estate other than in the ordinary course of business. See also Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

70. Although Bankruptcy Code § 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have uniformly held that approval of a proposed sale of property pursuant to Bankruptcy Code § 363(b) is appropriate if proceeding with the transaction is consistent with the reasonable business judgment of the debtor. See Comm. of Equity Security Holders v. Lionel Corp. (In re

---

[12] As several courts have noted, the paramount goal for any proposed sale of property of a bankruptcy estate is to maximize the proceeds received by the estate. See, e.g., Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the debtor's duty with respect to such sales is to obtain the highest price or overall greatest benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also Stephens Indus. Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a Bankruptcy Code § 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith."); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988).

71.     Further, as stated by the Bankruptcy Appellate Panel for the Ninth Circuit Court of Appeals in Walter, the bankruptcy court should consider all salient factors pertaining to the proposed transaction and, accordingly, act to further diverse interests of the debtor, creditors, and other constituencies. Walter, 83 B.R. at 19-20 (citing In re Lionel, 722 F.2d 1063). The factors a court should evaluate include, inter alia, the consideration to be paid, the financial condition and needs of the estate, the qualifications of the buyer, and whether a risk exists that the assets proposed to be utilized by the estate would decline in value if simply left in the estate's possession. See Fin. Assocs. v. Loeffler (In re Equity Funding Corp.), 492 F.2d 793, 794 (9th Cir. 1974); In re Work Recovery, Inc., 202 B.R. 301 (Bankr. D. Ariz. 1996).

72.     The Sale pursuant to the Agreement is supported by sound business justifications. Initially, and of immediate concern, the Final DIP Order requires the Debtors to obtain Bankruptcy Court approval of the Sale no later than January 20, 2011. If the Debtors fail to meet that deadline, it could potentially result in Ally's declaring an event of default under the Final DIP Order, meaning the Debtors would lack the required funding to continue operating any of their businesses (not just the Business at issue in the Agreement). Accordingly, the ongoing viability of the Debtors' entire operations depends upon the Debtors' obtaining this Court's approval of the Sale within the timeframe established in the Final DIP Order.

RLF1 3749758v. 1

73.    The Debtors believe that the Sale is supported by the Committee, Ally, and the other Lenders, who have reached an agreement in principle as to the allocation of the proceeds from the Sale (as reflected in the Final DIP Order). Specifically, the Final DIP Order provides (with all such terms as defined in the Final DIP Order):

> $125,000 plus five percent (5.0%) of the net proceeds (after costs of sale) from the sale of the seven (7) The Office Beer Bar & Grill restaurants... in excess of $2,500,000 shall be paid to the Debtors' estates (as opposed to the Lenders hereunder); provided however, that the first $125,000 of such proceeds distributed to the holders of general unsecured claims shall not be shared with the Pre-Petition Lenders as holders of general unsecured claims (the "Office Resolution Consideration")

See Final DIP Order, ¶ 33.a (Docket No. 177). Thus, because the Debtors' unsecured creditors will benefit to the extent of the Office Resolution Consideration, the Sale (as well as the overall marketing and Auction process reflected in the Sale Procedures) is in the best interests of the Debtors' creditors. Also, as discussed above, the Agreement provides for the Debtors' estates to retain the Excluded Assets including avoidance actions under Chapter 5 of the Bankruptcy Code, which (along with the Office Resolution Consideration) may potentially yield a further recovery to the Debtors' estates.

74.    Moreover, the Debtors' liquidity concerns described above -- which precipitated the filing of these cases -- continue both to significantly undermine the value of the Assets and the Debtors' ability to operate the Business as a going concern in the foreseeable future. Thus, the Debtors have determined that if they are unable to complete the Sale to the Proposed Buyer (or such other entity that makes a higher and better offer for the Assets at the Auction), they may have no other choice but ultimately to cease operations at the Business and liquidate the Assets (and, for the reasons described above regarding the requirements in the Final DIP Order that they get Court approval to sell the Business by a date certain, potentially their other assets and businesses as well). This would clearly result in a diminished return to the Debtors' entire creditor body.

34

75.     The Agreement with the Proposed Buyer also represents the culmination of the Debtors' marketing efforts regarding the Business to date, while further allowing the Debtors to continue seeking higher or otherwise better offers therefor from other parties. It is the opinion of the Debtors and their advisors that the proposed course of action, a timely yet open Sale process, is designed to protect the interests of all parties in these cases.

76.     Moreover, the Debtors intend to continue operating the Business during the Sale process. The Debtors and their professionals believe that a currently-operating restaurant division such as the Business is of far greater value to potential purchasers and all other parties-in-interest than a closed business. This is especially true in light of the fact that the Debtors understand that the Proposed Buyer is interested in acquiring the Assets because of the anticipated synergies that will develop following the sale, which would likely be lost or reduced if the transactions were to occur following the cessation of the Business.

77.     Specifically, the Proposed Buyer is clearly acting as a "strategic buyer" in this instance. The Proposed Buyer and its affiliates are major participants in the New Jersey restaurant market, and are interested in The Office Bar & Grill Business primarily for its strong brand in the New Jersey market and for its positioning within the casual dining segment, which will create significant synergies with the Proposed Buyer's and its affiliates' existing brands.

78.     The Debtors also believe that the Purchase Price is fair and reasonable and exceeds what the Debtors would likely obtain in any liquidation sale of the Assets. In addition, the Proposed Buyer has agreed to assume the Assumed Liabilities. The Debtors do not believe that the Assumed Liabilities would be similarly assumed or otherwise satisfied to the same extent in any liquidation.

79.     Similarly, the Debtors are also hopeful that the Proposed Buyer (or the Successful Bidder, as the case may be) would agree to hire certain of the Sellers' employees following the Sale, thereby potentially providing continued employment for these individuals. In addition, the Sellers' customers should benefit, as, in connection with the parties' agreeing to provide each

35

other with certain transitional support in connection with the Sale, the Proposed Buyer has agreed to honor all Gift Cards and all Pub Club membership, points, and rewards issued prior to the Initial Effective Transfer Date. See the Agreement, §§ 3.03 and 3.04.

80. Finally, the Auction process itself, and the Debtors' ongoing efforts to continue negotiating with the other parties that have previously expressed or in the future express an interest in a Sale, will confirm that the Debtors have obtained the highest and best offer for the Assets.

81. Accordingly, as set forth herein, the Sale is supported by sound business reasons and is in the best interests of the Debtors' estates.

B. The Procedures to be Undertaken by the Debtors Will Assure that the Highest Value for the Assets Will be Received

82. In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction. Further, pursuant to Bankruptcy Rule 2002(a)(2), this Court may, for cause shown, shorten or direct another method of giving notice regarding the general 21-day by-mail period for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. See Fed. R. Bankr. Pro. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. Id.

83. The Debtors submit that the notice, procedures, and rules set forth in this Motion, as well as the requested respective dates for the Sale Procedures Hearing, the Auction, and the Sale Hearing, satisfy the timing and notice requirements of the Bankruptcy Rules, the Local Rules, and Bankruptcy Code § 363(b), constitute good and sufficient notice, and that no other or further notice of the Sale, the Auction, the Sale Hearing, the assumption and assignment of the

36

Assumed Agreements in connection with the Sale, or any other of the transactions referenced in this Motion or the Agreement, is required.

      C.      The Proposed Sale and Purchase Would Be in Good Faith.

84.      Bankruptcy Code § 363(m) provides that:

> The reversal or modification on appeal of an authorization under [Bankruptcy Code § 363(b) or (c)] of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

85.      The terms of the Agreement were negotiated at arm's length, without collusion, and in good faith. Upon information and belief, the Proposed Buyer is not an insider nor is it affiliated in any way with any of the Debtors. Also, the Debtors have fully disclosed and requested this Court's approval of all of the terms and conditions of the Sale (as the current Agreement is attached as Exhibit A hereto, and the final form of the Agreement, once executed, will also be filed and thus made publicly available) and intend to provide notice as set forth herein and as directed by this Court. See generally In re Colony Hill Assocs., 111 F.3d 269 (2nd Cir. 1997) (stating that the determination of "in good faith" is based upon traditional equitable principles, including whether there has been full disclosure to the bankruptcy court).

86.      In addition, the Proposed Buyer and the Debtors each were represented by separate experienced professionals, helping to ensure that the Sale process has been fair to date and will continue to be so and that the Agreement was negotiated, proposed, and entered into by the Debtors and the Proposed Buyer without collusion, in good faith, and at arm's length.

87.      Lastly, the proposed Sale Procedures Order provides that each Qualified Bidder and the Proposed Buyer would be required at or prior to the Auction to confirm that they have not engaged in any collusion with any other party respect to its bidding on the Assets. See Exhibit B, ¶ 7.

37

88. Accordingly, the Debtors request that this Court determine that the Proposed Buyer (or the Successful Bidder, as the case may be) has negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good-faith purchaser under Bankruptcy Code § 363(m). See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-150 (3rd Cir. 1986) (parties acted in good faith if purchase price is adequate and reasonable and terms of sale are fully disclosed).

D. The Proposed Sale Satisfies the Requirements of Bankruptcy Code § 363(f)

89. The Debtors presently believe that all of the Assets have been pledged to Ally and/or the other Lenders. Furthermore, various other creditors (such as certain suppliers or vendors) may hold or assert security interests in some of the Assets. Thus, in order to facilitate the Sale of such property, and as contemplated and required by the Agreement, the Debtors request authorization to sell all of the Assets free and clear of any and all Liens which may be asserted (including any claims for successor liability).

90. In accordance with Bankruptcy Code § 363(f), a debtor-in-possession may sell property under Bankruptcy Code § 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

      (1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

      (2)    the [lienholder or claimholder] consents;

      (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (4)    such interest is in bona fide dispute; or

      (5)    [the lienholder or claimholder] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Because Bankruptcy Code § 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the Sale free and clear of liens. See Folger

38

Adam Sec. Inc. v. De Matties/McGregor JV, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how Bankruptcy Code § 363(f) authorizes the sale of a debtor's assets free and clear if all liens, claims, and interests if "any one of [the] five prescribed claims is met"); In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) (property may be sold "free and clear" if at least one of the subsections of Bankruptcy Code § 363(f) is met); In re DVI, Inc., 306 B.R. 496, 503 (Bankr. D. Del. 2004) (same); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991), cert. dismissed, 503 U.S. 987 (1992) (same). The Debtors believe that they will satisfy one or more of these requirements.

91. First, based on the parties' discussions, as well as the provisions of the Final DIP Order described herein setting deadlines for the various stages of the Sale process, the Debtors believe that Ally and the other Lenders have consented to the Sale free and clear of their liens as provided for herein, because the Sale provides the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the partial repayment of the amounts due thereto.[13]

92. Moreover, if a holder of a lien, claim, encumbrance, or other interest receives notice of this Motion and does not object within the prescribed time period, such holder will be deemed to have consented to the Sale free and clear of such holder's liens, claims, encumbrances, and other interests pursuant to the terms proposed herein on that basis alone. See, e.g., Veltman v. Whetzel, 93 F.3d 517 (8th Cir. 1996) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of Bankruptcy Code § 363); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) ("implied consent" was sufficient to satisfy the consent requirement of Bankruptcy Code § 363(f)(2) "[b]ecause [the secured creditor] admit[ed] that it received notice

---

[13] The Debtors note that, alternatively, the Sale Procedures provide that the Lenders would be authorized to credit bid the allowed amount of their secured claims pursuant to Bankruptcy Code § 363(k), which states that "[a]t a sale under... this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."

39

of the proposed sale and also admit[ed] that it did not file any timely objection the sale was authorized by § 363(f)"); In re Enron Corp., 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. Feb. 5, 2004) (same); Hargrave v. Pemberton (In re Tabore, Inc.), 175 B.R. 855 (Bankr. D. N.J. 1994) (same).

93.    Also, Bankruptcy Code § 363(f)(l) allows a sale to proceed free and clear of liens if the power to sell free and clear exists outside the bankruptcy context in another body of law. The existence of such ability is unquestionable here under applicable state law, such as state law foreclosure statutes. See Precision Indus. Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537, 545 (7th Cir. 2003), rev'g Precision Indus., Inc. v. Qualitech Steel SBQ, LLC, No 00-0247, 2001 WL 699881 (S.D. Ind. Apr. 24, 2001) (reversing district court and finding that property sold pursuant to Bankruptcy Code § 363(f)(1) on account of state foreclosure law was sold free and clear of lessee's possessory interest in property). Indeed, outside of bankruptcy, the Lenders could have foreclosed upon the Debtors' assets -- including the Assets -- and sold such assets free and clear of junior liens (potentially other than any liens previously in existence that under applicable law are senior and have not been subordinated to the liens and security interests of the Lenders). The foreclosure laws in most states (including at least certain of the states in which the Debtors operate) permit the sales of real property free and clear of liens, even when such liens are not satisfied from sale proceeds.

94.    In addition, because the Debtors' secured creditors may be required to accept money damages in exchange for their interests, Bankruptcy Code § 363(f)(5) is satisfied. See In re Trans World Airlines, 322 F.3d 283, 290-91 (3d Cir. 2003) (property sold free and clear of interests when claims were subject to monetary valuation and satisfaction). Indeed, because the Assets will be sold for what the Debtors, in the exercise of their business judgment, approximates at least the fair market value thereof, particularly in light of the opportunity for competitive bidding at the Auction, the holders of any liens thereon could therefore be compelled to accept money in satisfaction of same. See In re WPRV-TV, Inc., 143 B.R. 315, 321 (D.P.R.

40

1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992), aff'd in part, rev'd in part, 983 F.2d 336 (1st Cir. 1993) (where "properties . . . sold for the best price obtainable under the circumstances, and the liens will attach to the sale proceeds, the proposed sale [satisfies Bankruptcy Code § 363(f)(5)] and may be approved").

95.     Accordingly, the Debtors submit that at least one (if not more) of the subsections of Bankruptcy Code § 363(f) will be satisfied here, such that this Court should approve the Sale of the Assets free and clear of Liens.

E.     Cause Exists to Approve the Bidding Protections

96.     Sellers of assets often employ bidding protections in order to encourage bids. Break-up fees, expense reimbursement provisions, overbid requirements, and other bidder protection devices are a normal, and frequently necessary component of sales outside the ordinary course of business under Bankruptcy Code § 363.

97.     Approval of a proposed termination fee and/or expense reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the United States Court of Appeals for the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). In O'Brien, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives such as a break-up fee or expense reimbursement must provide some benefit to the debtor's estate. Id. at 533.

98.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that

41

serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

99. Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Expense Reimbursement Fee of $200,000 under the terms and conditions of the Agreement, should be approved. Specifically, the amount of the Expense Reimbursement Fee (while somewhat high on a percentage basis with respect to the Purchase Price, compared to other sales under Bankruptcy Code § 363) is nonetheless relatively small in the overall context of these cases and with respect to similar transactions of this type and complexity.

100. The Bidding Protections also pass muster under the "business judgment rule", as they are the product of extended good faith and arm's-length negotiations between the Debtors and the Proposed Buyer. The Proposed Buyer has to date made the highest definitive offer for the Assets; however, its bid is contingent upon this Court's timely approval of the Expense Reimbursement Fee and the other Sale Procedures, as it is unwilling to hold open its offer to purchase the Assets under the terms of the Agreement unless the Sale Procedures Order approving the Bidding Protections and authorizing the payment of the Expense Reimbursement Fee is not timely entered.

101. In addition, the Debtors believe that the Bidding Protections are fair and reasonable in amount, particularly in view of the Proposed Buyer's efforts to date, the risk to the Proposed Buyer of being used as a "stalking horse," and the stabilizing effect that the execution of the Agreement is expected to have on the Business and the Debtors' other businesses (by, among other things, enabling the Debtors to avoid potentially defaulting under the Final DIP Order), thereby preserving value for creditors here, and increasing the likelihood of additional bidding.

42

102.    Further, the Expense Reimbursement Fee and the other Bidding Protections already have encouraged bidding, in that the Proposed Buyer would not have entered into the Agreement without these provisions.  These Bidding Protections thus have induced a bid that otherwise would not have been made and without which other bidding would be limited. Similarly, the Proposed Buyer's offer provides a minimum bid on which other bidders can rely, thereby increasing the likelihood that the price at which the Assets will be sold will reflect their true worth.  Finally, the mere existence of these proposed Bidding Protections permits the Debtors to insist that competing bids for the Assets be higher or otherwise better than that contained in the Agreement, a clear benefit to the Debtors' estates.

103.    In sum, the Debtors' ability to offer the Bidding Protections enables them to ensure the Sale of the Assets to a contractually committed bidder (be it the Proposed Buyer or any Successful Bidder) at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.  Thus, under these circumstances, this Court should not override the Debtors' business judgment, and the Expense Reimbursement Fee and the other Bidding Protections should be approved.

### Assumption and Assignment of Executory Contracts and Unexpired Leases

104.    To facilitate and effect the Sale, the Debtors seek to assume and assign the Assumed Agreements to the purchaser of the Assets to the extent required in connection with the Sale.  Bankruptcy Code § 365 authorizes a debtor to assume and/or assign its executory contracts and unexpired leases subject to the approval of this Court:

(a)    Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debt the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

(A)    cures, or provides adequate assurance that the trustee will promptly cure such default…;

43

(B)     compensates or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

**** 

(f)(2)     The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

Accordingly, Bankruptcy Code § 365 authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.

105.     It is well established in the Third Circuit and in other jurisdictions that the decision to assume or reject an executory contract is a matter within the "business judgment" of the debtor.  See In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992); In re Taylor, 913 F.2d 102 (3d Cir. 1990); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36 (3d Cir. 1989); In re Trans World Airlines, Inc., 261 B.R. 103, 120-23 (Bankr. D. Del. 2001); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993).  The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice.  See Lubrizol Enters. v. Richmond Metal Finishes, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 10571 (1986).  Indeed, to impose more exacting scrutiny would slow a debtor's reorganization, thereby increasing its costs and undermining the "Bankruptcy Code's provisions for private control" of the estate's administration.  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1986).

44

106.    The Debtors submit that their decision to assume and assign those of their executory contracts and unexpired leases as selected by the Proposed Buyer or to the Successful Bidder (as the case may be) in connection with a Sale of the Assets would be a sound exercise of their business judgment, and such assumption and assignment would undoubtedly serve as an important component of the Assets and the Business being acquired by such bidder. Accordingly, Bankruptcy Code § 365 authorizes the Debtors to assume and assign their executory contracts and unexpired leases at the request of a successful bidder, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.

107.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

108.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

109.    The Debtors believe that they can and will demonstrate that all requirements for the assumption and assignment of the Assumed Agreements will be satisfied at the Sale Hearing.

45

Initially, the Debtors will cause a notice of the Cure Amount Schedule to be served in the time and manner set forth above, thereby providing all known non-debtor parties to the Assumed Agreements an opportunity to be heard and to object to either the Proposed Cure Amount or any other aspect of such proposed assumption and assignment. The Debtors would demonstrate (to the extent required) at the Sale Hearing that the purchaser of the Assets (be it the Proposed Buyer or the Successful Bidder) adequately assures future performance under the Assumed Agreements and otherwise satisfies the requirements of Bankruptcy Code § 365(b)(3), as outlined above.

110.    In particular, the Debtors understand that the Proposed Buyer and its affiliated entities on a consolidated basis have been in the restaurant business for nearly 45 years. It has a global base of 314 restaurants in six countries, with 174 company-owned units, and 140 franchised units. Its operations fall into four categories: (i) quick service concept; (ii) casual dining concept; (iii) fine dining concept; and (iv) franchising. It develops and operates an international chain of five different quick service concepts under different names (Villa Fresh Italian Kitchen, Greenleaf's, South Philly Steak & fries, Bananas, and Casa Java), and also operates stand-alone fine dining and casual dining restaurants under such names as Black Horse Pub, Il Forno, Mackenzie's, and George and Martha's.

111.    In addition to the United States and Puerto Rico, the Proposed Buyers' affiliated restaurants are located throughout the world (including in Italy, Mexico, Kuwait, the United Kingdom, and the Czech Republic) principally in shopping malls and other high traffic locations. The Proposed Buyer and its affiliates currently employ approximately 1,930 persons, of whom approximately 1,840 are field and restaurant personnel and 90 are corporate personnel.

112.    The Proposed Buyer's and its affiliates' aggregate annual revenues approximate $160 million. The Proposed Buyer and its affiliates have very limited amounts of long-term debt and almost no equipment financing arrangements. Most of the Proposed Buyer and its affiliates' assets are unencumbered. The Proposed Buyer and its affiliates are parties to over 180 leasehold agreements.

46

113.    Accordingly, the Debtors believe that the Proposed Buyer would clearly be able to satisfy its future obligations under the Assumed Agreements, based upon its experience, willingness, and financial wherewithal.

114.    Moreover, the Sale Procedures would require as part of any Qualified Bid that such bidder provide written evidence of its ability to consummate the transaction, including the assumption and assignment of the Assumed Agreements. See Exhibit D.

115.    Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, the assumption and assignment of the Assumed Agreements to the Proposed Buyer or to the Successful Bidder (as the case may be) should be approved.

116.    The Debtors request that any objections that relate to the assumption and assignment of executory contracts and unexpired leases (including, but not limited to, any objections relating to the Proposed Cure Amounts under Bankruptcy Code § 365(b)(1)) must be filed and served so as to be actually received by the undersigned, the respective counsel to the various Lenders, counsel to the Proposed Buyer, and proposed counsel to the Committee, by the applicable objection deadline set forth above.

### Exemption from Bulk Sale Statutes

117.    The Debtors understand that New Jersey and the specific localities in which the Business is operated and the Assets are located have or may have statutes or regulations with respect to parties' conduct concerning bulk sale transfers, including, without limitation, New Jersey Division of Taxation TB-60R and any noticing or escrowing requirements under any such laws. The Debtors have not conducted a comprehensive study of such requirements for New Jersey and every city and town in which the Assets are located. However, certain of the statutes and regulations may provide that if a liquidation or bankruptcy sale is court authorized, then a company need not comply with such statutes or regulations. Moreover, in the context of bankruptcy cases such as these, where creditors are given notice of the proposed sale in advance,

47

as well as an opportunity to be heard before this Court, the application of such statutes and regulations would be redundant and unnecessary, and would otherwise impose unwarranted costs and other burdens upon the Debtors and their estates.[14]

118.    Accordingly, the Debtors seek this Court's authorization to consummate the Sale without the necessity of complying with any state's, local authority's (including any liquor license authorities), or other jurisdiction's bulk transfer requirements, including, without limitation, New Jersey Division of Taxation, TB-60R and any noticing or escrowing requirements under any such laws, such that no bulk sales or transfer laws or any similar laws or requirements (including any requirements to post any escrow amounts) of any state, local authority (including any liquor license authorities) would apply in any way to the Sale or any of the other transactions contemplated by the Agreement.  The Debtors note that the Agreement provides that the Proposed Buyer may terminate the Agreement if the Approval Order does not "include an exemption from, or relief from complying with, bulk sales laws or similar state, federal, or local laws, rules, or regulations." See the Agreement, § 9.01(b).

**Request for Relief Under Bankruptcy Rule 6004(h) and 6006(d)**

119.    Bankruptcy Rule 6004(h) provides, in substance, that an order authorizing the use, sale, or lease of a debtor's property is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  Bankruptcy Rule 6006(d) provides, in substance, that an order authorizing the assignment of an executory contract or unexpired lease is also stayed for a period of 14 days after the entry of the order unless the court orders otherwise.

---

[14]    To that end, Section 6.18 of the Agreement currently provides that "[u]nless the Approval Order includes an exemption from, or relief from complying with, bulk sales laws or similar state, federal, or local laws, rules, or regulation (the "Bulk Sale Laws"), Sellers will be solely responsible for all costs associated with compliance with the Bulk Sale Laws."

48

120.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, the leading bankruptcy law treatise suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIERS ON BANKRUPTCY 15TH ED. REV., ¶ 6004.10[18] (15th rev. ed. 2008). That treatise further indicates that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

121.    As described above, time is clearly of the essence here. The continuing troubled economic environment, especially for restaurants such as those operated by the Debtors, enhanced with the threat of liquidation not only of the Business but also of all of the Debtors' other assets and operations by virtue of requirements set forth in the Final DIP Order described above, and the Debtors' ongoing liquidity concerns, means that the Assets are at significant risk of losing value if the Agreement is not promptly approved or if the Debtors cannot promptly start proceeding towards the transfers of the applicable assets upon the Effective Transfer Dates. In addition, the Agreement provides that the Proposed Buyer may terminate the Agreement after the Termination Deadline. See the Agreement, § 9.01(b).

122.    Thus, it is critically important to authorize the Debtors to promptly begin to act under the Agreement to commence any required or appropriate actions in connection with the eventual asset transfers on the applicable Effective Transfer Dates, and the Debtors therefore

request that this Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## No Previous Application

123. No previous application for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court enter orders, substantially in the forms attached hereto, granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated: December 23, 2010
     Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Tyler D. Semmelman (No. 5386)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Joel H. Levitin
Stephen J. Gordon
Richard A. Stieglitz Jr.
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Proposed Attorneys for the Debtors and Debtors-in-Possession*

RLF1 3749758v 1