# EXHIBIT A

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

BY AND AMONG

CHARLIE BROWN'S INC.
THE OFFICE AT BRIDGEWATER, INC.,
THE OFFICE AT CRANFORD, INC.,
THE OFFICE AT MONTCLAIR, INC.,
THE OFFICE AT MORRISTOWN, INC.,
THE OFFICE AT RIDGEWOOD, INC.,
THE OFFICE AT SUMMIT, INC.,

Charlie Brown's Mark Corp. solely as to any Assigned Intellectual Property

VILLA ENTERPRISES LTD., LLC

DATED AS OF
December [ ], 2010

# TABLE OF CONTENTS

## ARTICLE I
## SALE OF ASSETS; EXCLUDED ASSETS

SECTION 1.01. Transferred Assets .................................................................. 1
SECTION 1.02. Excluded Assets ...................................................................... 3
SECTION 1.03. Assumed Liabilities ................................................................. 4
SECTION 1.04. Excluded Liabilities ................................................................. 5
SECTION 1.05. Pro-Rated Payments ................................................................ 5

## ARTICLE II
## PURCHASE PRICE; CLOSING

SECTION 2.01. Purchase Price ........................................................................ 6
SECTION 2.02. Closing; Closing Date; Effective Transfer Date; Payment of Purchase
Price ..................................................................................................... 7
SECTION 2.03. [RESERVED] ........................................................................... 9
SECTION 2.04. Bankruptcy Auction ................................................................. 9

## ARTICLE III
## TRANSITIONAL SUPPORT

SECTION 3.01. [RESERVED] ........................................................................... 10
SECTION 3.02. [RESERVED ............................................................................. 10
SECTION 3.03. Transition of Assigned Liquor Licenses ................................... 10
SECTION 3.04. Gift Card Processing and Reimbursement ................................ 10
SECTION 3.05. Pub Club .................................................................................. 10

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

SECTION 4.01. Organization ............................................................................ 10
SECTION 4.02. Authorization .......................................................................... 11
SECTION 4.03. No Conflicts ............................................................................ 11
SECTION 4.04. [RESERVED] ........................................................................... 11
SECTION 4.05. Real Property .......................................................................... 11
SECTION 4.06. Personal Property .................................................................... 11
SECTION 4.07. Intellectual Property ................................................................ 11
SECTION 4.08. Purchased Assets ..................................................................... 12
SECTION 4.09. Employment, Labor and Employee Benefit Matters ................. 12
SECTION 4.10. Compliance with Law; Permits ............................................... 12
SECTION 4.11. Litigation ................................................................................ 12
SECTION 4.12. Financial Information .............................................................. 12
SECTION 4.13. [RESERVED] ........................................................................... 12
SECTION 4.14. [RESERVED] ........................................................................... 13
SECTION 4.15. [RESERVED] ........................................................................... 13
SECTION 4.16. Environmental Matters ............................................................ 13
SECTION 4.17. [RESERVED] ........................................................................... 13

SECTION 4.18. [RESERVED] ............................................................................................... 13
SECTION 4.19. Insurance ................................................................................................... 13
SECTION 4.20. [RESERVED] ............................................................................................... 13
SECTION 4.21. Third Party Consents and Governmental Approvals ................................ 13
SECTION 4.22. Brokers and Finders ................................................................................. 14
SECTION 4.23. Sales Taxes ............................................................................................... 14
SECTION 4.24. No Other Representations or Warranties ................................................. 14

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

SECTION 5.01. Organization ............................................................................................ 14
SECTION 5.02. Authorization ........................................................................................... 14
SECTION 5.03. No Conflicts .............................................................................................. 14
SECTION 5.04. No Brokers and Finders ........................................................................... 15
SECTION 5.05. No Other Representations or Warranties ................................................. 15
SECTION 5.06. Ability to Consummate Transaction ........................................................ 15

## ARTICLE VI
## COVENANTS

SECTION 6.01. Efforts to Complete Transaction .............................................................. 15
SECTION 6.02. Consents; Filings ...................................................................................... 15
SECTION 6.03. Operation of Business .............................................................................. 16
SECTION 6.04. Access to Information ............................................................................... 16
SECTION 6.05. Notification of Certain Matters ............................................................... 17
SECTION 6.06. [RESERVED] ............................................................................................... 18
SECTION 6.07. Licenses and Permits ............................................................................... 18
SECTION 6.08. Employees ................................................................................................. 18
SECTION 6.09. Non-Solicitation and Non-Hire ................................................................ 18
SECTION 6.10. Announcements; Confidentiality ............................................................. 18
SECTION 6.11. Assumed Leases ....................................................................................... 20
SECTION 6.12. Assumed Contracts .................................................................................. 20
SECTION 6.13. Restaurant Dining Cards ......................................................................... 20
SECTION 6.14. Inventory .................................................................................................. 20
SECTION 6.15. Change of Corporate Names .................................................................... 20
SECTION 6.16. Closing Balance Sheet ............................................................................. 20
SECTION 6.17. Post-Closing Cooperation; Retransfer ..................................................... 20
SECTION 6.18. Bulk Sales ................................................................................................. 21
SECTION 6.19. Acquired Assets "AS IS"; Purchaser's Acknowledgment Regarding
Same .................................................................................................... 21

## ARTICLE VII
## CASUALTY AND CONDEMNATION

SECTION 7.01. Casualty .................................................................................................... 21
SECTION 7.02. Condemnation .......................................................................................... 23
SECTION 7.03. Supplemental Casualty and Condemnation Disclosures ......................... 24

## ARTICLE VIII
## CONDITIONS TO CLOSING

SECTION 8.01.    Conditions to Obligations of the Parties .............................................................. 25
SECTION 8.02.    Conditions to Purchaser's Obligations to Close....................................................... 25
SECTION 8.03.    Conditions to Sellers' Obligations to Close............................................................ 27

## ARTICLE IX
## TERMINATION

SECTION 9.01.    Termination of Agreement.................................................................................. 28
SECTION 9.02.    Effect of Termination........................................................................................ 29
SECTION 9.03.    [RESERVED] .................................................................................................... 29
SECTION 9.04.    Expense Reimbursement Fee............................................................................. 29

## ARTICLE X
## NO SURVIVAL

SECTION 10.01.    No Survival of Representations and Warranties ..................................................... 29

## ARTICLE XI
## DEFINITIONS; RULES OF CONSTRUCTION

SECTION 11.01.    Definitions...................................................................................................... 30
SECTION 11.02.    Rules of Construction ...................................................................................... 35

## ARTICLE XII
## MISCELLANEOUS

SECTION 12.01.    Public Announcements ..................................................................................... 36
SECTION 12.02.    Entire Agreement; Amendment; Waiver .............................................................. 36
SECTION 12.03.    Further Assurances.......................................................................................... 36
SECTION 12.04.    Notices .......................................................................................................... 36
SECTION 12.05.    Expenses ....................................................................................................... 38
SECTION 12.06.    Transfer Taxes and Prorations .......................................................................... 38
SECTION 12.07.    Notification of Sale ........................................................................................ 38
SECTION 12.08.    Record Retention and Access ........................................................................... 39
SECTION 12.09.    Dispute Resolution.......................................................................................... 39
SECTION 12.10.    Governing Law; Jurisdiction............................................................................. 39
SECTION 12.11.    Assignment .................................................................................................... 39
SECTION 12.12.    Captions ........................................................................................................ 39
SECTION 12.13.    Representation by Counsel; Interpretation........................................................... 40
SECTION 12.14.    Parties in Interest............................................................................................ 40
SECTION 12.15.    Severability ................................................................................................... 40
SECTION 12.16.    Counterparts .................................................................................................. 40

Exhibit A      Restaurants
Exhibit B      Form of Bill of Sale
Exhibit C      Approval Order
Exhibit D      Assignment of Copyrights
Exhibit E      Assignment of Service Marks and Trademarks

Exhibit F                    Sale Procedures Order

## DISCLOSURE SCHEDULES

| | |
|---|---|
| Section 1.01(c) | Assumed Leases |
| Section 1.01(e) | Liquor Licenses |
| Section 1.01(g) | Books and Records |
| Section 4.03 | Conflicts, Breaches, Defaults and Liens |
| Section 4.05(a) | Leased Property |
| Section 4.06 | Personal Property |
| Section 4.07(a) | Intellectual Property |
| Section 4.08 | Assets |
| Section 4.10 | Material Permits |
| Section 4.11 | Litigation |
| Section 4.12 | Financial Reports |
| Section 4.19 | Insurance |
| Section 4.21 | Third Party Consents and Governmental Approvals |
| Section 6.09(c) | Non-Solicitation and Non-Hire |
| Section 8.02(c) | Purchaser Consents |
| Section 8.03(c) | Seller Consents |

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement") made and entered into this [ ] day of December, 2010 among Charlie Brown's Inc, a New Jersey corporation ("Charlie Brown's"), The Office at Bridgewater, Inc., a New Jersey corporation ("Bridgewater"), The Office at Cranford, Inc., a New Jersey corporation ("Cranford"), The Office at Montclair, Inc., a New Jersey corporation ("Montclair"), The Office at Morristown, Inc., a New Jersey corporation ("Morristown"), The Office at Ridgewood, Inc., a New Jersey corporation ("Ridgewood"), The Office at Summit, Inc., a New Jersey corporation ("Summit" and, together with Charlie Brown's, Bridgewater, Cranford, Montclair, Morristown and Ridgewood, each a "Seller" and collectively the "Sellers"), Charlie Brown's Mark Corp., a Delaware corporation, and Villa Enterprises Ltd., LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

WHEREAS, the Sellers are, collectively, engaged in the business of operating The Office restaurants listed on Exhibit A (each, a "Restaurant," and collectively, the "Restaurants"). The operation of the Restaurants, collectively, shall be referred to herein as the "Business;"

WHEREAS, on November 17, , 2010, Sellers each commenced voluntary cases, Case Nos. 10-13755 (MFW), 10-13700 (MFW), 10-13749 (MFW), 10-13720 (WFW), 10-13689 (MFW), 10-13691 (MFW), and 10-13743 (MFW) (collectively referred to herein as the "Bankruptcy Cases"), under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers are currently operating their businesses (including the Business) and managing their properties and assets as debtors and debtors-in-possession pursuant to Sections 1107 and 1008 of the Bankruptcy Code;

WHEREAS, the Sellers wish to sell, and Purchaser wishes to purchase, the Assets of the Business set forth herein on the terms and subject to the conditions set forth in this Agreement and subject to the approval of the Bankruptcy Court and higher and better offers at the Auction;

WHEREAS, the Sellers shall assume and assign the Assumed Leases and the Assumed Contracts, subject to the terms hereof and approval of the Bankruptcy Court, to Purchaser;

WHEREAS, Purchaser acknowledges that the transactions provided in this Agreement are of direct and material benefit to it; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Sellers and Purchaser, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## SALE OF ASSETS; EXCLUDED ASSETS

SECTION 1.01.      Transferred Assets. Sellers hereby agree to, sell, assume and assign and deliver to Purchaser, and Purchaser hereby agrees to purchase and accept from the Sellers, all of the Sellers' right, title and interest in and to the following assets (but specifically excluding the Excluded Assets) free and clear of all Liens (such assets shall be collectively referred to herein as the "Assets"):

(a)　　Inventory. All inventory of food, non-alcoholic beverages, alcoholic beverages (only to the extent transferable under applicable Law), paper products, cooking supplies and cleaning supplies used or held for use in the operation of each Restaurant on its applicable Effective Transfer Date (the "Inventory");

(b)　　Equipment. All fixtures, furniture and equipment, used or held for use (whether at each Restaurant, in storage or in transit) in the operation of each Restaurant on its applicable Effective Transfer Date, including but not limited to tables, chairs, smallwares, signs, lights, ornaments, decor, collectibles, appliances, computers, tools, machinery, display cases, shelves, cabinets, racks, bars, bar equipment, and any desktop and laptop personal computers that are used in the operation of each Restaurant on its applicable Effective Transfer Date. Sellers also transfer to Purchaser all of the unexpired warranties for this equipment when such equipment is transferred;

(c)　　Assumed Leases. All of the Sellers' interests in and to all Leases set forth in Section 1.01(c) of the Disclosure Schedule (collectively the "Assumed Leases") on the applicable Effective Transfer Date of each Restaurant to which the underlying Assumed Lease pertains, including all of the Sellers' interests in any tenant improvements, fixtures, easements, rights of way and other appurtenances related to such Assumed Lease;

(d)　　Assumed Contracts. All of the Sellers' rights, privileges and claims under all Contracts of the Sellers relating to each Restaurant to the extent assignable in accordance with their terms and applicable Law (the "Assumed Contracts") on each applicable Effective Transfer Date of such Restaurant;

(e)　　Liquor Licenses. All of the Sellers' Liquor Licenses used in the operation of each Restaurant set forth in Section 1.01(e) of the Disclosure Schedule (the "Assigned Liquor Licenses") transferred on the applicable Effective Transfer Date of such Restaurant;

(f)　　Permits. All of the Sellers' Permits relating to each Restaurant that, under applicable Law, the Sellers may transfer to Purchaser (the "Assigned Permits") on the applicable Effective Transfer Date of such Restaurant;

(g)　　Books and Records. Except as set forth in Section 1.01(g) of the Disclosure Schedule, all books, records, correspondence, advertising and promotional materials, marketing information, operating manuals, training manuals, recipes, menus, business reports, customer lists and databases, studies and pricing information relating exclusively to, or used exclusively in, the operation of the Business, and the right to use, but not exclusively, and a copy of the documentation of, all shared recipes used in connection with the operation of the Restaurants and other businesses of the Sellers; any recipes used exclusively in the Business shall be transferred on an exclusive basis and the Sellers shall not use such recipes after the last Effective Transfer Date; provided, however, that Sellers shall have the right to retain copies of any portions of such materials that relate to the Business or any of the Assets as operated and used by Sellers prior to the applicable Effective Transfer Date .

(h)　　Intellectual Property. All Intellectual Property Rights used by the Sellers exclusively in connection with the Business set forth on Section 1.01(h) of the Disclosure Schedule, including all goodwill associated therewith, to the extent assignable in accordance with applicable Law (the "Assigned Intellectual Property") upon the Initial Effective Transfer Date; provided that the Sellers will be granted a license to use such Intellectual Property in connection with each Restaurant that is not yet transferred to Purchaser pursuant to the terms and conditions of a licensing agreement which is to be executed at the Initial Closing Date by the Purchaser and Sellers in accordance with, and as provided for by, this Agreement (the "Intellectual Property License Agreement");

       (i)     <u>Telephone Numbers and Listings</u>. All transferable telephone numbers, facsimile numbers, email addresses and directory listings used exclusively in connection with each Restaurant on the applicable Effective Transfer Date of such Restaurant;

       (j)     [RESERVED];

       (k)     <u>Cash</u>. Cash on hand at each Restaurant on the applicable Effective Transfer Date;

       (l)     [RESERVED];

       (m)     <u>Security Deposits</u>. All security deposits made by the Company that relate to Real Property Leases of each Restaurant on the applicable Effective Transfer Date; <u>provided</u> that such security deposits are exclusively in connection with such Restaurant; and

       (n)     All assets of every kind and nature related, in whole or in part, to the each Restaurant on its applicable Effective Transfer Date.

All such sales and assumptions and assignments shall be subject to approval in all respects by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code.

       SECTION 1.02.   <u>Excluded Assets</u>. Notwithstanding anything to the contrary contained in this Agreement, the Assets do not include the following assets of the Sellers (the "<u>Excluded Assets</u>"):

       (a)     [RESERVED];

       (b)     All bank accounts and the amounts on deposit therein, including any bank accounts used in connection with the Business, and any cash or cash equivalents related to the Business other than the cash on hand at each of the Restaurants on its applicable Effective Transfer Date;

       (c)     All accounts receivable, including accounts receivable generated by each Restaurant for products or services provided prior to such Restaurant's Effective Transfer Date;

       (d)     All inventories of alcoholic beverages used or held for use in whole or in part in the businesses of any Seller or its Subsidiaries, other than the Business, and all inventories of alcoholic beverages used or held for use exclusively in the operation of the Restaurants, other than those transferable to Purchaser under applicable Law;

       (e)     All Permits related in whole or in part to businesses of any Seller or its Subsidiaries, other than the Business, and all of the Sellers' Permits related exclusively to the Business, but not transferable to Purchaser under applicable Law;

       (f)     All Liquor Licenses used other than exclusively in the operation of the Restaurants and all Liquor Licenses used exclusively in the operation of the Restaurants that, under applicable Law, may not be transferred to Purchaser;

       (g)     All rights, privileges and claims under shared contracts that (i) are not transferable or (ii) relate to businesses other than the Business;

(h)     All insurance policies (except as otherwise provided in Section 7.01 with respect to proceeds);

(i)     All corporate records and other documents, books, records, customer lists and databases not relating exclusively to the Business (except as otherwise provided in Section 1.01(g)), any books and records related to Sellers' employees the transfer of which would conflict with any confidentiality or privacy obligation of Sellers under applicable Law, and all books and records listed in Section 1.01(g) of the Disclosure Schedule;

(j)     All Tax Returns, Tax records and any other Tax related work papers and documentation;

(k)     All properties, capital stock, claims, Contracts, goodwill and assets and rights of any nature relating to any extent to any business conducted by the Sellers other than the Business;

(l)     All rights under the Transaction Documents;

(m)     All Intellectual Property Rights used in whole or in part in connection with businesses of any Seller or its Subsidiaries, other than the Business, including computer software not used exclusively in connection with the Business and computer software used at the Restaurants to report or communicate with other Seller locations, and any licenses of Intellectual Property Rights (including software licenses) that are not assignable pursuant to applicable Law;

(n)     All employee benefit plans and assets relating thereto;

(o)     All Leases other than the Assumed Leases;

(p)     All claims for refunds of Taxes and any other Tax assets;

(q)     All deposits (other than security deposits covered by clause 1.01(m) hereto) made exclusively in connection with the Assets or the Business, including escrows relating to liquor purchases, and any prepaid expenses incurred exclusively in connection with the Business including prepaid utilities and any amounts deposited or prepaid with respect to Assumed Contracts, Assumed Leases, Assigned Permits and Assigned Liquor Licenses; and

(r)     All Contracts that are not Assumed Contracts.

SECTION 1.03.     Assumed Liabilities.  Purchaser shall assume and thereafter pay, honor and discharge when due and payable the following liabilities (the "Assumed Liabilities"):

(a)     All obligations of the Sellers to be performed under each Assumed Lease, other than obligations arising from acts, omissions and/or breaches prior to the Effective Transfer Date of the underlying Restaurant related to such Assumed Lease, accruing from and after each Effective Transfer Date of the underlying Restaurant related to such Assumed Lease;

(b)     [RESERVED];

(c)     All obligations of the Sellers to be performed under each Assumed Contract accruing from and after the transfer of such Assumed Contract;

(d)     All obligations of the Sellers to be performed under each Assigned Liquor Licenses accruing from and after the transfer of such Assigned Liquor License;

(e)     All obligations of the Sellers to be performed under the Assigned Permits accruing from and after the transfer of such Assigned Permit;

(f)     All obligations remaining under (i) the Gift Cards, (ii) the Pub Club Rewards Program and (iii) all coupons and promotional offers outstanding as of the Initial Effective Transfer Date; and

(g)     All obligations of Purchaser under Purchaser's pro rata portion of the Pro-Rated Payments set forth in Section 1.05 and the transfer Taxes under Section 12.06(a).

SECTION 1.04.     Excluded Liabilities. Other than the Assumed Liabilities and Purchaser's pro rata portion of any Pro-Rated Payments, Purchaser shall not assume or retain, pay, discharge, perform or in any way be responsible or liable for any liabilities or obligations of the Sellers (the "Excluded Liabilities") and the Sellers shall retain or assume, pay, discharge, perform and be responsible and liable for such liabilities and obligations, including, without limitation:

(a)     any liabilities or obligations with respect to Taxes other than (i) Transfer Taxes for which Purchaser is responsible under Section 12.06(a) and (ii) any other Taxes allocated to Purchaser under Section 12.06(b);

(b)     any accrued quarterly bonus associated with any employee benefit plan;

(c)     any liability under Leases, Contracts or Permits of the Sellers that are not validly assumed and assigned to Purchaser or under which Purchaser is not provided benefits;

(d)     any intercompany debt or any third-party debt of the Sellers;

(e)     any liability or obligations relating to, resulting from or arising out of occurrences of or claims by current or former employees or third parties for personal or bodily injury or death or property damage (including any workers' compensation claim) incurred prior to the Closing Date;

(f)     any liability arising out of or relating to (i) any products manufactured or sold or any services provided by any Seller prior to the Closing Date or (ii) the business or operations of any Seller prior to the Closing Date, including any warranty, product liability, or other claim;

(g)     any liability arising out of or relating to the Excluded Assets;

(h)     except as otherwise provided in Section 1.05, any liability for accounts payable of the Sellers as of the Closing Date; and

(i)     Any other liabilities or amounts owed to employees pursuant to any 401K or other profit sharing or retirement plans.

SECTION 1.05.     Pro-Rated Payments.

(a)     The following payments relating to the Business and the Assets (the "Pro-Rated Payments") shall be shared between Purchaser and the Sellers as follows:

(b)     Rent payments and other fees, charges and costs payable under each Assumed Lease for the period commencing before and ending after the applicable Effective Transfer Date shall be the obligation of the Sellers for the period prior to such applicable Effective Transfer Date and the obligation of Purchaser for the period from and including such applicable Effective Transfer Date (the parties acknowledge that none of the Assumed Leases contain percentage rent clauses);

(c)     Utility charges incurred in connection with the operation of each of the Restaurants for periods commencing before the applicable Effective Transfer Date and ending after such applicable Effective Transfer Date shall be allocated to the Sellers for utility usage for the period prior to such applicable Effective Transfer Date and to Purchaser for the period from and including such applicable Effective Transfer Date;

(d)     Real property Taxes, personal property Taxes and other similar Taxes relating to the Assets for any taxable period commencing prior to the Closing Date and ending after the Closing Date shall be prorated as provided in Section 12.06(b);

(e)     Charges for services including but not limited to snow removal, trash pickup, security, janitorial and similar services incurred in connection with the operation of each Restaurant for the period commencing before the applicable Effective Transfer Date and ending after such Effective Transfer Date under any Assumed Contracts shall be allocated to the Sellers for services for the period prior to such Effective Transfer Date and to Purchaser for the period from and including such Effective Transfer Date.

(f)     Liquor License renewal fees incurred for periods commencing before the applicable Effective Transfer Date and ending after such Effective Transfer Date shall be allocated to the Sellers for the period prior to such Effective Transfer Date and to Purchaser for the period from and including the such Effective Transfer Date.

(g)     Unless otherwise provided herein, Pro-Rated Payments shall be made pursuant to the procedures set forth in Section 2.01(b).

## ARTICLE II
## PURCHASE PRICE; CLOSING

SECTION 2.01.     Purchase Price.

(a)     Consideration.  As consideration for the sale of the Assets to Purchaser, Purchaser shall pay to the Sellers a purchase price (the "Purchase Price") equal to (i) three million four hundred thousand Dollars ($3,400,000) (including the Deposit (as defined in Section 2.01(e))) payable in cash as provided in Section 2.02(d), subject to adjustment as provided herein; plus (ii) the amount of cash on hand at each Restaurant on the applicable Effective Transfer Date which is transferred to the Purchaser pursuant to Section 1.01(k), payable in cash on such applicable Effective Transfer Date; plus (iii) the cost of all Inventory in each Restaurant on the applicable Effective Transfer Date, payable in cash seven (7) days following such Effective Transfer Date.

(b)     Statement for Pro-Rated Payments.  As soon as practicable after the applicable Effective Transfer Date, the Sellers shall deliver to Purchaser a statement (the "Pro-Ration Statement") of the amounts for the Pro-Rated Payments described in Section 1.05(a).  The net amount on the Pro-Ration Statement, as reasonably agreed to by Purchaser, shall be paid by the Sellers or Purchaser, as appropriate, within ten (10) business days after the delivery of the Pro-Ration Statement.  Following the applicable Effective Transfer Date, in the event that the amount of any Pro-Rated Payment was incorrectly calcu-

lated, the Sellers or Purchaser, as applicable, shall invoice the other Party for the actual amount due. Any such invoice shall list the items paid and the actual cost paid, and the invoiced Party shall pay the invoiced amount within thirty (30) days of receipt of the invoice. Following such Effective Transfer Date, in the event that the actual amount paid is less than the amount for any Pro-Rated Payment on the Pro-Ration Statement, the Party that paid such lesser amount shall reimburse the other Party for the difference between the amount set forth on the Pro-Ration Statement and the actual amount paid within thirty (30) business days of submitting such payment to the applicable third party. Upon request, each Party shall provide the other with reasonable documentation supporting any amounts paid with respect to Pro-Rated Payments.

(c)  Inventory Payables and Reimbursements. The accounts payable relating to Inventory in each Restaurant on its applicable Effective Transfer Date (the "Effective Transfer Date Inventory") shall be retained or assumed, as applicable, and discharged by the Sellers and Purchaser shall reimburse the Sellers for the applicable Effective Transfer Date Inventory valued at the actual cost paid for such Effective Transfer Date Inventory. On the applicable Effective Transfer Date, Purchaser and the Sellers shall conduct a physical inventory of the items of Effective Transfer Date Inventory at the Restaurants. Sellers shall invoice Purchaser for the Effective Transfer Date Inventory based on such physical count and Sellers' invoiced cost for such Effective Transfer Date Inventory. Such Effective Transfer Date inventory reimbursement shall be made seven (7) days following such Effective Transfer Date. Nothing herein shall obligate Purchaser to pay for any Inventory that is spoiled and/or expired as of the Effective Transfer Date Inventory.

(d)  Leases and Contracts. Sellers shall not reject any Assumed Contract or Assumed Lease in any bankruptcy proceeding following the date hereof without Purchaser's prior written consent. The cure amounts, as determined by the Bankruptcy Court, if any (the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have results from such defaults under the Assumed Leases and the Assumed Contracts (other than those Leases and Contracts which have been rejected with Purchaser's prior written consent) shall be paid by Sellers and not by Purchaser and Purchaser shall have no liability therefor. At each Effective Transfer Date, and pursuant to Section 365 of the Bankruptcy Code, Sellers shall assume and assign to Purchaser the applicable Assumed Leases and the applicable Assumed Contracts.

(e)  Deposit. The parties acknowledge that on the date hereof, Purchaser has paid to Sellers a deposit of three hundred and forty-thousand Dollars ($340,000) (the "Deposit"). The Deposit will be held in escrow by Purchaser's attorney (the "Escrow Agent") pursuant to the terms and conditions of an escrow agreement which is to be executed by the Purchaser and Sellers as of the date hereof (the "Escrow Agreement") and will not become property of the Sellers until Closing, by Order of the Court or pursuant to Section 9.02.

SECTION 2.02.  Closing; Closing Date; Effective Transfer Date; Payment of Purchase Price.

(a)  As used in this Agreement, the term "Transferable Restaurant", shall mean a Restaurant that satisfies all conditions to the obligations of the Parties to consummate the sale and transfer of such Restaurant or has been granted a waiver of such conditions (other than conditions with respect to actions the respective Parties shall take at the Final Effective Transfer Date), including, but not limited to, all necessary approvals of the Bankruptcy Court, and counsel to Purchaser having confirmed that all necessary approvals have been given to the assignment of the Liquor License related to that Restaurant).

(i)  The first restaurant to qualify as a Transferable Restaurant will be labeled as the "First Transferable Restaurant;"

(ii)     The second restaurant to qualify as a Transferable Restaurant will be labeled as the "Second Transferable Restaurant;"

(iii)    The third restaurant to qualify as a Transferable Restaurant will be labeled as the "Third Transferable Restaurant;"

(iv)    The fourth restaurant to qualify as a Transferable Restaurant will be labeled as the "Fourth Transferable Restaurant;"

(v)     The fifth restaurant to qualify as a Transferable Restaurant will be labeled as the "Fifth Transferable Restaurant;"

(vi)    The sixth restaurant to qualify as a Transferable Restaurant will be labeled as the "Sixth Transferable Restaurant;" and

(vii)   The seventh restaurant to qualify as a Transferable Restaurant will be labeled as the "Seventh Transferable Restaurant."

(b)     As used in this Agreement, the term "Effective Transfer Date" with respect to each Restaurant, shall mean the day after such Restaurant is classified as a Transferable Restaurant.

(c)     A separate closing will occur with each Transferable Restaurant in the order of Section 2.01(a)(i) through (vii). The first closing of the transactions contemplated by this Agreement (the "Initial Closing" and together with all subsequent closings as provided below, the "Closing") shall take place at the offices of Cahill Gordon & Reindel LLP, 80 Pine Street, New York, NY 10005 commencing at 9:00 A.M. local time, no later than the business day following the Effective Transfer Date of the First Transferable Restaurant or at such other place or on such other date as may be mutually agreeable to Purchaser and Sellers. Subsequent closings will occur on the business day following the Effective Transfer date of each Transferable Restaurant. The Initial Closing (and each subsequent Closing), the Parties shall deliver those documents and take such other actions, as to all the Assets, Assumed Contracts, Assumed Leases and Assigned Permits relating to each Restaurant for which such Closing is taking place, the delivery or performance of which are conditions to the other parties' obligations pursuant to Article VIII. The parties contemplate that at or prior to each Effective Transfer Date they may execute all necessary documents to be held in escrow and delivered at each Closing. The date of the first Closing is herein referred to as the "Initial Closing Date" and together with all subsequent closings, the "Closing Date."

(d)     The parties acknowledge that on the Initial Closing Date (i) an amount equal to two million three-hundred thousand Dollars ($2,300,000) will be paid to the Sellers as consideration for the First Transferable Restaurant and other assets transferred (for avoidance of doubt not including any other Transferable Restaurant besides the First Transferable Restaurant) on the Initial Closing Date and (ii) an amount equal to seven-hundred sixty-thousand Dollars ($760,000) will be paid to the Escrow Agent to combine with the Deposit to form the remainder of the Purchase Price (the "Escrowed Amount"), which is to be released by the Escrow Agent in accordance with Section 2.02(e), notwithstanding the requirements set forth in the Escrow Agreement.

(e)     The Escrow Agent shall be authorized to release from escrow and shall disburse to Sellers and reduce the Escrowed Amount as follows:

(i)     Upon the Closing of the Second Transferable Restaurant, $200,000 will be transferred to Sellers.

(ii)     Upon the Closing of the Third Transferable Restaurant, $200,000 will be transferred to Sellers.

(iii)     Upon the Closing of the Fourth Transferable Restaurant, $200,000 will be transferred to Sellers.

(iv)     Upon the Closing of the Fifth Transferable Restaurant, $200,000 will be transferred to Sellers. Forty Thousand dollars ($40,000) of the amount transferred will be considered disbursed from the Deposit.

(v)     Upon the Closing of the Sixth Transferable Restaurant, $200,000 will be transferred to Sellers. All of the amount transferred will be considered disbursed from the Deposit.

(vi)     Upon the Closing of the Seventh Transferable Restaurant, $100,000 will be transferred to Sellers. All of the amount transferred will be considered disbursed from the Deposit.

(f)     At each Closing, Purchaser may designate an Affiliate of Purchaser to take title of such Transferable Restaurant.

SECTION 2.03.     [RESERVED].

SECTION 2.04.     Bankruptcy Auction.

(a)     This Agreement shall be subject to the consideration of higher or better offers submitted at an auction (the "Auction") to be conducted in accordance with the Sale Procedures annexed hereto as Exhibit F (as may be modified by agreement of the Parties or by order of the Bankruptcy Court).

(b)     On or before December 23, 2010, the Sellers shall file with the Bankruptcy Court the Sale Procedures Motion and the Sale Motion, including all supporting papers, notices and proposed orders, including but not limited to the Approval Order, seeking authorization for the Sellers to enter into this Agreement, the approval of the Sale Procedures, the scheduling of a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing"), and the approval of the form and manner of notice of the Sale Procedures and the Sale Hearing. The Sale Procedures Motion, the Sale Motion, and all notices, statements, schedules, applications, reports and other papers to be filed by the Sellers in connection therewith shall be in form and substance reasonably satisfactory to Purchaser and shall be served in compliance with Rules 2002, 6004 and 6006 of the Bankruptcy Rules, Sections 363 and 365 and any other applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, the Local Rules and any applicable orders of the Bankruptcy Court.

(c)     The Sellers shall schedule hearings to consider the Sale Procedures Motion and the Sale Motion as soon as possible so as to obtain entry by the Bankruptcy Court of the Sale Procedures Order no later than January 3, 2011, establishment of a deadline for submission of bids no later than January 14, 2011, fixing an Auction by no later than January 18, 2011, and entry by the Bankruptcy Court of the Approval Order no later than January 20, 2011, or such other dates as may be required by the Bankruptcy Court.

(d)     The Sellers and Purchaser shall cooperate with filing, serving and prosecuting the Sale Procedures Motion and the Sale Motion and obtaining entry of the Sale Procedures Order and the Approval Order, and the Sellers shall deliver to Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Purchaser its counsel to review and comment on, copies of all proposed pleadings, motions (including, without limitation, the Sale Motion and the Sale

Procedures Motion), notices, statements, schedules, applications, reports and other papers to be filed by the Sellers in connection with the Sale Procedures Motion and the Sale Motion and the relief requested therein.

(e)    [RESERVED].

(f)    Sellers agree that the Sales Procedures for the Auction shall also include the requirement that (i) the bidding occurs in increments of Purchaser's Purchase Price, plus the Expense Reimbursement Fee and in $50,000 increments thereafter (i.e., the additional overbid must be in the amount of $3,650,000).

## ARTICLE III
## TRANSITIONAL SUPPORT

SECTION 3.01.    [RESERVED].

SECTION 3.02.    [RESERVED].

SECTION 3.03.    Transition of Assigned Liquor Licenses. Subject to the conditions of Closing stated herein, Sellers and Purchaser agree to cooperate in identifying those Assigned Liquor Licenses with respect to which a commercially reasonable arrangement may be reached between the Seller currently holding such Assigned Liquor License and Purchaser to permit the transfer of the Restaurant to which such Assigned Liquor License relates and the continued operation of such Restaurant by Purchaser pending approval by the relevant Governmental Entities of the transfer of such Assigned Liquor License to Purchaser.

SECTION 3.04.    Gift Card Processing and Reimbursement. Purchaser shall continue to honor all Gift Cards issued prior to the Closing, Purchaser shall be solely liable for all obligations relating to Gift Cards that have not been redeemed prior to the Closing Date. The Sellers shall have no obligations to reimburse Purchaser for the redemption of any Gift Cards that are redeemed after the Closing Date. Sellers will give Purchaser a list of outstanding gift cards.

SECTION 3.05.    Pub Club. Purchaser shall continue to honor all Pub Club membership, points and rewards issued prior to the Closing, and shall enter into an agreement with an appropriate vendor, for the use of such vendor's processing services. Purchaser shall be solely liable for all obligations relating to the Pub Club that have not been redeemed prior to the Closing Date. The Sellers shall have no obligations to reimburse Purchaser for the redemption of any Pub Club rewards or points that are redeemed after the Closing Date. Sellers will supply a list of the Pub Club points and a list of the terms and conditions of the Pub Club.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller, jointly and severally, hereby represents and warrants to Purchaser as follows as of the date hereof and as of each Effective Transfer Date:

SECTION 4.01.    Organization. Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and is in good standing in each jurisdiction where the character of the property owned or leased by it or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or to be in good standing would not reasonably be expected to have a Material Adverse Effect on the Business. Each Seller has the

corporate power and authority to own the Assets owned by such Seller, and each Seller has the corporate power and authority to conduct the business as presently conducted by such Seller, in each case, except where the failure to have such power and authority would not reasonably be expected to have a Material Adverse Effect on the Business.

SECTION 4.02. Authorization. Each Seller, subject to any necessary approvals of the Bankruptcy Court, has full corporate power and authority to execute and deliver all Transaction Documents to which such Seller is, or will be, a party and to consummate the transactions contemplated hereby and thereby. Each Seller has taken all corporate action required by its certificate of incorporation and by-laws or operating agreement to authorize the execution and delivery of all Transaction Documents to which such Seller is a party and to authorize the consummation of the transactions contemplated hereby and thereby. This Agreement is, and each other Transaction Document upon execution and delivery by the Sellers party thereto will be, a legal, valid and binding obligation of each Seller that is a party thereto, enforceable against such Seller in accordance with its terms, subject to any necessary approvals of the Bankruptcy Court.

SECTION 4.03. No Conflicts. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) conflict with or violate any provision of the certificate of incorporation or by-laws of any Seller, (ii) conflict with or violate any Law applicable to any Seller in respect of the Business or by which any Asset is bound, or (iii) except as set forth in Section 4.03 of the Disclosure Schedule, conflict with or result in any breach of or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under any agreement or other instrument to which any Seller is a party or by which the Assets are bound or which would result in the creation of any Lien on any of the Assets.

SECTION 4.04. [RESERVED].

SECTION 4.05. Real Property.

(a) Leased Real Property. Section 4.05(a) of the Disclosure Schedule contains a list of all Leases under which the Sellers use or occupy, or have the right or obligation to use or occupy or pay rent, any real property used exclusively in connection with the Business (collectively, the "Real Property Leases"), and the address of each location, the name of the lessor and the date of each Real Property Lease.

(b) With respect to the real property subject to the Real Property Leases (the "Leased Real Property"), the Sellers shall continue the operations of the Leased Real Property in its normal and usual manner and deliver same in no less a satisfactory condition than exists on the signing of this Agreement, normal wear and tear excepted.

SECTION 4.06. Personal Property. Except as set forth in Section 4.06 of the Disclosure Schedule, the Sellers have good and transferable title to all of the tangible personal property included in the Assets (collectively, the "Personal Property") free and clear of any Liens.

SECTION 4.07. Intellectual Property.

(a) Section 4.07(a) of the Disclosure Schedule identifies, as of the date hereof, (i) all Assigned Intellectual Property that is material to the Business (ii) each license, agreement or other permission relating to the Assigned Intellectual Property that is material to the Business whether granted (A) to the Sellers by a third party or (B) by the Sellers to a third party.

(b)     To the Knowledge of Sellers, with respect to the operation of the Business, (i) there have not been any infringement actions, (ii) no Seller has received in connection with any Assigned Intellectual Property any written charge, complaint, claim, demand or notice alleging any interference with, infringement or misappropriation of, act of unfair competition with or any other conflict with any Intellectual Property Rights of a third party; and (iii) in the past three (3) years no Seller has sent to any third party or otherwise communicated to another Person any charge, complaint, claim, demand or notice asserting infringement or misappropriation of, or other conflict with, any Intellectual Property Right of such Seller in or to the Assigned Intellectual Property, by such other Person or any acts of unfair competition by such other Person.

SECTION 4.08.     Purchased Assets. Sellers have good, valid and marketable title to, or valid leasehold or license interests in, as the case may be, all of the Assets, which it shall, subject to any approvals of the Bankruptcy Court, transfer free and clear of any Lien. The Assets constitute all the material assets, rights and properties used or held for use in the conduct of the Business as conducted as of the date of the most recent Financial Reports, subject to such changes in Inventory as have occurred in the ordinary course of business consistent with past practice or otherwise permitted by this Agreement since such date. Except as disclosed in Section 4.08 of the Disclosure Schedule, all of the Assets are in normal operating condition and repair, ordinary wear and tear excepted, commensurate with such Assets' age, and the Assets are in usable condition. Except as set forth in Section 4.08 of the Disclosure Schedule, the Assets constitute all of the material assets, properties and rights, tangible and intangible, necessary for the continued operation of the Business consistent with the manner in which the Sellers were operating the Business prior to the date of this Agreement.

SECTION 4.09.     Employment, Labor and Employee Benefit Matters. Sellers acknowledge that Purchaser is buying the Assets and not guaranteeing employment to any employees. There are no known employment law or similar issues, suits, or contracts that impact the Assets.

SECTION 4.10.     Compliance with Law; Permits. Except as would not (i) materially and adversely affect the ability of the Sellers to operate the Business, or (ii) otherwise reasonably be expected to have a Material Adverse Effect on the Business, the Sellers are not in violation of any applicable Laws. The Sellers hold all material Permits issued or provided by Governmental Entities, which are necessary for the ownership of the Assets and the operation of the Business, all of which are listed in Section 4.10 of the Disclosure Schedule.

SECTION 4.11.     Litigation. Except as set forth in Section 4.11 of the Disclosure Schedule, no claims, actions, suits, proceedings or investigations are pending or, to the Knowledge of Sellers, threatened before any arbitrator or Governmental Entity relating to the Business or the Assets, which if determined adversely to the Business or the Assets would reasonably be expected to have a Material Adverse Effect, or which seek to prevent the consummation of the transactions contemplated by this Agreement.

SECTION 4.12.     Financial Information. Schedule 4.12(a) sets forth copies of unaudited historical balance sheet items of The Office Concept as of September 26, 2010 and income statement for the two year period ended September 26, 2010 (the "Financial Reports"). The Financial Reports have been prepared in accordance with the assumptions set forth therein.

The Financial Reports have been prepared in good faith based upon the books and records of Sellers, consistent with past practices of Sellers, except as described in Section 4.12(b) of the Disclosure Schedule.

SECTION 4.13.     [RESERVED].

SECTION 4.14.    [RESERVED].

SECTION 4.15.    [RESERVED].

SECTION 4.16.    Environmental Matters. As it pertains to environmental matters, (i) the Sellers have complied, and their operation of the Business and the Assets have complied with all Environmental Laws applicable to the Business and the Assets; (ii) the Sellers have not received any written notice, demand, claim or request for information from any Person alleging a violation of, or any liability under, any applicable Environmental Law relating to the Business or Assets; (iii) the Sellers have obtained all Permits required under applicable Environmental Laws with respect to the Business and Assets, and the Sellers, Business and Assets are all in compliance with the terms and conditions of such Permits; (iv) there are no pending or to the Knowledge of Sellers threatened, actions, claims, notices of violation, investigations, notices of potential liability or requests for information under or pursuant to any Environmental Law relating to the Business or Assets; (v) the Sellers are not currently conducting any investigation, response or other corrective action pursuant to any Environmental Law at any of the Assets, or at any facility or property formerly owned, leased or operated in connection with the Business, nor are they a party to any Contract, order, judgment or decree which obligates any of them to conduct any such actions; (vi) to the Knowledge of Sellers, there are no activities, occurrences or conditions relating (a) to the Business or (b) to the Assets, to the extent arising out of the operation or use thereof by any of the Sellers, including without limitation the Release of any Hazardous Materials, that could reasonably be expected to result in any violation of or liability under any Environmental Law; and (vii) to the Knowledge of Sellers, there are not now at any of the Assets any (a) underground storage tanks or related piping, (b) aboveground storage tanks or related piping, (c) impoundments (d) landfill areas (e) asbestos or asbestos-containing materials, or (f) polychlorinated biphenyls.

None of the representations and warranties in this Agreement, other than those contained in this Section 4.16, shall address matters involving Environmental Laws, Hazardous Materials or other environmental matters as they relate to the Sellers, the Business or the Assets.

SECTION 4.17.    [RESERVED].

SECTION 4.18.    [RESERVED].

SECTION 4.19.    Insurance. Section 4.19 of the Disclosure Schedule sets forth an accurate and complete list of all insurance policies held by the Sellers that relate to the Business or Assets (the "Insurance Policies"), which list includes (a) the name of the insurer and agent, (b) the amount of coverage and (c) the expiration date, as applicable. Each Insurance Policy is currently in full force and effect. All insurance premiums for such policies have been timely paid. The Sellers are in compliance with the terms and conditions of the Insurance Policies. No Seller has received any notice of cancellation or non-renewal of any Insurance Policy nor, the Knowledge of Sellers, is the termination of any the Insurance Policies threatened. No Seller has received any declination of coverage from insurers with respect to any currently pending claim that relates to the Business or the Assets tendered for defense or recovery.

SECTION 4.20.    [RESERVED].

SECTION 4.21.    Third Party Consents and Governmental Approvals. Except for necessary Bankruptcy Court approvals and such third-party consents and government approvals that are listed in Section 4.21 of the Disclosure Schedule and any additional third-party consents or government approvals that are obtained on or prior to the Closing Date, no approval of any Governmental Entity or other approval, consent, waiver, order or authorization of, or registration, qualification, declaration, or filing with, or notice to, any third party is required on the part of any Seller in connection with the execu-

tion and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement.

SECTION 4.22. Brokers and Finders. Except for Raymond James & Associates, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers. Except as otherwise provided for herein, Sellers are solely responsible for the Bankruptcy Court-approved fees and expenses of Raymond James & Associates, Inc. in connection with this transaction.

SECTION 4.23. Sales Taxes. Sales taxes pertaining to the Business and Assets have been paid to date and in full.

SECTION 4.24. No Other Representations or Warranties. Except as expressly set forth in this Agreement, no Seller nor any agent or representative of any Seller has made, and no Seller is liable for, any other express or implied representations or warranties, guarantees, promises, statements, inducements, representations, or information pertaining to the Business or the Assets. Without limiting the generality of the foregoing, except as expressly set forth herein, no Seller is liable for or bound by, and Purchaser has not relied upon, any oral or written statements, representations or any other information respecting the Business or the Assets furnished by any Seller or any agent or representative of any Seller, including but not limited to projections, estimates and other forecasts with respect to the Business and the Restaurants that have been provided by any Seller in connection with Purchaser's investigation of the Business.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represent and warrant to Sellers as follows as of the date hereof and as of each Effective Transfer Date:

SECTION 5.01. Organization. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

SECTION 5.02. Authorization. Purchaser has full corporate or limited liability company power and authority to execute and deliver this Agreement and all other documents contemplated hereby and to consummate the transactions contemplated hereby and thereby. Purchaser has taken all corporate action required by its certificate of incorporation and by-laws to authorize the execution and delivery of this Agreement and all other documents contemplated hereby and thereby. This Agreement is, and each other Transaction Document (upon execution and delivery by Purchaser) will be, a legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

SECTION 5.03. No Conflicts. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) conflict with or violate any provision of the certificate of incorporation or by-laws, as applicable, of Purchaser, (ii) conflict with or violate any Law applicable to Purchaser in respect of its business or by which any of the assets of its business is bound, or (iii) conflict with or result in any breach of or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under any agreement or other instrument to which Purchaser is a party or by which its assets are bound, excluding from the foregoing in clauses (ii) and (iii)

above such conflicts, breaches or defaults which, either singly or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.04.    No Brokers and Finders. Except for Raymond James & Associates, Inc. and Hilco Real Estate, LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers. Except as otherwise provided for herein, Sellers are solely responsible for the Bankruptcy Court-approved fees and expenses of Raymond James & Associates, Inc. and Hilco Real Estate, LLC in connection with this transaction.

SECTION 5.05.    No Other Representations or Warranties. Purchaser acknowledges and agrees that no Seller nor any other Person has made any representation or warranty, expressed or implied, as to the Business, the Assets or The Office Concept or the accuracy or completeness of any information regarding the Business, the Assets or The Office Concept furnished or made available to Purchaser and its representatives, except as expressly set forth in this Agreement, the Disclosure Schedule or the Exhibits hereto. Purchaser has not relied on any representation or warranty from any Seller or any other Person in determining to enter into this Agreement, except as expressly set forth in this Agreement, the Disclosure Schedule and the Exhibits hereto.

SECTION 5.06.    Ability to Consummate Transaction. Purchaser has and will have sufficient funds to pay the Purchase Price in full in cash at Closing, and all other amounts payable by Purchaser under this Agreement, together with all fees and expenses of Purchaser associated with the transactions contemplated hereby.

## ARTICLE VI
## COVENANTS

The Parties covenant and agree as follows:

SECTION 6.01.    Efforts to Complete Transaction. Each Party shall use its commercially reasonable efforts to take all action and to do all reasonable things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in Article VIII below).

SECTION 6.02.    Consents; Filings. Each Party shall use its commercially reasonable efforts to (i) obtain any consents, approvals or other authorizations required in connection with the transactions contemplated by this Agreement, including necessary Bankruptcy Court approvals (without limiting the foregoing, Sellers shall take all commercially reasonable steps legally required of them to make Purchaser's application for the Assigned Liquor License transfer possible and agree to reasonably cooperate and assist with Purchaser's efforts in connection therewith including providing copies of the existing applications and floor plans and assisting with any requirement to document the assignment of the Assumed Leases sufficiently for the Division of Alcoholic Beverage Control for the state of New Jersey) and (ii) make any necessary filings and notifications, and thereafter make any other submissions either required or deemed appropriate by each Party, in connection with the transactions contemplated by this Agreement, including any filings or notifications under (A) the Securities Act, the Securities Exchange Act and state securities or "blue sky" Laws and (B) any other applicable Laws. Notwithstanding the foregoing, nothing herein shall obligate Purchaser to accept what it deems to be reasonably unacceptable conditions for the transfer or assignment of any of the contracts and/or agreements herein being assigned and/or transferred.

SECTION 6.03. <u>Operation of Business</u>. Sellers shall continue until each applicable Closing to conduct each Restaurant in substantially the same manner as heretofore conducted, and, without limiting the generality of the foregoing,

(a) shall, unless otherwise provided in this Agreement (including without limitation obtaining the necessary Bankruptcy Court approvals):

(i) perform in all material respects all Contracts in relation to the Business which by their terms require performance by any Seller;

(ii) use their commercially reasonable efforts to preserve, in the aggregate and in all material respects, their respective properties and operations related to the Business and relationships of the Business with suppliers, customers and other Persons with whom the Business has material commercial dealings;

(iii) keep all insurance policies with respect to the Business, or comparable replacements, in full force and effect until the underlying Assets are transferred to the Seller;

(b) shall not, unless otherwise expressly approved in writing by Purchaser, which approval shall not be unreasonably delayed, conditioned or withheld or otherwise required by the Bankruptcy Court:

(i) remove or sell, or cause to be removed or sold, any Assets, except such Personal Property as may be consumed or disposed of in the regular course of the Business or such Real Property Leases as may be transferred from the Sellers to an Affiliate of the Sellers in accordance with the terms of Section 6.12;

(ii) [RESERVED];

(iii) (A) start litigation or arbitration proceedings related to the Business except in the ordinary course of business; or (B) compromise, settle, release or discharge any litigation or arbitration proceedings related to the Business other than litigation or arbitration proceedings that are settled or compromised for aggregate payments by the Business that do not exceed $50,000 individually or $100,000 in the aggregate, to the extent such payments are not covered by insurance;

(iv) enter into any Contract, written or oral, in relation to the Business potentially binding Purchaser after the transfer of the Assets to it, except usual and ordinary commitments for the purchase of goods and services (which shall not include capital expenditures in excess of $20,000 individually or in the aggregate);

(v) distribute coupons or promotional offers other than in a manner that is consistent with past practices; or

(vi) agree or commit to take any of the foregoing actions.

SECTION 6.04. <u>Access to Information</u>.

(a) <u>Pre-Closing Access</u>. Sellers shall permit representatives of Purchaser to have, upon 3 days prior written notice to Sellers, full access at all reasonable times prior to each applicable

Closing, and in a manner so as not to interfere with the normal operations of the Business or Sellers' other businesses, to all premises, properties, personnel, books, records (including Tax records), Contracts, and documents of or pertaining to the Business and the Assets. For the avoidance of doubt, such access shall include reasonable access to and cooperation from the Sellers' relevant information technology systems and employees to permit the integration of the Business' systems with those of the Purchaser and its Affiliates. With respect to the information disclosed to Purchaser and its representatives pursuant to this Section 6.04(a), Purchaser shall comply with all of the obligations of Purchaser under the Confidentiality Agreement of Purchaser to Raymond James & Associates, Inc. for itself and as representative and on behalf of CB Holding Corp. dated September 22, 2010 (the "Confidentiality Agreement").

(b)     Post-Closing Access for Purchaser. For a period of three (3) years following the Final Closing Date, Sellers shall permit representatives of Purchaser to have, upon 3 days prior written notice to Sellers, reasonable access at reasonable times, and in a manner so as not to interfere with the normal operations of Sellers' other businesses, to personnel, books, records (including Tax records), Contracts, and documents of or pertaining to the Business or the Assets as may reasonably be requested by Purchaser in connection with any audits (including Tax audits), investigations, regulatory filings (including filings with the Securities and Exchange Commission and Tax authorities) or other legal compliance.

(c)     Post-Closing Access for Sellers. For a period of three (3) years following the Final Closing Date, Purchaser shall permit representatives of Sellers to have reasonable access at reasonable times, and in a manner so as not to interfere with the normal operations of Purchaser's businesses, to any books or records included in the Assets as may reasonably be required by Sellers in connection with any audits, investigations, regulatory filings (including filings with the Securities and Exchange Commission) or other legal compliance.

SECTION 6.05.     Notification of Certain Matters.

(a)     Notification of Changes. From the date of this Agreement and until the Final Closing Date, Sellers or Purchaser, as the case may be, shall promptly notify the other of (i) its obtaining actual knowledge as to the matters set forth in clauses (x) and (y) below, or (ii) the occurrence, or failure to occur, of any event, which occurrence or failure to occur would cause (x) any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing, or (y) any material failure of Sellers or Purchaser, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement and shall use commercially reasonable efforts to cure before the Effective Time, any event, transaction or circumstance occurring after the date of this Agreement that causes or will cause any such covenant or agreement under this Agreement to be breached or that renders or will render untrue any such representation or warranty contained in this Agreement; provided, however, that no such notification shall affect the representations or warranties of the Parties or the conditions to the obligations of the Parties hereunder.

(b)     Notices from Third Parties. From the date of this Agreement and until the Final Closing Date, Sellers or Purchaser, as the case may be, shall promptly notify the other of (i) any written notice or other communication from any third party alleging that the consent of such third party is or may be required in connection with the transactions contemplated by this Agreement and (ii) any written notice or other communication from any Governmental Entity or any other third party in connection with the transactions contemplated hereby.

SECTION 6.06.    [RESERVED].

SECTION 6.07.    Licenses and Permits. Purchaser shall use its commercially reasonable efforts, but always in compliance with applicable Law, to secure from the applicable licensing authorities (i) all Liquor Licenses other than the Assigned Liquor Licenses required for Purchaser's operation of the Restaurants; (ii) consent to the assignment to Purchaser of the Assigned Liquor Licenses, to the extent necessary and issuance of any necessary temporary or provisional Permits required for the Purchaser's continued operation of the Restaurants; and (iii) all Permits required for the operation of the Restaurants that are not transferable by the Sellers. No later than January 15, 2011, Purchaser shall had made all complete government filings, including but not limited to each local issuing authority, for purposes of transferring all the Assigned Liquor Licenses to the Purchaser. Purchaser shall comply with and carry out any and all reasonable requirements, demands, requests, rules, and regulations of the local issuing authority, so as to expedite the approval of the issuance or transfer of such Liquor Licenses and Permits. Sellers shall use commercially reasonably efforts to cooperate with Purchaser in obtaining the Liquor Licenses and Permits required to operate the Restaurants and will promptly comply with reasonable requests made by any local issuing authority.

SECTION 6.08.    Employees. Purchaser will have the right but not the obligation to hire Sellers' employees after they have been terminated by Sellers. Purchaser will not assume any obligations or liabilities pertaining to the employees' employment with Sellers.

SECTION 6.09.    Non-Solicitation and Non-Hire.

(a)    Except as otherwise provided in Section 6.08, for a period ending two years after the Final Closing Date, without Purchaser's prior consent, Sellers shall not, and shall cause their Affiliates not to, directly or indirectly, employ or retain, any individual who was employed as a restaurant manager or higher level manager at the Business within twelve (12) months prior to the date of such employment or retention; provided, however, that Sellers and their Affiliates shall not be prohibited from employing or retaining persons who respond to a general solicitation or advertisement directed to general applicant pools.

(b)    Except as otherwise provided in Section 6.08, for a period ending two years after the Closing Date, without Sellers' prior consent, Purchaser and its Subsidiaries shall not, directly or indirectly, employ or retain, any individual who was employed as a restaurant manager or higher level manager at any of Sellers' restaurant concepts (other than The Office Concept) within twelve (12) months prior to the date of such employment or retention; provided, however, that Purchaser and its Subsidiaries shall not be prohibited from employing or retaining persons who respond to a general solicitation or advertisement directed to general applicant pools.

(c)    From and after the Final Closing Date, Sellers shall not, and shall cause their Affiliates not to, use in any manner any lists or databases of customers or suppliers (including those relating to any customer loyalty programs) relating exclusively to The Office Concept.

(d)    For a period ending two years after the Final Closing Date, without Sellers' consent, Purchaser shall not employ, retain or obtain services from the parties listed in Section 6.09(c) of the Disclosure Schedule, each of whom provide from time to time services to Sellers with respect to its restaurant concepts.

SECTION 6.10.    Announcements; Confidentiality.

(a)     Public Announcements. Each party hereto agrees that no public release or announcement concerning the transactions contemplated by this Agreement shall be issued by any such party without the prior consent of the other parties hereto (which consent shall not be unreasonably withheld or delayed), except (a) press releases by each of Purchaser and Sellers regarding the execution of this Agreement and the Closing, (b) an announcement by Sellers to employees of the Business regarding the execution of this Agreement and the Closing and (c) any other release that may be required by Purchaser pursuant to applicable Laws; provided, however, in the case of each of (a)-(c) above, the party electing to or required to make the release or announcement shall allow the other parties reasonable time to comment on such release or announcement in advance of such issuance and will not make any statement if any other party reasonably objects.

(b)     Confidentiality.

(i)     All information not previously disclosed to the public or generally known to persons engaged in the Business or in any other business of any Seller which shall have been or will be furnished by any Seller to the Purchaser in connection with the transactions contemplated hereby or as provided pursuant to this Agreement shall be considered confidential information and treated in accordance with the Confidentiality Agreement between the Purchaser and the Sellers. The Confidentiality Agreement shall terminate at the Final Closing Date.

(ii)     After the Final Closing Date, the Sellers shall treat and hold as confidential any information concerning the business and affairs of the Business that is not already generally available to the public (the "Business Confidential Information"), refrain from using any of the Business Confidential Information, and (except for any information that this Agreement expressly permits any Seller to retain) deliver promptly to the Purchaser, at the request and expense of the Purchaser, all tangible embodiments (and all copies) of the Business Confidential Information which are in its possession or under its control; provided, however, Sellers may retain one hard copy (1) as well as electronic copies of Business Confidential Information to comply with applicable Law or regulation or to comply with policies consistent with past practices. If the Sellers are required to disclose any Business Confidential Information in order to avoid violating any applicable Law, the Sellers will provide the Purchaser with prompt notice of such requirement. To the extent legally permissible and at the Purchaser's expense, the Sellers shall provide the Purchaser, in advance of any such disclosure, with copies of any Business Confidential Information that the Sellers intend to disclose (and, if applicable, the text of the disclosure language itself) and shall cooperate with the Purchaser to the extent the Purchaser may seek to limit such disclosure. If in the absence of a protective order or the receipt of a waiver from the Purchaser after a request in writing therefore is made by the Sellers, and after complying with the foregoing, the Sellers are, on the advice of counsel required by applicable law or legal process to disclose Business Confidential Information, such Seller may do so; provided that such Seller shall disclose only such portion of the Business Confidential Information as it is required to disclose.

(iii)     After the Final Closing Date, the Purchaser shall treat and hold as confidential any information concerning the Business and the business and affairs of the Sellers unrelated to the operation of the Business and that is not already generally available to the public (the "Seller Confidential Information"), refrain from using any of the Seller Confidential Information, and (except for any information that this Agreement expressly permits the Purchaser to retain) deliver promptly to the Sellers, at the request and expense of the Sellers, all tangible embodiments (and all copies) of the Seller Confidential Information which are in its possession or under its control. If the Purchaser is required to disclose any Seller Confidential Information in order to avoid violating any applicable law, the Purchaser will provide the Sellers with prompt notice of such requirement. To the extent legally permissible and at the Sellers' expense, the Purchaser shall pro-

vide the Sellers, in advance of any such disclosure, with copies of any Seller Confidential Information that the Purchaser intends to disclose (and, if applicable, the text of the disclosure language itself) and shall cooperate with the Sellers to the extent the Sellers may seek to limit such disclosure. If in the absence of a protective order or the receipt of a waiver from the Sellers after a request in writing therefore is made by the Purchaser, and after complying with the foregoing, the Purchaser is, on the advice of counsel required by applicable law or legal process to disclose Seller Confidential Information, the Purchaser may do so; provided that the Purchaser shall disclose only such portion of the Seller Confidential Information as it is required to disclose.

SECTION 6.11.     Assumed Leases. Sellers will pay all "cure" costs under Bankruptcy Code Section 365(b) associated with the Assumed Leases.

SECTION 6.12.     Assumed Contracts. Sellers will pay all "cure" costs under Bankruptcy Code Section 365(b) associated with the Assumed Contracts.

SECTION 6.13.     Restaurant Dining Cards. From and after the Initial Closing Date, Purchaser shall not be obligated to honor any cards provided by the Sellers to employees of the Sellers, or their Affiliates, prior to the Initial Closing Date for use in dining at the Restaurants.

SECTION 6.14.     Inventory. Purchaser shall purchase, pay for and be entitled to receive all Inventory held by Sysco Corporation for each Restaurant on its applicable Effective Transfer Date, which Inventory bears any The Office intellectual property or is otherwise held for distribution exclusively to The Office restaurants and has been acquired in the ordinary course of business.

SECTION 6.15.     Change of Corporate Names.

(a)     Promptly (but in any event within five (5) business days) following each applicable Closing Date, such Seller who owns the applicable Restaurant that is transferred and whose corporate name includes the words "The Office", shall change its corporate name to a name that does not include the words "The Office";

(b)     Any Seller whose corporate name includes the words "The Office" and possesses a Restaurant Intellectual Property License after the Final Closing Date, shall be permitted to retain its corporate name for the duration of the Restaurant Intellectual Property License. Promptly (but in any event within five (5) business days) following the expiration of such license such Seller shall change its corporate name to a name that does not include the words "The Office"; and

(c)     Any Affiliate that does not directly own any Restaurants, whose name includes the words "The Office", shall change its corporate name to a name that does not include the words "The Office" promptly (but in any event within five (5) business days) following the Initial Closing Date.

SECTION 6.16.     Closing Balance Sheet. Promptly (but in any event within thirty (30) days of the date of such balance sheet) following the Closing of each Restaurant, Sellers shall deliver to Purchaser a statement setting forth key balance sheet items of the Business relating to such Restaurant as of the most recently ended fiscal period, which balance sheet shall be prepared in good faith on the same basis as the Financial Reports.

SECTION 6.17.     Post-Closing Cooperation; Retransfer. Following each applicable Closing Date, in the event that Purchaser or any Seller identifies any asset or other right that (x) was transferred to Purchaser pursuant to this Agreement but that does not constitute an Asset or (y) was not transferred to Purchaser pursuant to this Agreement but constitutes an Asset, Purchaser or such Seller, as

the case may be, shall and shall cause each of its Affiliates and Subsidiaries, to the extent applicable, to execute agreements to transfer any and all rights in such assets or other rights to the Sellers or their Affiliates or Purchaser or its Affiliates, as the case may be, for no consideration and take such further actions and execute such further documents as may be necessary or reasonably requested by such Seller or Purchaser, as the case may be, in order to effectuate such transfer and to provide such Seller or Purchaser, as the case may be, with the benefits of such assets or rights; provided, that nothing in this Section 6.17 shall require Sellers to make any expenditure or incur any obligation on its own or on behalf of Purchaser.

SECTION 6.18. Bulk Sales. Any escrow required by the New Jersey Division of Taxation pursuant to the New Jersey Bulk Transfer Statute shall be made from the sale proceeds at the time of the Initial Closing Date. Sellers shall provide full cooperation with Purchaser in filing the bulk sale notice with the State of New Jersey.

SECTION 6.19. Acquired Assets "AS IS"; Purchaser's Acknowledgment Regarding Same. Purchaser agrees, warrants and represents that (a) Purchaser is purchasing the Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Purchaser's own investigation of the Assets and Business and (b) except as expressly provided in this Agreement, neither Sellers nor any Affiliate of Sellers has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Assets, any part of the Assets, the financial performance of the Assets or the Business, or the physical condition of the Assets. Purchaser further acknowledges that the consideration for the Assets specified in this Agreement has been agreed upon by Sellers and Purchaser after good-faith arms-length negotiation in light of Purchaser's agreement to purchase the Assets "AS IS" and "WITH ALL FAULTS" except as provided in this Agreement. Purchaser agrees, warrants and represents that, except as set forth in this Agreement, Purchaser has relied, and shall rely, solely upon its own investigation of all such matters, and that Purchaser assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ASSETS.

## ARTICLE VII
## CASUALTY AND CONDEMNATION

SECTION 7.01. Casualty.

(a) Until the applicable Closing Date, Sellers shall maintain the same or substantially the same (the definition of "substantially" herein meaning no material change in coverage) casualty insurance coverage for the Leased Real Property as is currently carried by Sellers. If prior to such Closing Date any portion of any of the improvements located on any Leased Real Property is damaged or destroyed by fire or other casualty, then Sellers shall (i) promptly deliver written notice to Purchaser of the occurrence of such casualty (and of any action by the landlord pursuant to clause (x) of the following sentence) and (ii) commence repairs and protections required under applicable insurance policies and land use requirements to safeguard the property in question. If, as a result of such damage or destruction to Leased Real Property, (x) the landlord under such Real Property Lease has the right to terminate such Real Property Lease as a result of such damage, destruction or other casualty and, in fact, terminates such Real Property Lease within the time specified in the applicable Real Property Lease, (y) the applicable Seller or party to such Real Property Lease has a right to terminate such Real Property Lease and Purchaser notifies Sellers that it elects to have that termination right exercised which notice is received by Sellers in reasonably sufficient time to allow the applicable Seller to exercise such right, or (z) the dam-

age to such Leased Real Property is of a substantial nature that cannot reasonably be expected to be repaired within six (6) months, then Purchaser may elect to terminate this Agreement as to the real property subject to such Real Property Lease only by the provision of prior written notice to the applicable Seller (the "Casualty Termination Notice"). The Casualty Termination Notice shall be provided to Sellers (i) in the case of (x) and (z), within ten (10) business days after the later of Purchaser's receipt of Sellers' notice of the occurrence of such casualty and Purchaser's receipt from Sellers of notice of the landlord's exercise of its right to terminate or (ii) in the case of (y), on the date Purchaser notifies Sellers that it elects to have any Sellers' termination right under a Real Property Lease exercised. In the case of termination of this Agreement by Purchaser as to any property subject to a casualty loss in accordance with the foregoing provisions, the Purchase Price shall be reduced in an amount equal to $100,000, and such property and any insurance proceeds or other rights related thereto shall be deemed Excluded Assets and shall be deemed not included in the definition of the "Business" for purposes of this Agreement. In any case, except as set forth in this Section 7.01, the Sellers shall have no obligation to repair or restore any property suffering casualty damage or loss prior to such Closing Date.

(b)     Except as otherwise provided in clause (a) above, if such damage or destruction is to Leased Real Property and the related Real Property Lease is not terminated by the landlord or the applicable Seller, at the direction of the Purchaser, then Purchaser shall have no right to terminate this Agreement as to the property subject to such casualty. With respect to any Leased Real Property that (i) has suffered a casualty prior to its applicable Closing Date, which casualty has not been repaired prior to such Closing Date and (ii) is not removed from the transaction pursuant to Section 7.01(a) above, Sellers shall maintain the same or substantially the same (the definition of "substantially" herein meaning no material change in coverage) casualty (including business interruption) insurance as is then carried by Sellers immediately prior to the casualty with respect to such Restaurant until such Restaurant has reopened for business. With respect to such a Restaurant, Sellers shall take commercially reasonable efforts to preserve rights Sellers may have to proceeds under such casualty (including business interruption) insurance policies following a casualty to any such Restaurant so as to allow any proceeds collectible under such policies to be continued to be paid by the applicable insurer to the applicable Seller as if such Seller continued to operate such Restaurant until the Restaurant has reopened for business. Purchaser shall cooperate with Sellers in the filing and adjustment of insurance claims with respect to such Leased Real Property by providing such information and taking such other actions as the applicable Seller insurance carrier or any Seller may request. Following the casualty and prior to the applicable Closing Date, the applicable Seller will promptly proceed with the repair of the damaged Restaurant pursuant to Contracts entered into by the applicable Seller so as to complete the repair or reconstruction of, and reopen, the Restaurant for business as soon as practicable; provided, that Sellers shall not enter into a Contract requiring expenditures or obligations (together with any other such expenditures or obligations by the Sellers) in excess of $500,000 in the aggregate or expend insurance proceeds or other amounts (together with any other such expenditures by the Sellers) in excess of $500,000 in the aggregate with respect to such Leased Real Property without the prior written consent of Purchaser (such consent not to be unreasonably conditioned, withheld or delayed). To the extent that such repair or reconstruction is not completed at such Closing Date, the applicable Seller shall assign to Purchaser and Purchaser shall assume as Assumed Liabilities, all Contracts entered into pursuant to the preceding sentence to which such applicable Seller shall be party with respect to the repair or reconstruction of such Leased Real Property and shall assume all repair and reconstruction of such Leased Real Property. Following such Closing Date, Purchaser shall promptly proceed with the repair or reconstruction of the damaged Restaurant pursuant to any Contracts entered into by the applicable Seller prior to such Closing Date or other Contracts entered into by Purchaser so as to complete the repair or reconstruction of, and reopen, the Restaurant for business as soon as practicable. Sellers agree to pay to Purchaser an amount equal to the business interruption insurance proceeds that Sellers would have been entitled to receive with respect to such Restaurant as a result of the casualty for the period after the Closing Date that the Restaurant is closed as a result of the casualty had Sellers (x) continued to own such Restaurant following the applicable Closing Date and (y) continued the insur-

ance policies that were in effect immediately prior to such Closing Date. To the extent that Purchaser does not complete the repair or reconstruction and reopening of the Restaurant for business within the time limits required by Sellers' insurance coverage as in effect immediately prior to such Closing Date with respect to such Restaurant, or in the event that Purchaser's actions with respect to the repair, reconstruction or reopening of the Restaurant or other actions taken by Purchaser cause the diminution or termination of insurance proceeds payable to such Seller or the term for which proceeds are payable to such Seller, Sellers' obligations with respect to payments to Purchaser required pursuant to the preceding sentence shall be accordingly diminished or terminated in an amount equal to the amount that insurance proceeds payable to such Seller would have been diminished or terminated if the conditions in clauses (x) and (y) of the preceding sentence were satisfied and such Seller had failed to complete the repair, reconstruction or reopening within such time periods or such Seller had taken such actions, Sellers agree to pay to Purchaser a portion of the deductible with respect to a casualty claim equal to the total amount of the applicable deductible multiplied by a fraction, the numerator of which is the total amount of the claim (without reduction for any deductible amount) for both casualty and business interruption losses but excluding the portion of the claim attributable to business interruption losses for business interruption from the date of the casualty to the date of such Closing, and the denominator of which is the total amount of the claim (without reduction for any deductible amount) for both casualty and business interruption losses. Sellers agree to pay to Purchaser all insurance proceeds received by Sellers for casualty to the Leased Real Property, to the extent that such insurance proceeds have not been expended by the applicable Seller in the repair or reconstruction of the Leased Real Property. Purchaser shall bear all expenses related to the ownership and operation of the Leased Real Property from and after such Closing Date.

SECTION 7.02.    Condemnation.

(a)    If prior to the applicable Closing Date there shall be commenced or instituted against any Leased Real Property any eminent domain or similar condemnation action or proceedings, Sellers shall promptly give written notice of same (and of any action by the landlord pursuant to clause (x) of the following sentence) to Purchaser. If, as a result of such proceeding against Leased Real Property, (x) the landlord under such Real Property Lease has the right to terminate such Real Property Lease as a result of such action or proceeding and, in fact, terminates such Real Property Lease within the time in which it may do so, or (y) the applicable Seller party to such Real Property Lease has a right to terminate the Lease and Purchaser notifies Sellers that it elects to have that termination right exercised, which notice is received by Sellers in reasonably sufficient time to allow the applicable Seller to exercise such right, or (z) if the impact of such action or proceeding on the Leased Real Property is of a nature that substantially impairs the value of the affected Real Property Lease, but does not give rise to a right of either party to the affected Real Property Lease to terminate such Real Property Lease and Purchaser and Sellers do not reach agreement as contemplated in Section 7.02(c) as to the diminution in the value of such Real Property Lease, then Purchaser shall have the right to terminate this Agreement as to the property in question by the provision of prior written notice to Sellers (the "Condemnation Termination Notice"). The Condemnation Termination Notice shall be delivered to Sellers (i) in the case of (x) within ten (10) business days after the later of Purchaser's receipt of Sellers' notice of such proceeding and Purchaser's receipt of notice of the landlord's exercise of its right to terminate, (ii) in the case of (y), on the date Purchaser notifies Sellers that it elects to have a Sellers' termination right under a Real Property Lease exercised, or (iii) in the case of (z), within ten (10) business days after Purchaser's receipt of Sellers' notice of such proceeding in the event that Purchaser and Sellers have not agreed upon the amount of the diminution in value of the affected Real Property Lease. In the event that the impact of such action or proceeding on the Leased Real Property is of a nature that substantially impairs the value of the affected Real Property Lease, but does not give rise to a right of either party to the affected Real Property Lease to terminate such Real Property Lease and Purchaser and Sellers do not reach agreement as contemplated in Section 7.02(c) as to the diminution in the value of such Real Property Lease, Sellers shall have the right to terminate this Agreement as to the property in question by provision of prior written notice to Pur-

chaser, which notice shall also be considered a Condemnation Termination Notice. In the event Purchaser or Sellers terminate this Agreement as to the property subject to such proceeding, then the Purchase Price shall be reduced in an amount equal to $100,000, and such property and any condemnation proceeds or other rights related thereto shall be deemed Excluded Assets and shall be deemed not included in the definition of the "Business" for purposes of this Agreement. In any case, the Sellers shall have no obligation to repair, restore or replace any property subject to any eminent domain or condemnation action or proceeding.

(b) If such eminent domain or condemnation proceeding is with respect to Leased Real Property and the related Real Property Lease is not terminated by the landlord, then Purchaser shall have no right to terminate this Agreement on account thereof except as otherwise provided in Section 7.02(a)(y) and (z) and Sellers shall have no right to terminate this Agreement on account thereof except as otherwise provided in Section 7.02. In the event that this Agreement is not terminated with respect to any Leased Real Property subject to eminent domain or condemnation proceedings, at the applicable Closing Date (i) the conveyance of the property in question shall be less such portion of the property so taken by or subject to such proceeding without adjustment of the Purchase Price, and Sellers shall assign to Purchaser all of the Sellers' right, title and interest in any award payable, and pay to Purchaser all such awards previously paid, on account of such proceeding to the extent that such award payable has not been expended by Seller in the repair or reconstruction of such property and (ii) the applicable Seller shall assign to Purchaser and Purchaser shall assume as Assumed Liabilities, all Contracts to which such Seller shall be party with respect to any repair or reconstruction of such property; provided that no Seller shall enter into a Contract requiring expenditures or obligations (together with any other such expenditures or obligations by the Sellers) in excess of $500,000 in the aggregate or expend insurance proceeds or other amounts (together with any other such expenditures by the Sellers) in excess of $500,000 in the aggregate with respect to such Leased Real Property without the prior written consent of Purchaser (such consent not to be unreasonably conditioned, withheld or delayed).

(c) In the event that there shall be commenced or instituted any such eminent domain or condemnation proceeding and the impact of such action or proceeding on the Real Property Lease affected is of a nature that substantially impairs the value of such Real Property Lease, Purchaser and Sellers shall promptly following Sellers' notice of such proceeding to Purchaser obtain and provide to the other an estimate of the diminution in the value of the Real Property Lease and negotiate in good faith to agree upon the dollar amount of such diminution in value. Matters which may be considered in such valuation include, without limitation, loss or restriction of access or of parking spaces servicing the site and loss of space for dining or for kitchen and other supporting areas. In the event that the parties reach an agreement on such diminution in value, the Purchase Price will be reduced by such agreed amount and the condemnation proceeds shall be deemed Excluded Assets.

SECTION 7.03. Supplemental Casualty and Condemnation Disclosures.

In the event this Agreement is terminated as to any property subject to a casualty loss or condemnation proceeding, as permitted pursuant to Sections 7.01 and 7.02, and the exclusion of such property from this Agreement would result in the inaccuracy of any representation, warranty or other provision in this Agreement absent an update to the Disclosure Schedule or Exhibits to this Agreement, Sellers shall have the right to deliver to Purchaser an update to the Sections of the Disclosure Schedule or Exhibits to this Agreement affected by any such termination (a "Termination Supplement") to reflect changed facts or circumstances directly resulting from such termination within ten (10) business days after receipt of the applicable Casualty Termination Notice or Condemnation Termination Notice (or the date of delivery of the applicable Condemnation Termination Notice in the event that Sellers deliver such notice). Any such Termination Supplement shall be deemed to supplement or amend the Disclosure Schedule or Exhibits to this Agreement, as applicable, for the purpose of determining the accuracy of any

covenant, representation or warranty made by Sellers in this Agreement. In no event shall Sellers be deemed to have breached any representations, warranties or covenants hereunder as a result of any changes in a condition, event, fact or circumstance disclosed in the Disclosure Schedule or Exhibits to this Agreement as a result of a casualty or condemnation for which the subject property is removed from the transaction.

## ARTICLE VIII
## CONDITIONS TO CLOSING

SECTION 8.01. <u>Conditions to Obligations of the Parties</u>. The obligation of each Party to consummate the transactions to be performed by such Party in connection with each Closing is subject to satisfaction of the following conditions:

(a) <u>Governmental Approvals</u>. The Parties shall have received all authorizations, consents, and approvals of Governmental Entities referred to in Section 6.02 and 6.07 for each Restaurant at its applicable Closing Date.

(b) <u>No Injunctions or Restraints</u>. There shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing the consummation of any of the transactions contemplated by this Agreement.

(c) Prior to the Initial Closing Date, the receipt of an Approval Order to the sole satisfaction of the Purchaser.

SECTION 8.02. <u>Conditions to Purchaser's Obligations to Close</u>. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to satisfaction of the following conditions:

(a) <u>Representations and Warranties</u>. The representations and warranties set forth in Article IV above, except to the extent that they expressly relate to an earlier date, shall be true and correct at and as of each Closing Date as it pertains to such Restaurant being transferred, except for such failures of representations and warranties to be true and correct that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business. Each Seller shall have delivered to Purchaser an officer's certificate, in form and substance reasonably satisfactory to Purchaser and its counsel, to the effect of the matters stated in Sections 8.02(a) and 8.02(b).

(b) <u>Covenants</u>. Sellers shall have performed and complied with all of their covenants hereunder in all material respects for each Restaurant as of its applicable Closing Date.

(c) <u>Consents</u>. Purchaser shall have received executed counterparts of all consents, waivers, approvals and other authorizations set forth in Section 8.02(c) of the Disclosure Schedule for each Restaurant as of its applicable Closing Date.

(d) [RESERVED].

(e) <u>FIRPTA</u>. Prior to the Initial Closing Date, each Seller shall have delivered to Purchaser a tax certificate of non-foreign status in accordance with Treasury Regulation section 1.1445-2(b)(2).

(f) <u>Bill of Sale</u>. Purchaser shall have received a Bill of Sale executed by the applicable Sellers, in substantially the form attached hereto as <u>Exhibit B</u> ("<u>Bill of Sale</u>"), transferring to Pur-

chaser the Assets that are tangible Personal Property to Purchaser for each Restaurant as of its applicable Closing Date.

      (g)    Intellectual Property Assignment. Prior to the Initial Closing Date, Purchaser shall have received an Assignment of Copyrights in substantially the form attached hereto as Exhibit D and an Assignment of Service Marks and Trademarks in substantially the form attached hereto as Exhibit E, each executed by the applicable Seller possessing Intellectual Property Rights in the Assigned Intellectual Property.

      (h)    [RESERVED].

      (i)    [RESERVED].

      (j)    [RESERVED].

      (k)    Obligations of Sellers. All actions to be taken by Sellers in connection with the consummation of the transactions contemplated hereby shall have been taken and all documents required to effect the transactions contemplated hereby shall have been delivered.

      (l)    [RESERVED].

      (m)    Closing Certificates.

      (i)    Each Seller shall have delivered to Purchaser a certificate, dated the Initial Closing Date and signed by such Sellers' Secretary or an Assistant Secretary, certifying that the following documents (which shall be attached) are true and correct copies of such documents and that such documents have not been amended or superseded:

      A.    a copy of such Sellers' certificate of incorporation certified by the Secretary of State of such entity's jurisdiction of incorporation and a certificate of good standing from each such entity's jurisdiction of incorporation, in each case dated within ten days of the Closing Date;

      B.    a copy of the by-laws, of such Seller, with all amendments thereto; and

      C.    copies of the resolutions duly adopted by the board of directors of such Seller authorizing its execution, delivery and performance of this Agreement and the other agreements contemplated hereby to which it is a party, and the consummation of all transactions contemplated hereby and thereby.

      (ii)    The Sellers shall have delivered to Purchaser customary mortgage releases, terminations and satisfactions in form and substance reasonably satisfactory to the Title Insurance Company with respect to any Indebtedness of the Sellers existing as of the applicable Closing Date that is secured by a lien upon any of the Assets.

      (n)    Sellers shall provide at the applicable Closing proof and evidence that all taxes, including sales taxes pertaining to the Restaurant being transferred have been paid to date and in full.

      (o)    Other Real Property Deliverables. For each Restaurant as of its applicable Closing Date, in connection with the Leased Real Property associated therewith, Purchaser shall have received (i) all notifications, registrations and filings to the extent required by, and in accordance with, all govern-

mental real property disclosure requirements, (ii) an assignment to Purchaser of all the Sellers' right, title and interest in security deposits relating to the Assumed Lease of such Restaurant or insurance proceeds of such Restaurant payable to Purchaser pursuant to Section 7.01, if any, and (iii) all keys for such Restaurant.

(p)     Approval Order. The Approval Order, containing, among other things, provisions substantially the same as those described in Exhibit C attached hereto or as otherwise to the sole satisfaction of Purchaser, shall have been entered by the Bankruptcy Court and the effectiveness of the Approval Order shall not have been modified, reversed, vacated, stayed, restrained, dissolved or enjoined on or prior to the Initial Closing Date.

(q)     Material Adverse Effect. Since the date hereof, there shall have been no Material Adverse Effect.

(r)     Leases. Each of the Assumed Leases shall have been assigned to Purchasers.

(s)     Liquor Licenses. Each of the Assigned Liquor Licenses shall have been assigned to Purchaser as of the applicable Closing Date of the Restaurant that such Assigned Liquor License is associated.

SECTION 8.03.     Conditions to Sellers' Obligations to Close. The obligation of Sellers to consummate the transactions contemplated by this Agreement are subject to satisfaction of the following conditions:

(a)     Representations and Warranties. The representations and warranties set forth in Article V above, except to the extent that they expressly relate to an earlier date, shall be true and correct at and as of the Closing Date, except for such failures of representations and warranties to be true and correct (without giving effect to any materiality or Material Adverse Effect qualification) that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the transactions contemplated hereby. Purchaser shall have delivered to Sellers an officer's certificate, in form and substance reasonably satisfactory to Sellers and their counsel, to the effect of the matters stated in Sections 8.03(a) and 8.03(b).

(b)     Covenants. Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     Consents. Sellers shall have received executed counterparts of all consents, waivers, approvals and other authorizations set forth in Section 8.03(c) of the Disclosure Schedule.

(d)     Escrow Agreement. The Escrow Agreement shall be executed prior to the filing of the Sales Procedures Motion.

(e)     Intellectual Property License Agreement. The Intellectual Property License Agreement shall be agreed to in form by Purchaser and Sellers prior to the filing of the Sales Procedures Motion, shall be executed on the Initial Closing Date and will provide in substance that (i) following the Initial Closing Date, Purchaser will grant Sellers separate royalty-free licenses for each untransferred Restaurant to all Assigned Intellectual Property (each a "Restaurant Intellectual Property License"), (ii) each Restaurant Intellectual Property License will terminate upon the Closing Date of the Restaurant associated therewith and (iii) if the Agreement hereby is terminated by Purchaser, each Restaurant Intellectual Property License then outstanding will last for a term of 16 months following the Final Closing Date, be fully transferable by the Sellers and be royalty-free.

(f)      [RESERVED].

(g)      [RESERVED].

(h)      [RESERVED].

(i)      <u>Purchase Price</u>. Sellers shall have received payment of the Purchase Price.

(j)      <u>Obligations of Purchaser</u>. All actions to be taken by Purchaser in connection with the consummation of the transactions contemplated hereby shall have been taken and all documents required to effect the transactions contemplated hereby shall have been delivered.

**ARTICLE IX**
**TERMINATION**

SECTION 9.01.    <u>Termination of Agreement</u>.

(a)      <u>Mutual Termination</u>. Purchaser and Sellers may terminate this Agreement by mutual written consent at any time. The actual date on which this Agreement is terminated in accordance with this Section 9.01 is referred to herein as the "<u>Termination Date</u>;"

(b)      <u>Termination by Purchaser</u>. Purchaser may terminate this Agreement by giving written notice to Sellers at any time (i) in the event Sellers have breached any covenant contained in this Agreement in any material respect, Purchaser has notified Sellers of the breach, and the breach has continued without cure for a period of five (5) business days after the notice of breach, (ii) [RESERVED], (iii) if the Sale Procedures Order, in the form annexed hereto as <u>Exhibit F</u> inclusive of approving the Expense Reimbursement Fee set forth in Section 9.04 hereof, or as otherwise acceptable in the reasonable discretion of Purchaser, shall not have been entered by the Bankruptcy Court on or before January 3, 2011, (iv) after the Termination Deadline, by reason of the failure of any condition precedent under Article VIII hereof (unless the failure results primarily from Purchaser itself breaching any representation, warranty, or covenant contained in this Agreement) or (v) if the Approval Order, in the form annexed hereto as <u>Exhibit C</u> or as otherwise acceptable in the reasonable discretion of Purchaser, which shall include an exemption from, or relief from complying with, bulk sales laws or similar state, federal or local laws, rules or regulations, shall not have been entered by the Bankruptcy Court on or before January 20, 2011, except otherwise extended, or if the effectiveness of the Approval Order shall have been modified, reversed, vacated, stayed, restrained, dissolved or enjoined;

(c)      <u>Termination by Sellers</u>. Sellers may terminate this Agreement by giving written notice to Purchaser at any time (i) in the event Purchaser has breached any covenant contained in this Agreement in any material respect, Sellers have notified Purchaser of the breach, and the breach has continued without cure for a period of five (5) business days after the notice of breach, or (ii) after the Termination Deadline, by reason of the failure of any condition precedent under Article VIII hereof (unless the failure results primarily from a Seller breaching any representation, warranty, or covenant contained in this Agreement); and

(d)      Notwithstanding anything contained herein to the contrary, if by June 15, 2011 (the "<u>Termination Deadline</u>") the approval for the transfer to Purchaser of all the Assigned Liquor Licenses and Assumed Leases shall not have been obtained, the Agreement will terminate; <u>provided</u> that the Termination Date shall automatically extend for successive 30-day periods if Purchaser is working in good faith to obtain the approval for the transfer of the Assigned Liquor Licenses and Assumed Leases. At any point following the Termination Deadline, Purchaser may then terminate this Agreement and its

obligations hereunder in respect of each such Restaurant, by giving written notice to Sellers and to the Escrow Agent. Escrow Agent shall then release from escrow and pay to Purchaser, in the manner described by the Escrow Agreement, an amount equal to the amounts that would have been transferred under Section 2.02 (g) if the Restaurant(s) had been deemed Transferable Restaurant(s).

SECTION 9.02.    Effect of Termination. If any Party terminates this Agreement pursuant to Section 9.01 above or otherwise, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any liability of any Party then in breach); provided, that: (a) if this Agreement is terminated solely as a result of an Alternative Transaction to the extent permitted under Section 9.04, the Expense Reimbursement Fee, as described in Section 9.04, in addition to the Deposit, shall be paid to Purchaser as the sole and exclusive remedy of Purchaser; (b) if this Agreement is terminated by Sellers pursuant to Section 9.01(c)(i) or (ii), Sellers shall be entitled to receive the Deposit as the sole and exclusive remedy of Seller, and Purchaser and Sellers shall promptly instruct the Escrow Agent accordingly; and (c) if this Agreement is terminated by either Party pursuant to Section 9.01, other than if this Agreement is terminated by Sellers pursuant to Section 9.01(c)(i) or (ii), subject to the right to receive the Expense Reimbursement Fee as described in (a) above, Purchaser shall be entitled to receive the remaining Escrowed Amount as its sole and exclusive remedy, and Sellers shall promptly instruct the Escrow Agent accordingly.

SECTION 9.03.    [RESERVED].

SECTION 9.04.    Expense Reimbursement Fee. In the event that the Bankruptcy Court authorizes an Alternative Transaction prior to any termination of this Agreement by either Party (which transaction may be due to a third party making a higher or better offer than Purchaser's offer), then at the earlier of (i) the point in time at which the Sellers actually receive at least two million five hundred thousand Dollars ($2,500,000) in proceeds from the closing of such Alternative Transaction and (ii) the second closing of such Alternative Transaction in accordance with the Sales Procedures, Sellers will pay to the Purchaser the sum of two hundred thousand Dollars ($200,000.00) which amount is inclusive of any (a) fees and expenses incurred by Purchaser in connection with this Agreement or any of the transactions contemplated hereunder, (b) the preparation and negotiation of this Agreement and related documents, (c) legal fees and costs incurred by Purchaser in connection with the collection of these amounts, and (d) a break-up fee for participating as the "stalking horse bidder" (collectively, the "Expense Reimbursement Fee"). Purchaser shall not be obligated to document any of its fees or expenses or to establish that its actual fees and expenses are or will be equal to the Expense Reimbursement Fee or any other minimum amount. The Expense Reimbursement Fee shall be paid in cash from the proceeds of and concurrent with the closing of any Alternative Transaction or as otherwise ordered by the Bankruptcy Court. The Expense Reimbursement Fee shall be paid as, and constitute an administrative expense of Sellers under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code. The Sales Procedure Order shall provide for approval of this provision.

## ARTICLE X
## NO SURVIVAL

SECTION 10.01.    No Survival of Representations and Warranties. The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Final Closing Date hereunder, and none of the Parties shall have any liability to each other after the Final Closing Date for any breach thereof. The Parties hereto agree that the covenants contained in this Agreement to be performed at or after each applicable Closing Date shall survive the Final Closing Date hereunder, and remain enforceable in accordance with their terms; it being understood that other than Sellers' obligation to perform such post-Closing obligations, this transaction shall be non-recourse against Sellers except in the case of actual fraud.

**ARTICLE XI**
**DEFINITIONS; RULES OF CONSTRUCTION**

SECTION 11.01.   Definitions.  Except as otherwise specified, when used in this Agreement, the Disclosure Schedule or any Exhibits hereto, the following terms shall have the following meanings:

"Affiliate" or "Affiliated" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means any sale or transaction relating to the acquisition of the Business or portion thereof, or the Assets (other than the sale of Inventory in the ordinary course of business); provided that in each case a majority of the Assumed Leases is acquired whether directly or indirectly, through purchase, merger, consolidation or otherwise.

"Approval Order" means the order to be entered by the Bankruptcy Court approving this Agreement and the sale by Sellers to Purchaser of the Assets in the form set forth in Exhibit C attached hereto.

"Assets" has the meaning set forth in Section 1.01.

"Assigned Intellectual Property" has the meaning set forth in Section 1.01(h).

"Assigned Liquor Licenses" has the meaning set forth in Section 1.01(e).

"Assigned Permits" has the meaning set forth in Section 1.01(f).

"Assumed Contracts" has the meaning set forth in Section 1.01(d).

"Assumed Leases" has the meaning set forth in Section 1.01(c).

"Assumed Liabilities" has the meaning set forth in Section 1.03.

"Auction" has the meaning set forth in Section 2.04.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bill of Sale" has the meaning set forth in Section 8.02(f).

"Bridgewater" has the meaning set forth in the Preamble.

"Business" has the meaning set forth in the Recitals.

"Business Confidential Information" has the meaning set forth in Section 6.10(b)(ii).

"Casualty Termination Notice" has the meaning set forth in Section 7.01(a).

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq*.

"Charlie Brown's" has the meaning set forth in the Preamble.

"Closing" has the meaning set forth in Section 2.02(c).

"Closing Date" has the meaning set forth in Section 2.02(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Condemnation Termination Notice" has the meaning set forth in Section 7.02(a).

"Confidentiality Agreement" has the meaning set forth in Section 6.04(a).

"Contract" means any written or oral contract, agreement, understanding, arrangement, lease, license, commitment or other obligation, other than a Permit or Liquor License.

"Cranford" has the meaning set forth in the Preamble.

"Cure Amounts" has the meaning set forth in Section 2.01(d).

"Declaration" has the meaning set forth in Section 12.07.

"Deposit" has the meaning set forth in Section 2.01(e).

"Disclosure Schedule" means the disclosure document dated the date hereof, which has been prepared by Sellers and delivered to Purchaser, and which identifies exceptions to the representations and warranties set forth in Article IV and other disclosure matters contemplated by this Agreement.

"Effective Time" 12:01 a.m. New York City time on the Final Closing Date.

"Effective Transfer Date" has the meaning set forth in Section 2.02(b).

"Effective Transfer Date Inventory" has the meaning set forth in Section 2.01(c).

"Environment" means the ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all federal, state and local laws, judgments, decrees and orders concerning pollution or protection of the Environment or human health (to the extent related to exposure to Hazardous Materials), including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, distribution, Release or threatened Release of any Hazardous Materials, as such requirements are enacted and in effect on or prior to the Closing Date.

"Escrow Agent" has the meaning set forth in Section 2.01(e).

"Escrow Agreement" has the meaning set forth in Section 2.01(e).

"Escrowed Amount" has the meaning set forth in Section 2.02(d).

"Excluded Assets" has the meaning set forth in Section 1.02.

"Excluded Liabilities" has the meaning set forth in Section 1.04.

"Expense Reimbursement Fee" has the meaning set forth in Section 9.04.

"Financial Reports" has the meaning set forth in Section 4.12.

"Final Closing Date" means the Closing of the last Transferable Restaurant prior to termination of the Agreement; provided that if the Closing is not for the Seventh Transferable Restaurant, then the Final Closing Date will be considered the Termination Date.

"Final Effective Transfer Date" means the Effective Transfer Date of the Seventh Transferable Restaurant.

"Fifth Transferable Restaurant" has the meaning set forth in Section 2.02(a)(v).

"First Transferable Restaurant" has the meaning set forth in Section 2.02(a)(i).

"Fourth Transferable Restaurant" has the meaning set forth in Section 2.02(a)(iv).

"Gift Cards" means unredeemed gift cards issued prior to the Closing Date that are redeemable at the Restaurants.

"Governmental Entity" means any federal, state, provincial or local governmental, regulatory or administrative authority, agency, commission, court, tribunal, arbitral body or self-regulated entity, whether domestic or foreign.

"Hazardous Materials" means any pollutant, contaminant, substance, waste, chemical, compound or material including, without limitation, petroleum and petroleum products and asbestos and asbestos-containing materials, which are regulated under any Environmental Law.

"Initial Closing" has the meaning set forth in Section 2.02(c).

"Initial Closing Date" has the meaning set forth in Section 2.02(c).

"Initial Effective Transfer Date" means the Effective Transfer Date of the First Transferable Restaurant.

"Insurance Policies" has the meaning set forth in Section 4.19.

"Intellectual Property License Agreement" has the meaning set forth in Section 1.01(h).

"Intellectual Property Rights" means, collectively, (i) trademarks, service marks, trade dress, trade names, logos, slogans, and corporate names (in each case, whether registered or unregistered) and registrations and applications for registration thereof, (ii) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, and (iii) domain names.

"Inventory" has the meaning set forth in Section 1.01(a).

"Knowledge of Sellers" means the actual knowledge after due inquiry of Sam Borgese and Ed Schwartz.

"Law" means any law, statute, ordinance, rule, regulation, code or executive order executed, issued, adopted, promulgated or applied by any Governmental Entity.

"Leased Real Property" has the meaning set forth in Section 4.05(b).

"Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties and other agreements with respect thereto which any Seller is a party.

"Lien" means any security interest, pledge, hypothecation, mortgage, lien, charge, claim, interest or encumbrance of any kind or nature.

"Liquor License" means a license or permit authorizing the sale of alcoholic beverages.

"Local Rules" means the Local Rules for the United States Bankruptcy Court for the District of Delaware, effective February 1, 2010 (as the same may be supplemented, modified, and/or amended).

"Material Adverse Effect" means any event, fact, condition, change, circumstance or effect that individually or in the aggregate, is materially adverse to the business, operations, assets, liabilities, properties, results of operations or condition (financial or otherwise) of (x) in the case of the Sellers, the Business, taken as a whole, or on the ability of the Sellers to consummate the transactions contemplated by this Agreement and (y) in the case of Purchaser, Purchaser's financial condition, taken as a whole, or on the ability of Purchaser to consummate the transactions contemplated by this Agreement; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has been a "Material Adverse Effect": (i) events, facts, conditions, changes, circumstances or effects that generally affect the restaurant industry (including changes in Law), except to the extent that the Business is disproportionately affected; (ii) general economic or political conditions or events, circumstances, changes or effects affecting the financial, or securities markets generally, except to the extent that the Business is disproportionately affected;; (iv) any event, fact, condition, change, circumstance or effect that results from any action required to be taken by a Party pursuant to this Agreement or taken at the request of Purchaser; (v) changes caused by material worsening of current conditions caused by acts of terrorism or war (whether or not declared); and (vi); provided, further, however that in no event shall any damage or destruction to Leased Real Property, any taking pursuant to the exercise of the power of eminent domain or similar condemnation action or proceeding with respect to any portion of any Leased Real Property, either alone or in combination, be considered in determining whether there has been a "Material Adverse Effect".

"Montclair" has the meaning set forth in the Preamble.

"Morristown" has the meaning set forth in the Preamble.

"Notification" has the meaning set forth in Section 12.07.

"Party" means any party to this Agreement.

"Permits" means any authorizations, grants, licenses, registrations, variances, exceptions, consents, certificates, approvals or other permits of any nature granted by a Governmental Entity, other than Liquor Licenses.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity (or any department, agency, or political subdivision thereof).

"Personal Property" has the meaning set forth in Section 4.06.

"Pro-Rated Payments" has the meaning set forth in Section 1.05(a).

"Pro-Ration Statement" has the meaning set forth in Section 2.01(b).

"Purchase Price" has the meaning set forth in Section 2.01(a).

"Purchaser" has the meaning set forth in the Preamble.

"Real Property Leases" has the meaning set forth in Section 4.05(a).

"Release" shall have the same meaning ascribed thereto under CERCLA Section 101(22), except that it shall apply to any and all Hazardous Materials, not just CERCLA hazardous substances.

"Restaurant" has the meaning set forth in the Recitals.

"Restaurant Intellectual Property License" has the meaning set forth in Section 8.03(e).

"Ridgewood" has the meaning set forth in the Preamble.

"Sale Hearing" has the meaning set forth in Section 2.04(b).

"Sale Motion" means the motion to be filed with the Bankruptcy Court contemporaneously with the Sale Procedures Motion by or on behalf of Sellers requesting that the Bankruptcy Court enter the Approval Order.

"Sale Procedures" means the procedures for the submission of competing bids for the acquisition of the Assets.

"Sale Procedures Motion" means the motion to be filed in the Bankruptcy Court on behalf of Sellers for, among other things, approval of the Sale Procedures, Expense Reimbursement Fee and entry of the Approval Order.

"Sale Procedures Order" means the order to be entered by the Bankruptcy Court in the form set forth in Exhibit F attached hereto.

"Second Transferable Restaurant" has the meaning set forth in Section 2.02(a)(ii).

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Seller Confidential Information" has the meaning set forth in Section 6.10(iii).

"Sellers" has the meaning set forth in the Recitals.

"Seventh Transferable Restaurant" has the meaning set forth in Section 2.02(a)(vii).

"Sixth Transferable Restaurant" has the meaning set forth in Section 2.02(a)(vi).

"Subsidiary" means with respect to any Person, any corporation or other entity of which such Person has, directly or indirectly, ownership of securities or other interests having the power to elect a majority of such corporation's board of directors (or similar governing body), or otherwise having the power to direct the business and policies of that corporation or other entity other than securities or interests having such power only upon the happening of a contingency that has not occurred.

"Summit" has the meaning set forth in the Preamble.

"Tax" means (i) all federal, state, local or non-U.S. taxes, duties, imposts or other similar assessments imposed by any governmental body and (ii) all interest and penalties related to the foregoing.

"Tax Return" means any Tax return or other statement required to be filed with any governmental body in respect of any Tax.

"Termination Date" has the meaning set forth in Section 9.01(a).

"Termination Deadline" has the meaning set forth in Section 9.01(d).

"Termination Supplement" has the meaning set forth in Section 7.03.

"The Office Concept" means the restaurant concept operated by Sellers under The Office mark.

"Third Transferable Restaurant" has the meaning set forth in Section 2.02(a)(iii).

"Title Insurance Company" shall mean any title insurance company as shall be retained by Purchaser.

"Transferable Restaurant" has the meaning set forth in Section 2.02(a).

"Transaction Documents" means this Agreement and all other agreements and instruments to be entered into or delivered by Purchaser or any of the Sellers in connection with the transactions contemplated hereby.

"Transfer Tax" has the meaning set forth in Section 12.06(a).

SECTION 11.02. Rules of Construction. This Agreement shall be construed in accordance with the following rules of construction:

(a)     the terms defined in this Agreement include the plural as well as the singular;

(b)     unless otherwise indicated, all references in the Agreement to designated "Articles," "Sections" and other subdivisions are to the designated articles, sections and other subdivisions of the body of this Agreement;

(c)     pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms;

(d)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; and

(e)     the words "includes" and "including" are not limiting.

## ARTICLE XII
## MISCELLANEOUS

SECTION 12.01.  Public Announcements. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior review and approval of the other Party, except for any public disclosure otherwise required by applicable Law or by any obligations of any Party pursuant to any rule or regulation of the Securities and Exchange Commission or pursuant to any listing agreement with or rules of any securities exchange (in which case, such Party shall consult with the other Parties reasonably in advance of such public disclosure unless such Party determines in good faith that such consultation is reasonably likely to result in a delay with respect to such public disclosure with adverse consequences to the disclosing Party in which case such Party shall provide notice of such public disclosure as soon as is practicable under the circumstances).

SECTION 12.02.    Entire Agreement; Amendment; Waiver. This Agreement, the Exhibits hereto, the other Transaction Documents and the Disclosure Schedule constitute the entire understanding between the Parties with respect to the subject matter hereof, and supersede all other understandings and negotiations with respect thereto. This Agreement may be amended only in writing signed by all Parties hereto. Any provision of this Agreement may be waived only in a writing signed by the Party to be charged with such waiver. No course of dealing between the Parties shall be effective to amend or waive any provision of this Agreement.

SECTION 12.03.  Further Assurances. As permitted by the Bankruptcy Code, after the date hereof, each Party shall (and shall cause its respective Affiliates to) take such reasonable further actions and execute such further documents as may be necessary or reasonably requested by the other in order to effectuate the intent of this Agreement and to provide such other Parties with the benefits of this Agreement; provided, that nothing in this Section 12.03 shall require Sellers to make any unreasonable expenditure or incur any unreasonable obligation on its own or on behalf of Purchaser.

SECTION 12.04.    Notices. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given (i) upon receipt if personally delivered (with written confirmation of receipt), (ii) upon receipt if mailed by certified or registered mail, return receipt requested (with written confirmation of receipt), (iii) upon receipt if sent by a nationally recognized guaranteed and receipted courier service (with written confirmation of receipt) or (iv) upon receipt if sent by facsimile (with written confirmation of transmission). Notices or other communications shall be directed to the following addresses:

If to any Seller to:

        Charlie Brown's, Inc.
        The Office At Bridgewater, Inc.,
        The Office At Cranford, Inc.,
        The Office At Montclair, Inc.,
        The Office At Morristown, Inc.,
        The Office At Ridgewood, Inc.,
        The Office At Summit, Inc.
        c/o Charlie Brown's Inc.
        1450 Route 22 West
        Mountainside, NJ 07092
        Attention: Samuel Borgese and Gary Lembo
        Telephone: 908-518-5882
        Facsimile: 908-518-5358

And to:

        CB Holding Corp.
        c/o Charlie Brown's Inc.
        1450 Route 22 West
        Mountainside, NJ 07092
        Attention: Samuel Borgese and Gary Lembo
        Telephone: 908-518-5882
        Facsimile: 908-518-5358

With a copy (which shall not constitute notice) to:

        Cahill Gordon & Reindel LLP
        80 Pine Street
        New York, NY 10005
        Attention: John Papachristos and Richard Stieglitz
        Telephone: 212-701-3000
        Facsimile: 212-269-5420

If to Purchaser, to:
        Villa Enterprises Management and counsel to Villa Enterprises Management,
        Laurent Xatart and Beth R. Stearns, Esq.,
        c/o Cozzoli Broward, LLC
        25 Washington St.
        Morristown, NJ 07960
        Telephone: 973-285-4800
        Facsimile: 973-695-0940

With a copy (which shall not constitute notice) to:

> Norris McLaughlin & Marcus, P.A.,
> 721 Route 202-206, Suite 200
> P.O. Box 5933
> Bridgewater, NJ 08807-5933
> Attention: Morris Bauer
> Telephone: 908-252-4345
> Facsimile: 908-722-0755
>
> Bifferato Gentilotti,
> 800 North King Street, Plaza Level
> Wilmington, DE 19801
> Attention: Garvin F. McDaniel
> Telephone: 302-429-1900
> Facsimile: 302-429-8600

Any Party may, by notice given in accordance with this Section 12.04, specify a new address for notices under this Agreement.

SECTION 12.05.   Expenses.  Except as otherwise provided herein, each Party hereto will pay all fees and expenses incurred by it in connection with this Agreement and the consummation of the transactions contemplated hereby.

SECTION 12.06.   Transfer Taxes and Prorations.

(a)   Transfer Taxes.  Purchaser shall pay all sales, use, transfer, real property transfer and other similar Taxes arising out of or in connection with the transfer of the Assets and assumption of the Assumed Liabilities effected pursuant to this Agreement (the "Transfer Tax").  If a Seller is required to file any Transfer Tax Return, Purchaser shall pay to such Seller, at least five (5) Business Days prior to the due date for filing such Transfer Tax Return, the amount of any Transfer Tax due.  Each of the parties shall provide the other with any cooperation reasonably requested by the other party in connection with the preparation, execution and filing of Transfer Tax Returns, the securing of any available exemption and any audits or other matters relating to Transfer Tax.

(b)   Prorations of Property Taxes.  Personal property Taxes, real property Taxes and other similar Taxes with respect to each Restaurant for any taxable period commencing prior to such Restaurant's Effective Transfer Date and ending after such Restaurant's Effective Transfer Date shall be prorated according to calendar year on a per diem basis between Purchaser and the Sellers as of such Effective Transfer Date.  The amount of all such prorations shall be paid on the applicable Effective Transfer Date, provided, however, that final payments with respect to prorations that are not able to be calculated as of such Effective Transfer Date shall be calculated and paid as soon as practicable after such Effective Transfer Date.  Furthermore, Sellers retain the sole and exclusive right to any and all refunds of taxes attributable to any period of time prior to the applicable Effective Transfer Date, as well as the right to pursue collection of such refunds, and Purchaser agrees to cooperate in this regard.  The obligations set forth in this Section 12.06(b) shall survive the Final Effective Transfer Date.

SECTION 12.07.   Notification of Sale.  Prior to the Initial Closing Date, Purchaser shall submit any forms required by the Department of Treasury, Division of Taxation, State of New Jersey relating to notification of sale, transfer or assignments in bulk for the transactions contemplated in this Agreement (the "Notification").  Sellers shall cooperate with and provide to Purchaser any information

required by Purchaser to complete the Notification. In addition, Sellers shall complete any asset transfer tax declaration form as required by the Department of Treasury, Division of Taxation, State of New Jersey (the "Declaration") and deliver each completed Declaration to Purchaser's counsel so that Purchaser's counsel can submit the Declaration at the same time that Purchaser's counsel submits the Notification.

SECTION 12.08. Record Retention and Access. Purchaser shall maintain possession of all books and records transferred to it as Assets until the expiration of all periods during which such books and records are required to be retained under applicable Law or regulation; provided that, thereafter Purchaser shall give Sellers not less than sixty (60) days prior written notice of its intention to dispose of any such books and records. After the date hereof, Purchaser and Sellers shall each provide the other and its representatives with access to, copies of and excerpts from, such books, records and other materials, and access to such employees and agents, as the other may reasonably request for the purposes of preparing, filing and supporting reports relating to the Business as may be required to be filed.

SECTION 12.09. Dispute Resolution.

(a) Except as otherwise provided in this Agreement, the Parties shall negotiate in good faith to resolve any controversy, dispute or disagreement arising out of or relating to this Agreement, the Transaction Documents or the breach of any provision thereof. The Bankruptcy Court shall have exclusive jurisdiction to consider any matters or disputes related to this Agreement and the transactions contemplated hereby.

(b) The prevailing Party shall be entitled to recover its attorneys' fees and expenses; provided, however, notwithstanding anything herein to the contrary, a refund of the Deposit shall serve as Purchaser's sole and exclusive remedy and maximum recourse (subject to Section 9.04 with respect to the Expense Reimbursement Fee). Similarly, Sellers' sole and exclusive remedy hereunder shall be to receive damages in the amount of the Deposit.

SECTION 12.10. Governing Law; Jurisdiction. This Agreement shall be governed in accordance with the Bankruptcy Code and the substantive laws of the State of New Jersey and any dispute arising under this Agreement shall be resolved in accordance with the laws of the State New Jersey. The Parties hereby (a) irrevocably and unconditionally submit, for themselves and their property, to the jurisdiction of the Bankruptcy Court in any action or proceeding related to the enforcement or interpretation of this Agreement and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any action for such purpose, any claim that it is not subject personally to the jurisdiction of the Bankruptcy Court, that its property is exempt or immune from attachment or execution, that any such action, claim or other proceeding is brought in an inconvenient forum, that the venue of the action claim or proceeding is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by Bankruptcy Court.

SECTION 12.11. Assignment. This Agreement may not be assigned by any Party without the written consent of the other Parties, except (a) to the successor or assignee of all or substantially all of the assignor's business to which the Agreement relates and (b) Purchaser may (x) collaterally assign this Agreement or a portion thereof to lenders in connection with the financing of the transactions contemplated hereby (or any amendments, supplements, restatements, or refinancings thereof) and (y) assign this Agreement or a portion thereof to any Subsidiary of the Purchaser. This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns. No assignment of this Agreement shall relieve any Party of its obligations hereunder.

SECTION 12.12. Captions. The captions in this Agreement are for purposes of reference only and shall not limit or otherwise affect the interpretation hereof.

SECTION 12.13. <u>Representation by Counsel; Interpretation</u>. Sellers and Purchaser each acknowledge that they have been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and any such right is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of Sellers and Purchaser.

SECTION 12.14. <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of the Parties hereto and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, benefits, remedies, obligations or liabilities of any nature whatsoever under or by reason of this Agreement other than the Parties hereto and their respective successors and permitted assigns and the Persons indemnified pursuant to Sections 10.01 and 10.02.

SECTION 12.15. <u>Severability</u>. In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision or provisions shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without invalidating the remainder of such provision or provisions or the remaining provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein, unless such a construction would be unreasonable.

SECTION 12.16. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which when executed shall be deemed to be an original but all of which when taken together shall constitute one and the same agreement.

[Signatures on Following Page]

IN WITNESS WHEREOF, the Parties have executed this Purchase Agreement as of the date first set forth above.

CHARLIE BROWN'S, INC.

By: _____
       Name:
       Title:

THE OFFICE AT BRIDGEWATER, INC.

By: _____
       Name:
       Title:

THE OFFICE AT CRANFORD, INC.

By: _____
       Name:
       Title:

THE OFFICE AT MONTCLAIR, INC.

By: _____
       Name:
       Title:

THE OFFICE AT MORRISTOWN, INC.

By: _____
       Name:
       Title:

THE OFFICE AT RIDGEWOOD, INC.

By: _____
       Name:
       Title:

THE OFFICE AT SUMMIT, INC.

By: _____
    Name:
    Title:

VILLA ENTERPRISES LTD., LLC

By: _____
    Name:
    Title:

Solely as to any Assigned Intellectual Property:

CHARLIE BROWN'S MARK CORP.

By: _____
    Name:
    Title:

## EXHIBIT A

## RESTAURANTS

THE OFFICE AT BRIDGEWATER
THE OFFICE AT CRANFORD
THE OFFICE AT MONTCLAIR
THE OFFICE AT MORRISTOWN
THE OFFICE AT RIDGEWOOD
THE OFFICE AT SUMMIT
THE OFFICE AT WESTFIELD