## EXHIBIT B

**Modified Amended Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-13683 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## MODIFIED FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' MODIFIED FIRST AMENDED JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

CAHILL GORDON & REINDEL LLP
Joel H. Levitin
Stephen J. Gordon
Richard A. Stieglitz Jr.
Maya Peleg
Eighty Pine Street
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Tyler D. Semmelman (No. 5386)
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for the Debtors and Debtors-in-Possession*

January 4, 2012

---

[1]    The other Debtors, and the last four digits of each of their tax identification numbers, are listed herein.

## PRELIMINARY STATEMENT

THIS MODIFIED FIRST AMENDED DISCLOSURE STATEMENT WAS FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JANUARY 4, 2012.  [AFTER A HEARING ON THE ADEQUACY OF THE DISCLOSURE CONTAINED HEREIN, THE BANKRUPTCY COURT HAS DETERMINED THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION, AS DEFINED IN BANKRUPTCY CODE § 1125.]  A HEARING ON CONFIRMATION OF THE PROPOSED JOINT PLAN OF REORGANIZATION DESCRIBED HEREIN HAS BEEN SCHEDULED FOR [_____ __, 2012, AT _:__ _.M.] (PREVAILING EASTERN TIME).

AS DISCUSSED IN GREATER DETAIL HEREIN, THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PROPOSED PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____ __, 2012, AT __:__ _.M.] (PREVAILING EASTERN TIME) IN THE MANNER DESCRIBED HEREIN.

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT IT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................ i

I.     INTRODUCTION ....................................................................................................... 1

       A.     Definitions and Exhibits ................................................................................. 1

       B.     Notice to Creditors .......................................................................................... 2

       C.     Disclosure Statement Enclosures .................................................................... 3

       D.     Inquiries .......................................................................................................... 4

       E.     Summary Table of Classification and Treatment of Claims and Equity Interests
              Under the Plan ................................................................................................. 4

II.    OVERVIEW OF THE DEBTORS AND THESE CHAPTER 11 CASES ...................... 6

       A.     The Debtors' Pre-Sale Business Operations .................................................... 6

       B.     The Debtors' Pre-Petition Capital Structure ................................................... 7

       C.     Significant Events Leading to the Commencement of These Chapter 11 Cases .......... 8

       D.     The Chapter 11 Cases ...................................................................................... 8

III.   OVERVIEW OF THE PLAN ..................................................................................... 25

       A.     General .......................................................................................................... 25

       B.     Description of Classification and Treatment of Claims and Equity Interests
              Under the Plan ............................................................................................... 26

       C.     Reservation of "Cram Down" Rights ............................................................ 35

       D.     Means for Implementation and Execution of the Plan and the Liquidating Trust ...... 35

       E.     Funding of the Plan Fund to the Liquidating Trustee. ................................... 38

       F.     The Transfer of the Liquidating Trust Assets to the Liquidating Trust. ........ 39

       G.     The Liquidating Trust .................................................................................... 39

       H.     The Liquidating Trustee ................................................................................. 44

       I.     Final Administration of the Liquidating Trust ............................................... 47

       J.     Dissolution of the Debtors; Closing of the CB Holding Chapter 11 Case .......... 48

       K.     Preservation of Rights Regarding Avoidance Actions and of All other Causes of
              Action ............................................................................................................ 49

       L.     Cancellation of Notes, Instruments, Debentures, and Equity Interests .......... 50

       M.     Dissolution of the Creditors Committee ........................................................ 51

       N.     Accounting ..................................................................................................... 51

       O.     Settlement with Respect to Fees, Costs, and the Plan by and Among the
              Administrative Agent, the Creditors Committee, the Second Lien Noteholders,
              and the Debtors .............................................................................................. 51

P.      Objections to Claims; Prosecution of Disputed Claims ............................................. 52

Q.      Estimation of Claims ................................................................................................. 52

R.      Interest and Distributions on Disputed Claims or any Other Claims that Become
        Allowed Claims After the Effective Date ................................................................. 53

S.      Means of Cash Payment ............................................................................................ 53

T.      Delivery of Distributions .......................................................................................... 53

U.      Undeliverable Distributions ...................................................................................... 53

V.      Withholding and Reporting Requirements ................................................................ 54

W.      Time Bar to Cash Payments ...................................................................................... 55

X.      Interest and Late Charges .......................................................................................... 55

Y.      Fractional Dollars; De Minimis Distributions .......................................................... 55

Z.      Set-Offs ..................................................................................................................... 55

AA.     Deadlines for Determining Record Holders of Various Classes of Claims ............... 56

BB.     Treatment of Executory Contracts and Unexpired Leases ........................................ 56

CC.     Acceptance or Rejection of the Plan ......................................................................... 59

DD.     Conditions Precedent to Confirmation and Effectiveness of Plan ............................ 60

EE.     Revocation, Withdrawal, or Non-Consummation ..................................................... 61

FF.     Modification of Plan .................................................................................................. 61

GG.     Effect of Plan Confirmation ...................................................................................... 61

HH.     Retention of Jurisdiction by Bankruptcy Court ........................................................ 69

II.     Payment of Statutory Fees ........................................................................................ 71

JJ.     Exemption from Securities Laws .............................................................................. 71

KK.     Bankruptcy Code § 1146 Exemption ........................................................................ 71

LL.     Books and Records .................................................................................................... 72

MM.     Privileges as to Certain Causes of Action ................................................................. 72

NN.     New Employee Agreements ....................................................................................... 73

OO.     Unclaimed Property ................................................................................................... 73

IV.     ALTERNATIVES TO THE PLAN ........................................................................... 73

A.      Liquidation Under Chapter 7 of the Bankruptcy Code ............................................. 74

B.      Alternative Chapter 11 Plan ...................................................................................... 74

C.      Certain Risk Factors .................................................................................................. 75

V.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................. 77

A.      Consequences to the Debtors ..................................................................................... 78

B.    Consequences to Holders of Allowed Senior Creditor Claims and Allowed General Unsecured Claims ...................................................................................... 79

C.    Information Reporting and Withholding ................................................... 83

VI.    VOTING PROCEDURES AND REQUIREMENTS ....................................................... 83

A.    Ballots and Voting Deadline ..................................................................... 83

B.    Holders of Claims Entitled to Vote .......................................................... 84

C.    Voting Procedures .................................................................................... 84

VII.    CONFIRMATION OF THE PLAN .......................................................................... 87

A.    No Unfair Discrimination/Fair and Equitable Test ................................... 87

B.    Best-Interests Test ................................................................................... 88

C.    Feasibility ................................................................................................ 89

D.    Classification of Claims and Equity Interests Under the Plan ................... 90

E.    Confirmation of the Plan If a Class Does Not Accept the Plan ................. 90

F.    Confirmation Hearing .............................................................................. 91

VIII.    CONCLUSION AND RECOMMENDATION ............................................................. 91

## I.    <u>INTRODUCTION</u>

This is the disclosure statement (as the same has been and may be further amended, modified, or supplemented from time to time, this "Disclosure Statement") submitted by CB Holding Corp. ("CB Holding") and the other above-captioned debtors and debtors-in-possession (collectively, and together with CB Holding, the "Debtors")[2] in their Chapter 11 Cases pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") filed in connection with, and in support of, the Modified First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code of the Debtors, dated January 4, 2012 (as the same has been and may be further amended, modified, or supplemented from time to time, the "Plan"),[3] a copy of which is attached to the Disclosure Statement as <u>Exhibit A</u>.

### A.    **Definitions and Exhibits**

---

[2]    The other Debtors, and the last four digits of each of their tax identification numbers, are:  1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc. (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc. (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc. (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc. (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp., LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc. (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc. (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc. (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc. (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc. (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc. (4776); Jonathan Seagull Property Corp. (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc. (3131);   The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc. (3126); and What's Your Beef V, Inc. (4719).  The Debtors' address is 1450 Route 22 West, Mountainside, NJ 07092.

[3]    The Debtors filed an initial proposed joint plan of liquidation (ECF No. 944) and accompanying disclosure statement (ECF No. 945) on August 1, 2011, and amended versions of each (ECF No. 1149) on December 29, 2011.

1.      Definitions.  Unless otherwise specifically defined herein, all capitalized terms used in the Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

2.      Exhibits.  All exhibits to the Disclosure Statement are incorporated as if fully set forth herein and are a part of the Disclosure Statement.

B.      **Notice to Creditors**

1.      Recommendations of the Debtors, the Administrative Agent, and the Creditors Committee.  **THE DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS.  THEREFORE, THE DEBTORS, THE ADMINISTRATIVE AGENT, AND THE CREDITORS COMMITTEE EACH RECOMMEND THAT ALL CREDITORS IN CLASSES 1, 2, AND 4 VOTE TO ACCEPT THE PLAN.**

2.      Purpose of the Disclosure Statement.  The purpose of the Disclosure Statement is to set forth information that (a) summarizes the Plan and potential alternatives to the Plan, (b) advises Holders of Claims and Equity Interests of their rights under the Plan, (c) assists those creditors entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or to reject the Plan, and (d) assists the Bankruptcy Court in determining whether the Plan complies with the Bankruptcy Code and should be confirmed.  The information included in the Disclosure Statement is solely for purposes of soliciting acceptances of the Plan.

By order dated [January __], 2012, the Bankruptcy Court approved the Disclosure Statement, finding that it contains "adequate information", as that term is used in Bankruptcy Code § 1125(a)(1).  However, the Bankruptcy Court has not passed on the merits of the Plan; the Confirmation Hearing, at which time the Court will consider Confirmation of the Plan, is currently scheduled for [_____ __], 2012, or such other date as the Debtors or the Bankruptcy Court may adjourn such hearing to, including any adjournments announced at the Bankruptcy Court.  All creditors entitled to vote on the Plan should carefully read the Disclosure Statement, in its entirety, before voting.

The Disclosure Statement and the Plan (including any exhibits and supplements hereto and thereto) are the only materials creditors should use to determine whether to vote to accept or to reject the Plan.  No solicitation of votes on the Plan may be made except pursuant to the Disclosure Statement, and no Person has been authorized to use any information concerning the Debtors or their businesses, other than the information contained herein, for purposes of solicitation.

**THE *LAST DAY* TO VOTE TO ACCEPT OR TO REJECT THE PLAN IS [_____ __,] 2012 (the "Voting Deadline").**

**THE RECORD DATE FOR DETERMINING WHICH CREDITORS IN CLASS 1, CLASS 2, OR CLASS 4 MAY VOTE ON THE PLAN IS [_____ __,] 2012 (the "Voting Record Date").**

**PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN AND ALL OTHER EXHIBITS, IN ITS AND THEIR ENTIRETIES. A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u>. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. REFERENCE IS MADE TO THE PLAN AND THE DOCUMENTS REFERRED TO HEREIN AND THEREIN FOR A COMPLETE STATEMENT OF THE TERMS AND PROVISIONS THEREOF. ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

The Plan Supplement will be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date, which is [_____ __], 2012. The deadline to object to any such Plan Supplement is [_____ __], 2012 at 4:00 p.m. (prevailing Eastern Time).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THE DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCE, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT OR SUCH OTHER SPECIFIED TIME.

THE DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THOSE CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN, TO ENABLE SUCH HOLDERS TO MAKE AN INFORMED DECISION ABOUT THE PLAN. THE DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

C. **Disclosure Statement Enclosures**

Accompanying the Disclosure Statement are the following enclosures:

1. <u>Notice of Confirmation Hearing</u>: a copy of the notice of the deadline for submitting Ballots to accept or to reject the Plan and, among other things, the date, time, and place of the Confirmation Hearing and the deadline for filing objections to Confirmation of the Plan.

2. <u>Ballots</u>: one or more Ballots (and return envelopes) for voting to accept or to reject the Plan. **If you are the Holder of a Claim subject to an objection filed by the Debtors, and/or otherwise the Holder of a Disputed Claim, your Claim is deemed disallowed for voting purposes (to the extent of the objected-to amount, in the event the full amount of any asserted Claim is not objected to); provided, however, that any such Holder may** a file a motion under Bankruptcy Rule 3018 to seek to allow its Claim (or a portion thereof) solely for voting purposes.

The Bankruptcy Code provides that only creditors that vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Any failure to deliver a properly-completed Ballot by the Voting Deadline will constitute an

abstention.  Any Ballot that is executed and timely delivered prior to the Voting Deadline, but does not comply with the procedures and/or requirements established by the Bankruptcy Court will not be counted.  *See* Article VI, entitled *Voting Procedures and Requirements*, below, for a more detailed discussion of such procedures and/or requirements.

D.    **Inquiries**

If you have any questions about the Plan, the Disclosure Statement, or procedures for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, please call the Claims Agent at (877) 398-2187 or visit http://www.cbhinfo.com/.

Additional copies of the Disclosure Statement and copies of the Plan Supplement are available at the Debtors' case website at http://www.cbhinfo.com/ or upon request made to the Claims Agent at either of the following addresses:

| if by mail: | if by hand delivery or overnight courier: |
|---|---|
| GCG, Inc. | GCG, Inc. |
| Attn: CB Holding Corp. Ballot Processing | Attn: CB Holding Corp. Ballot Processing |
| PO Box 9587 | 5151 Blazer Parkway, Suite A |
| Dublin, OH 43017-4887 | Dublin, OH 43017 |

E.    **Summary of Possible Recoveries and Classification and Treatment of Claims and Equity Interests Under the Plan**

During these Chapter 11 Cases, the Debtors sold substantially all of their assets and, in exchange therefor, received approximately $20 million in total proceeds, net of costs of administration of their Estates.  As of the date hereof, after giving effect to the Plan and the Unsecured Creditor Settlement, the Debtors believe that there will be approximately $1.2 million (not including the proceeds of any Avoidance Actions or any as yet remaining unsold assets) available for distribution to Holders of Allowed General Unsecured Claims in Class 4, and $[482,000] of this approximately $1.2 million would not be shared with the Pre-Petition Lenders on account of the Pre-Petition Lenders Deficiency Claims.  The anticipated approximate percentage recovery for such Holders on account of their Allowed Claims, along with percentage recoveries in other Classes, is set forth in the following table that briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.  The previous discussion and the summary below are qualified in their entireties by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and all disclaimers in the Disclosure Statement.  For a more detailed description of the terms and provisions of the Plan, *see* Article III, below, entitled *Overview of the Plan*.

For certain Classes of Claims and Equity Interests, estimated percentage recoveries are set forth below.  The value of consideration to be provided, if any, and the amount of Claims were determined based upon the Debtors' review of their respective Books and Records and includes estimates of a number of Claims that may be contingent, disputed, and/or unliquidated.  For various reasons, including consideration of unanticipated expenses and/or additional Claims that may be filed or otherwise asserted prior to the Bar Date, the actual

recoveries expected in these Chapter 11 Cases and the amounts of Allowed Claims could materially exceed (or could be materially less) than the estimated amounts shown below.

| Class | Claim and Estimated Approximate Aggregate Amount of Claims in Class | Treatment | Estimated Approximate Recovery |
|---|---|---|---|
| 1 | Senior Creditor Claims $73 million, not including any Claims of the Second Lien Lenders | Impaired | Between 20% and 23% |
| 2 | Other Secured Claims $0[4] | Impaired | Unknown[5] |
| 3 | Other Priority Claims $82,000[6] | Unimpaired | 100% |
| 4 | General Unsecured Claims $120 million | Impaired | Between .01% and 1.1% |
| 5 | Intercompany Claims $0.00 | Impaired | N/A |
| 6 | Equity Interests (n/a) | Impaired | 0% |

**ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED RECOVERIES SET FORTH ABOVE ARE REASONABLE AND WITHIN THE RANGE OF LIKELY ASSUMED RECOVERIES, THERE IS NO ASSURANCE THAT THE ACTUAL RECOVERIES WILL NOT BE SIGNIFICANTLY LESS THAN THE ESTIMATED RECOVERIES SET FORTH ABOVE BECAUSE THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN SUCH CLASSES MATERIALLY EXCEED THE ASSUMED AGGREGATE CLAIM AMOUNTS, AVAILABLE DISTRIBUTIONS TO BE MADE UNDER THE PLAN ARE LOWER THAN EXPECTED, OR OTHERWISE.** The actual recoveries under the Plan by creditors in Classes 1, 2, and 4 will depend upon a variety of factors, including a claims-reconciliation process that will be completed after the Bar Date. *Accordingly, no representations can be made, or are being made, with respect to whether the*

---

[4] The Debtors believe that, at most, there will be a *de minimis* amount of Allowed Other Secured Claims.

[5] The actual recovery on account of any Allowed Other Secured Claims will depend on the actual value of the applicable underlying collateral with respect to such Claim.

[6] The estimated amount of Allowed Other Priority Claims does not include approximately $206,000 in anticipated Allowed Claims under Bankruptcy Code § 503(b)(9), which are treated as Administrative Claims under the Plan, or approximately $430,000 of anticipated Allowed Priority Tax Claims, which are not required to be classified under the Plan.

*estimated percentage recoveries set forth above with respect to Classes 1, 2, and 4 will actually be realized by the Holders of Allowed Claims in such Classes.*

## II.    OVERVIEW OF THE DEBTORS AND THESE CHAPTER 11 CASES

### A.    The Debtors' Pre-Sale Business Operations

The Debtors owned and operated the *Charlie Brown's Steakhouse* ("*Charlie Brown's*"), *Bugaboo Creek Steak House* ("*Bugaboo Creek*"), and *The Office Beer Bar & Grill* ("*The Office*") restaurant brands.  Charlie Brown's and Bugaboo Creek were classic steakhouses, offering their customers exceptional service, value, and fresh food, along with seasonal specialties, while The Office was more casual, offering classic pub appetizers and dining options.

Charlie Brown's, the flagship of the Debtors' restaurants brands, was founded in 1966 in Warren, New Jersey, and in that same year, The Jolly Trolley (later to be made part of The Office restaurant chain) was purchased.  Charlie Brown's is known for its neighborhood restaurant image, a large salad bar featuring locally-grown produce and more than 60 items, and its signature prime rib.

Bugaboo Creek was founded in 1992.  Bugaboo Creek restaurants include exposed wooden beams, large fireplaces, and antler chandeliers, designed to remind diners of Canadian hunting lodges, and feature detailed animatronics, including "Moxie the Moose", a talking moose head mounted in each restaurant.  Charlie Brown's purchased Bugaboo Creek in 2007.  Bugaboo Creek had also previously operated restaurant locations in Georgia, Connecticut, and Rhode Island, which were closed prior to the Petition Date.

The Office, located entirely in New Jersey, provides guests with an exciting pub-like atmosphere, including flat panel televisions and free wi-fi service.  The Office offers over 60 beers (including 18 unique craft options and microbrews).  Restaurant Associates, a former owner of Charlie Brown's, acquired The Office in 1986, and The Office was eventually consolidated into Charlie Brown's prior to Charlie Brown's sale to Castle Harlan in 1997.  In 2009, The Jolly Trolley was converted to The Office location in Westfield, New Jersey.

The Debtors closed 29 Charlie Brown's and 18 Bugaboo Creek restaurants (collectively, the "*Closed Restaurants*") in the week prior to the Petition Date.  On December 13, 2010, the Bankruptcy Court entered an omnibus order (ECF No. 176) authorizing the rejection, *nunc pro tunc* to the Petition Date, of the leases related to the Closed Restaurants.

As of the Petition Date, there were 20 remaining Charlie Brown's restaurants in New York, New Jersey, and Pennsylvania; 12 remaining Bugaboo Creek restaurants in Massachusetts, Delaware, Maryland, New Hampshire, and Maine; and 7 The Office restaurants in New Jersey.  On or about April 21, 2011, the Debtors began closing Sales of their assets with the Sale of Bugaboo Creek, as discussed below, and they completed all of the Sales of their restaurant brands on July 28, 2011.  Accordingly, as of July 28, 2011, the Debtors no longer had any operations, and on August 31, 2011, they closed and exited their corporate headquarters in Mountainside, New Jersey.

As of the Petition Date, the Debtors had approximately 185 full-timed salaried employees and more than 2,200 full-time and part-time hourly employees. None of the Debtors' employees were members of a union.

B.    **The Debtors' Pre-Petition Capital Structure**

1.    The Financing Agreement.

On June 21, 2007, in connection with the acquisition of Bugaboo Creek, the Debtors entered into the Financing Agreement with the Pre-Petition Lenders. Obligations under the Finance Agreement are secured by Liens on substantially all of the Debtors' assets, including mortgages on most of the Debtors' leases, but excluding liquor licenses, and are guaranteed by all of the Debtors.

The Financing Agreement provides for a revolving line of credit (the "*Revolver*"), under which the Debtors borrowed up to an aggregate amount equal to the lesser of $15 million and a defined borrowing base, with a letter of credit sublimit of the lesser of $4 million and the total commitment under the Revolver minus certain reserves. At the Debtors' option, interest on the Revolver accrues at a defined margin based on a ratio of total indebtedness to EBITDA. The Financing Agreement also provides for a term loan (the "*Term Loan*") of $71 million, bearing interest at the same rates described above.

As of the Petition Date, the Debtors had (a) approximately $6 million in outstanding borrowings under the Revolver, bearing interest at 10.25% (including default interest of 2%), (b) $3.925 million of letters of credit outstanding, approximately $1.3 million of which were cash collateralized, and (c) approximately $64 million outstanding under the Term Loan ($12 million outstanding under Term Loan A, and $52 million outstanding under Term Loan B), bearing interest at 10.25% (including default interest of 2%).

2.    Second Lien Note Purchase Agreement.

On September 28, 2008, the Debtors issued $10 million in Second Lien Notes to the Second Lien Noteholders pursuant to the Second Lien Note Purchase Agreement in connection with amendments to the Financing Agreement and the Subordinated Note Purchase Agreement.

As of the Petition Date, approximately $14 million, including accrued and unpaid interest, was outstanding under the Second Lien Notes, which obligations are expressly subordinated to obligations owed to the Pre-Petition Lenders.

3.    Subordinated Notes Purchase Agreement.

On June 21, 2007, also in connection with the acquisition of Bugaboo Creek, the Subordinated Note Issuers issued $20 million in Subordinated Notes pursuant to the Subordinated Note Purchase Agreement. Outstanding borrowings under the Note Purchase Agreement accrue interest at 15.5% per year (11% payable in cash and 4.5% PIK). The default rate of interest on the Subordinated Notes is an additional 2% (payable in cash).

As of the Petition Date, the Debtors owed approximately $30 million, including accrued and unpaid interest, under the Subordinated Notes, which obligations are expressly subordinated to obligations owed to the Pre-Petition Lenders and the Second Lien Noteholders.

C. **Significant Events Leading to the Commencement of These Chapter 11 Cases**

A variety of external factors led to a decline in the Debtors' revenue over the last several years, at the same time that costs increased.  For instance, the restaurant industry grew more competitive, the fast-food industry improved product offerings and increased market share, to the detriment of casual dining restaurants, such as those operated by the Debtors, and consumers changed their ordering habits.  In addition, the "Great Recession" led to a decline in discretionary spending among the Debtors' customers, and fewer families frequented restaurants while food and labor costs increased, compounding the Debtors' financial distress.

Accordingly, for some time prior to the Petition Date, the Debtors discussed a financial restructuring with the Pre-Petition Lenders and other parties and entered into multiple amendments to their various credit and related facilities, but the Debtors' need for additional liquidity was not resolved, and the economy did not improve.  On the Petition Date, the only party willing to provide the Debtors with necessary funding was the Administrative Agent (which is defined in the Plan as "Ally Commercial Finance LLC, in its capacities as (i) one of the Pre-Petition Lenders and a participant in the financing provided under the Financing Agreement and (ii) administrative agent and collateral agent to the DIP Lender under the DIP Facility, and all successors and assigns thereof"), which informed the Debtors that it was only willing to do so as a DIP loan in Chapter 11 cases to allow the Debtors to market their assets in anticipation of a global asset sale.  Thus, in an effort to maximize their value, the Debtors entered into the DIP Facility and commenced the Chapter 11 Cases with an intent to attempt to sell substantially all of their assets expeditiously pursuant to Bankruptcy Code § 363.

As described in detail below, the Plan is the culmination of these efforts and the Sales, and it would effectuate the Lenders/Committee Resolution (as defined and described below).

D. **The Chapter 11 Cases**[7]

 1. Commencement of the Chapter 11 Cases.  On November 17, 2010, each of the Debtors commenced individual Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").  On November 18, 2010, the Bankruptcy Court entered an order directing the joint administration of the Debtors' separate Chapter 11 cases (ECF No. 23) as these Chapter 11 Cases.

 2. Appointment of the Creditors Committee.  On December 1, 2010, the Office of the United States Trustee for Region 3 appointed the Creditors Committee pursuant to

---

[7] Copies of all motions, orders, or other documents filed in these Chapter 11 Cases may be obtained online, for a fee, at http://ecf.ctb.uscourts.gov (registered users) and at http://pacer.psc.uscourts.gov (unregistered users), or free of charge, by contacting the Debtors' claims, notice, and balloting agent, GCG, Inc., as set forth above or by calling 877 398-2187, or by visiting www.cbhinfo.com.

Bankruptcy Code § 1102 (ECF No. 95) to represent the interests of unsecured creditors in these Chapter 11 Cases. The Creditors Committee consists of the following members: (a) Tucker Co. Inc.; (b) Performance Food Group, Inc.; (c) Oakleaf Waste Management; (d) Valassis; (e) Tri Mark United East, Inc.; (f) GDF Suez Energy Resources NA, Inc.; and (g) Simon Property Group, Inc.

The Creditors Committee retained Pachulski Stang Ziehl & Jones LLP, as its attorneys, and the Bankruptcy Court approved this retention on February 4, 2011 (ECF No. 498). The Creditors Committee is actively participating in all aspects of these Chapter 11 Cases, including negotiating the terms of the DIP Facility Order and the Lenders/Committee Resolution and participating in discussions regarding the Plan, including negotiating the Unsecured Creditors Settlement.

3.    <u>First-Day Motions</u>. To minimize the possible disruption to the Debtors' businesses and operations upon the filing of these Chapter 11 Cases, among other reasons, on or shortly after the Petition Date, the Debtors filed the following motions with the Bankruptcy Court:

- *Debtors' Emergency Motion for Order (i) Authorizing Payment of Pre-Petition Payroll Obligations, (ii) Authorizing and Directing their Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Payroll Obligations, and (iii) Prohibiting Banks from Placing Holds on, or Attempting to Reverse, Related Transfers* (ECF No. 3, approved by ECF No. 21);

- *Debtors' Motion for Joint Administration* (ECF No. 4, approved by ECF No. 23);

- *Debtors' Motion for Interim and Final Orders Authorizing them to Pay Pre-Petition Wages and Salaries and to Pay and Honor Pre-Petition Employee Benefits and Related Obligations* (ECF No. 6, approved by ECF Nos. 41 and 170);

- *Debtors' Motion for an Order Authorizing Continued Use of their Existing Bank Accounts, Cash Management System, and Checks and Business Forms* (ECF No. 7, approved by ECF No. 42);

- *Debtors' Motion for Interim and Final Orders Authorizing them to Pay Claims Under Perishable Agricultural Commodities Act* (ECF No. 8, approved by ECF Nos. 43 and 419);[8]

---

[8]    In accordance with the procedures established by the Bankruptcy Court for the payment of pre-petition claims of creditors that provided goods covered by the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499, <u>et seq.</u> ("*PACA*"), and as set forth in the PACA reports filed by the Debtors (ECF Nos. 544 & 704), the Debtors were able to reach a resolution with each of the 13 claimants that asserted PACA claims. The aggregate payment by the Debtors on account of PACA claims was $1,008,034.67, and all of the PACA claimants that received payment, and any such claimant that did not

- *Debtors' Motion for Interim and Final Orders Authorizing Payment of Pre-Petition Taxes and Liquor License Fees and Taxes* (ECF No. 9, approved by ECF Nos. 44 and 172);

- *Debtors' Motion for Interim and Final Orders Authorizing Them to Honor Certain Pre-Petition Customer Programs* (ECF No. 10, approved by ECF Nos. 45 and 173);

- *Debtors' Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services* (ECF No. 11, approved by ECF Nos. 17 and 175);

- *Debtors' Motion for Interim and Final Orders Authorizing Payment of Pre-Petition Obligations to Critical Liquor Vendors* (ECF No. 12, approved by ECF Nos. 46 and 174); and

- *Debtors' Motion for Approval of Stipulation and Order (i) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 364, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (ECF No. 13, approved by ECF Nos. 48, 177, and 597).

The Bankruptcy Court entered orders (as detailed above) approving each of these motions, in some instances with certain modifications.

The Debtors also filed several motions and/or applications, as appropriate, to retain Professionals in these Chapter 11 Cases. Specifically, on the Petition Date and thereafter, the Debtors filed motions and/or applications to employ and to retain the following parties in the following roles:

- *The Garden City Group, Inc., as Claims, Notice, and Balloting Agent* (approved on November 19, 2010, *nunc pro tunc* to the Petition Date) (ECF No. 5, approved by ECF No. 40);

- *Cahill Gordon & Reindel LLP, as general bankruptcy and restructuring co-counsel* (approved on January 10, 2011, *nunc pro tunc* to the Petition Date) (ECF No. 69, approved by ECF No. 417);

- *Richards Layton & Finger, P.A., as general bankruptcy and restructuring co-counsel* (approved on December 13, 2010, *nunc pro tunc* to the Petition Date) (ECF No. 70, approved by ECF No. 169);

---

assert a PACA claim, were deemed to have waived, released, and discharged any and all claims, of any type, kind, or priority on account of or in connection with PACA against (i) the Debtors, (ii) any former, present, or future officer, director, or employee of the Debtors, (iii) the Debtors' assets and properties, and (iv) any funds or amounts held by the Debtors.

- *CRG Partners, as restructuring advisor, as well as providing services of the CRO* (approved on January 11, 2011, *nunc pro tunc* to the Petition Date) (ECF No. 201, approved by ECF No. 429);

- *Raymond James & Associates, Inc., as investment banker* (approved on January 10, 2011, *nunc pro tunc* to the Petition Date) (ECF No. 202, approved by ECF No. 424);

- *Hilco Real Estate, LLC,* as real estate and related advisor (approved January 10, 2011, *nunc pro tunc* to the Petition Date) (ECF No. 203, approved by ECF No. 423); and

- *J.H. Cohn LLP, as tax accountants* (approved June 23, 2011, *nunc pro tunc* to April 26, 2011) (ECF No. 809, approved by ECF No. 855).

The Bankruptcy Court has entered orders approving several interim applications for the payment of fees and reimbursement of expenses of the Debtors' and the Creditors Committees' Professionals during these Chapter 11 Cases (ECF Nos. 714 and 909).

        4.   <u>Certain Other Motions and Orders</u>.  In order to operate their businesses and to ensure the potential for a successful outcome in these Chapter 11 Cases and to maximize value, the Debtors also sought and obtained (or consented to entry of) the following orders, among others, following the Petition Date, certain of which, as described below, were sought by parties other than the Debtors:

- *Order Extending Time to File Schedules and Statements* (ECF No. 71, approved by ECF No. 167);

- *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 73, approved by ECF No. 168);

- *Order Authorizing Employment and Retention of Professionals Used in Ordinary Course of Business* (ECF No. 75, approved by ECF No. 194);

- *Omnibus Order Authorizing Retroactive Rejection of Certain Unexpired Leases for Restaurants Closed Prior to Petition Date* (ECF No. 76, approved by ECF No. 176);

- *Agreed-Upon Order Regarding Certain Automobile Lease(s) Between Debtors and Enterprise* (ECF No. 94, approved by ECF No. 420);

- *Second Omnibus Order Authorizing Rejection of Certain Unexpired (I) Automobile Leases Nunc Pro Tunc to November 30, 2010 and (II) Parking Lot Leases Nunc Pro Tunc to the Petition Date* (ECF No. 94, approved by ECF No. 425);

- *Interim and Final Orders (I) Authorizing Entry Into Post-Petition Insurance Financing Agreement and (II) Approving Adequate Protection For Related Pre-Petition Insurance Financing Agreement* (ECF No. 178, approved by ECF Nos. 205 and 421);

- *Order Extending Time to Assume or to Reject Unexpired Leases of Non-Residential Real Property* (ECF No. 464, approved by ECF No. 516);

- *Orders Approving Section 365(d)(4) Extension Stipulations* (ECF No. 750, approved by ECF No. 789, supplement by ECF Nos. 786, 815, 821, 853, and 922);

- *Order Approving Compromise and Settlement of Adversary Proceeding Commenced by Waterpart, LLC* (ECF No. 729, approved by ECF No. 788);

- *Order Approving Compromise and Settlement of Personal Injury Litigation and Related Potential Insurance Coverage and Cost Issues* (ECF No. 730, approved by ECF No. 781);

- *Orders Extending Exclusive Periods During Which Debtors May File and Solicit Acceptances of Chapter 11 Plan* (ECF No. 465, 802, 1019, and 1117 approved by ECF Nos. 510, 845, 1057, and 1138);

- *Orders Pursuant to 28 U.S.C. § 1452 and Bankruptcy Rules 9006(b) and 9027 Extending Time Period Within Which Debtors May Remove Claims and Actions* (ECF Nos. 463, 760, 962, and 1085 approved by ECF Nos. 509, 847, 1017, and 1106, respectively);

- *Consent Order Granting Lenders' Assented-to Joint Motion to Lift the Automatic Stay in Order to Apply Cash Collateral to Satisfy Draws Under Standby Letters of Credit* (ECF No. 753, approved by EC No. 790); [9]

- *Order Authorizing Debtors to (i) Terminate Certain Benefit Plans and (ii) Enter into Related Agreements to Effectuate Such Terminations* (ECF No. 949, approved by ECF No. 978); and

- *Agreed Order Rejecting Lease and Authorizing Return of Vehicle to Cab East LLC* (ECF No. 963, approved by ECF No. 1013). [10]

---

[9]    The motion requesting this order was filed and/or joined by certain of the Pre-Petition Lenders.

[10]    The motion requesting this order was filed by CAB EAST LLC.

- *Order Approving Stipulation Deeming Second Lien Lenders to Have Filed Consolidated Claims Against Each of the Debtors* (ECF No. 1062, approved by ECF No. 1067).

5.    The DIP Facility and the Lenders/Committee Resolution.  On the Petition Date, the Debtors filed a motion (the "*DIP Motion*") (ECF No. 13) seeking approval of a stipulation and order, among other things, (a) authorizing secured post-petition financing, (b) authorizing the use of cash collateral, and (c) granting adequate protection.  On November 19, 2010, the Bankruptcy Court entered an order (ECF No. 48) approving the DIP Motion and the DIP Facility on an interim basis, subject to approval of various items at a subsequent, final hearing.  This final hearing was scheduled for December 10, 2010.  The DIP Facility Lender initially made available a $2.5 million facility as an overadvance to the Debtors pursuant to the DIP Facility Order.

After the Creditors Committee announced its intention to object to various aspects of the proposed financing under the DIP Facility, the Debtors and the Administrative Agent, on behalf of the Pre-Petition Lenders, engaged in settlement discussions with the Creditors Committee over the terms of a consensual DIP financing and other matters.  On December 13, 2010, the Bankruptcy Court entered an order approving the financing under the DIP Facility on a final basis (the "*DIP Facility Order*") (ECF No. 177), including an agreement and resolution (as described below, the "*Lenders/Committee Resolution*") among the Debtors, the Creditors Committee, the DIP Facility Lenders, and the Pre-Petition Lenders, resolving the Creditors Committee's asserted objections to the DIP Facility and providing for the allocation of net proceeds of Sales and other assets during these Chapter 11 Cases.

Pursuant to Paragraph 5 of the DIP Facility Order, as security for the DIP Facility and as part of the Lenders/Committee Resolution, the DIP Facility Lender were granted valid and perfected security interests in, and liens upon, essentially all assets of the Debtors, except for liens on Avoidance Actions and the Estate Shared Proceeds.  In addition, no waiver of the Debtors' surcharge rights under Bankruptcy Code § 506(c) was contained in the DIP Facility Order, and the DIP Facility Order contained carve-outs, subject to amendment based on agreed-upon and subsequently-filed budgets under the DIP Facility Order, for Administrative Claims and Professional Fees.

Specifically, as set forth in Paragraph 33 of the DIP Facility Order, and as memorialized by the Plan, in exchange for the Creditors Committee's agreement to consent to the terms of the DIP Facility Order, under the Lenders/Committee Resolution, the DIP Facility Lender and the Pre-Petition Lenders agreed to share certain proceeds of the Sales and liquidation of the Debtors' Estates, as follows:

- $125,000 plus five percent (5%) of the net proceeds (after costs of sale) from the sale of The Office in excess of $2.5 million (the "*Office Shared Proceeds*") will be paid to the Estates (as opposed to the Pre-Petition Lenders or the DIP Facility Lender) to be distributed under the Plan to General Unsecured Creditors, and the first $125,000 of such proceeds will be distributed to Holders of Allowed General Unsecured Claims and will not be shared with

the Pre-Petition Lenders on account of the Pre-Petition Lenders Deficiency Claim (the "*Office Resolution Consideration*");

- $125,000 (the "*First $125,000*") plus four percent (4%) of the net proceeds from the sale or liquidation of the Debtors' estates (other than (i) The Office Restaurants, (ii) the D&O Claim, and (iii) Avoidance Actions) in excess of $4 million (the amount over $4 million, the "*Sharing Percentage Recovery*") will be paid to the Estates to be distributed under the Plan, and the First $125,000 and the first $125,000 of the Sharing Percentage Recovery will be distributed to Holders of Allowed General Unsecured Creditors and will not be shared with the Pre-Petition Lenders on account of the Pre-Petition Lenders Deficiency Claim; and

- 50% of the net proceeds (after litigation fees, costs, and expenses) of the D&O Claim will be paid to the Estates to be distributed under the Plan (the "*D&O Shared Proceeds*"), with the first $1,000,000 of the D&O Shared Proceeds to be distributed under the Plan to General Unsecured Creditors and will not be shared with the Pre-Petition Lenders as Holders of General Unsecured Claims (the "*D&O Resolution Consideration*").

On March 4, 2011, the Debtors filed an emergency motion seeking approval of an amendment (the "*DIP Amendment*") of the DIP Facility Order (ECF No. 571).   The Bankruptcy Court approved the DIP Amendment on March 9, 2011 (ECF No. 597), which, among other things, extended the term of the DIP Facility Order and increased the maximum permitted borrowings under the DIP Facility to $5.5 million.   The DIP Lenders increased the facility available by an additional $3 million as an overadvance to the Debtors under the DIP Facility Order according to the DIP Amendment.   The term of the DIP Facility Order has subsequently been extended by several agreed-upon modified budgets related thereto filed with the Bankruptcy Court since the DIP Amendment (ECF Nos. 751, 876, and 885).

Pursuant to, and in accordance with, the DIP Facility Order and the DIP Amendment, during these Chapter 11 Cases, the Administrative Agent has collected approximately $61 million from the Sales and the Debtors' operations and has advanced to the Debtors an aggregate of approximately $45 million (at no one time more than $5.5 million). Moreover, as of the date hereof, the Administrative Agent is holding approximately $17.8 million in segregated accounts on account of proceeds of Sales of the Lenders' collateral that have closed and other funds from the Debtors' operations during these Chapter 11 Cases and the carve-out in favor of the Debtors' Professionals under Paragraph 6 of the DIP Facility Order, and the Debtors estimate that the Administrative Agent will, on or about the currently-anticipated Confirmation Date, hold a total of approximately $20 million (assuming that all currently-pending Sales of liquor licenses have closed and that no payments have been made on account of the DIP Facility), which, except for the amount of the Estate Resolution Consideration of approximately $[482,000], is the proceeds of the Lenders' collateral sold during these Chapter 11 Cases and is to be applied in accordance with the Confirmation Order, the Plan, and the DIP Facility Order on the Effective Date.   In addition, the Administrative Agent asserts that all funds

in the possession of the Debtors (except for the Estate Resolution Consideration) constitute the proceeds of the collateral of the DIP Facility Lender and, under the plan, shall be distributed to the Administrative Agent in accordance with, and subject to, the Confirmation Order, the Plan, and the DIP Facility Order on the Effective Date.   As set forth below and described in detail in Section II.B of the Plan, these funds held by the Administrative Agent other than the Estate Resolution Consideration, after payments of any and all amounts required to fully fund the Plan Fund, in the manner set forth in Section IV.B of the Plan, will be distributed by the Administrative Agent in accordance with the terms of the DIP Facility Order, the Financing Agreement, the Plan, and the Confirmation Order, to the respective Holders of: the Allowed DIP Facility Claims, in the amount required to satisfy in full all then outstanding Allowed DIP Facility Claims, with any excess to be distributed to Holders of Allowed Pre-Petition Lender Claims in accordance with Section III.B.1 of the Plan.   Any amounts funded by the Administrative Agent in connection with the Plan, including but not limited to any portion of the Plan Fund, will be the Administrative Agent's and the DIP Facility Lender's final contribution to the Debtors' Estates.

Net proceeds of any remaining Sales will be distributed by the Liquidating Trustee as follows:  (i) 96% to the Administrative Agent for distribution in accordance with Section III.B.1 of the Plan and (ii) 4% to General Unsecured Creditors (which, other than any funds that constitute the Estate Resolution Consideration, will be shared with the Pre-Petition Lenders on account of the Pre-Petition Lenders Deficiency Claims).  In addition, the proceeds of any D&O Claims realized will be distributed by the Liquidating Trustee as follows:  (y) 50% to the Administrative Agent for distribution, in accordance with Section III.B.1 of the Plan, and (z) 50% to General Unsecured Claims (which, after $2 million in such proceeds are realized, will be shared with the Pre-Petition Lenders on account of the Pre-Petition Lenders Deficiency Claims).

Notwithstanding the foregoing, all of the Pre-Petition Lenders' pre-petition or post-petition collateral, or the proceeds thereof, which are returned or refunded to the Debtors or the Liquidating Trustee (as applicable), including without limitation, Workers Compensation Insurance Policy deposits or any other deposits, or any retainers, once returned or refunded will be paid 100% to the Administrative Agent, for subsequent distribution thereby to the Holders of Allowed Pre-Petition Lenders Secured Claims, until all such Allowed Claims are satisfied in full, in the manner set forth in the Financing Agreement.

Upon the closing of the Sale of Bugaboo Creek on April 21, 2011, as described below, the Debtors believed that they were in receipt of sufficient funds necessary to satisfy all obligations under the DIP Facility, but at the request of the Administrative Agent, such funds are being held in segregated accounts, to be applied in accordance with the terms of the Plan on the Effective Date.   Since April 21, 2011, the DIP Facility Lender has not been charging the Debtors any interest on the DIP Facility, but have, instead, been charging unused line fee of 0.5% on the undrawn amount of the DIP Facility.

6.     The Office Sale.  Prior to the Petition Date, the Debtors had engaged in certain limited efforts to sell The Office, and in September 2010, the Debtors, with the assistance of Raymond James & Company, Inc. ("*Raymond James*"), began an extensive marketing campaign.

In December 2010, the Debtors negotiated a stalking-horse bid and asset purchase agreement for the Sale of The Office for $3.4 million, subject to higher and better offers, with Villa Enterprises Ltd., LLC ("*VEM*"), as the proposed stalking-horse bidder. Prior to executing the sale agreement with VEM for The Office, the Debtors conducted an informal auction between VEM and The Lessing Company, whereby the initial proposed stalking-horse bid for The Office increased by $900,000 from $2.5 million to $3.4 million.

On December 23, 2010, the Debtor filed a motion (ECF No. 213) seeking, among other things, approval of a stalking-horse asset purchase agreement with VEM, scheduling a competitive auction and approving related bidding and sale procedures, authorizing the Sale of The Office free and clear of liens, claims, encumbrances, and other interests, authorizing the assumption and assignment of certain agreements, and authorizing the Debtors to consummate all such transactions. On January 6, 2011, the Bankruptcy Court entered an order (ECF No. 258) approving certain initial relief, including bid and sale procedures, approving VEM as the stalking-horse bidder and related bid protections, including a break-up fee, and scheduling an auction and related sale hearing. Prior to the scheduled auction, on or about January 14, 2011, the Debtors received one other bid for The Office, from Doherty Enterprises Inc.

On January 18, 2011, the Debtors conducted an auction for The Office, at which time, after more than 25 rounds of bidding (including purchase price increases and other modifications to the proposed structure of the transaction that benefited the Debtors), VEM submitted the highest and best offer for The Office in the amount of $4.675 million. Certain other concessions were made by VEM at the auction, including agreeing to pay a large portion of the purchase price upfront and to fund the entire purchase price into escrow upon the first closing of a restaurant. Accordingly, the Debtors, in an exercise of their business judgment, elected to pursue the Sale of The Office to VEM, and on January 19, 2011, the Debtors filed an executed version of an amended asset purchase agreement (ECF No. 459) for the Sale of The Office. On January 20, 2011, the Bankruptcy Court entered an order (ECF. No. 468) approving the Sale of The Office to VEM.

The terms of the Sale of The Office to various permitted assignees of VEM required the transaction to be consummated through multiple, separate closings, the first of which occurred on May 26, 2011. The final such closing occurred on June 24, 2011.

7.    _Bugaboo Creek Sale._  In June 2010, the Debtors decided to attempt to sell Bugaboo Creek and hired Raymond James to assist them in marketing Bugaboo Creek and related assets. In February 2010, the Debtors negotiated a stalking horse bid and asset purchase agreement for the Sale of Bugaboo Creek for $3 million, subject to higher and better offers, with Landry's Seafood House - North Carolina, Inc. ("*Landry's*"), as the proposed stalking-horse bidder.

On February 21, 2011, the Debtors filed a motion (ECF No. 489) seeking, among other things, approval of the stalking-horse asset purchase agreement with Landry's, scheduling a competitive auction and approving related bidding and sale procedures, authorizing the Sale of Bugaboo Creek free and clear of liens, claims, encumbrances, and other interests, authorizing the assumption and assignment of certain agreements, and authorizing them to consummate all such transactions. On February 24, 2011, the Bankruptcy Court entered an order (ECF No. 551)

approving certain initial relief, including bid and sale procedures, approving Landry's as the stalking-horse bidder and related bid protections, including a break-up fee, and scheduling an auction and related sale hearing.  Prior to the scheduled auction, on or about March 4, 2011, the Debtors received one other bid for Bugaboo Creek, from RRGK, LLC ("*RRGK*"), an affiliate of the owner of Capitol Q and Capitol C restaurants.

On March 7, 2011, the Debtors conducted an auction for Bugaboo Creek, at which time, after more than 25 rounds of bidding, RRGK submitted the highest and best offer for Bugaboo Creek in the amount of $10.05 million, plus payment of all cure costs under Bankruptcy Code § 365 in connection with the assumption and assignment of any applicable executory contracts and unexpired leases related to Bugaboo Creek.  Certain other concessions were made by Landry's prior to the auction and acknowledged by RRGK at the auction, including an agreement to close on the purchase of Bugaboo Creek on April 21, 2011, without condition, and an agreement to fund the entire purchase price, to be held in escrow until, and then released on, April 21, 2011.  Accordingly, the Debtors, in an exercise of their business judgment, elected to pursue the Sale of Bugaboo Creek to RRGK, and on March 10, 2011, the Debtors filed an executed version of an amended asset purchase agreement (ECF No. 608) for the Sale of Bugaboo Creek.  On March 11, 2011, the Bankruptcy Court entered an order (ECF No. 614) approving the Sale of Bugaboo Creek to RRGK.

The Sale of Bugaboo Creek to Charlie Brown's Acquisition Corp., a permitted assignee of RRGK, closed on April 21, 2011, at which time the entire purchase price of $10.05 million, plus certain other amounts, was received by the Debtors.

8.    <u>Charlie Brown's Sale</u>.  Commencing in December 2010, in accordance with the requirements of the DIP Facility Order, Raymond James began marketing Charlie Brown's and related assets.  As a result of this process, the Debtors negotiated a stalking-horse bid and asset purchase agreement for the sale of Charlie Brown's for $5.2 million, subject to higher and better offers, with CB Restaurants, Inc., an affiliate of Praesidian Capital Opportunity Fund III-A LP ("*Praesidian*"), as the stalking-horse bidder.

On February 17, 2011, the Debtors filed a motion (ECF No. 531) seeking, among other things, approval of a stalking-horse asset purchase agreement with Praesidian, scheduling a competitive auction and approving related bidding and sale procedures, authorizing the Sale of Charlie Brown's free and clear of liens, claims, encumbrances, and other interests, authorizing the assumption and assignment of certain agreements, and authorizing the Debtors to consummate all such transactions.  On March 9, 2011, the Bankruptcy Court entered an order (ECF No. 596) approving certain initial relief, including bid and sale procedures, approving Praesidian as the stalking-horse bidder and related bid protections, including a break-up fee, and scheduling an auction and related sale hearing.  Prior to the scheduled auction, on or about April 4, 2011, the Debtors received two other bids for Charlie Brown's, from BET Funding LLC and CB Restaurant Group, an affiliate of The Beekman Group.

On April 6, 2011, the Debtors conducted an auction for Charlie Brown's, at which time, after 30 rounds of bidding, Praesidian submitted the highest and best offer for Charlie Brown's, in the amount of $9.5 million.  Certain other concessions were made by Praesidian at the auction, including removing the ability to reject certain restaurants and lower the purchase

price and agreeing to pay a large portion of the purchase price by June 1, 2011, regardless of whether any sales of particular restaurant locations had closed, and to fund the entire purchase price into escrow upon the first closing.  Accordingly, the Debtors, in an exercise of their business judgment, elected to pursue the Sale of Charlie Brown's to Praesidian, and on April 11, 2011, the Bankruptcy Court entered an order (ECF. No. 710) approving the Sale of Charlie Brown's to Praesidian and attaching an executed version of an amended asset purchase agreement for the Sale of Charlie Brown's as an exhibit to such order.

   The terms of the Sale of Charlie Brown's to various permitted assignees of Praesidian required the transaction to be consummated through multiple, separate closings, the first of which occurred on June 15, 2011.  The final such closing occurred on July 28, 2011.

   9.    <u>Newnan, Georgia Restaurant</u>.  Shortly after the Petition Date, Hilco Real Estate, LLC ("*HRE*"), on behalf of the Debtors, began to market certain real property located at 355 Bullsboro Drive, Newnan, Georgia (the "*Newnan Property*"), at which the Debtors had operated a 6,766 square foot Bugaboo Creek restaurant prior to the Petition Date.  As a result of HRE's marketing efforts, 20 interested parties requested additional information about the Newnan Property, and because of this high interest, the Debtors established a deadline for offers to purchase the Newnan Property.

   On April 7, 2011, after receiving multiple competitive offers for the Newnan Property and related signed agreements and good-faith deposits, the Debtors held an informal telephonic auction, at which three prospective purchasers participated.  At this auction, following approximately 10 rounds of bidding, Triangle Capital, LLC ("*Triangle*"), submitted the highest and best bid of $927,500, and the Debtors entered into an amended purchase agreement (the "*Newnan Purchase Agreement*") with Triangle, reflecting this increased purchase price.

   On April 21, 2011, the Debtors filed a motion (ECF No. 731) for authority to sell the Newnan Property to Triangle, and this motion was approved by the Bankruptcy Court on May 15, 2011 (ECF No. 785).  The sale of the Newnan Property closed on or about June 3, 2011.

   10.    <u>Liquor License Sales</u>.  As discussed above, the Debtors closed 29 Charlie Brown's and 18 Bugaboo Creek restaurants in the week prior to the Petition Date.  As a result, the Debtors were not utilizing the liquor licenses for the Closed Restaurants, and the Debtors returned certain liquor licenses that may not be transferable to the applicable state, county, town, or municipality control board or agency.  In order to maximize the value of any remaining liquor licenses for the Closed Restaurants that were not returned (collectively, the "*Remaining Liquor Licenses*"), HRE, on behalf of the Debtors, commenced marketing the Remaining Liquor Licenses shortly after the Petition Date.

   a.    *Private Liquor License Sales*

As a result of these efforts to market the Remaining Liquor Licenses, the Debtors have sold 25 of the Remaining Liquor Licenses through private sales.  As of the date hereof, the following Sales of the Remaining Liquor Licenses have closed:  Tenafly, New Jersey (for $280,000); Hackettstown, New Jersey (for $407,500);[11] Franklin, New Jersey (for $250,000); Piscataway, New Jersey (for $200,000); Harrisburg, Pennsylvania (for $100,000); Lacey, New Jersey (for $225,000); Dedham, Massachusetts (for $250,000); Green Brook, New Jersey ($175,000); Hillsborough, New Jersey ($200,000); Burlington, Massachusetts (for $150,000); Harrisburg, Pennsylvania (for $100,000); Seekonk, Massachusetts (for $75,000); York, Pennsylvania (for $140,000); Watertown, Massachusetts (for $25,000); East Windsor, New Jersey (for $575,000); Peabody, Massachusetts (for $14,000); Fairfield, New Jersey (for $145,000); and Tinton Falls, New Jersey (for $305,000).[12]   Moreover, the following chart summarizes other of the Remaining Liquor Licenses for which Sales have been approved, but have not yet closed.[13]

---

[11]    Prior to the hearing to approve the Sale of the Hackettstown liquor license, the Debtors received higher and better offers therefor, which led to an informal, telephonic auction.  At the Hackettstown auction, after 85 rounds of bidding, the purchase price for that liquor license increased by more than $250,000.

[12]    Prior to the hearing to approve the Sale of the Tinton Falls liquor license, the Debtors received higher and better offers therefor, which led to an informal, telephonic auction.  At the Tinton Falls auction, after 20 rounds of bidding, the purchase price for that liquor license increased by more than $100,000.

[13]    It is possible that certain liquor license Sales could close between the date hereof and the date the Disclosure Statement is circulated by the Debtors and/or received by a particular party.  The receipt of proceeds of all such Sales is assumed in the estimated recovery amounts and percentages set forth herein.

| Liquor License Number | Location | Purchaser | Date of Approval Order | ECF No. of Approval Order | Purchase Price |
|---|---|---|---|---|---|
| 2102-33-001-009 | Alpha, NJ | Diane Hewitt | 03/09/2011 | 622 | $45,000 |
| 0713-32-005-006[14] | Montclair, NJ | Montclair Hospitality, LLC | 04/07/2011 | 701 | $725,000 |
| TR-712 | Allentown, PA | Anjin Asian Diner and Grill Inc. | 04/07/2011 | 702 | $100,000 |
| 1511-33-025-001 | Jackson, NJ | Hotel Unlimited, Inc. | 07/19/2011 | 910 | $160,000 |
| R 19138 | Langhorne, PA | Oxford Valley Ground Round, Inc. | 09/08/2011 | 1016 | $175,000 |
| 1322-32-005-009 | Keyport, NJ | Sandip Talati | 10/21/2011 | 1103 | $75,000 |
| 1329-33-016-009 | Matawan, NJ | Jose Barreiro | 10/21/2011 | 1104 | $155,000 |
| 1207-33-010-008 | Highland Park, NJ | ARTA, LLC | 10/21/2011 | 1105 | $50,000 |

Prior to the hearings to approve the Sales of the Hackettstown and Tinton Falls liquor licenses, the Debtors received, for each, higher and better offers therefor, which, in each case, led to informal, telephonic auctions. At the Hackettstown auction, after 85 rounds of bidding, the purchase price for that liquor license increased by more than $250,000, and at the Tinton Falls auction, after more than 20 rounds of bidding, the purchase price for that liquor license increased by more than $100,000.

        b.    *Liquor License Auction*

On June 8, 2011, the Debtors filed a motion for orders, among other things, approving auction procedures to be employed in connection with the sales of certain of the Remaining Liquor Licenses and authorizing such sales free and clear of liens, claims, encumbrances, and other interests (ECF No. 819). On June 22, 2011, the Bankruptcy Court entered an order, approving, among other things, the proposed sale and auction procedures (ECF No. 854), and the Debtors conducted auctions (the "*Liquor License Global Auctions*") at the Edison Hotel and Conference Center in Edison, New Jersey, on June 12, 2011.

The following chart summarizes those bids determined by the Debtors, in an exercise of their business judgment, to be the highest and best offers for the respective liquor licenses that were sold by the Debtors at the Liquor License Global Auctions. These bids were subsequently memorialized in purchase agreements between the Debtors and the particular purchasers and then approved by orders of the Bankruptcy Court (ECF Nos. listed below).

---

[14]    The transfer of the Montclair liquor license was approved effective as of January 4, 2012. The Debtors anticipate that this Sale will close on or about January 9, 2012.

| Number | Location | Purchaser and Purchase Price | ECF No. for Approval Order |
|---|---|---|---|
| 1602-33-130-007 | City of Clifton | Robert T. Larsen and Frank A. Ciolli<br><br>$30,000 | 912 |
| 2019-33-033-008 | Township of Union | Makras Ent. Inc.<br><br>$50,000 | 913 |
| 1225-33-003-007 | Town of Woodbridge | Umang Swali<br><br>$135,000 | 914 |
| R-9207 | Tredyffrin Twp. (Berwyn) | Steven Schwenk<br><br>$170,000 | 911 |
| | | **TOTAL**:  $385,000 | |

As of the date hereof, the following Sales of the Remaining Liquor Licenses have closed:  Clifton, New Jersey (for $30,000); and Berwyn, Pennsylvania (for $170,000).

c.    *Remaining Liquor License*

At the Liquor License Global Auctions, the Debtors chose not to sell certain of the Remaining Liquor Licenses, or no bids were received for such liquor licenses.   The Remaining Liquor Licenses to be sold or otherwise disposed of by the Debtors or the Liquidating Trustee, as applicable, are detailed in the chart below:

| Seller | LID Number | Liquor License Number | City | County | State |
|---|---|---|---|---|---|
| Charlie Brown's of Bloomsburg, LLC | 55420 | R-19773 | Hemlock Twp. | Columbia | PA |
| Bugaboo Creek Holdings, Inc. (Franklin Mills) | 46195 | R-6598 | Philadelphia | Philadelphia | PA |
| Charlie Brown's of Blackwood, Inc. | | 0415-33-027-007 | Twp. of Gloucester | Camden | NJ |

The Debtors intend to keep marketing these licenses for sale, and if they are not sold prior to the Effective Date, they will transfer to the Liquidating Trust under the Plan pursuant to the Confirmation Order to be sold or otherwise liquidated and/or monetized in accordance with the Liquidating Trust Agreement.

-21-

11.     <u>Resolution of Claims Against Certain Former Senior Employees</u>.

a.     *Russell D'Anton*

Russell D'Anton was the President, Chief Executive Officer, and Chairman of the Board of Directors of Charlie Brown's Acquisition Corporation, one of the Debtors, until on or about December 10, 2008, when he was fired.   Among other things, as set forth in the information related to a criminal case and investigation (the "*D'Anton Indictment*") by the Government of Mr. D'Anton, *US v. D'Anton, Criminal No. 10-00077-001 (MLC)* (the "*D'Anton Criminal Case*"), pending in the United States District Court for the District of New Jersey (the "*New Jersey District Court*"), and the Complaint filed by certain of the Debtors against Mr. D'Anton and various other parties in the Superior Court of New Jersey, Law Division:  Union County, Docket No. UNN-L-001157-09, Mr. D'Anton conspired to defraud the Debtors by arranging for, and entering into, economically unfavorable contracts for the Debtors with parties that ultimately provided him with kickbacks and other improper benefits.   Mr. D'Anton eventually pled guilty to certain of the crimes alleged in the D'Anton Indictment, and he is currently serving his associated prison sentence.

On or about November 16, 2009, the Debtors and Mr. D'Anton entered into a settlement agreement and release (the "*D'Anton Settlement Agreement*"), resolving direct claims against Mr. D'Anton for $275,000.  The Settlement Agreement did not prohibit the Debtors from receiving or seeking to receive, from any third party, additional payments, including restitution payments, made by D'Anton or any other party to any government agency.

On or about March 11, 2011, the Government submitted a letter brief (the "*Government D'Anton Brief*") in the D'Anton Criminal Case regarding, among other issues, the proper amount of restitution to be awarded for the benefit of the Debtors, as the victims of the crimes outlined in the D'Anton Indictment ("*Restitution Award*").   On May 2, 2011, after briefing by Mr. D'Anton, the Debtors submitted their own letter brief requesting an adjournment to enable them to conduct discovery in accordance with a motion, under Bankruptcy Rule 2004, for such and other discovery that the Debtors had filed in the Bankruptcy Court on the same day (ECF No. 752), on Mr. D'Anton's financial ability to satisfy any Restitution Award that may be ordered.

The Debtors and Mr. D'Anton have since reached an agreement, subject to the approval of the New Jersey District Court, that the Restitution Award will be $110,000, and it will be paid to the Debtors as the sole victim of Mr. D'Anton's crimes.  On June 27, 2011, the Debtors filed a motion seeking authority to consent to the Restitution Award being set at $110,000 (ECF No. 867), and on July 15, 2011, the Bankruptcy Court entered an order granting such relief (ECF No. 903).

The full $110,000 restitution amount has been paid to the Debtors, to be allocated and distributed under the terms of the Plan.

b.     *Michael Mulligan*

Mr. Mulligan served as Vice President of Food and Beverage for the Debtors until he resigned on or about December 10, 2008.  As detailed in the D'Anton Indictment, along with

Mr. D'Anton, Mr. Mulligan conspired to defraud the Debtors by arranging for, and entering into, economically unfavorable contracts for the Debtors with parties that ultimately provided him with kickbacks and other improper benefits. Mr. Mulligan pled guilty to various crimes related to these matters, and his assistance and testimony was used in connection with the D'Anton Criminal Case. Mr. Mulligan's plea deal did not include any jail time.

On May 2, 2011, the Debtors filed a motion for an order, pursuant to Bankruptcy Rule 2004, to conduct discovery on Mr. Mulligan's financial ability to satisfy any restitution amounts that may be ordered by the New Jersey District Court or any judgment from the Bankruptcy Court or otherwise (ECF No. 752). On July 27, 2011, the Debtors and Mr. Mulligan reached an agreement to settle all claims, including direct claims held by the Debtors against Mr. Mulligan, and the amount of restitution that may be ordered against Mr. Mulligan and paid to the Debtors, as the sole victim of Mr. Mulligan's crimes, for $110,000. On July 28, 2011, the Debtors filed a motion with the Bankruptcy Court (ECF No. 935) seeking approval of this settlement and related relief, and the Bankruptcy Court entered an order granting such relief on August 16, 2011 (ECF No. 890).

The full $110,000 settlement payment has been paid to the Debtors, to be allocated and distributed under the terms of the Plan.

12.    Adversary Proceedings and Other Litigation.

a.    *Jones v. CB Holding Corp. et al., Case No. 10-55437*

On November 18, 2010, Rashida Jones commenced adversary proceeding 10-55437 (MFW) by filing a complaint (ECF No. 28, ADI No. 1) (the "*WARN Complaint*") against certain of the Debtors, alleging violation of the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. § 2101 et seq. The WARN Complaint was dismissed by the Bankruptcy Court on April 12, 2010 (ADI No. 7), for failure to effectuate service. The Debtors agreed not to oppose Ms. Jones' motion to reconsider such dismissal and to reinstate the WARN Complaint, and on May 9, 2011, the Bankruptcy Court entered an order to that effect and requiring that Ms. Jones serve the WARN Complaint within 10 days (ADI No. 10). Ms. Jones has still not served the WARN Complaint on the Debtors.

b.    *Waterpart, LLC v. Bugaboo Creek Holdings, Inc., Case No. 11-50481*

On or about August 16, 1994, Watertown Arsenal Associates, L.P., a predecessor-in-interest to Waterpart, LLC ("*Waterpart*"), and Bugaboo Creek Holdings, Inc., one of the Debtors, entered into a lease (the "*Waterpart Lease*") for certain real property located at 617 Arsenal Street, Watertown, Massachusetts. On February 4, 2011, Waterpart, through its managing agent Camco Management Company, Inc., commenced adversary proceeding no. 11-50481 (MFW) by filing a complaint (the "*Waterpart Complaint*") (ECF No. 500, ADI No. 1) against the Debtors, seeking, among other things, a declaratory judgment confirming its alleged exclusive ownership of, and interest in, Massachusetts liquor license number 13360062 (the "*Watertown Liquor License*"), as allegedly granted to Waterpart under the Waterpart Lease.

On April 14, 2011, Waterpart and the Debtors entered into a settlement agreement (the "*Original Waterpart Settlement Agreement*") resolving the issues alleged in the Complaint and providing for the transfer of the Watertown Liquor License.  On April 21, 2011, the Debtors filed a motion (the "*Waterpart 9019 Motion*") (ECF No. 729) with the Bankruptcy Court, seeking approval of the Original Waterpart Settlement Agreement.

On April 25, 2011, the Debtors and SE Asian Bistro of Watertown, Inc., entered into a purchase and sale agreement for the Watertown Liquor License, and the Debtors filed a motion (the "*Watertown Sale Motion*") (ECF No. 734) with the Bankruptcy Court seeking approval thereof.  After filing the Watertown Sale Motion, the Debtors and Waterpart entered into an amended settlement agreement, whereby Waterpart agreed to an amended settlement agreement for an increased amount, as evidenced by the revised agreement filed with the Bankruptcy Court on May 16, 2011 (ECF No. 779).  On May 17, 2011, the Bankruptcy Court entered an order (ECF No. 788) approving this amended agreement, and the settlement amount set forth thereunder has been paid to the Debtors

Under the Amended Waterpart Settlement Agreement, Waterpart purchased the Watertown Liquor License for $25,000, and the parties exchanged mutual, complete releases.  Moreover, the Debtors withdrew the Watertown Sale Motion, and the Waterpart Complaint was dismissed.

> c.    *Hackettstown Liquor License Litigation*

On or about August 8, 2000, Debtor Charlie Brown's of Hackettstown, L.L.C., entered into a lease (as amended, the "*Hackettstown Lease*") for the Debtors' former restaurant in Hackettstown, New Jersey.  The Hackettstown Lease was rejected on December 13, 2010, *nunc pro tunc* to the Petition Date (ECF No. 176).

On or about February 1, 2011, the current landlord under the Hackettstown Lease (the "*Hackettstown Landlord*") entered into an agreement with the Debtors to purchase the Debtors' liquor license (the "*Hackettstown Liquor License*") for their former restaurant in Hackettstown for $151,000.  On or about February 2, 2011, the Debtors filed a motion (the "*Hackettstown Sale Motion*") for an order approving such sale (ECF No. 485), and a hearing on that motion was scheduled for March 9, 2011.

On March 8, 2011, the Debtors were contacted by an additional party interested in acquiring the Hackettstown Liquor License for an amount greater than $151,000.  At the March 9th hearing, the Debtors informed the Bankruptcy Court, among other things, of this higher offer, and the Bankruptcy Court concluded that an auction of the Hackettstown Liquor License was required to determine the highest and best price.

This auction was held telephonically on March 10, 2011, and after 85 competing bids, the Hackettstown Landlord was determined by the Debtors, in an exercise of their business judgment, to be the winning bidder for $407,500.  The Debtors and the Hackettstown Landlord then entered into an amended sale agreement at this higher price.

On or about March 11, 2011, the Bankruptcy Court approved the Sale of the Hackettstown Liquor License (ECF No. 648).  The Hackettstown Landlord had reserved its right

to assert that it could purchase the Hackettstown Liquor License for $100,000 under the Hackettstown Lease, and the Bankruptcy Court permitted the parties to file briefs regarding the enforceability of any such right to do so. On or about April 27, 2011, the Bankruptcy Court entered an order (ECF No. 738) and issued a memorandum opinion (ECF No. 739) finding any purported purchase right or option unenforceable and ordering the Hackettstown Landlord to pay $407,500 for the Hackettstown Liquor License. The Sale of the Hackettstown Liquor License has closed.

## III.    OVERVIEW OF THE PLAN

### A.    General

In general, a Chapter 11 plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under the Chapter 11 plan, and (iii) contains other provisions necessary to implement the Chapter 11 plan. Under the Bankruptcy Code, "claims" and "interests", rather than "creditors" and "shareholders", are classified because creditors and shareholders may hold claims and interests in more than one class. Under Bankruptcy Code § 1124, a class of claims is "impaired" under a Chapter 11 plan unless the Chapter 11 plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (ii) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class. Classes 1, 2, and 4 are impaired under the Plan, and Holders of Claims in these Classes are entitled to vote to accept or to reject the Plan, unless their Claims are subject to an objection filed by the Debtors or are otherwise Disputed Claims. Ballots are being furnished to all Holders of Claims in Classes 1, 2, and 4 that are entitled to vote to facilitate their voting to accept or to reject the Plan. "Disputed Claim or Equity Interest" is defined in the Plan as a Claim or Equity Interest, or any portion thereof: (i) listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been filed or (ii) that is the subject of an objection or request for estimation Filed by any of the Debtors or the Liquidating Trustee or any other party-in-interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.

A Chapter 11 plan of liquidation may also specify that certain classes of claims or interests are to have their claims or interests remain unaltered by the Chapter 11 plan. Such classes are referred to as "unimpaired", and they are conclusively deemed under Bankruptcy Code § 1126 to have accepted the Chapter 11 plan and, therefore, need not be solicited to vote to accept or to reject the Chapter 11 plan. Holders of Other Priority Claims in Class 3 are Unimpaired and, therefore, conclusively be deemed to have accepted the Plan. No Ballot is enclosed for Holders of Class 3 Other Priority Claims.

A Chapter 11 plan of liquidation may also specify that certain classes will not receive any distribution under the Chapter 11 plan. Under Bankruptcy Code § 1126(g), such classes are conclusively deemed to have rejected the Chapter 11 plan and, therefore, also need not be solicited to accept or to reject the Chapter 11 plan. Holders of Equity Interests in Class 6 will not receive any recovery under the Plan on account of such Equity Interests, and that Class is, therefore, conclusively deemed to reject the Plan. No Ballot is enclosed for Holders of Class 6 Equity Interests.

The "Effective Date" of the Plan means the date on which each of the conditions precedent to the occurrence of the Effective Date of the Plan specified in Article IX of the Plan has been satisfied or waived.

This Section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as <u>Exhibit A</u> hereto and made a part hereof.  This summary is qualified in its entirety by reference to the Plan, and in the event of any discrepancy or inconsistency between this summary and the Plan, the terms of the Plan shall govern.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

B.     **Description of Classification and Treatment of Claims and Equity Interests Under the Plan**

1.     <u>Unclassified Claims:  Administrative Claims, DIP Facility Claims, and Priority Tax Claims</u>.  As contemplated under the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims are not classified under the Plan.  In order to confirm the Plan, Allowed Administrative Claims, Allowed DIP Facility Claims, and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the Holders of those Claims.  The Debtors anticipate having more than sufficient Cash (either on hand or from amounts already paid to, and being held in segregated accounts by, the Administrative Agent) available on the Effective Date to pay all of the foregoing in full.

a.     *Administrative Claims*

Administrative claims are Claims for costs and expenses of administration of the Chapter 11 Cases with priority under Bankruptcy Code § 507(a)(2), costs and expenses allowed under Bankruptcy Code § 503(b) (including, without limitation, under Bankruptcy Code § 503(b)(9)), the actual and necessary costs and expenses of preserving the respective Estates of the Debtors and operating the respective businesses of the Debtors (prior to the closing of a particular Sale or portion thereof), any indebtedness or obligations incurred or assumed by any of the Debtors pursuant to Bankruptcy Code § 364 or otherwise (other than any DIP Facility Claims), and Professional Fee Claims of the Debtors' and the Creditors Committee's respective Professionals (including, without limitation, the expenses incurred by each member of the Creditors Committee in its capacity as such), in each case to the extent allowed by an order of the Bankruptcy Court under Bankruptcy Code § 330(a) or 331 or otherwise, and any fees or charges assessed against the respective Estates under 28 U.S.C. § 1930; *provided, however, that the Holder of an Administrative Claim (except for an Administrative Claim based upon (i) Professional Fee Claims, the allowance and timing for filing of applications for Professional Fees being governed by Section II.A(b)) of the Plan, (ii) DIP Facility Claims, or (iii) fees or charges asserted against the respective Estates under 28 U.S.C. § 1930) must file a request for payment on or before the Administrative Claims Bar Date for such Administrative Claim to be eligible to be considered an Allowed Claim.*

As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed Administrative Claims will be approximately $600,000.  The two primary categories of Allowed Administrative Claims in these Chapter 11 Cases are non-Professional Fee

Administrative Claims (which for the most part consist of Claims under Bankruptcy Code § 503(b)(9)) and Professional Fee Claims.  As the Debtors have not operated their businesses for some time, they believe that unpaid Allowed Administrative Claims other than Allowed Professional Fee Claims or Allowed Claims under Bankruptcy Code § 503(b)(9) will total less than $50,000.

               (i)    <u>Non-Professional Fee Administrative Claims</u>.  Other than the Holder of any Claim (including any Claim that could have otherwise potentially constituted an Allowed Administrative Claim against the Debtors but for the terms of any Sale Order, Asset Purchase Agreement, or management or other agreement entered into by the Debtors in connection with a Sale or otherwise) that the applicable Purchaser has agreed to satisfy, and is therefore obligated to pay, under the relevant Sale Order, Asset Purchase Agreement, or management or other agreement, each Holder of any then outstanding Allowed Administrative Expense Claim will receive from the Plan Fund, or, in the case of any Allowed Sysco 503(b)(9) Claims, from the Estate Shared Proceeds (in each instance as set forth in Section IV.D.2(h)(2)(A) of the Plan), in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim (except to the extent that such Holder has agreed to a less favorable treatment of such Allowed Claim), Cash equal to the amount of such Allowed Claim on the later of (A) the Initial Distribution Date and (B) the date that is 10 days after the Allowance Date of such Claim; <u>provided</u>, <u>however</u>, and without limiting the applicable Holder's obligation to file a properly-completed Proof of Claim prior to the Administrative Claims Bar Date with respect to any purported unpaid and outstanding Administrative Claim, Allowed Administrative Claims representing obligations incurred in the ordinary course of the Debtors' businesses will be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements related thereto (including any sale or management agreement entered into in connection with a Sale or otherwise).  Notwithstanding anything to the contrary in the Plan, the applicable Purchaser will pay or otherwise satisfy any Claim, including any Claim that could have otherwise potentially constituted an Allowed Administrative Claim against the Debtors but for the terms of the applicable Sale Order, Asset Purchase Agreement, or management or other agreement that it has agreed to pay under such order and/or agreement in the time and manner set forth therein or that otherwise became the obligation of a particular Purchaser upon the closing of the underlying Sale (or portion thereof).

               As set forth further herein, in accordance with the Unsecured Creditor Settlement, all Allowed Claims against the Estates under Bankruptcy Code § 503(b)(9) other than the Sysco 503(b)(9) Claims (as set forth on <u>Exhibit C</u> hereto) will be paid from the Plan Fund.[15]  As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of such Allowed Claims will be approximately $206,000.  As further set forth in the Unsecured Creditor Settlement, any Allowed Sysco 503(b)(9) Claims would (after application of any applicable offsets for Avoidance Actions or other available offsets or defenses, in accordance with Section IV.D.2(e) of the Plan or otherwise) be paid from the Estate Shared Proceeds.  The aggregate stated amount of the Sysco 503(b)(9) Claims is approximately $470,000; however, there appear

---

[15]    <u>Exhibit C</u> lists those timely-asserted alleged Claims under Bankruptcy Code § 503(b)(9) that the Debtors believe will ultimately be Allowed.  All rights, defenses, objections, offsets, and counterclaims, as well as the ability to amend this exhibit, are reserved.

to be valid defenses and objections to the Sysco 503(b)(9) Claims, including offsets in connection with Avoidance Actions against the Sysco entities, such that there ultimately may not be any Allowed amount of such Claims.

(ii)    Professional Fee Claims.  All Persons seeking an award by the Bankruptcy Court of Professional Fees will be required to file their respective final applications for allowance of Professional Fees for services rendered and reimbursement of expenses incurred by the Professional Fee Bar Date and, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, will be paid in full from separate escrow accounts funded by a portion of the Plan Fund (in an amount to be determined by the Debtors, the Creditors Committee, and the Administrative Agent) (the "*Professional Fee Escrows*"), in such amounts as are allowed by the Bankruptcy Court (A) within 10 days of the date upon which the order relating to any such Professional Fee Claim is entered or (B) upon such other terms as may be mutually agreed upon between the Holder of such Claim for Professional Fees and the Debtors.  Unless otherwise expressly set forth in the Plan, a Professional Fee Claim will be Allowed only if:  (i) on or before the Professional Fee Bar Date the entity holding such Professional Fee Claim files with the Bankruptcy Court a final fee application and serves the application on counsel to the Debtors, counsel to the Creditors Committee, counsel to the Administrative Agent, the Liquidating Trustee, and the United States Trustee; and (ii) the Bankruptcy Court enters an order allowing the Claim.  *Entities holding Professional Fee Claims that do not timely file and serve a fee application by the Professional Fee Bar Date in the foregoing manner will be forever barred from asserting any such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trust Assets (including the Preserved Collateral) or the respective property thereof.*

Until all Professional Fee Claims have been Allowed, Disallowed, expunged, settled, resolved, or otherwise adjudicated pursuant to a Final Order of the Bankruptcy Court, the funds contained in the Professional Fee Escrows may not be utilized for any purpose by the Liquidating Trustee or otherwise other than the payment of Allowed Professional Fee Claims. To the extent any funds remain in the Professional Fee Escrows after all Professional Fee Claims have been Allowed, Disallowed, expunged, settled, resolved, or otherwise adjudicated pursuant to a Final Order of the Bankruptcy Court and subsequently paid to the applicable Professional, the Liquidating Trustee may utilize such funds in a manner consistent with the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

In accordance with the Unsecured Creditor Settlement, notwithstanding anything to the contrary set forth in Paragraph 6 of the DIP Facility Order, the Professional Fee Claims of the Professionals retained by the Creditors Committee may not exceed $250,000 (less amounts previously Allowed and paid to such Professionals in these Chapter 11 Cases).  To the extent the final Allowed Professional Fee Claims of the Professionals retained by the Creditors Committee are less than $250,000, the difference between the ultimately-Allowed amount and $250,000 will be deemed to constitute Liquidating Trust Assets to be distributed to the beneficiaries of the Liquidating Trust in the manner set forth in the Plan and in the Liquidating Trust Agreement.  To the extent the final Allowed Professional Fee Claims of Professionals retained by the Creditors Committee exceeds $250,000, any such excess over $250,000 shall be paid from the Estate Resolution Consideration.

As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed Professional Fee Claims will be approximately $[340,000].

b.    *DIP Facility Claims*

DIP Facility Claims are all Claims of the DIP Facility Lender against the Debtors represented by, related to, arising under, or in connection with the DIP Facility for any outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of all payments made by any of the Debtors to the DIP Facility Lender prior to the Effective Date on account of such Claims (pursuant to the Sale Orders, the DIP Facility Order, any other order of the Bankruptcy Court, or otherwise).

In full and final satisfaction, settlement, and release of, and in exchange for, any Allowed DIP Facility Claims, in accordance with Bankruptcy Code § 1129(a)(9), on the Effective Date, all funds in the possession of the Debtors other than any amounts that have been specifically earmarked and set aside for other purposes in these Chapter 11 Cases (including with respect to the Plan Fund, the Office Shared Proceeds, the Sharing Percentage Recovery, and the D&O Shared Proceeds) that constitute the proceeds of the collateral of the DIP Facility Lender will be distributed to the Administrative Agent.  The Administrative Agent will, after funding the Plan Fund in accordance with Section IV.B of the Plan, distribute, upon reasonable prior notice to the Creditors Committee (to the extent practicable), in accordance with the terms of the DIP Facility Order, the Financing Agreement, the Plan, and the Confirmation Order, to the Holders of the Allowed DIP Facility Claims from (i) all such remaining funds and (ii) all sums previously paid by the Debtors to, or otherwise received by, the Administrative Agent pursuant to any of the DIP Facility Order, one or more of the Sale Orders, or any other applicable order of the Bankruptcy Court, the amount required to satisfy in full all then outstanding Allowed DIP Facility Claims.

In exchange for the treatment of Allowed DIP Facility Claims under the Plan, any and all outstanding notes issued in connection with the DIP Facility will be cancelled and will be deemed terminated and of no force and effect, and except as otherwise set forth in the Plan or as may otherwise be agreed to by the Debtors and the DIP Facility Lender, the DIP Facility Lender will receive cancellation without draw of any and all outstanding letters of credit issued under the DIP Facility.

c.    *Priority Tax Claims*

Priority Tax Claims are Claims of a governmental unit of the kind entitled to priority in payment as specified in Bankruptcy Code §§ 502(i) and 507(a)(8).  Other than the Holder of any Claim that the applicable Purchaser has agreed to satisfy, and is therefore obligated to pay, under the relevant Sale Order and/or management or sale agreement, on, or as soon as reasonably practicable after, the latest of the Initial Distribution Date or the date such Priority Tax Claim becomes an Allowed Claim, each Holder of an Allowed Priority Tax Claim as of the Distribution Record Date will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash from the Estate Shared Proceeds equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Debtors and such Holder have agreed upon.  Notwithstanding anything to the contrary

in the Plan, the applicable Purchaser will pay or otherwise satisfy any Priority Tax Claim, including any Claim that could have otherwise potentially constituted an Allowed Priority Tax Claim against the Debtors but for the terms of the applicable Sale Order, Asset Purchase Agreement, or management or other agreement that it has agreed to pay under such order and/or agreement in the time and manner set forth therein or that otherwise became the obligation of a particular Purchaser upon the closing of the underlying Sale (or portion thereof).

As of the date hereof, the Debtors believe that, as of the Effective Date, the total amount of Allowed Priority Tax Claims will be approximately $330,000.

2.    <u>Classified Claims and Equity Interests</u>.  Other Claims and Equity Interests are divided into six (6) Classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the chart set forth above in the Disclosure Statement.  Such classification takes into account the different nature and priority of the Claims and Equity Interests.  The Plan contains one Class of Senior Secured Claims (Class 1) that are Impaired, one Class of Other Secured Claims (Class 2) that are Impaired, one Class of Other Priority Claims (Class 3) that are not Impaired, one Class of General Unsecured Claims (Class 4) that are Impaired, one Class of Intercompany Claims (Class 5) that are Impaired, and one class of Equity Interests (Class 6) that are Impaired.

Unless otherwise indicated, the characteristics and amount of the Claims and/or Equity Interests in the following Classes are based on the Books and Records of the Debtors. **The estimated amounts of Claims set forth below may change significantly after the claims-reconciliation process to be performed by the Debtors or the Liquidating Trustee, as applicable and appropriate, is completed after the Bar Date.**

a.    *Senior Creditor Claims (Class 1)*

The Claims in Class 1 consist of all Senior Creditor Claims.  The Senior Creditor Claims are all remaining and outstanding:  (a) Pre-Petition Lenders Secured Claims and (b) Second Lien Note Secured Claims.

On or after the Effective Date, the Administrative Agent will distribute, in accordance with the DIP Facility Order, the Financing Agreement, the Plan, and the Confirmation Order, all remaining sums (after the payment in full by the Administrative Agent of (i) all Allowed DIP Facility Claims, in the manner set forth in Section II.B of the Plan, and (ii) all amounts required to fully fund the Plan Fund, in the manner set forth in Section IV.B of the Plan) to the Holders of Allowed Pre-Petition Lenders Secured Claims as of the Distribution Record Date, until all Allowed Pre-Petition Lenders Secured Claims have been satisfied in full. To the extent the Allowed Pre-Petition Lenders Secured Claims are not thereby, or have not otherwise previously been, satisfied in full, the Holders of such Claims as of the Distribution Record Date will receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Claims, a distribution of, in the aggregate, (1) 96% of the net proceeds (after costs of sale, as determined pursuant to Section IV.D.2(h) of the Plan) from the sale or liquidation of the remaining Preserved Collateral, and (2) all net proceeds realized from the D&O Claims other than the D&O Shared Proceeds, in each instance as and when such net proceeds (as determined pursuant to Section IV.D.2(h) of the Plan) are generated or otherwise become available in the

manner provided in the Plan and the Liquidating Trust Agreement, until all such Allowed Claims have been satisfied in full. Such distributions of proceeds referenced in (1) and (2) in Section III.B.1(b) of the Plan will be made by the Liquidating Trustee to the Administrative Agent, for subsequent distribution thereby to the Holders of Allowed Pre-Petition Lenders Secured Claims in the manner set forth in the Financing Agreement. For the avoidance of doubt, all of the Pre-Petition Lenders' pre-petition or post-petition collateral, or the proceeds thereof, which are returned or refunded, including without limitation, Workers Compensation Insurance Policy deposits or any other deposits, or any retainers, once returned or refunded, will be paid 100% to the Administrative Agent, for subsequent distribution thereby to the Holders of Allowed Pre-Petition Lenders Secured Claims, until all such Allowed Claims are satisfied in full, in the manner set forth in the Financing Agreement.

       In accordance with the Unsecured Creditor Settlement, the Second Lien Noteholders will be deemed to have waived any right to a recovery under the Plan or otherwise from the Debtors, the Estates, or the Liquidating Trust on account of the Second Lien Note Claims.

       The Pre-Petition Lenders will retain any perfected security interests in, and liens upon, the Preserved Collateral from and after the Effective Date in the same order of priority and with the same rights as existed before the Effective Date, without the need for the Pre-Petition Lenders to file UCC financing statements. Such perfected security interests in, and Liens upon, such Preserved Collateral will continue to secure the obligations to the Pre-Petition Lenders under the Plan until such time as the Allowed Pre-Petition Lenders Claims have been satisfied in full, or all of the Preserved Collateral has been sold by the Liquidating Trustee in accordance with Section III.B.1(d) of the Plan, whichever occurs first. The Pre-Petition Lenders will release any Liens in connection with any such sales or other dispositions of the Preserved Collateral, provided that (i) the Administrative Agent consents to such sale or other disposition, which consent may not be unreasonably withheld, (ii) the proper percentage of net proceeds are paid to the Administrative Agent for distribution to the Pre-Petition Lenders in accordance with the Plan, and (iii) the proposed sale is consummated in accordance with, and subject to, the Liquidating Trust Agreement.

       In exchange for the treatment of Allowed Senior Creditor Claims under the Plan, on the Effective Date, all outstanding notes issued in connection with the Financing Agreement and the Second Lien Notes will be cancelled and will be deemed terminated and of no force and effect, and except as otherwise set forth in the Plan or as may otherwise be agreed to by the Debtors and the Pre-Petition Lenders, the Pre-Petition Lenders will receive cancellation without draw of any and all outstanding letters of credit issued under the Financing Agreement.

       Class 1 is Impaired, and Holders of Allowed Senior Creditor Claims in Class 1 are entitled to vote to accept or to reject the Plan. As of the date hereof, the Debtors believe that, as of the Effective Date, in accordance with the Lenders/Committee Resolution and the Unsecured Creditor Settlement, the total amount of Allowed Senior Creditor Claims will be approximately $14.8 million (absent these settlements, the total amount of Allowed Senior Creditor Claims would be approximately $16 million).

       b.    *Other Secured Claims (Class 2)*

The Claims in Class 2 consist of any Claim, other than Senior Creditor Claims, that are secured by a properly-perfected, valid, enforceable, and not otherwise avoidable Lien on property in which an Estate has an interest or that is subject to setoff under Bankruptcy Code § 553, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a) and, if applicable, Bankruptcy Code § 1129(b); provided, however, that if the Holder of a Secured Claim is entitled to and does timely elect application of Bankruptcy Code § 1111(b)(2), then such Holder's entire Claim will be a Secured Claim to the extent such Claim is Allowed.  Any such Holder would have needed to elect application of Bankruptcy Code § 1111(b)(2) prior to the conclusion of the hearing held by the Bankruptcy Court to consider the approval of the Disclosure Statement in accordance with Bankruptcy Rule 3014, but no Holder has done so as of the date hereof.

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Initial Distribution Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim as of the Distribution Record Date, will receive the property securing such Allowed Other Secured Claim.

Class 2 is Impaired and Holders of Allowed Other Secured Claims in Class 2 are entitled to vote to accept or to reject the Plan.  As of the date hereof, the Debtors believe that, as of the Effective Date, the total amount of Allowed Other Secured Claims should not exceed a *de minimis* amount, subject to occurrence of the reconciliation and review of Filed Claims.

c.      *Other Priority Claims (Class 3)*

Other Priority Claims are any Claims accorded priority in right of payment under Bankruptcy Code § 507(a), other than Priority Tax Claims or Administrative Claims.

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable or other treatment, on, or as soon as reasonably practicable after, the later of the Initial Distribution Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim (including any Allowed Vacation Claim) as of the Distribution Record Date will receive in full satisfaction, settlement, and release of, and in exchange for, such Allowed Other Priority Claim, Cash from (i) the Plan Fund or (ii) any other escrows that may be established for the payment of any particular remaining unpaid Allowed Other Priority Claims, equal to the unpaid portion of such Allowed Other Priority Claim.

Class 3 is Unimpaired and Holders of Allowed Other Priority Claims will be deemed to have accepted the Plan and, thus, are not entitled to vote to accept or to reject the Plan.  As of the date hereof, and as set forth on Exhibit D hereto,[16] the Debtors believe that, as of the Effective Date, the total amount of Allowed Other Priority Claims will be approximately

---

[16]      Exhibit D lists those timely-asserted alleged priority Claims that the Debtors believe will ultimately be Allowed.  All rights, defenses, objections, offsets, and counterclaims, as well as the ability to amend this exhibit, are reserved.

$82,000, consisting solely of Allowed Vacation Claims (which is defined in the Plan as "any Allowed Claim of a present or former employee of any of the Debtors for or relating to unused vacation pay or time either (i) for which a Proof of Claim was properly Filed on or prior to the Bar Date or (ii) such Claim was listed on the Schedules not as contingent, unliquidated, or disputed").

        d.      *General Unsecured Claims (Class 4)*

General Unsecured Claim are Claims against any of the Debtors other than DIP Facility Claims, Administrative Claims (including any Professional Fees Claims), a Secured Claims (including Senior Creditor Claims and Other Secured Claims), Priority Tax Claims, Other Priority Claims, any other Claims entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, Intercompany Claims, or any Claims that constitute Equity Interests. Without limiting the generality of the foregoing, General Unsecured Claims will include Pre-Petition Lenders Deficiency Claims (subject to the terms and conditions of the Plan, including Section III.B.4(b) thereof), any Other Secured Claims Deficiency Claims, Rejection Claims, and Subordinated Notes Claims. General Unsecured Claims shall not include Second Lien Note Deficiency Claims, which are deemed waived under the Plan in accordance with the Unsecured Creditor Settlement.

Holders of Allowed General Unsecured Claims, as of the Distribution Record Date, will receive their Pro Rata share of the Transferred Property (or the proceeds thereof) from the Liquidating Trustee, in the time and manner provided in Article IV of the Plan and in the Liquidating Trust Agreement; provided, however, that the Holders of Allowed General Unsecured Claims will not be entitled to any Pro Rata distribution of the Plan Fund (notwithstanding the fact that the Transferred Property includes the Plan Fund), and instead, the Plan Fund will be utilized and/or distributed in the manner set forth in the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement. Notwithstanding the foregoing, the Estate Resolution Consideration will not be shared on a Pro Rata basis with the Pre-Petition Lenders as Holders of General Unsecured Claims on account of the Pre-Petition Lenders Deficiency Claims or otherwise, but instead will be distributed to all other Holders of Allowed General Unsecured Claims in the manner and subject to the limitations set forth in the Plan and in the Liquidating Trust Agreement. Further notwithstanding the foregoing, the Holders of Allowed General Unsecured Claims will not be entitled to any Pro Rata distribution of the Plan Fund (notwithstanding the fact that the Transferred Property includes the Plan Fund); instead, the Plan Fund will be utilized and/or distributed in the manner set forth in the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement. *See* Section II.D.5, entitled *DIP Facility and Lenders/Committee Resolution*, above, for a more detailed discussion of the distributions to be made to Holders of Allowed Class 4 Claims under the Plan.

Class 4 is Impaired and Holders of Allowed General Unsecured Claims in Class 4 are entitled to vote to accept or to reject the Plan. As of the date hereof, the Debtors believe that, as of the Effective Date, the total amount of Allowed General Unsecured Claims will be approximately $120 million, including the Pre-Petition Secured Deficiency Claims of approximately $67.1 million, subject to the review and reconciliation of Filed Claims. As set forth in greater detail on Exhibit B hereto and described in Section VII.B below entitled "Best Interest-Test", it is anticipated that approximately $1,166,000 (not including any recoveries on

account of Avoidance Actions) would be available for distribution to General Unsecured Creditors in these Chapter 11 Cases, with approximately $[482,000] of this $1,166,000 not shared with the Pre-Petition Lenders on account of the Pre-Petition Lenders Deficiency Claims

e.    *Intercompany Claims (Class 5)*

Intercompany Claims are (i) any accounts reflecting intercompany book entries by one Debtor with respect to any other Debtor, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against any other Debtor, in each case accruing before or after the Petition Date, including, but not limited to, any claim for reimbursement, payment as guarantor or surety, or any claim for contribution or expenses that were allocable between multiple Debtors.

On the Effective Date, all Intercompany Claims will be reviewed and adjusted or cancelled as the Debtors or the Liquidating Trustee, as applicable, determines is appropriate (by, among other things, releasing, canceling, or waiving such claims). Holders of Intercompany Claims will not be entitled to participate in any of the distributions on account of Claims under any other sections of the Plan and will only be entitled to the treatment provided in Section III.B.5 of the Plan.

Class 5 is Impaired, and because Holders of Intercompany Claims will receive no distribution under the Plan, Class 5 will be deemed to have voted to reject the Plan.

f.    *Equity Interests (Class 6)*

Equity Interests are any interests in any Debtor, including, without limitation, (i) a share or membership interest in a corporation or limited liability corporation, whether or not denominated "stock", "interest", or similar security, and whether or not issued, unissued, authorized, or outstanding, (ii) an interest of a limited partner in a limited partnership, (iii) an interest of a general partner in a general partnership, or (iv) a warrant, option, contract, or right to purchase, sell, or subscribe to a share, security, or interest of a kind specified or similar to those referenced in subsections (i), (ii), or (iii) of this definition, as well as (a) any rights to any dividends or distributions as a result of such ownership, and (b) any and all Claims (1) for damages arising from the rescission of the purchase or sale of any such interest or (2) for reimbursement or contribution allowed under Bankruptcy Code § 502 on account of such Claims, which Claims are subordinated pursuant to Bankruptcy Code § 510.

On the Effective Date, all Equity Interests (including any and all options or rights to exercise warrants or options or to otherwise acquire any Equity Interests) will be cancelled, deemed terminated, and of no further force and effect, and the Holders of Equity Interests will not receive or retain any distribution or property on account of such Equity Interests.

Class 6 is Impaired, and because Holders of Equity Interests will receive no distributions under the Plan, Class 6 will be deemed to have voted to reject the Plan.

3.    <u>Classes With No Claims</u>.  To the extent that a Class of Claims contains no Claims upon Confirmation of the Plan, such Class will be disregarded for all purposes under the Plan, including voting.

-34-

4.    Special Provision Regarding Unimpaired or Impaired Claims.  Except as may otherwise be provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document included in the Plan Supplement, nothing will affect the Debtors' or the Liquidating Trustee's (as applicable) rights and defenses, both legal and equitable, with respect to any Claim that is either not Impaired or is Impaired under the Plan, including, but not limited to, all rights with respect to legal and equitable defenses to, and/or setoffs or recoupments against, such Claim and/or the Holder of such Claims, as applicable.

C.    **Reservation of "Cram Down" Rights**

The Bankruptcy Code permits the Bankruptcy Court to confirm a Chapter 11 plan over the dissent of any class of claims or interests as long as the standards in Bankruptcy Code § 1129(b) are met.  This power to confirm a Chapter 11 plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process.  It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors reserve the right to seek Confirmation of the Plan notwithstanding the rejection of the Plan by any Class entitled to vote.  In the event a Class votes to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in Bankruptcy Code § 1129(b) with respect to such Class.  The Debtors will also seek such a ruling with respect to Class 5 (Intercompany Claims) and Class 6 (Equity Interests), which are deemed to reject the Plan under Bankruptcy Code § 1126, as the Holders of Claims and Equity Interests in Classes 5 and 6, respectively, will not receive any distribution under the Plan.

D.    **Means for Implementation and Execution of the Plan and the Liquidating Trust**

1.    Substantive Consolidation.  The Plan contemplates, and is predicated upon, the entry of an order substantively consolidating the Estates and the Chapter 11 Cases for the purposes of all actions associated with Confirmation and Consummation of the Plan, including voting and distribution.  On and subject to the occurrence of the Effective Date, (a) all remaining assets and liabilities of the Debtors will be treated as if they were aggregated together, (b) all guaranties of any Debtor of the payment, performance, or collection of obligations of any other Debtor will be eliminated and cancelled, (c) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors will be treated as a single obligation, and such guaranties will be deemed a single Claim against the consolidated Debtors, (d) all joint obligations of two or more Debtors and all multiple Claims (including any and all multiple Proofs of Claim that were filed by the same party against more than one Debtor asserting the same underlying Claim) against such entities on account of such allegedly joint obligations will be treated and (to the extent such Claim is allowable) Allowed only as a single Claim against the consolidated Debtors, and (f) each Claim filed or scheduled in the Chapter 11 Case of any Debtor will be deemed filed or scheduled against the consolidated Debtors and treated as a single obligation of the consolidated Debtors on and after the Effective Date.  The foregoing substantive consolidation (i) will not affect the rights of any Holder of any remaining Allowed

-35-

DIP Facility Claim, Allowed Senior Creditor Claim, or Allowed Other Secured Claim with respect to any collateral securing its Claim (or the priorities of the applicable Holders' respective Liens on such collateral as of the Effective Date), or the terms and implementation of any settlement or any Final Order and the rights and obligations of the parties thereto entered into in connection with the Confirmation of the Plan or otherwise in the Chapter 11 Cases and (ii) will not, and will not be deemed to, prejudice the Avoidance Actions or any other Causes of Action (subject to the release, waiver, exculpation, and related provisions of the Plan, the Confirmation Order, the DIP Facility Order, and any other order of the Bankruptcy Court), which will survive entry of the Confirmation Order for the benefit of the Debtors and the Estates, as if there had been no substantive consolidation.

The Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases, although nothing in the Plan or in the Disclosure Statement will, or will be deemed to, prejudice or otherwise affect the Debtors' right to file a separate motion seeking substantive consolidation if they elect to do so in their sole discretion.  If no objection to the substantive consolidation provided for in the Plan is timely filed by the deadline established by the Bankruptcy Court for filing objections to the proposed Confirmation of the Plan, an order approving such substantive consolidation (which may be the Confirmation Order or any other order) may be entered by the Bankruptcy Court.  If any such objections are timely filed and served, a hearing with respect to the proposed substantive consolidation of the Chapter 11 Cases and the objections thereto may be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

Notwithstanding the substantive consolidation called for in the Plan, each and every one of the Debtors will remain obligated to pay any due and owing quarterly fees to the Office of the Unites States Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed in the manner provided in the Plan, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

Bankruptcy Code § 105(a), which empowers a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code and ensures a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction," *see Mgmt. Tech. Corp. v. Pardo*, 56 B.R. 337, 339 (Bankr. D. N.J. 1985), provides a court with the authority to grant substantive consolidation of separate Chapter 11 cases.  The United States Court of Appeals for the Third Circuit requires debtors seeking substantive consolidation to show that either (a) pre-petition, the debtors disregarded separateness, and their creditors relied on and treated the separate entities as one legal entity, or (b) post-petition, the debtors' assets and liabilities were so scrambled that separating them would be prohibitive and injurious.  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

The Debtors submit that there is more than ample evidence justifying substantive consolidation for the limited purposes set forth in the Plan.  As the Debtors have operated as a consolidated enterprise (and accounted on a consolidated basis) for decades, most creditors viewed them as either part of the Charlie Brown's or Bugaboo Creek enterprise (and after the acquisition of Bugaboo Creek by Charlie Brown's, as just part of the Charlie Brown's

enterprise).  Indeed, attempting to disentangle individual records and operations for each restaurant would be unduly costly and burdensome, if at all possible, and attempting to create detailed books and records for the individual Debtors for numerous periods prior and subsequent to the Petition Date, including reconciling related intercompany claims and ledgers, would be practically impossible and materially expensive.  Practically, as all of the Debtors guaranteed the Debtors' funded-debt obligations, and all secured creditors are largely undersecured, substantive consolidation would not prejudice any individual creditors.  Thus, the Debtors believe that they satisfy applicable legal standards and that the Bankruptcy Court can order the substantive consolidation of their Estates, which is necessary to effectuate the terms of the Plan and fair and reasonable under the circumstances.

          2.         <u>Resignation of Directors and Managers; Closing of the Affiliate Debtors Cases</u>.  On the later of the Effective Date and the applicable Sale Closing Date for the Sale or portion thereof, as applicable, of the Assets of a particular Debtor, (1) all the officers, directors, or managers, as the case may be, of each such Debtor will be deemed to have resigned, except for Edmund Schwartz, Chief Financial Officer, for those Debtors that continue to own any liquor licenses; (2) the Liquidating Trustee will be appointed the sole director, officer, and/or manager of CB Holding and of the applicable Affiliate Debtors for which all Sales have Closed, until certificates of cancellation, dissolution, or merger for such Debtors will have been filed in accordance with Section IV.F(a) of the Plan; and (3) the Chapter 11 Case of the applicable Affiliate Debtor will be closed without the need for any additional order of the Bankruptcy Court other than the Confirmation Order, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any such Affiliate Debtor will be brought or otherwise commenced in the CB Holding Chapter 11 Case, in each instance without any other or further action by the stockholders, members, or directors (or other governing body) of any of the Debtors, and any and all remaining Assets of such Affiliate Debtor (other than liquor licenses that cannot be transferred or assigned under applicable law) will be transferred to CB Holding for further distribution or liquidation in accordance with the terms of the Plan.  The Confirmation Order will constitute a Final Decree with respect to all of the Debtors whose Chapter 11 Cases are closed pursuant to Section IV.A.(b) of the Plan, and the Estates of all such Chapter 11 Cases will be deemed fully administered as of the Effective Date.  The Liquidating Trustee and/or its designee (including any employee of, or any other Person that may be engaged by, CRG) and Edmund Schwartz, Chief Financial Officer, as applicable, are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, any remaining Sales, and any corporate action required by the Debtors, without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors, as applicable.

          3.         <u>Issuance of One New Share in CB Holding</u>.  On the Effective Date, the New CB Holding Share will be issued to the Liquidating Trustee, as custodian for the benefit of the Estates.  The New CB Holding Share will be issued, for among other reasons, to facilitate the Liquidating Trust's pursuit of Avoidance Actions and other claims of the Debtors and the disposition of the Debtors' remaining assets (including any remaining liquor licenses).  The Liquidating Trustee will not sell, transfer, or otherwise dispose of the New CB Holding Share, except as may otherwise be set forth in the Liquidating Trust Agreement.  The New CB Holding Share will automatically be cancelled on the date CB Holding is dissolved in accordance with

Section IV.F of the Plan, without the need for any further action by, or order of, the Bankruptcy Court.

4.    <u>General Authorization for the Debtors and the Liquidating Trustee to Effectuate the Plan, the Remaining Sales, and Related Transactions.</u>  Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan or with respect to any remaining Sales involving the corporate structure of, or corporate action by, the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders, or the Debtors' boards of directors or managers (as applicable).  During the period prior to the Effective Date, the Debtors will remain debtors-in-possession and will remain subject to the jurisdiction of the Bankruptcy Court.  The Debtors, the Creditors Committee, the Administrative Agent, and all other parties-in-interest will be authorized and directed to take such actions during the period prior to the Effective Date as may be necessary and consistent with the Plan to prepare to effectuate and/or implement the Plan upon the Effective Date.  To the extent the manner of performance is not specified in the Plan or in any Sale Orders, the Debtors and/or the Liquidating Trustee (subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement), as applicable and appropriate, will have the discretion to carry out and perform all obligations and duties imposed on them, and actions contemplated or authorized, by the Plan, the Confirmation Order, any Plan Document, the Sale Orders, or by law, in any manner they so choose.

In addition, the Debtors (including Edmund Schwartz, Chief Financial Officer, where applicable), as applicable and appropriate, are authorized to take such action during the period on and after the Confirmation Date as may be necessary and consistent with the Plan to effectuate and/or implement the Plan, the Confirmation Order, and the Sale Orders.  The Debtors, the Chief Restructuring Officer, the Liquidating Trustee, the Oversight Committee, and any other individuals serving the Debtors or the Liquidating Trust in such capacity on and after the Confirmation Date, as the case may be, and any professionals retained thereby, will not be liable for actions taken or omitted in such capacity as, or on behalf of, the Debtors or the Estates following the Confirmation Date, except those acts arising out of its or their own willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each will be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Debtors or the Estates, except for any actions or inactions involving willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim of the Entities entitled to indemnification under the Plan will be satisfied, first, from any applicable insurance proceeds; second, from the Plan Fund; and, finally, to the extent permitted under the Plan, from any Transferred Property (to the extent provided in Section IV.D.2(j)(4) of the Plan).

E.    **Funding of the Plan Fund to the Liquidating Trustee.**

In accordance with Section II.B. and Section III.B.1(b) of the Plan, on the Effective Date, the Plan Fund will be funded, and transferred to the Liquidating Trustee, from a combination of funds transferred to the Administrative Agent, funds currently held by the Debtors, including the Estate Shared Proceeds, or funds previously paid by the Debtors to, or otherwise received by, the Administrative Agent pursuant to any of the DIP Facility Order, one or more of the Sale Orders, or any other applicable order of the Bankruptcy Court, in an aggregate amount equal to

$1,777,000 plus any budgeted amounts not paid prior to the Effective Date or such other amount that may be agreed to by the Debtors, the Administrative Agent, and the Creditors Committee at any time up until the Confirmation Date.  Any such funding by the Administrative Agent of a portion of the Plan Fund will be the final contribution by the Administrative Agent and the DIP Facility Lender to the Debtors' Estates.  The Plan Fund will be used by the Liquidating Trustee in the manner provided for in the Plan and in the Liquidating Trust Agreement.

F.    **The Transfer of the Liquidating Trust Assets to the Liquidating Trust.**

The Liquidating Trust, upon its creation in accordance with Section IV.D of the Plan, will be funded initially with the Liquidating Trust Assets, which are the Transferred Property on and after the Effective Date and any proceeds thereof held by the Liquidating Trust from time to time.  The Plan defines the "Transferred Property" as, except as otherwise set forth in the Plan or in the Confirmation Order, (i) any and all Avoidance Actions and other Transferred Causes of Action and any products or proceeds thereof; (ii) the Office Shared Proceeds; (iii) the D&O Shared Proceeds (to the extent available); (iv) the Sharing Percentage Recovery; (v) the Plan Fund; and (vi) all other remaining unliquidated property and Assets of the Debtors or the Estates (including any Preserved Collateral), other than (a) any collateral securing an Other Secured Claim that is to be distributed to the Holder of such Claim in the manner provided in Section III.B.2 of the Plan, (b) any assets that were the subject of any of the Sales or any other sale or transfer approved pursuant to a Final Order of the Bankruptcy Court or was otherwise subject to a motion to sell or transfer pending as of the Effective Date, or (c) any other Assets that were otherwise previously duly transferred, sold, distributed, waived, abandoned, or disposed of as of the Effective Date.

Except as otherwise set forth in the Plan (including Section IV.D.2(e) thereof), on the Effective Date, subject to any exceptions contained in the Plan and subject to the security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan, the Debtors will transfer and will be deemed to have irrevocably transferred the Liquidating Trust Assets (including any remaining Preserved Collateral) to the Liquidating Trust, for and on behalf of the beneficiaries of the Liquidating Trust in Class 4 (subject to the limitations set forth in Section III.B.4(b) of the Plan, and except as otherwise set forth in Section IV.D.2(e) of the Plan with respect to the Avoidance Actions and other Transferred Causes of Action) and to the Holders of Allowed Senior Creditor Claims with respect to the Preserved Collateral, with no reversionary interest in the Debtors.  Without limiting the generality of the foregoing, the Debtors will remit to the Liquidating Trust any sums that constitute the Office Shared Proceeds, the D&O Shared Proceeds, and the Sharing Percentage Recovery that the Debtors may receive on and after the Effective Date from the Sales or otherwise.

G.    **The Liquidating Trust**

1.    The Liquidating Trust will be administered by the Liquidating Trustee. The designation and appointment of the Liquidating Trustee will be effective on the Effective Date, without the need for any further order of the Bankruptcy Court other than the Confirmation Order.

2.     On the Effective Date or immediately prior thereto, (i) the Liquidating Trust will be created and established by the execution and delivery of the Liquidating Trust Agreement and any other necessary or appropriate action, subject to the provisions of the Plan, and (ii) all Transferred Property will be transferred to the Liquidating Trust free of all Liens, Claims, and interests (except those security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan) for the benefit of Holders of Allowed General Unsecured Claims (subject to the limitations set forth in Section III.B.4(b) of the Plan with respect to the Estate Share Proceeds and the Estate Resolution Consideration, as applicable, and except as otherwise set forth in Section IV.D.2(e) of the Plan with respect to the Avoidance Actions and other Transferred Causes of Action).  The Liquidating Trust will hold, manage, administer, receive, maintain, reduce to Cash, or otherwise liquidate, sell, monetize, transfer, or abandon the Transferred Property (including any remaining Preserved Collateral), in accordance with, and subject to, the Plan, without the need for any additional Bankruptcy Court order or approval other than the Confirmation Order, and receive, hold, manage, and distribute such liquidated property and the proceeds and products thereof (including all of the Cash that is obtained by the Liquidating Trustee after the Effective Date relating to any of the Transferred Property through the exercise of its power and authority under the Plan or the Liquidating Trust Agreement or otherwise) in accordance with and subject to the terms and provisions of the Plan (including Section III.B.4(b) thereof) and the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee will utilize and distribute the Plan Fund in the manner set forth in the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement and will not distribute the Plan Fund to the Holders of Allowed General Unsecured Claims.  As provided in Section IV.E and Section IV.F of the Plan, upon the entry of a Final Decree by the Bankruptcy Court with respect to the Chapter 11 Case of CB Holding, the Liquidating Trust will be dissolved without further action by the Liquidating Trustee or action or order of the Bankruptcy Court.

3.     As of the Effective Date, the Liquidating Trust will also have the power and authority to, and be responsible for, among other things (a) winding down the Estates, including, as applicable and appropriate in its discretion, operating (or liquidating and winding up) any remaining businesses and using and disposing of any remaining property and Assets, in accordance with, and subject to, the Plan and the Liquidating Trust Agreement, that do not constitute Transferred Property, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, other than those restrictions expressly imposed by the Plan, the Liquidating Trust Agreement, the Sale Orders, and the Confirmation Order, (b) subject to Section IV.D.2(e) of the Plan and any other limitations and/or requirements set forth in the Plan or the Liquidating Trust Agreement, filing, prosecuting, resolving, and settling in the names of the Debtors, the Estates, and/or the name of the Liquidating Trustee, the Avoidance Actions and all other Transferred Causes of Action (including the D&O Claims), (c) making distributions to the Holders of remaining Allowed Administrative Claims (including Professional Fees Claims), DIP Facility Claims (if any), Priority Tax Claims, Senior Creditor Claims, Other Secured Claims, and Other Priority Claims in the manner set forth in the Plan, (d) settling, resolving, and/or objecting to, in the names of the Debtors, the Estates, and/or the name of the Liquidating Trustee, any Disputed Claims, including any Disputed Administrative Claims (including Professional Fees Claims), Priority Tax Claims, Senior Creditor Claims, Other Secured Claims, Other Priority Claims, General Unsecured Claims, and Intercompany Claims in the manner set forth in Article V of the Plan, (e) making distributions to the Holders of Allowed General Unsecured Claims and, to the extent set forth in

the Plan (including Section III.B.1(b) thereof, to the Holders of Allowed Senior Secured Claims, with respect to the net proceeds from the sale or liquidation of the Preserved Collateral, and (f) taking all actions necessary or appropriate to enforce the Debtors' and the Estates' rights under the Sale Orders and any other order authorizing a sale or transfer of Assets and any related document and to fulfill, comply with, or otherwise satisfy the Debtors' covenants, agreements, and obligations under any such Sale or other transaction and any related document. The Liquidating Trustee and the Debtors will also have the power and authority to effectuate the termination of, or otherwise sign any documents in connection with or otherwise relating to, any Compensation and Benefits Program.

4.      The Liquidating Trustee will be authorized to take such action during the period on and after the Effective Date as may be necessary and consistent with the Plan to effectuate and/or implement the Plan, the Confirmation Order, and the Sale Orders. Without limiting the generality of the foregoing, the Liquidating Trustee will, in furtherance of, and consistent with, the purpose of the Plan, but subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement, have the power and authority to (a) take such actions as the Liquidating Trustee may determine to be necessary, desirable, or appropriate to carry out the purpose of, or to perform such other functions as are provided in or contemplated by, the Plan and the Liquidating Trust Agreement, (b) purchase or continue insurance protecting the Debtors, the Liquidating Trustee, their respective representatives, agents, employees, or independent contractors, and the property of the Debtors and the Liquidating Trust, and (c) in accordance with Section IV.F of the Plan, administer the closure of the Chapter 11 Cases of CB Holding and of any other Debtor whose Chapter 11 Case has not yet otherwise closed in accordance with Section IV.A(d) of the Plan. In addition, on and after the Effective Date, the Liquidating Trustee will (in conjunction with CB Holding and any Debtor whose Chapter 11 Case has not yet otherwise closed in accordance with Section IV.A(d) of the Plan) act to close any remaining Sales or portions thereof and thereafter close the Chapter 11 Cases of the applicable Affiliate Debtors, as and when a particular Sale or other transfer of all of such Debtor's Assets has closed pursuant to the terms of the applicable Asset Purchase Agreement or otherwise. In all circumstances, the Liquidating Trustee will act in the best interests of the Estates and the beneficiaries of the Liquidating Trust, and in furtherance of the purposes of the Plan and may do so without the need for any notice other than to the Administrative Agent and/or the Oversight Committee to the extent required in the Plan or in the Liquidating Trust Agreement, or for any additional order of the Bankruptcy Court or otherwise other than the Confirmation Order.

5.      Except as otherwise set forth in Article IV of the Plan (including as set forth in Section IV.D.2(h) thereof), all costs and expenses associated with the winding down of the Estates, the administration of the Liquidating Trust, and all other actions referenced in Sections IV.D, IV.E, and IV.F of the Plan will be the responsibility of, and paid for by, the Liquidating Trustee in accordance with the Plan from the Plan Fund or from any other cash of the Liquidating Trust on hand that does not otherwise constitute Transferred Property or is not to be distributed to any Holder of an Allowed Claim pursuant to the Plan (including any Allowed Pre-Petition Lenders Claims), the DIP Facility Order, the Sale Orders, or any other order of the Bankruptcy Court. The Liquidating Trustee is authorized to utilize the Plan Fund to perform such functions as are provided in, or contemplated by, the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement; without limiting the generality of the foregoing, the

Liquidating Trustee will be authorized to utilize the Plan Fund (including the Professional Fee Escrows, with respect to Allowed Professional Fee Claims) to, among other things, (a) satisfy all remaining Allowed Administrative Expense Claims (including, without limitation, all Claims for Professional Fees relating to services rendered or reimbursement of expenses incurred through and including the Confirmation Date, but not including any Allowed Sysco 503(b)(9) Claims), prior to any distributions therefrom being made to Holders of General Unsecured Claims, and all post-Confirmation Date and post-Effective Date fees and expenses of the Debtors and the Debtors' and the Creditors Committee's respective Professionals (as applicable) of the type set forth in Section IV.D.1(f) of the Plan; and any and all Allowed Other Priority Claims that were not paid in full on the Initial Distribution Date; (b) set aside an amount that would be required to distribute to the Holders of Disputed Administrative Expense Claims (other than any Disputed Sysco 503(b)(9) Claims), and Disputed Other Priority Claims if all such Claims are subsequently Allowed, as set forth more fully in Article V of the Plan; (c) satisfy all of the Debtors' and the Liquidating Trustee's anticipated costs and expenses in connection with their respective obligations under the Plan and the Liquidating Trust Agreement (including an amount required to satisfy obligations to the Liquidating Trust Professionals); and (d) pay insurance, taxes, and other expenses arising in the ordinary course of business in connection with any of the foregoing. Subject to any exceptions expressly set forth in the Plan or the Confirmation Order, the Liquidating Trust may pay all such fees, costs, and expenses without Bankruptcy Court approval. As set forth in Section II.A(a) and Section II.C of the Plan, any Allowed Sysco 503(b)(9) Claims and all Allowed Priority Tax Claims will be paid from the Estate Shared Proceeds, and to the extent practicable, reserve funds will be set aside from the Estate Shared Proceeds with respect to all Disputed Sysco 503(b)(9) Claims or Disputed Priority Tax Claims until such Claims are resolved in the manner set forth in Article V of the Plan.

6. The Liquidating Trustee will be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets, subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement. Subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement, the Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers, translators, or other professionals as it may deem necessary (collectively, the "*Liquidating Trust Professionals*"), in its discretion, and (except as otherwise set forth in the Section IV.D.1(f) of the Plan) to be paid from the Plan Fund, to aid in the performance of its responsibilities pursuant to the terms of the Plan and the Liquidating Trust Agreement, including, without limitation, the liquidation and distribution of the Liquidating Trust Assets. The Liquidating Trustee's general insolvency counsel will be Pachulski Stang Ziehl & Jones LLP. The Liquidating Trustee will maintain an accounting of such costs and expenses. It will not be a requirement that the Liquidating Trustee or any such parties retained by the Liquidating Trust be a "disinterested person" (as such term is defined in Bankruptcy Code § 101(14)), and such retained parties may include Professionals or other Persons that had previously been active in the Chapter 11 Cases on behalf of any Debtor, Creditor, or Equity Interest Holder, the Creditors Committee, or other constituency in the Chapter 11 Cases. Without limiting the generality of the foregoing, such retained parties may include the Chief Restructuring Officer and any employee of CRG. The Liquidating Trustee may, without application by any of the Liquidating Trust Professionals to, or approval by, the Bankruptcy Court, pay the Liquidating Trust Professionals' fees that are incurred after the Effective Date.

7.      The Liquidating Trust Agreement will provide for the establishment of the Oversight Committee, which will consist of three members.  In accordance with the Unsecured Creditor Settlement, two of the initial members of the Oversight Committee will be designated on or before the Effective Date by the Creditors Committee and the third initial member will be designated by the Administrative Agent, and a notice setting forth the names of the members of the Oversight Committee will be filed with the Bankruptcy Court as part of the Plan Supplement or otherwise prior to the Confirmation Hearing.  The designation of the Oversight Committee will be effective on the Effective Date, without the need for a further order of the Bankruptcy Court other than the Confirmation Order.  The Oversight Committee will have the powers and authority set forth in the Liquidating Trust Agreement.

8.      Except as otherwise set forth in Article II or III of the Plan (including in Section III.B.4(b) of the Plan with respect to the prohibition on making distributions of the Estate Resolution Consideration to the Pre-Petition Lenders), the Liquidating Trustee will distribute to the Holders of Allowed General Unsecured Claims as of the Distribution Record Date on account of their interests in the Liquidating Trust, on a regular basis, all unrestricted Cash on hand (including any Cash received from the applicable Debtors on or after the Effective Date and treating any permissible investment as Cash for purposes of such provision), except such amounts (a) as have been reserved on account of Disputed Claims or are otherwise part of the claims reserve established by the Liquidating Trustee (the "*Disputed Claim Reserve*"), (b) as are reasonably necessary to maintain the value of the remaining Liquidating Trust Assets during liquidation, (c) as are necessary to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Debtors or the Liquidating Trust or otherwise in respect of the Liquidating Trust Assets), or (d) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee will not be required to make a distribution pursuant to Section IV.D.(h) of the Plan if the Liquidating Trustee reasonably determines that the costs and expenses of making such distribution would be excessive compared to the aggregate, net amount of unrestricted Cash available for such distribution (taking into account the above listed exclusions) as would make the distribution impracticable.  The Liquidating Trustee will also distribute to the Administrative Agent the allocated percentage of the net proceeds from the sale or liquidation of the Preserved Collateral in the manner provided for in Section III.B.1(b) of the Plan.

9.      For U.S. federal and applicable state and local income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation Section 301.7701-4 and that the trust assets be treated as owned by its beneficiaries. Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received a distribution of an undivided interest in the Transferred Property in which they have an interest and then contributed such interests to the Liquidating Trust.  The Liquidating Trust Agreement will (i) state that the primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating and wind-down purposes as provided in the Plan and (ii) contain a fixed or determinable termination date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is

necessary or appropriate. Each such extension must be approved by the Bankruptcy Court within six (6) months before the beginning of the extended term. In conformity with IRS Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Senior Creditor Claims, and the Holders of General Unsecured Claims) will be required, for U.S. federal income tax purposes, to treat the Liquidating Trust as a grantor trust of which the Holders of Claims are the owners and grantors.

        10.    The Liquidating Trustee will file or cause to be filed all U.S. federal and applicable state and local tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4 and, after the Effective Date, all U.S. federal and applicable state and local income tax returns for the Debtors. The Liquidating Trustee also will annually send to each known beneficiary of the Liquidating Trust a separate statement regarding such beneficiary's share (as determined from time to time by the Liquidating Trustee in its discretion) of the items of income, gain, loss, deduction, and credit of the Liquidating Trust as relevant for U.S. federal and applicable state and local income tax purposes and will instruct all such parties that they will be required to use such information in preparing their U.S. federal and applicable state and local income tax returns. The Liquidating Trustee will also file (or cause to be filed) any other statement, return, or disclosure relating to the Liquidating Trust that is required by any governmental unit.

        11.    The beneficial interests of the Liquidating Trust will be nontransferable, and any transfer in violation of the Plan or the Liquidating Trust Agreement may be disregarded by the Liquidating Trustee, except with respect to a transfer by will or under laws of descent and distribution; provided, however, such transfer will not be effective unless and until the Liquidating Trustee receives written notice of such transfer under the applicable law of descent and distribution.

        12.    The Liquidating Trustee will make a good-faith valuation of the Liquidating Trust Assets, and unless otherwise required by law, all parties (including the Holders of Senior Creditor Claims and General Unsecured Claims) will be required to use such valuation for all U.S. federal and applicable state and local income tax purposes. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis with respect to Liquidating Trust Assets, as relevant).

H.    **The Liquidating Trustee**

        In accordance with the Unsecured Creditor Settlement, CRG will be appointed as the initial Liquidating Trustee. On the Effective Date, the Liquidating Trustee will execute the Liquidating Trust Agreement and any other documents necessary to be appointed the Liquidating Trustee. The Liquidating Trustee, once appointed, will act as trustee on behalf of the Liquidating Trust to carry out its obligations and exercise its rights in accordance with, and subject to, the Plan, the Confirmation Order, and the Liquidating Trust Agreement. The Liquidating Trustee may be removed and replaced as provided for in the Liquidating Trust Agreement.

        The Liquidating Trustee and the Liquidating Trust Professionals will be compensated as set forth in the Plan and the Liquidating Trust Agreement and will not be required to file fee applications to receive compensation. *Any objection to the designation of the*

*Liquidating Trustee must be raised at or prior to the Confirmation Hearing or be forever barred. Without the permission of the Bankruptcy Court, no judicial, administrative, arbitration, or other action or proceeding will be commenced against the Liquidating Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.*  The Liquidating Trustee will be vested with the rights, powers, and benefits set forth in the Plan, the Confirmation Order, and the Liquidating Trust Agreement, which will include, without limitation, all rights, powers, and benefits afforded to a "trustee" under Bankruptcy Code §§ 704 and 1106.

On, or as soon as practicable after, the Effective Date, the Plan Fund will be deposited in a non-interest-bearing account of the Liquidating Trust for use in the manner set forth in the Plan.  The investment powers of the Liquidating Trustee, other than those reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating and wind-down purposes of the Liquidating Trust, are limited to investing in demand and time deposits.

Upon any determination by the Liquidating Trustee that it is holding any amount or asset not constituting the Transferred Property or the products or proceeds of Transferred Property, the Liquidating Trustee will promptly transfer such property either to the Debtors or to the Administrative Agent (as applicable), or pay such amount to the Administrative Agent for the benefit of the Holders of remaining Allowed Pre-Petition Lenders Claims.

Subject to the provisions of the Liquidating Trust Agreement and the powers of the Oversight Committee set forth therein, the Liquidating Trustee will be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, all Avoidance Actions and other Transferred Causes of Action, whether or not such causes of action have been commenced prior to the Effective Date, and will be substituted the real party-in-interest in any such action, commenced by or against the Debtors, the Estates, or the Creditors Committee prior to the Effective Date.  In connection therewith, the Liquidating Trustee may act in accordance with its business judgment, without any other or further notice or Bankruptcy Court approval, subject to the provisions of the Liquidating Trust Agreement and the powers of the Oversight Committee set forth therein and in the Plan (including any requirements pertaining to the need for prior Oversight Committee approval before instituting or settling any particular Avoidance Action or other Transferred Cause of Action).  Without limiting the generality of the foregoing, the Liquidating Trustee will be authorized to seek to recover or otherwise obtain any sums owed to the Debtors or the Estates or any Assets or property of the Debtors or their Estates in the possession or control of any other party.  Notwithstanding the transfer of the Avoidance Actions or any other Transferred Causes of Action to the Liquidating Trust on the Effective Date (to the extent and in the manner provided in the Plan), in the event that the Debtors or the Liquidating Trustee (as applicable) determines that it is necessary or appropriate to utilize any such Avoidance Action or other Transferred Cause of Action as either (i) a defense (including any affirmative defense) or in any other way in connection with any objection to any claim asserted against a Debtor under Bankruptcy Code § 503(b)(9) or (ii) as part of an objection or defense (including any affirmative defense) to the Allowance of a Claim under Bankruptcy Code § 502(d) or otherwise, then, as applicable, (1) such Avoidance Action or other Transferred Cause of Action will not be transferred to the Liquidating Trust on the Effective Date, or (2) to the extent such Avoidance Action or other Transferred Cause of Action has been transferred to the

Liquidating Trust on the Effective Date under the Plan and the Confirmation Order, then the Liquidating Trustee will take all steps as may be necessary or appropriate to transfer or assign such Avoidance Action or other Transferred Cause of Action back to the Estates for such purpose. The Debtors will inform the Creditors Committee and the Administrative Agent of any such Avoidance Action or other Transferred Cause of Action that they know prior to the Effective Date will be necessary or appropriate to any such defense or objection and, thus, will not be transferred to the Liquidating Trust.

The Liquidating Trustee may be removed and replaced as provided for in the Liquidating Trust Agreement.

Upon the Effective Date and the execution of the Liquidating Trust Agreement, the Liquidating Trustee, in its capacity as the trustee of the Liquidating Trust and not personally, will be vested with all right, title, and interest in all Liquidating Trust Assets and all rights to enforce any orders of the Bankruptcy Court entered in these Chapter 11 Cases. From and after the Effective Date, the Liquidating Trustee may dispose of, sell, transfer, liquidate, or abandon the assets of the Liquidating Trust (including the Preserved Collateral) free and clear of (i) all Liens, Claims, interests, or encumbrances, subject to the Plan and the security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan, or (ii) any restrictions of the Bankruptcy Code, Bankruptcy Rules, or Local Rules and without the need for any or other Bankruptcy Court order or approval or any other order, but it must otherwise act in accordance with the provisions of the Plan, the Confirmation Order, and the Liquidating Trust Agreement (including with respect to any requirements therein regarding the need for prior consultation with, or the approval of, the Oversight Committee).

The Liquidating Trustee and the Liquidating Trust Professionals will not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each will be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts. Any indemnification claim of the Liquidating Trustee (and the other parties entitled to indemnification under the Plan) will be satisfied, first, from any applicable insurance proceeds; second, from the Plan Fund; and finally, from the remaining Transferred Property (to the extent provided in Section IV.D.2(h)(4) of the Plan).

In accordance with the Unsecured Creditor Settlement, for purposes of determining the amount of the "net proceeds (after costs of sales)" and "the net proceeds (after litigation fees, costs, and expenses actually incurred)", as both phrases are used in Paragraph 33 of the DIP Facility Order, from all prior Sales and any future sales or other dispositions of the various items that constitute the Transferred Property to be distributed to either the Holders of Allowed Pre-Petition Lenders Deficiency Claims or to Holders of Allowed General Unsecured Claims, certain costs and expenses already incurred or to be incurred in connection therewith will be allocated and paid as follows:

(1)      50% of the aggregate amount of (A) if, prior to the Effective Date, the Debtors' and the Committee's respective Professionals' fees and expenses, and (B) if on and after the Effective Date, the Liquidating Trustee's professionals' fees and expenses, and all other fees and expenses associated with pursuing the D&O Claims, Avoidance Actions, and other Transferred Causes of Action, to the extent not provided for in the Plan Fund, will be deducted from the amount of gross proceeds thereof before calculating the net amounts to be distributed on account thereof to the Holders of Allowed General Unsecured Claims pursuant to Section III.B.4(b) of the Plan as part of the Estate Shared Proceeds;

(2)      (A) the payments required to satisfy (i) all Allowed Claims against the Estates under Bankruptcy Code § 503(b)(9), other than the Sysco 503(b)(9) Claims, as set forth on Exhibit C hereto, and (ii) all Allowed Other Priority Claims, as set forth on Exhibit D hereto, will be paid entirely (i.e., 100%) from the Plan Fund, and (B) the payments required to satisfy (i) any Allowed Sysco 503(b)(9) Claims against the Estates (after application of any applicable offsets for Avoidance Actions or other available offsets or defenses, in accordance with Section IV.D.2(e) of the Plan or otherwise) and (ii) all Allowed Priority Tax Claims will be paid entirely (i.e., 100%) from the Estate Shared Proceeds; and

(3)      all other costs of the Liquidating Trust (including the fees of the Liquidating Trustee, the Oversight Committee, and all professionals retained or entities employed thereby and any indemnification claims under Section IV.A(d) of the Plan) will be allocated to, and paid from, the Estate Shared Proceeds.

For the avoidance of doubt, other than as set explicitly forth in the Plan with respect to the Unsecured Creditor Settlement, to the extent there are any conflicts between the Plan and anything contained in Paragraph 33 of the DIP Facility Order, Paragraph 33 of the DIP Facility Order will govern.

In the event that the Liquidating Trustee cannot take any action, including, without limitation, the prosecution of any Transferred Cause of Action or the objection to any Claim, by reason of an actual or potential conflict of interest, the Oversight Committee will be authorized to take any such action(s) in its place and stead, including without limitation, the retention of professionals (which may include professionals retained by the Liquidating Trustee) for such purpose of taking such actions.

I.      **Final Administration of the Liquidating Trust**

Upon the entry of a Final Decree by the Bankruptcy Court closing the CB Holding Chapter 11 Case contemplated in Section IV.F of the Plan, the Liquidating Trust will be deemed terminated without further notice, and the Liquidating Trustee will thereupon be forever discharged of, and released from, all power, duties, and responsibilities under the Liquidating Trust Agreement and the Plan.  Every effort will be made to effectuate such entry no later than the time reasonably necessary to accomplish the Liquidating Trust's purposes as set forth in the Liquidating Trust Agreement and the Plan, and in no event will the Liquidating Trust continue

for more than five (5) years after the date of the creation of the Liquidating Trust, without further order of the Bankruptcy Court.

J.     **Dissolution of the Debtors; Closing of the CB Holding Chapter 11 Case**

Within 30 days after the later of their completion of any acts required of them by the Plan (including in Section IV.A thereof) and the Sale Closing Date of any remaining Sale (or portion thereof) of its Assets, or as soon thereafter as is practicable, each of the Debtors will be deemed automatically dissolved for all purposes, without the necessity for any other or further actions to be taken by or on behalf of each Debtor, including without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors (the "*Dissolution*") or any compliance with any notice or waiting periods; provided, however, that each Debtor will file with the office of the applicable Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution or, alternatively, it may be merged with and into another Debtor and file an appropriate certificate of merger.

When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by order of the Bankruptcy Court or otherwise resolved or withdrawn in the manner provided for in the Plan, and all of the proceeds of the Liquidating Trust Assets have been distributed in accordance with the Plan (including, without limitation, pursuant to Sections III.B.4(b) and IV.F(c) of the Plan), all aspects of any remaining Sales have closed, and all Transferred Causes of Action have been prosecuted, settled, resolved, withdrawn, or abandoned, the CB Holding Chapter 11 Case and any other of the Chapter 11 Cases that were not previously closed pursuant to Section IV.A(d) of the Plan will be closed, and the Liquidating Trustee will file with the Bankruptcy Court a notice thereof with respect to such Chapter 11 Case(s); provided, however, that nothing in the Plan or the Liquidating Trust Agreement will prevent the Debtors and the Liquidating Trustee from seeking authority from the Bankruptcy Court at any time prior thereto to close the CB Holding Chapter 11 Case or any other of the Chapter 11 Cases that were not previously closed pursuant to Section IV.A(d) of the Plan.

Notwithstanding anything to the contrary in Section IV.F(b) of the Plan, if at any time after (i) the Dissolution and (ii) such time as all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by an order or otherwise resolved or withdrawn in the manner provided for in the Plan, the Liquidating Trustee, after consultation with the Administrative Agent and the Oversight Committee and upon the receipt of any approvals required under the Liquidating Trust Agreement, determines that the expense of administering the Liquidating Trust so as to make a further or final distribution to the Holders of Allowed General Unsecured Claims or Allowed Senior Creditor Claims (with respect to the Preserved Collateral) is likely to exceed the value of the assets remaining in the Liquidating Trust or the Preserved Collateral (as applicable), the Liquidating Trustee will apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the CB Holding Chapter 11 Case and any other of these Chapter 11 Cases that were not previously closed (if any), (ii) donate any balance to a charitable organization exempt from U.S. federal income tax under Section 501(c)(3) of the Tax Code that is unrelated to any of the Debtors, the Creditors Committee or its members, CRG, the Pre-Petition Lenders, the Holders of the Equity Interests as of the Effective Date, and the Liquidating Trustee, and (iii) close the CB Holding Chapter 11 Case and any of the Chapter 11 Cases that were not previously closed, in accordance with the

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of such application will be required to be given only electronically, to the extent practicable, to those parties that have filed requests for notices in these Chapter 11 Cases and whose electronic addresses then remain current and operating.

> K.    **Preservation of Rights Regarding Avoidance Actions and of All other Causes of Action**

The Debtors and the Creditors Committee have investigated whether to pursue potential Avoidance Actions and other Causes of Action against any parties or Entities.  Under the Plan, the Liquidating Trustee retains all rights of and on behalf of the Debtors and the Liquidating Trust to commence and pursue (subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement) any and all Avoidance Actions and under all other Transferred Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal, including, without limitation, in an adversary proceeding filed in these Chapter 11 Cases in the Bankruptcy Court) discovered in such investigation to the extent the Liquidating Trustee deems appropriate.  Potential Avoidance Actions and other Causes of Action may, but need not, be pursued by the Debtors, prior to the Effective Date, and the Liquidating Trustee may, but need not, pursue the Avoidance Actions and other Transferred Causes of Action after the Effective Date.

Except as may otherwise be provided in Article X of the Plan and the Confirmation Order, the potential Avoidance Actions and other Causes of Action that may be pursued by the Debtors, prior to the Effective Date, and by the Liquidating Trust and the Liquidating Trustee, after the Effective Date, include, without limitation, any Causes of Action, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' businesses or operations, including, without limitation, the following:  possible claims against vendors, landlords, sublessees, assignees, customers, or suppliers for warranty, indemnity, back charge/set-off issues, overpayment, or duplicate payment issues, and collections/accounts receivable matters; deposits, rebates, refunds, sales incentives, or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other Entity; claims against landlords, sublessees, and assignees arising from the various leases, subleases, and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance, and other similar charges; financial reporting; environmental and product liability matters; actions against insurance carriers relating to coverage, indemnity, or other matters; counterclaims and defenses relating to any Claims or other obligations; contract or tort claims that may exist or subsequently arise; and any and all Avoidance Actions pursuant to any applicable section of the Bankruptcy Code arising from any transaction involving or concerning the Debtors; <u>provided</u>, <u>however</u>, *that neither the Debtors nor the Liquidating Trustee nor any other party may pursue any Causes of Action that have been waived, relinquished, released, compromised, abandoned, transferred, or settled pursuant to the Plan, the DIP Facility Order, the Sale Orders, or any other Final Order of the Bankruptcy Court.*

Unless a claim against a Creditor or other Entity or Avoidance Action or other Cause of Action is expressly waived, relinquished, released, compromised, abandoned,

transferred, or settled in the Plan, the Sale Orders, the DIP Facility Order, or any other order of the Bankruptcy Court, the Debtors expressly reserve such claim or Avoidance Action or other Cause of Action for later enforcement by the Debtors, prior to the Effective Date, or by the Liquidating Trust, thereafter (including, without limitation, claims and Avoidance Actions and other Causes of Action that may be set forth in the Plan Supplement or not specifically identified or that the Debtors may presently be unaware of or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those which the Debtors now believe to exist), and therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches, will apply to such claims, Avoidance Actions, or other Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan Supplement, the Plan, the Confirmation Order, or any other document Filed in the Chapter 11 Cases, except where such claims or Avoidance Actions or other Causes of Action have been expressly waived, relinquished, released, compromised, abandoned, transferred, or settled in the Plan, the Confirmation Order, the DIP Facility Order, or any other order of the Bankruptcy Court.  In addition, the Liquidating Trust and the Liquidating Trustee expressly reserve the right to pursue or adopt any claim, crossclaim, or counterclaims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions of the Plan, the DIP Facility Order, the Sale Orders, or any Final Order.

**The Debtors and the Liquidating Trustee do not intend, and it should not be assumed that because any existing or potential Avoidance Actions or other Causes of Action may not have yet been pursued by the Debtors or are not set forth specifically in the Plan or expressly preserved in the Disclosure Statement, the Plan Supplement, the Confirmation Order, any other document Filed in the Chapter 11 Cases, or otherwise, that any such Avoidance Actions or other Causes of Action have been or are deemed to be waived or released.**

L.      **Cancellation of Notes, Instruments, Debentures, and Equity Interests**

1.      In exchange for the treatment provide for under the Plan, on the Effective Date, all Notes and all other notes, instruments, debentures, certificates, stock certificates, Liens, mortgages, deeds of trust, pledges, security interests, and other documents evidencing Claims and all Equity Interests in any of the Debtors (including, without limitation, the DIP Agreement, the Financing Agreement, the Subordinated Notes Purchase Agreement, and the Second Lien Note Purchase Agreement) will be cancelled and deemed terminated, released, and of no force and effect and surrendered (regardless of whether such notes, instruments, debentures, certificates, or other documents are in fact surrendered for cancellation to the appropriate indenture trustee, agent, or other such Person) and will instead represent only the right to participate in the distributions contemplated by the Plan, if any.  **On the Effective Date, any indentures or other agreements relating to any of the Notes or any other notes to which any Debtor is a party will be deemed cancelled as permitted by Bankruptcy Code § 1123(a)(5).**

2.      Except as may otherwise be set forth in the Plan, all distributions under the Plan on account of any Allowed DIP Facility Claims or Allowed Pre-Petition Lenders Claims

will be made by the Debtors or the Liquidating Trustee (on account of the Pre-Petition Lenders Deficiency Claims or with respect to the distribution of net proceeds from the sale or other disposition, liquidation, or monetization of Preserved Collateral, in the manner set forth in Section III.B.1(b) of the Plan) to the Administrative Agent, for further distribution to the Holders of the Allowed DIP Facility Claims or Allowed Pre-Petition Lenders Claims (as applicable) as of the Distribution Record Date.  All distributions, if any, under the Plan on account of the Allowed Subordinated Notes Claims will be made by the Liquidating Trustee to the administrative agent for the Subordinated Notes, for further distribution to the Holders of the Allowed Subordinated Notes Claims as of the Distribution Record Date in accordance with the Subordinated Notes Purchase Agreement and in accordance with, and subject to, any subordination provisions set forth therein or in any separate, applicable subordination agreement.  *Upon the delivery of the foregoing distributions, if any, to the applicable agents or similar parties, the Debtors and the Liquidating Trustee will be released of all liability and responsibility with respect to their obligations relating to such distributions.*

M.    **Dissolution of the Creditors Committee**

On the first (1st) Business Date following the Effective Date, and provided the Liquidating Trust has become effective as provided under the Plan, the Creditors Committee will be dissolved, and the Creditors Committee and its members will be released and discharged from the rights and duties arising from or related to the Chapter 11 Cases, and the retention or employment of the Creditors Committee's Professionals will terminate, except with respect to final applications for Professional Fee Claims.  After the Effective Date, the Professionals retained by the Creditors Committee and the members thereof will only be entitled to compensation or reimbursement of expenses or fees for any services rendered or expenses incurred in their capacity as such after the Effective Date that exclusively relate to the prosecution of any final applications by such Professionals or Creditors Committee members for allowance of Professional Fees and reimbursement of expenses (as applicable) pending on the Effective Date or timely filed after the Effective Date as provided for in the Plan.

N.    **Accounting**

Except as otherwise set forth in the Plan, the Liquidating Trust Agreement, or the Confirmation Order, the Liquidating Trustee will establish a separate bank account for the Plan Fund and for any and all other reserves or funds maintained by the Debtors or the Liquidating Trustee, as the case may be, in connection with the distribution of funds on account of Allowed Claims or their other respective functions under the Plan, the Confirmation Order, or the Liquidating Trust Agreement (as the case may be).

O.    **Settlement with Respect to Fees, Costs, and the Plan by and Among the Administrative Agent, the Creditors Committee, the Second Lien Noteholders, and the Debtors**

As set forth further in the Plan (including, without limitation, in Sections II.A(b), III.B.1(c), IV.D.1(a), IV.D.1(g), IV.D.2(h), X.D, X.E, and X.F thereof), the Plan incorporates and implements a further compromise and settlement reached by and among (i) the Administrative Agent, (ii) the Creditors Committee, (iii) the Second Lien Noteholders, and (iv)

the Debtors (the "*Unsecured Creditor Settlement*").   As a result of the Unsecured Creditor Settlement, the Creditors Committee, the Administrative Agent, and the Second Lien Noteholders have agreed to support and recommend the confirmation of the Plan, and will not object to (or support any party in objecting to) the Plan or to any provisions thereof.

P.        **Objections to Claims; Prosecution of Disputed Claims**

1.        Except as otherwise set forth in the Plan, the Confirmation Order, the DIP Facility Order, the Sale Orders, or any other order of the Bankruptcy Court, (a) prior to the Effective Date, the Debtors may object to any Claims, and (b) on and after the Effective Date, the Liquidating Trustee may object (and will take over, and continue prosecuting and settling or otherwise resolving, any outstanding objections of the Debtors) to the allowance of any Claims (subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).   All objections by either the Debtors or the Liquidating Trustee, as the case may be, will be litigated to Final Order; provided, however, that, as set forth in Article IV of the Plan and in the Liquidating Trust Agreement, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, will have the authority and sole discretion to file, settle, compromise, or withdraw any objections to Claims, in each instance without the need to obtain the approval of the Bankruptcy Court (but subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).

2.        Any objections to Claims must be filed by the Claim Objection Deadline. Claim objections and, as applicable, any settlement thereof will be dealt with as the Debtors or the Liquidating Trustee, as the case may be, in its discretion, deems appropriate (in the case of the Liquidation Trustee, subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).   Further, (a) the Debtors, prior to the Effective date, and (b) the Liquidating Trustee, on and after the Effective Date, will have the sole and complete discretion to decide not to review and/or to object to proofs of General Unsecured Claims or any other Claims, in each instance to the extent they believe that such review and/or objection would be uneconomical or not otherwise warranted under the circumstances (but in the case of the Liquidating Trustee, subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).

3.        Unless otherwise provided by the Plan or the Liquidating Trust Agreement, no Bankruptcy Court approval will be required in order for the Debtors or the Liquidating Trustee (as applicable) to settle and/or compromise any Claim, objection to Claim, cause of action, or right to payment of or against the Debtors, the Estates, or the Liquidating Trust.

Q.        **Estimation of Claims.**

Prior to the Effective Date, the Debtors, or on or after the Effective Date, the Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claims, pursuant to Bankruptcy Code § 502(c) or otherwise, regardless of whether the Debtors or the Liquidating Trustee previously has objected to such Claim or whether

the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Subject to the provisions of Bankruptcy Code § 502(j), in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, and the amount so estimated will constitute the maximum allowable amount of such Claim, the Debtors or the Liquidating Trustee (as applicable) may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by as set forth in the Plan or by any other mechanism approved by the Bankruptcy Court.

R.      **Interest and Distributions on Disputed Claims or any Other Claims that Become Allowed Claims After the Effective Date**

No interest will accrue or be due or paid by the Debtors or the Liquidating Trustee on any Disputed Claim that later becomes an Allowed Claim or on any other Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, or with respect to any distribution to the Holders thereof.  All distributions with respect to any such Claims as and when they become Allowed will be deemed to have been made on the Effective Date.  No distribution will be made with respect to all or any portion of any Claim, a portion of which or all of which is a Disputed Claim, pending the entire resolution thereof.

S.      **Means of Cash Payment**

Cash payments made pursuant to the Plan will be in U.S. dollars and, at the option and in the sole discretion of the Debtors or the Liquidating Trustee (as applicable), be made by (1) checks drawn on or (2) wire transfers from a domestic bank selected by the Debtors or the Liquidating Trustee (as applicable).  Cash payments to foreign creditors may be made, at the option of the Debtors or the Liquidating Trustee (as applicable), in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

T.      **Delivery of Distributions**

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided in the Plan, distributions and deliveries to Holders of Allowed Claims will be made at the address of each such Holder as set forth on the Schedules, unless superseded by the address set forth on a timely-filed and properly-completed proof of claim or some other writing Filed with the Bankruptcy Court and served upon the Liquidating Trustee.

U.      **Undeliverable Distributions**

1.      Holding of Undeliverable Distributions.

If any distribution pursuant to the Plan to any Holder is returned to the Liquidating Trustee or the Debtors (as applicable) as undeliverable, no further distributions will be made to such Holder unless and until the Liquidating Trustee is notified by such Holder, in writing, of such Holder's then-current address.  Upon such an occurrence, to the extent it is

possible to make a subsequent distribution at that time, the appropriate distribution will be made as soon as reasonably practicable after such distribution has become deliverable. All Entities ultimately receiving previously-undeliverable Cash will not be entitled to any interest or other accruals of any kind with respect thereto. Nothing contained in the Plan, the Confirmation Order, or the Liquidating Trust Agreement will require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

2.    <u>Failure to Claim Undeliverable Distributions</u>.

*Any Holder of an Allowed Claim entitled to an undeliverable or unclaimed distribution that does not provide notice of such Holder's correct address to the Liquidating Trustee within the later of six (6) months after (i) the Effective Date or (ii) the date of the initial attempted distribution made by the Debtors or the Liquidating Trustee (as applicable) to such Holder will be deemed to have forfeited its claim for such undeliverable or unclaimed distribution or any other distribution, and will be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution or any other distribution against any of the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust.* In such cases, the Forfeited Distributions will be distributed in accordance with the terms of the Plan and/or the Liquidating Trust Agreement (as applicable).

V.    **Withholding and Reporting Requirements**

In connection with the Plan and all distributions thereunder, the Debtors and the Liquidating Trustee (as applicable) will comply with all applicable tax withholding and reporting requirements imposed by any U.S. federal, state, or local or non-U.S. taxing authority, all distributions under the Plan will be subject to any such withholding and reporting requirements, and all amounts withheld will be deemed for all purposes of the Plan to have been distributed to the Person in respect of whom such withholding was made. The Debtors and the Liquidating Trustee (as applicable) will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, (1) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (2) the Debtors and the Liquidating Trustee reserve the option, in their discretion, not to make a distribution to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Debtors or the Liquidating Trustee (as applicable) for the payment and satisfaction of such tax obligations or has, to the Debtors' or Liquidating Trustee's satisfaction, established an exemption therefrom. Any distributions to be made pursuant to the Plan will, pending the implementation of such withholding and reporting requirements, be treated as undeliverable pursuant to Section VI.C.2 of the Plan. The Liquidating Trustee will request (in writing) from each beneficiary of the Liquidating Trust (1) a properly-completed IRS Form W-9 or substitute Form W-9 or (2) an applicable Form W-8. *Any beneficiary of the Liquidating Trust that does not provide a completed Form W-9 or an applicable Form W-8 within the date that is 45 days of the date of such written request sent by the Liquidating Trustee will have its Claim disallowed for all purposes in these Chapter 11 Cases*, and such response deadline and the effect of non-compliance therewith will be included in the written request.

-54-

W.      **Time Bar to Cash Payments**

Checks issued by the Liquidating Trustee or the Debtors (as applicable) on account of Allowed Claims will be null and void if not negotiated within the date that is 90 days from and after the date of issuance thereof. Requests for reissuance of any check will be made directly to the Liquidating Trustee or the Debtors (as applicable) by the Holder of the Allowed Claim. Any claim relating to such voided check will be made on or before the later of: (i) six months after the Effective Date; or (ii) 180 days after the date of issuance of such check. *After such date, all claims relating to such voided checks will be discharged and forever barred, and the Liquidating Trustee or the Debtors (as applicable) will treat all such moneys as Forfeited Distributions.*

X.      **Interest and Late Charges**

Unless otherwise required by applicable law or as otherwise set forth in the Plan, post-petition interest will not accrue or be paid on any Claims, and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim, <u>provided</u>, <u>however</u>, that the DIP Facility Lender is entitled to interest at the rates set forth in the DIP Facility on the terms set forth in the DIP Facility Order up until April 21, 2011. Except as expressly stated in the Plan or allowed by a Final Order of the Bankruptcy Court, no late charge is to be allowed on any Claim subsequent to the Petition Date.

Y.      **Fractional Dollars; *De Minimis* Distributions**

Notwithstanding anything contained in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Liquidating Trustee and the Debtors (as applicable) will not make any payment of less than $50 on account of any Allowed Claim, unless a specific request therefor is made in writing to the Liquidating Trustee on or before 90 days after the Effective Date.

Z.      **Set-Offs**

Consistent with applicable law, the Debtors and the Liquidating Trustee may, but will not be required to, set-off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account thereof), any claims, rights, and causes of action of any nature that the Debtors, the Estates, or the Liquidating Trust may hold against the Holder of such Allowed Claim (unless such claims, rights, and causes of action have been released by the Debtors pursuant to the releases contained in Article X of the Plan, the Confirmation Order, the DIP Facility Order, or any other Final Order); <u>provided</u>, <u>however</u>, that neither the failure to effect such a set-off nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust of any such claims, rights, and Causes of Action that the Debtors, the Estates, or the Liquidating Trust may possess against such Holder; and <u>provided</u>, <u>further</u>, <u>however</u>, that the Holder of the applicable Allowed Claim against which the

Debtors or the Liquidating Trustee seeks to so exercise set-off may file an objection or other motion in the Bankruptcy Court challenging such set-off.

AA.    **Deadlines for Determining Record Holders of Various Classes of Claims**

At the close of business on the Distribution Record Date, the respective transfer records for the DIP Facility, the Financing Agreement, the Second Lien Notes, the Subordinated Notes, and the Equity Interests will be closed, and there will be no further changes in the record Holders of the respective Administrative Expense Claims, DIP Facility Claims, Priority Tax Claims, Senior Creditor Claims, Other Secured Claims, General Unsecured Claims, Other Priority Claims, or the Equity Interests after such date. *None of the Debtors, the Liquidating Trustee, any disbursing agent or transfer agent retained thereby or Liquidating Trust Professional, nor the Administrative Agent or the indenture trustees for the Second Lien Notes or the Subordinated Notes will (as applicable) have any obligation to recognize any transfer of the applicable Claims or Equity Interests, any notes or other securities issued in connection with either the DIP Facility, the Financing Agreement, the Second Lien Notes, the Subordinated Notes, or any of the Equity Interests occurring after the Distribution Record Date, and such parties will be entitled, instead, to recognize and deal for all purposes under the Plan, the Confirmation Order, and the Liquidating Trust Agreement with only those record holders of such Claims, Equity Interests, notes, or other securities (as applicable) as of the close of business on the Distribution Record Date.*

BB.    **Allocation of Distributions**

All distributions paid to Holders of Allowed Claims in satisfaction thereof pursuant to the Plan will be allocated, first, to the principal amounts of such Claims (as determined for U.S. federal income tax purposes) and, second, to the portion of such Claims comprising interest (as determined for U.S. federal income tax purposes), if any (but solely to the extent that interest is a portion of such Allowed Claim), including, without limitation, any portion of the Claim representing accrued original issue discount ("*OID*") or accrued but unpaid interest; any excess thereafter will be allocated to the remaining portion of such Claims.

CC.    **Executory Contracts and Similar Matters**

1.    <u>Rejection of Executory Contracts</u>.  Any Executory Contracts that (i) have not expired or been terminated by their own terms on or prior to the Effective Date, (ii) have not been assumed, assumed and assigned, rejected, or deemed rejected and terminated pursuant to a Sale Order, any other order of the Bankruptcy Court, or letter agreement (including the Mountainside Letter Agreement) by and between the applicable Debtor and non-Debtor party thereto prior to the Confirmation Date, or (iii) are not the subject of a motion by the Debtors to either assume and assign or to reject such Executory Contract that is pending on the Confirmation Date, will be deemed rejected by the Debtors as of the Confirmation Date, subject to the occurrence of the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the rejections of such Executory Contracts pursuant to Bankruptcy Code §§ 365(a) and 1123 or otherwise.

Without limiting the generality of the foregoing, in accordance with the Mountainside Letter Agreement, the Mountainside Office Lease will be deemed rejected and terminated *nunc pro tunc* to August 31, 2011, pursuant to the Plan, and the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejection by the Debtors and termination of the Mountainside Office Lease (effective as of August 31, 2011) pursuant to Bankruptcy Code §§ 365(a) and 1123.

2.    <u>Rejection Damages Claim</u>.  Except as otherwise set forth in the Plan with respect to the Mountainside Office Lease, each entity that is a party to an Executory Contract that is rejected as of the Confirmation Date pursuant to the Plan and the Confirmation Order will be entitled to file, not later than the Rejected Contract Claim Bar Date, a Proof of Claim for damages alleged to have been suffered due to such rejection; <u>provided</u>, <u>however</u> that the opportunity afforded an Entity whose Executory Contract is rejected as of the Confirmation Date pursuant to the Plan and the Confirmation Order to file a Proof of Claim will in no way apply to Entities that were required to assert a claim on account of an Executory Contract that was previously or otherwise rejected by the Debtors by a prior or other bar date that was established by a separate order of the Bankruptcy Court, which such other bar date will remain unaffected by the Plan and the Confirmation Order.  *Any Entity that has a Claim for (i) damages as a result of the rejection of an Executory Contract pursuant to the Plan or (ii) that in any way relates to, or arises from an Executory Contract being rejected hereby, that in either instance does not file a Proof of Claim in accordance with the terms and provisions of the Plan with the Bankruptcy Court (and serve such Proof of Claim upon the Liquidating Trustee) will be forever barred from asserting that Claim against, and such Claim will be unenforceable against, the Debtors or the Liquidating Trust, and the Debtors and Liquidating Trust will have no obligation to pay the same.*

*Notwithstanding anything to the contrary in the Plan or the Confirmation Order, in accordance with the Mountainside Letter Agreement, the Mountainside Landlord will have no claims or right to assert any such claims against any of the Debtors or the Estates related to any time after August 31, 2011, with respect to the Mountainside Lease.*

3.    <u>Classification of Claims Related to Executory Contracts</u>.  All Rejection Claims and any other Claim against any of the Debtors that in any way relates to, or arises from, any Executory Contract being rejected pursuant to the Plan will, to the extent it is an Allowed Claim, be treated in the manner provided for in Bankruptcy Code §§ 365 and 502.  The Debtors, the Estates, the Liquidating Trustee, and all other parties-in-interest herein reserve the right to object or otherwise assert any defenses with respect to any such Claim.

4.    <u>Insurance Policies</u>.  Nothing in the Plan, the Disclosure Statement, or the Confirmation Order alters the rights and obligations of the Debtors and the Debtors' insurers (and third-party claims administrators) under any Insurance Policies or Vested Insurance Agreements or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies and the Vested Insurance Agreements.

For the avoidance of doubt, all of the Debtors' rights and any third party's rights under any Insurance Policy and Vested Insurance Agreement to which the Debtors may be

beneficiaries, including any directors and officers liability insurance policy, will vest with the Liquidating Trust for the benefit of the Estates and all of the beneficiaries of such policies; and the Liquidating Trustee and/or the Debtors will not take any action that would impair or alter the coverage currently in place for the Debtors' current or former directors and officers under any directors and officers liability insurance and/or similar policies, as such coverage will remain in full force and effect for benefit of such directors and officers and for the Estates for the duration and term of all such policies.  The Debtors and the Liquidating Trust will have no monetary obligations with respect to the Insurance Policies and the Vested Insurance Agreements other than with respect to any General Unsecured Claims and/or Other Secured Claims (as applicable, and to the extent set forth in the subsequent sentence) properly and timely asserted in the Chapter 11 Cases, to the extent that such Claims are Allowed.  Specifically, to the extent that a Claim of an insurer (or third-party administrator) is properly secured by virtue of such party's having previously been granted collateral (including letters of credit), such Claim will continue to be secured by and to the extent of such collateral and will be deemed to be (a) an Other Secured Claim in accordance with the Plan and Bankruptcy Code § 506(a) and will be treated as Class 2 Claims under the Plan, provided that any excess collateral will be returned to the Debtors or the Liquidating Trustee, as applicable, in accordance with the Insurance Policies and the Vested Insurance Agreements or court order (to be further distributed in the manner set forth in Section III.B.1(b) of the Plan) and (b) to the extent of any collateral deficiency, a General Unsecured Claim to be treated as a Class 4 Claim under the Plan, in each case subject to the filing of a Proof of Claim therefor and the Allowance thereof.

Any injunction set forth in the Plan and the automatic stay of Bankruptcy Code § 362(a), if and to the extent applicable, will be lifted, without further order of the Bankruptcy Court, to permit (a) claimants with valid outstanding workers' compensation claims that are covered by any of the Insurance Policies or the Vested Insurance Agreements to undertake any actions that are necessary in order to proceed with their claims under such Insurance Policies or Vested Insurance Agreements and thereafter solely to collect thereon from any third party other than the Debtors, the Liquidating Trust, the Liquidating Trustee, or the Estates, (b) the applicable insurers and/or third-party administrators to administer, handle, defend, settle, and/or pay all workers' compensation claims arising under the Insurance Policies and the costs related thereto without further order of the Bankruptcy Court, (c) the applicable insurers and/or third-party administrators to draw upon paid loss deposit funds and/or other collateral for payments of the claims, costs, and expenses described in subclauses (b) and (d) of this paragraph, in accordance with the applicable Insurance Policies and the Vested Insurance Agreements, and (d) all applicable insurers and third-party administrators to pay claims and/or defense costs and expenses related to claims arising under any Insurance Policies (other than with respect to workers' compensation claims, which are, for the avoidance of doubt, addressed in subclauses (a) and (c) of this paragraph), provided that such payments are permitted under the terms and conditions of such Insurance Policies or Vested Insurance Agreements; provided, however, that defense attorneys or claimants will not be permitted to recover from both the Liquidating Trust and the applicable insurer or third-party administrator on account of the same claim.

5.    <u>Compensation and Benefits Programs</u>.  Except as otherwise expressly provided under the Plan or the Confirmation Order, all Compensation and Benefits Programs, to the extent (a) not previously or otherwise terminated and/or cancelled by the Debtors prior to the Confirmation Date and/or (b) not the subject of a motion by the Debtors to reject or to otherwise

cancel or terminate such program that is pending on the Confirmation Date, will, on the Confirmation Date but subject to the occurrence of the Effective Date, be cancelled and deemed terminated and/or rejected and of no force or effect as of the Confirmation Date or any applicable prior termination and/or cancellation date, pursuant to the provisions of Bankruptcy Code §§ 365 and 1123, or otherwise, and the Debtors and/or the Liquidating Trustee, as applicable, are authorized and empowered to take all actions necessary to effectuate any such termination, cancellation, and/or rejection, and all third parties are authorized and directed to rely on Section VII.D of the Plan in connection therewith.  For the avoidance of doubt, the Insurance Policies and the Vested Insurance Agreements will not constitute a Compensation and Benefits Programs and will not otherwise be terminated on the Effective Date under the Plan.

        6.      Return of Deposits by Utility Companies.  Except to the extent the Debtors have previously agreed in writing (after having provided notice thereof to the Creditors Committee and the Administrative Agent) that a Utility Company may apply all or a portion of a deposit held thereby against any amounts owed by the Debtors thereto, all Utility Companies will be required to return to the Liquidating Trustee all deposits previously provided by any of the Debtors within 30 days after the Effective Date (and the Debtors will provide notice of this requirement to all Utility Companies as soon as practicable following the occurrence of the Effective Date, which notice may be part of the general notice of occurrence of the Effective Date for these Chapter 11 Cases).  Such returned deposits will constitute Transferred Property to be administered and utilized by the Liquidating Trustee in the manner set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee will be authorized to take any and all actions to enforce this provision.

        DD.    **Acceptance or Rejection of the Plan**

        1.      Acceptance by Impaired Classes.  An Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in the Class actually voting on the Plan have voted to accept the Plan, in each case not counting the vote of any Holder designated under Bankruptcy Code § 1126(e).

        2.      Elimination of Classes.  Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, will be deemed not included in the Plan for purposes of (a) voting to accept or to reject the Plan and (b) determining whether such Class has voted to accept or to reject the Plan under Bankruptcy Code § 1129(a)(8).

        3.      Nonconsensual Confirmation.  A court may confirm a Chapter 11 plan over the dissent of, or deemed rejection by, any Impaired Class of Claims or Equity Interests if all of the requirements for consensual confirmation under Bankruptcy Code § 1129(a), other than Bankruptcy Code § 1129(a)(8), and for nonconsensual confirmation under Bankruptcy Code § 1129(b), have been satisfied.  In the event that any Impaired Class of Claims or Equity Interests fails to vote to accept the Plan, or is deemed to reject the Plan pursuant to Bankruptcy Code § 1126(g), in accordance with Bankruptcy Code § 1129(a), the Debtors reserve the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code §

1129(b), (ii) amend the Plan, or (iii) withdraw the Plan and take any other action they deem necessary or appropriate in their discretion in the Chapter 11 Cases.

       EE.    **Conditions Precedent to Confirmation and Effectiveness of Plan**

       1.    <u>Conditions Precedent to Confirmation of Plan</u>.  The occurrence of the Confirmation Date will be subject to satisfaction of the following conditions precedent:

       a.    The Confirmation Order, the provisions of which are nonseverable and mutually independent, is entered in form and substance reasonably satisfactory to the Debtors, the Administrative Agent, and the Creditors Committee.

       b.    All provisions, terms, and conditions of the Plan are approved in the Confirmation Order or in another order of the Bankruptcy Court.

       c.    The Debtors obtain authority to take all actions necessary or appropriate to enter into, implement, and consummate the Plan and other agreements or documents created in connection with, or as contemplated by, the Plan.

       2.    <u>Conditions Precedent to Effective Date</u>.  The occurrence of the Effective Date and the Consummation of the Plan are subject to satisfaction of the following conditions precedent:

       a.    The Confirmation Order, as entered by the Bankruptcy Court, will be a Final Order in full force and effect with no stay thereof then in effect.

       b.    All actions, documents, and agreements necessary or appropriate to implement the Plan, including the Liquidating Trust Agreement, will have been effected or executed.

       c.    The Plan Fund will have been established and funded in the manner set forth in the Plan, in accordance with the terms of the Plan and the Liquidating Trust Agreement, respectively (as applicable).

       3.    <u>Waiver of Conditions Precedent</u>.  To the extent legally permissible, any of the conditions precedent in Article IX of the Plan may be waived, in whole or in part, by the Debtors (in consultation with the Administrative Agent and the Creditors Committee).  Any such waiver of a condition precedent may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than proceeding as if such condition did not exist.  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights.  Upon the waiver of any conditions to the Effective Date set forth in Section IX.B of the Plan, and subject to the satisfaction in full of each of the remaining

conditions, the Plan will become effective in accordance with its terms, without any notice to third parties or any other formal action.

FF.    **Revocation, Withdrawal, or Non-Consummation**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent or different plans (in consultation with the Administrative Agent and the Creditors Committee). If the Debtors revoke or withdraw the Plan, or if (1) the Confirmation Order will not have become a Final Order or is otherwise vacated for any reason, or (2) the Effective Date will not otherwise have occurred within 180 days of the Confirmation Date, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan or the Disclosure Statement, and no acts taken in preparation for the Consummation of the Plan, will (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or the Estates, (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any Debtor Releasees, or (iv) constitute a release of any Causes of Action possessed or maintained by the Debtors or the Estates.

GG.    **Modification of Plan**

The Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order (with the consent of the Creditors Committee and the Administrative Agent in the event such amendment or modification would materially affect either of their respective substantive rights, which consent may not unreasonably be withheld); provided, however, that in the event they make any material amendments to the Plan prior to the Confirmation Hearing, the Debtors will file a motion or other pleading with the Bankruptcy Court requesting that the Bankruptcy Court find that no resolicitation of votes with respect to the Plan is required. Upon the entry of the Confirmation Order, the Debtors (or, after the Effective Date, the Liquidating Trustee) may, after notice and a hearing, amend or modify the Plan, in accordance with Bankruptcy Code § 1127(b), remedy any defect or omission, or reconcile any inconsistency in the Plan or the Liquidating Trust Agreement, in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim that has voted to accept the Plan will be deemed to have voted to accept the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder, and the votes of each Class for or against the Plan will be counted and used in connection with the modified plan.

HH.    **Effect of Plan Confirmation**

1.    <u>Settlement of Claims</u>.  Except as otherwise expressly set forth in the Plan or in the Confirmation Order, the classification and/or manner of satisfying all Claims and Equity Interests, and the respective distributions and treatments thereunder, will take into

account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code § 510, contractual agreement, the DIP Facility Order (with respect to the Other Assets Resolution Consideration), or otherwise, and any and all such rights are not settled, compromised, or released pursuant to the Plan.

2. _General Plan Injunction._ **Except as may otherwise be provided in the Plan or in the Confirmation Order, upon the occurrence of the Effective Date, the rights afforded by the Plan and the payments and distributions to be made under the Plan will be in complete exchange for, and in full and unconditional settlement, satisfaction, and release of, any and all existing debts, Claims, and Equity Interests of any kind, nature, or description whatsoever against the Debtors or any of the Debtors' Assets or other property and will effect a full and complete release and termination of all Liens, security interests, or other Claims, Equity Interests, interests, or encumbrances upon all of the Debtors' Assets and property, except for the security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan. No Creditor or Equity Interest Holder of the Debtors nor any other Person may receive any distribution from the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or their respective Assets or seek recourse against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or any of their respective Assets, except for those distributions expressly provided for under the Plan. All Persons are precluded from asserting against any property that is to be distributed under the terms of the Plan any Claims, obligations, rights, Causes of Action, liabilities, Liens, or Equity Interests based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other than to the extent expressly provided for in the Plan or the Confirmation Order, whether or not (a) a Proof of Claim or proof of Equity Interest based upon such debt or Equity Interest (as applicable) is filed or deemed filed under Bankruptcy Code § 501; (b) a Claim or Equity Interest based upon such debt or Equity Interest (as applicable) is allowed under Bankruptcy Code § 502; or (c) the Holder of a Claim or Equity Interest based upon such debt or Equity Interest (as applicable) has voted to accept the Plan or is deemed to have accepted the Plan under Bankruptcy Code § 1126(f). _All Holders of Liens, Claims, and/or Equity Interests arising prior to the Effective Date will be permanently barred and enjoined from asserting against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or their respective Assets any of the following actions on account of such Claim or Equity Interest: (a) commencing or continuing in any manner any action or other proceeding on account of such Lien, Claim, or Equity Interest against property to be distributed under the terms of the Plan or the property of any of the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, Lien, or order against any of the property to be distributed under the terms of the Plan or the property of any of the Debtors, the Liquidating Trustee, or the Liquidating Trust, other than as permitted under subclause (a) of this sentence; (c) creating, perfecting, or enforcing any Lien, claim, or encumbrance against any property to be distributed under the terms of the Plan or the property of any of the Debtors, the Liquidating Trustee, or the Liquidating Trust; (d) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any obligation due the Debtors, the Liquidating Trustee, the_**

*Liquidating Trust, or any of their respective Assets or any other property of the Debtors or the Liquidating Trust, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Confirmation Order, and the Liquidating Trust Agreement.*

          3.    <u>Terms of Existing Injunctions or Stays</u>.  Unless otherwise provided in the Plan, all injunctions and stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 105, 362, and 525, and otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.  *The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to the Plan.*

          4.    <u>Exculpation</u>.  ***NEITHER THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, THE CREDITORS COMMITTEE AND ITS MEMBERS SOLELY IN THEIR CAPACITIES AS MEMBERS OF THE CREDITORS COMMITTEE AND NOT IN ANY OTHER CAPACITY, THE ADMINISTRATIVE AGENT, THE PRE-PETITION LENDERS, THE DIP FACILITY LENDER, THE SECOND LIEN NOTEHOLDERS, NOR ANY OF THEIR RESPECTIVE PRESENT OR FORMER OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, EMPLOYEES, ADVISORS, PROFESSIONALS, ATTORNEYS, OR AGENTS ACTING IN SUCH CAPACITY OR THEIR RESPECTIVE AFFILIATES, WILL HAVE OR INCUR ANY LIABILITY (WHETHER ARISING UNDER CONTRACT, TORT, OR FEDERAL OR STATE SECURITIES OR EMPLOYMENT AND/OR LABOR LAWS OR REGULATIONS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, NOW EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE) TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, THE DEBTORS, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, OR ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST, OR ANY OTHER PARTY-IN-INTEREST IN THESE CHAPTER 11 CASES, OR ANY OF THEIR RESPECTIVE AGENTS, SHAREHOLDERS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, PROFESSIONALS, ATTORNEYS, OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY PRE-PETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN OR ANY OTHER TRANSACTION, EVENT, OR OCCURRENCE IN ANY WAY CONNECTED WITH, ARISING FROM, OR RELATING TO (A) THE DEBTORS, (B) THE CHAPTER 11 CASES OR THE COMMENCEMENT OR ADMINISTRATION THEREOF, (C) THE DISCLOSURE STATEMENT, THE PLAN (EITHER PRIOR TO CONFIRMATION OR APPROVAL OF SAME OR AS THE SAME MAY BE CONFIRMED OR OTHERWISE APPROVED BY THE BANKRUPTCY COURT), INCLUDING THE NEGOTIATION AND FORMULATION THEREOF, OR ANY ORDERS OF THE BANKRUPTCY COURT RELATED THERETO (INCLUDING THE CONFIRMATION ORDER), AND THE DOCUMENTS NECESSARY TO EFFECTUATE THE PLAN (INCLUDING THE LIQUIDATING TRUST AGREEMENT) OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, (D) THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN AND THE RELEASES AND WAIVERS PROVIDED FOR IN THE PLAN, (E) THE IMPLEMENTATION AND ADMINISTRATION OF THE PLAN AND THE LIQUIDATING TRUST, (F) THE***

***DISTRIBUTION OF PROPERTY UNDER THE PLAN (INCLUDING WITH RESPECT TO THE PRESERVED COLLATERAL), (G) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE LIQUIDATING TRUST, OR THE CHAPTER 11 CASES, (H) THE SALES, INCLUDING THE NEGOTIATION AND CONSUMMATION THEREOF, AND THE SALE ORDERS, OR (I) ANY OTHER ORDER OF THE BANKRUPTCY COURT ENTERED IN THE CHAPTER 11 CASES, EXCEPT FOR ANY LIABILITY ARISING FROM CONDUCT CONSTITUTING FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER.***

The Debtors believe that the foregoing exculpation provision and the protections afforded thereby, particularly considering that the proposed exculpation expressly excludes claims for willful misconduct and fraud, are common and widely-accepted in Chapter 11 cases of this size and complexity.  Absent this provision and such protections, the Debtors are concerned that the threat of potential lawsuits might hinder (and could have hindered) the Released Parties' ability to focus their attention on these Chapter 11 Cases and on the Debtors' ongoing and future liquidation, investigation, and wind-down efforts, and the Debtors believe that it is entirely unfair for the Released Parties to continue to be exposed to lawsuits given their participation in, and furtherance of, the Debtors' Chapter 11 Cases, which included negotiation of the Lenders/Committee Resolution and the Unsecured Creditors Settlement and the maximization of the value of the Debtors' estates (through the consummation of the various successful Sales, as well the other actions undertaken in these Chapter 11 Cases) for the benefit of all parties-in-interest herein.

The Released Parties have invested, and must continue to invest, a great deal of time and effort aimed toward furthering the progress of these Chapter 11 Cases and the Debtors' liquidation, investigation, and wind-down efforts.  In addition, this provision is an important component of the Unsecured Creditor Settlement, which, as set forth in the Plan, provides for the waiver of various claims and otherwise provides significant benefits to the Estates and Holders of Allowed General Unsecured Claims.

Accordingly, the Debtors submit that it is particularly appropriate in the context of these Chapter 11 Cases that the Released Parties be afforded these customary protections.

     5.     <u>Limited Releases</u>.

     a.     *Releases by the Debtors and the Estates*

***NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE CONFIRMATION DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE DEBTORS, THE LIQUIDATING TRUSTEE AND THE LIQUIDATING TRUST, OR ANY OTHER PARTY ACTING ON BEHALF OF THE ESTATES WILL NOT RECEIVE OR OTHERWISE BE ENTITLED TO ASSERT ANY CLAIM OR CAUSE OF ACTION RELEASED UNDER THE PLAN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES (INCLUDING THE WAIVER OF THE SECOND LIEN NOTE CLAIMS AND OTHERWISE PURSUANT TO THE UNSECURED CREDITOR SETTLEMENT), THE***

***ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SATISFACTION AND RELEASE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID AND TRANSACTIONS UNDERTAKEN (INCLUDING THE CREATION AND FUNDING OF THE LIQUIDATING TRUST PURSUANT TO THE PLAN); (2) THE UNSECURED CREDITOR SETTLEMENT; AND (3) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, PROFESSIONALS, ATTORNEYS, SHAREHOLDERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE PLAN AND THE LIQUIDATING TRUST AND THE ASSOCIATED TRANSACTIONS CONTEMPLATED BY THE PLAN AND BY THE LIQUIDATING TRUST AGREEMENT, EACH OF THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, RELEASE AND WILL BE DEEMED TO HAVE PROVIDED A FULL RELEASE TO EACH RELEASED PARTY (AND EACH SUCH RELEASED PARTY SO RELEASED WILL BE DEEMED FULLY RELEASED BY THE DEBTORS AND THE ESTATES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING OR OTHERWISE ASSERTABLE AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES OR EMPLOYMENT AND/OR LABOR LAWS OR REGULATIONS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE ESTATES, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (DERIVATIVELY OR OTHERWISE) ON BEHALF OR IN THE NAME OF ANY OF THE DEBTORS OR ANY OF THE ESTATES; PROVIDED, HOWEVER,*** THAT NOTHING HEREIN WILL RELEASE OR BE DEEMED TO RELEASE LIABILITY OF ANY PERSON ARISING FROM CONDUCT CONSTITUTING FRAUD OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

Notwithstanding anything contained herein or in the Plan to the contrary, the Plan does not release the D&O Claims or any Avoidance Actions or any other Causes of Action, whether direct, derivative, or otherwise, that the Debtors, the Estates, or the Liquidating Trustee have or may have now or in the future solely to the extent that any such claims or actions are against any Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases, which include by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtors' Releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties (including the waiver of the Second Lien Note Claims and otherwise pursuant to the Unsecured Creditor Settlement); (ii) a good-faith settlement and compromise of the claims released by the Debtors hereby; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Equity Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and an opportunity for a hearing;

*and (vi) a bar to any of the Debtors' or the Liquidating Trustee's asserting any claim or cause of action released pursuant to Section X.E of the Plan.*

The purpose of this release by the Debtors and the Estates of the Debtors' personnel, advisors, professionals, and other related Persons is to prevent suits or other claims against those individuals based on claims that might be held by the Debtors or other derivative actions related to the Debtors' businesses and operations. It is the intent of the Plan, which includes the effectuation of the Lenders/Committee Resolution and the Unsecured Creditors Settlement and the creation of the Liquidating Trust, to bring finality to the disruption caused by these Chapter 11 Cases. The parties covered by this limited release have made enormous contributions to the Debtors' efforts to maximize the value of these Estates and to effectuate the compromises set forth in the Plan (including the Unsecured Creditor Settlement), which has the support of the Creditors Committee and the Administrative Agent. The Debtors believe that relieving the Released Parties of the potential threat of direct or derivative actions against them personally by the Debtors or other parties in these Chapter 11 Cases will best enable these parties to focus on concluding these Chapter 11 Cases in a timely and cost-efficient manner, for the benefit of all parties herein.

The Debtors further believe that the release is warranted in light of the limited scope and time period covered by the foregoing release, which implicates only pre-petition and specific post-petition conduct and excludes claims for fraud and willful misconduct. Indeed, the Debtors believe it would be entirely unfair for the Released Parties to continue to be exposed to the limited scope of lawsuits released under Article X of the Plan given their participation in, and furtherance of, (i) the planning and preparation for, and the filing of, these Chapter 11 Cases, the Plan, the auctions and Sales described herein, and the creation of the Liquidating Trust; (ii) negotiations regarding or concerning the Plan and the Lenders/Committee Resolution and the Unsecured Creditor Settlement; and (iii) the ownership, management, and operation of the Debtors since they began preparing for these Chapter 11 Cases and all actions taken thereafter to maximize the value of the Estates. In addition, this release is an important component of the Unsecured Creditor Settlement, which, as set forth further in the Plan, provides for the waiver of various claims and otherwise provides significant benefits to the Estates and Holders of Allowed General Unsecured Claims.

Accordingly, the Debtors submit that the release of estate claims provided for above is justified under the circumstances and under applicable law. In addition, the Debtors and the Creditors Committee are not currently aware of any definitive, material claims against the Released Parties that would be released by the Debtors pursuant to Section X.E of the Plan, and in any event, absent this release, it is likely that the Released Parties would assert a right of indemnification against the Debtors, the Estates, or the Liquidating Trust on account of the Claims at issue, such that the Estates themselves could potentially be harmed without these releases.

b.    *Releases by the Releasing Parties*

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE CONFIRMATION DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A**

***RELEASING PARTY IS ALSO A THIRD-PARTY RELEASEE) WILL PROVIDE A FULL RELEASE (AND EACH ENTITY SO RELEASED WILL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO ALL OF THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING OR OTHERWISE ASSERTABLE AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES OR EMPLOYMENT AND/OR LABOR LAWS OR REGULATIONS,  OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE ESTATES, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN.***  **NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE PLAN DOES NOT RELEASE THE D&O CLAIMS OR ANY CLAIMS, AVOIDANCE ACTIONS, OR OTHER CAUSES OF ACTION, WHETHER DIRECT, DERIVATIVE, OR OTHERWISE, THAT THE RELEASING PARTIES MAY HAVE NOW OR IN THE FUTURE AGAINST ANY NON-RELEASED PARTIES, OR ANY LIABILITY OF ANY PERSON ARISING FROM CONDUCT CONSTITUTING FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER.**

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided for in Section X.F of the Plan, which include by reference each of the related provisions and definitions contained therein, and, further, will constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties (including the waiver of the Second Lien Note Claims and otherwise pursuant to the Unsecured Creditor Settlement); (2) a good-faith settlement and compromise of the claims released in Section X.F of the Plan; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Equity Interests; (4) fair, equitable, and reasonable under the circumstances of these Chapter 11 Cases; (5) given and made after due notice and an opportunity for a hearing; *(6) a bar to any of the Releasing Parties' asserting any claim released pursuant to Section X.F of the Plan; and (7) be deemed to have been entered into consensually, by virtue of the applicable Releasing Party's having voted to accept the Plan.*

**ALL RELEASING PARTIES WILL BE FOREVER PRECLUDED FROM ASSERTING ANY OF THE CLAIMS RELEASED PURSUANT TO SECTION X.F OF THE PLAN AGAINST ANY OF THE RELEASED PARTIES OR ANY OF THE RELEASED PARTIES' RESPECTIVE ASSETS.  TO THE EXTENT THAT ANY RELEASING PARTY RECEIVES MONETARY DAMAGES FROM ANY RELEASED PARTY ON ACCOUNT OF ANY CLAIM RELEASED PURSUANT TO SECTION X.F OF THE PLAN, SUCH RELEASING PARTY HEREBY ASSIGNS ALL OF ITS RIGHT, TITLE, AND INTEREST IN AND TO SUCH RECOVERY TO THE RELEASED PARTIES AGAINST WHOM SUCH MONEY IS RECOVERED.**

The purpose of this voluntary third-party release of the Debtors' personnel, advisors, professionals, and other related Persons is to prevent an attack against those individuals based on actions related to the Debtors' business and operations and these Chapter 11 Cases, including negotiation of the Lenders/Committee Resolution and the various auctions and Sales.

It is the intent of the Plan to bring finality to the disruption caused by these Chapter 11 Cases, and the parties covered by this limited consensual release have made enormous contributions to the Debtors' efforts to maximize value and to implement the compromises set forth in the Plan. The Debtors believe it is important to relieve the Released Parties of the potential threat of such actions against them personally by parties in these Chapter 11 Cases that may be dissatisfied with the treatment provided in the Plan.

Given the limited scope and time period covered by the foregoing release, which implicates only pre-petition and specific post-petition conduct, and given that the release is only binding upon those who vote in favor of the Plan, and it excludes claims for fraud and willful misconduct, the Debtors believe that the release is properly and narrowly tailored and warranted to protect the Released Parties from released actions that could be commenced by the Releasing Parties in the absence of the release. Any party may still, if it wishes, commence actions not so released and may also initiate actions against any parties excluded from the release. Thus, the Debtors believe it would be entirely unfair for the Released Parties (including the Second Lien Noteholders, who have agreed to waive the Second Lien Note Claims in part as consideration for this release, and have also foregone any challenges to subordination and other related provisions of any intercreditor or similar agreements between the Pre-Petition Lenders and the Second Lien Note Holders) to continue to be exposed to the limited scope of lawsuits released under Article IX the Plan by those parties who have voted in favor of the Plan and are the direct beneficiaries of the Plan, given their participation in, and furtherance of, (i) the planning and preparation for, and the filing of, these Chapter 11 Cases, the Plan, and the Sales; (ii) negotiations regarding or concerning the Plan; and (iii) the ownership, management, and operation of the Debtors since they began preparing for these Chapter 11 Cases and for their actions after the Petition Date to maximize value here.

In addition, the Debtors and the Creditors Committee are not currently aware of any definitive, material claims against the Released Parties that would be released by the Releasing Parties pursuant to Section X.F of the Plan, and in any event, absent this release, it is likely that the Released Parties would assert a right of indemnification against the Debtors, the Estates, or the Liquidating Trust on account of the Claims at issue, such that the Estates themselves (including the Releasing Parties, in their capacity as the beneficiaries of the Liquidating Trust, could potentially be harmed without these releases. Moreover, this release is an important component of the Unsecured Creditor Settlement, which, as set forth further in the Disclosure Statement and in the Plan, provides for the waiver of various claims and otherwise provides significant benefits to the Estates and Holders of Allowed General Unsecured Claims.

Accordingly, the Debtors submit that the consensual third-party releases provided for above is justified under the circumstances and under applicable law.

6.    <u>Injunction Related to Releases</u>.    **The Confirmation Order will enjoin, and will be deemed to enjoin, permanently the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the Plan (including the releases set forth in Article X of the Plan).**

7.    <u>Limits to Release and Exculpation</u>.    Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, nothing in the Plan (including anything set forth in Article X thereof) will or will be deemed to (i) constitute a release, discharge, or waiver by any Debtor, Estate, Releasing Party, the Liquidating Trustee, the Liquidating Trust, or any other Person of, or (ii) impose any injunction against the enforcement of, any claim or cause of action or any potential claim or cause of action against Messrs. Michael Mulligan, Russell D'Anton, or Michael D'Anton and their respective family members or relatives or any entity in which they may have an ownership, partnership, shareholder, membership, pecuniary, or other interest.    In addition, nothing in the Plan or the Confirmation Order will or will be deemed to constitute a release, discharge, or waiver by (i) any Professional of any Professional Fee Claim against the Debtors, the Estates, or any other party, or (ii) any of the Pre-Petition Lenders of any claim or cause of action that any of them may have against any other Pre-Petition Lender.

8.    <u>Indemnification of Debtors' Officers and Directors</u>.    Pursuant to an indemnity agreement to be executed between the Debtors and the Administrative Agent in form and substance acceptable to the parties thereto, the Administrative Agent will indemnify and hold harmless all officers and directors of any of the Debtors serving as of October 1, 2010, or at any time thereafter, in an aggregate amount of up to $500,000 (the "*Indemnity Amount*"), with respect to all costs of defense, settlements, and/or payments upon any judgments that may be entered against any such parties, in connection with certain causes of action, claims, liabilities, losses, expenses, and damages asserted against any such officer or director on account of, or otherwise arising out of or in connection with their relationship with the Debtors.

II.    **Retention of Jurisdiction by Bankruptcy Court**

Following the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the intents and purposes of the Plan and the Liquidating Trust Agreement are carried out.    The Bankruptcy Court will also retain and have exclusive jurisdiction after the Effective Date over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases, the Plan, the Confirmation Order, or the Liquidating Trust Agreement, or that otherwise relates to any of the following:

1.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Confirmation Order, the Liquidating Trust Agreement, and the Sale Orders and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan and the Liquidating Trust;

2.    to determine any and all motions, adversary proceedings (including all Avoidance Actions and all other Causes of Action, regardless of whether such action is pending or has otherwise been commenced or instituted as of the Effective Date), applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by Debtors, the Liquidating Trustee, or the Liquidating Trust after the Effective Date, including, without limitation, among others, any claims or causes of action against Sysco Corporation and all related

entities, and any other claims or causes of action, whether actual or hypothetical, as disclosed in the Plan Supplement; provided, however, that the Debtors, the Liquidating Trust, and the Liquidating Trustee reserve the right to commence collection actions, actions to recover receivables, and other similar actions in any and all other appropriate jurisdictions;

3.    to ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan and in the Liquidating Trust Agreement;

4.    to hear and determine any objections to Claims or Equity Interests Filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or Secured or unsecured or priority or non-priority status of any Claim, in whole or in part, and any related proceedings, judicial, quasi-judicial, regulatory, administrative, or other;

5.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

6.    to issue such orders in aid of execution of the Plan and the Sales, to the extent authorized by Bankruptcy Code § 1142;

7.    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

8.    to hear and determine all applications for awards of Professional Fees or other compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

9.    to hear and determine disputes arising in connection with or relating to the Plan or the Liquidating Trust or the interpretation, implementation, or enforcement of the Plan or the Liquidating Trust Agreement (including to enforce the release, injunction, and exculpation provisions set forth in Article X of the Plan) whether explicitly referenced in the Plan or not of any Entity's obligations incurred in connection with or released, enjoined, and/or exculpated under the Plan;

10.   to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan (including with respect to the release and exculpation provisions set forth in Article X of the Plan), the Sale Orders, and the Liquidating Trust Agreement, including, without limitation, with respect to any asserted Claim for

unpaid vacation and any related proceedings, judicial, quasi-judicial, regulatory, administrative, or other;

11.     to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Liquidating Trust, the Liquidating Trust Agreement, the Confirmation Order, the Sales, the Sale Orders, the Asset Purchase Agreements, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement to be executed in connection with the Plan or the Liquidating Trust;

12.     to hear and determine matters concerning state, local, or federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146;

13.     to hear and determine any disputes or other matters arising in connection with the interpretation, implementation, consummation, or enforcement of all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered pursuant to the Plan and/or in any way in connection with the Chapter 11 Cases; and

14.     to hear any other matter or for any purpose specified in the Disclosure Statement, the Confirmation Order, the Plan, the Liquidating Trust Agreement, or any other document entered into in connection with any of the foregoing.

## JJ.     Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 will be paid on or before the Effective Date, to the extent required by applicable law, or, if not required to be paid on or prior to the Effective Date, by the Debtors or the Liquidating Trustee as soon as practicable following the Effective Date, as and when such fees become due and payable in accordance with applicable law.

## KK.     Exemption from Securities Laws

The creation or issuance of (i) any beneficial interests in the Liquidating Trust to the Holders of Allowed General Unsecured Claims or otherwise under the Plan and (ii) the New CB Holding Share, to the extent, if any, either of such interests constitute "securities" under applicable law, in each instance satisfies the requirements of Bankruptcy Code § 1145, and therefore, such creation or issuance will be exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer or sale of securities.

## LL.     Bankruptcy Code § 1146 Exemption

Pursuant to Bankruptcy Code § 1146(a), (i) the creation, modification, consolidation, or recording of any mortgage, deed of trust, lien, pledge, or other security interest; (ii) the making, recording, or assignment of any lease or sublease; or (iii) the making, recording,

or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan and the remaining Sales or portions thereof that have not closed as of the Confirmation Date, including, without limitation, any merger agreements; assignments; agreements of consolidation, restructuring, disposition, liquidation, or dissolution; deeds; bills of sale; and transfers of tangible property by the Debtors or the Liquidating Trustee, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax, or other similar tax.  Any transfers from the Debtors to the Liquidating Trust or any other Person (including any Purchaser) following the Confirmation Date or by the Liquidating Trust to a creditor or other Entity or otherwise pursuant to the Plan, the Sale Orders, the Confirmation Order, any other order of the Bankruptcy Court, or the Liquidating Trust Agreement will not be subject to any such taxes, and all appropriate state or local governmental officials or agents are hereby and by the Confirmation Order directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Any of the foregoing sales or transactions taken or closing on or after the Confirmation Date will be deemed to have been in furtherance of, or in connection with, the Plan.

MM.    **Books and Records**

On the Effective Date, the Debtors' Books and Records (excluding any electronic mail or other correspondence among the Debtors and their counsel subject to Privilege other than those referred to herein) will be transferred to the Liquidating Trust, except to the extent any such Books and Records were transferred to the various Purchasers under the respective Asset Purchase Agreements.  With respect to the Books and Records that were transferred to a Purchaser under an Asset Purchase Agreement, such Purchaser will provide the Liquidating Trustee and the Debtors reasonable access to the Books and Records in the manner provided in the applicable Asset Purchase Agreement to enable the Liquidating Trustee and the Debtors to carry out their respective duties under the Liquidating Trust Agreement or otherwise under the Plan (as applicable).

With respect to all other Books and Records retained by the Debtors after the Confirmation Date, the Liquidating Trustee will be free, in its discretion, upon prior notice to the Administrative Agent, to abandon, destroy, or otherwise dispose of any such Books and Records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further court order; provided, however, that in the Liquidating Trustee's discretion, these Books and Records so retained may otherwise be destroyed or disposed of beginning six (6) months after the Effective Date, notwithstanding any applicable laws, rules, or regulations that potentially would have required the Debtors to retain such Books and Records for longer.  The Liquidating Trustee will also be free, in its discretion, upon prior notice the Administrative Agent, and in compliance with applicable non-bankruptcy law, to abandon, destroy, or otherwise dispose of all Books and Records previously transferred thereto by the Debtors in accordance with Section XI.E of the Plan, without the need for any other or further court order.

NN.    **Privileges as to Certain Causes of Action**

Privileges relating solely to any existing Avoidance Actions or other Transferred Causes of Action pursued, investigated, or considered by the Debtors prior to the Confirmation Date (not otherwise resolved) will be transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and will vest with the Liquidating Trust. The Liquidating Trustee will hold and be the beneficiary of all such Privileges and entitled to assert such Privileges. No such Privilege will be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information, or communications subject to attorney-client privileges, work product protections or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtors. The Liquidating Trustee will reserve the right to request other materials that may be subject to Privilege for appropriate reasons, but representatives of the Debtors and the Debtors' Professionals will maintain the ability to oppose any such request on any grounds or to seek compensation in connection with such production, with any disputes to be decided by the Bankruptcy Court.

OO. **New Employee Agreements**

The Debtors and the Liquidating Trustee are authorized to negotiate employment, consulting, or similar contracts or arrangements with any current or former employees or officers of the Debtors or any Professionals, to the extent necessary, beneficial, or appropriate to wind down the Estates or otherwise fulfill their respective duties and responsibilities under the Plan or the Liquidating Trust Agreement (as applicable). To the extent the Debtors and/or the Liquidating Trustee, as applicable, enter into any such arrangements with any current officers of the Debtors, such parties would remain and continue as officers, until such time as their services are no longer needed by the Debtors and/or the Liquidating Trustee, as applicable.

PP. **Unclaimed Property**

Notwithstanding any local, state, federal, or other laws or regulations regarding unclaimed property or escheatment of property, all funds or other property possessed by the Debtors or the Liquidating Trust on and after the Effective Date (including any unclaimed pay checks; any unclaimed or returned distributions or other benefits under any Compensation and Benefits Program or otherwise; or customer gift, club, or similar cards in connection with any customer promotion, similar activity, or otherwise that is unclaimed, unutilized, returned, or unredeemed (as the case may be) or otherwise remaining outstanding), in each case subject to escheatment or potentially subject to escheatment, as of the Effective Date, will be treated as property of the Debtors under the Plan, and will accordingly be deemed transferred to, vested with, and become the property of the Debtors or the Liquidating Trust (as applicable) to be either destroyed and of no force and effect or held and distributed pursuant to the terms of the Plan, in each case free and clear of any such laws or regulations. *No local, state, federal, or other regulatory or other administrative agency may assert any claims or causes of action against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, and/or any of the Debtors' or the Liquidating Trustee's respective officers, directors, employees, agents, or professionals with respect to any such funds or other property that is the subject of Section XI.H of the Plan, and such agencies are by enjoined and estopped from doing so.*

IV. <u>**ALTERNATIVES TO THE PLAN**</u>

The Plan reflects, among other things, the implementation and effectuation of the compromise set forth in the Lenders/Committee Resolution and the wind-down of the Debtors' Estates in an efficient manner. Thus, the Debtors have determined that the Plan is the most practical means of providing maximum recoveries to creditors in these Chapter 11 Cases.

Alternatives to the Plan that have been considered and evaluated by the Debtors during the course of these Chapter 11 Cases include (i) liquidation of the Debtors' remaining assets under Chapter 7 of the Bankruptcy Code or (ii) an alternative Chapter 11 plan. The Debtors' thorough consideration of these alternatives to the Plan has led each of them to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable and in a manner which minimizes inherent risks in any other course of action available to the Debtors.

A.    **Liquidation Under Chapter 7 of the Bankruptcy Code**

If the Plan or any other Chapter 11 plan for the Debtors cannot be confirmed under Bankruptcy Code § 1129(a), these Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to Chapter 7 of the Bankruptcy Code. As discussed further below in the Section entitled "Best-Interests Test", the Debtors believe that Holders of Allowed Claims will receive a recovery greater than or equal to what they would otherwise receive in Chapter 7. Specifically, if a trustee is appointed, and the remaining assets of the Debtors are liquidated under Chapter 7 of the Bankruptcy Code, creditors may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions than they would under the Plan. It is also possible that the Sales that have not yet closed could fail to close for various reasons, or that liquor licenses that are integral to such Sales could be revoked, were these Chapter 11 Cases to be converted to cases under Chapter 7 of the Bankruptcy Code, either of which could result in greatly diminished recoveries for Creditors.

B.    **Alternative Chapter 11 Plan**

If the Plan is not confirmed, the Debtors or any other party-in-interest (if the Debtors' exclusive periods in which to file a Chapter 11 plan and solicit votes therefor have expired) could attempt to formulate an alternative Chapter 11 plan that might provide for the liquidation of the Debtors' assets other than as provided in the Plan. However, because substantially all of the Debtors' assets have already been sold, and the Plan provides for the effectuation of the Lenders/Committee Resolution and the distribution of the proceeds of the Liquidating Trust Assets, the Debtors believe that any alternative Chapter 11 plan will necessarily be substantially similar to the Plan. The Debtors thus further believe that any attempt to formulate an alternative Chapter 11 plan would necessarily delay creditors' receipt of distributions yet to be made and would likely decrease such distribution as a result of, among other things, increased Administrative Expenses. It is also possible that the Sales that have not yet closed could fail to close for various reasons, or that liquor licenses that are integral to such Sales could be revoked, were an alternative Chapter 11 plan to be proposed, which could result in greatly diminished recoveries for Creditors. Accordingly, the Debtors believe that the Plan will enable all creditors entitled to receive distributions thereunder to realize the greatest possible

recovery on their respective Claims with the least possible delay and without entailing undue additional administrative and other expenses.

C.    **Certain Risk Factors**

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS ASSOCIATED WITH THE PLAN, CONFIRMATION, AND CONSUMMATION.**

1.    Risk of Decreased Distributions to Holders of Class 1 and Class 4 Claims.

a.    *Lower Actual Amounts of Net Proceeds from the Liquidating Trust Assets*

The Liquidating Trust Assets that may be distributed pursuant to the Plan consist of, among other things, any proceeds actually obtained in connection with the Transferred Property. Although no specific amount for the proceeds of the Transferred Property (other than the liquidated amounts already known) was considered by the Debtors in determining the potential distribution to Holders of Allowed Class 1 and 4 Claims set forth herein, the potential for any increased recovery is unknown, uncertain, and speculative.

In particular, as set forth further herein, certain components of the Transferred Property (including the Avoidance Actions and the other Transferred Causes of Action and the D&O Shared Proceeds) pertain to future potential litigation. The outcomes of these matters, as well as the timing and the costs required to resolve them, cannot be predicted with any degree of certainty at this time. In addition, it is also possible that, in accordance with Section IV.D.2(e) of the Plan, the Liquidating Trust may be required to transfer or assign back to the Debtors or the Estates a particular Transferred Cause of Action, reducing potential related recoveries. Similarly, the Debtors cannot predict with any certainty the net proceeds the Liquidating Trustee will be able to obtain from liquidating the other Transferred Property, including the potential amount of net proceeds of any remaining Sales. Thus, the potential for any increased recovery for Holders of Allowed Class 1 and Class 4 Claims would decline in the event that the Liquidating Trustee is ultimately not able to collect significant net proceeds from the Transferred Causes of Action and the other Transferred Property.

b.    *Material Disputed Claims*

There may be Disputed Claims that prove to be material. Depending on the resolution of such Disputed Claims, the actual total amount of all Allowed Class 4 General Unsecured Claims may exceed the amounts estimated by the Debtors for such Claims set forth above in the Disclosure Statement, and in that case, percentage recoveries and ultimate distribution that will be received by any particular Holder of an Allowed Class 1 or 4 Claim may

be adversely affected by the aggregate amount of all Allowed Claims after any Disputed Claims are resolved.

        2.    <u>Timing of Distributions to Holders of Allowed Class 1 and Class 4 Claims</u>.  There can be no assurance as to when, if ever, distributions will actually be made to Holders of Allowed Class 1 and Class 4 Claims from the Liquidating Trust or otherwise following the Effective Date.  In particular, the Debtors cannot predict how long it would ultimately take for the Liquidating Trustee to generate proceeds from the various Transferred Causes of Action or with respect to the D&O Shared Proceeds, or to liquidate the other Transferred Property.

        3.    <u>Risk of Non-Confirmation of the Plan; Feasibility</u>.  Even if all Impaired Classes of Claims vote to accept the Plan, or with respect to a Class that votes to rejects, or is deemed to reject, the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for Confirmation under Bankruptcy Code § 1129(a) and (b).  Bankruptcy Code § 1129(a) requires, among other things, a demonstration that the value of distributions to creditors and equity security holders that vote to reject the Plan, or are deemed to reject the Plan, not be less than the value of distributions such creditors and equity security holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such and other requirements for Confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

        If the Plan is not confirmed and consummated, there can be no assurance that these Chapter 11 Cases will continue rather than be converted to cases under Chapter 7 of the Bankruptcy Code, or that any alternative plan of reorganization would be on terms as favorable to Holders of Allowed Claims and Equity Interests as the Plan.  If a liquidation under Chapter 7 were to occur, the Debtors believe that distributions, if any, to Holders of Allowed Claims under the Plan would be reduced and/or delayed.  Additionally, the Debtors believe that in a liquidation under Chapter 7, before Holders of Allowed Claims would receive any distributions, payment of additional administrative expenses of a Chapter 7 trustee and such trustee's attorneys, accountants, or other professionals would likely cause a substantial diminution in the value of the Estates.  In addition, certain additional claims against the Debtors may arise by reason of the liquidation under Chapter 7.

        4.    <u>Non-Consensual Confirmation</u>.  Because Class 6 is deemed to reject the Plan, the Debtors will (i) seek Confirmation of the Plan under Bankruptcy Code § 1129(b) and/or (ii) modify the Plan in accordance with Section XIII.A thereof.  In order to confirm the Plan under Bankruptcy Code § 1129(b), the Bankruptcy Court must determine that, in addition to satisfying all other requirements for Confirmation, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that has not accepted the Plan.  The Debtors reserve the right to amend, modify, supplement, revoke, or withdraw the Plan, including to amend or modify the Plan or any exhibits or schedules thereto, in order to satisfy the requirements of Bankruptcy Code § 1129(b), if necessary.  Such amendments may include, but are not limited to, the alteration or elimination of distributions to various Classes.

5.    <u>Risk of Non-Occurrence of Effective Date</u>.  Consummation of the Plan is conditioned upon certain events enumerated in Section IX.B of the Plan.  There can be no assurance, however, that such events will occur.  Accordingly, even in the Plan is confirmed by the Bankruptcy Court, there can be no assurance that such conditions will be satisfied, that the Plan will be consummated, or that the Effective Date will occur.

## V.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to Holders of those Claims that are entitled to vote on the Plan (<u>i.e.</u>, Holders of Allowed Senior Creditor Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims).  It does not address tax consequences to (i) Holders whose Claims are entitled to satisfaction in full (<u>e.g.</u>, Holders of Allowed Administrative Claims, Allowed DIP Facility Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims) or (ii) Holders of Equity Interests.

This summary only addresses tax consequences to Holders that are "U.S. persons".  For purposes of this discussion, a U.S. person is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the U.S.; (ii) a corporation (or other entity taxable as a corporation) created or organized in or under the laws of the U.S., any state thereof, or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust if (a)(1) a court within the U.S. is able to exercise primary supervision over the administration of the trust and (2) one or more U.S. persons have the authority to control all substantial decisions of the trust, or (b) the trust has validly elected to be treated as a U.S. person.

If a Holder is treated as a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of a partner in the partnership generally will depend on the status of the partner, the activities of the partnership, and certain determinations made at the partner level.  If you are a partnership, you and your partners should consult your own tax advisors regarding the U.S. federal income tax consequences of the Consummation of the Plan.

This summary does not address special categories of Holders (including persons related to the Debtors within the meaning of the Tax Code, pass-through entities (<u>e.g.</u>, S corporations or entities taxable as partnerships for U.S. federal income tax purposes) and investors therein, insurance companies, banks and other financial institutions, tax-exempt organizations, real estate investment trusts, regulated investment companies, dealers or traders in securities or currencies, U.S. expatriates, Holders subject to the alternative minimum tax, Holders holding Claims as part of a straddle, hedging, conversion, or other risk reduction transaction, and Holders that are themselves in bankruptcy), which may be subject to special rules not addressed below.

This summary does not address any U.S. federal tax considerations other than income tax considerations (such as estate and gift tax considerations) or any state, local, or non-U.S. tax considerations applicable to any Holder.

This summary is based on relevant provisions of the Tax Code, the applicable Treasury regulations promulgated thereunder (the "*Treasury Regulations*"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof.  These rules are subject to change, possibly on a retroactive basis, and any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the U.S. federal tax aspects of the Plan.  There can be no assurance that the IRS will not take positions concerning the consequences of the Plan that are different from those discussed below or that a court would not sustain such positions.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the specific circumstances pertaining to a particular Holder of a Claim.  Each Holder is urged to consult its own tax advisor as to the consequences of the Plan under U.S. federal and applicable state, local, and foreign income and other tax laws.*

*IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.*

A.    **Consequences to the Debtors**

1.    <u>In General</u>.  As discussed in more detail below:  (a) the Debtors have already recognized taxable gains and/or losses during the current taxable year ending October 2, 2011, as a result of Sales occurring prior to Consummation of the Plan, and will recognize additional taxable gains and/or losses during the remainder of the current taxable year and/or in subsequent taxable years as a result of (i) the transfer of the Transferred Property to the Liquidating Trust upon Consummation of the Plan and (ii) post-Consummation Sales by the Debtors of any remaining assets (including any remaining liquor licenses); (b) while the Debtors do not currently anticipate a significant amount of U.S. federal income tax liability in connection with the foregoing sales, there can be no assurance that this will ultimately be the case, and any such taxes will reduce the ultimate recovery by the Holders of Allowed Senior Creditor Claims and Allowed General Unsecured Claims (including any Holder of an Allowed Other Secured Claim Deficiency Claim); (c) the Debtors will realize significant cancellation of indebtedness ("*COD*") income upon Consummation of the Plan; and (d) while any COD income realized will not be taxable to the Debtors, the Debtors will be required to reduce certain of their tax attributes (including NOLs and/or the tax basis of their assets) dollar-for-dollar as of the first day of the first taxable year following Consummation of the Plan, which might negatively impact the extent

to which any sales of property by the Debtors in post-Consummation taxable years will result in U.S. federal income tax liability.

2.    <u>Transfer of Assets to Liquidating Trust</u>.  Pursuant to the Plan, each of the Debtors will be treated for U.S. federal income tax purposes as transferring their respective shares of the Transferred Property directly to the applicable Holders of Claims, which will then be treated as retransferring such assets to the Liquidating Trust.  For U.S. federal income tax purposes, the deemed transfer of assets to the applicable Holders of Claims will be a taxable event to the Debtors that generally will result in the recognition of taxable gains or losses by the Debtors as if the Debtors sold such assets for their then fair market values.

3.    <u>Anticipated Tax Liability of the Debtors</u>.  The Debtors do not currently anticipate a significant amount of U.S. federal income tax liability in connection with any Sales occurring prior to the Consummation of the Plan, the deemed sales of Transferred Property to Holders of Claims upon Consummation of the Plan, or post-Consummation Sales of any remaining assets (including remaining liquor licenses).  However, there can be no assurance that this will ultimately be the case, due to a number of factors, including uncertainty regarding the valuation of specific assets already sold or to be sold in the future, the uncertain timing of Consummation of the Plan and subsequent asset sales, the fact that the Debtors will experience an "ownership change" (within the meaning of Section 382 of the Tax Code) upon Consummation of the Plan and may have already experienced an ownership change, and the tax attribute reduction that will result from the COD income to be realized by the Debtors upon Consummation of the Plan.  Any such tax liability will reduce the ultimate recovery by the Holders of Allowed Senior Creditor Claims and Allowed General Unsecured Claims (including any Holder of an Allowed Other Secured Claim Deficiency Claim).

4.    <u>Cancellation of Debt</u>.  The Debtors will realize significant cancellation of indebtedness ("*COD*") income upon Consummation of the Plan.  In general, the Tax Code provides that a corporate debtor may exclude from its taxable income any COD income arising in a bankruptcy proceeding, but, instead, must reduce dollar-for-dollar the amount of certain tax attributes, including its NOL carryforwards and current year NOLs, tax credits, and tax basis in assets.  This attribute reduction will take place on the first day of the first taxable year following the Consummation of the Plan and may negatively impact the taxability of asset sales occurring thereafter.

**B.    Consequences to Holders of Allowed Senior Creditor Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims**

Pursuant to the Plan, the Holders of Allowed Senior Creditor Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims will receive, in full satisfaction and release of such Claims, payments and/or other distributions provided for in the Plan, including, as applicable, interests in the Liquidating Trust (subject to the terms and conditions of the Plan and the Liquidating Trust Agreement) or the return of the property securing an Allowed Other Secured Claim.

1.    <u>Treatment of Transfers to the Liquidating Trust</u>.  As discussed in more detail below, the Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal

income tax purposes. Based on this treatment, the beneficiaries of the Liquidating Trust (including the Holders of Allowed Senior Creditor Claims and Allowed General Unsecured Claims, as well as the Holders of Other Secured Claims to the extent they also hold an Allowed Other Secured Claim Deficiency Claim) (each, a "*Liquidating Trust Beneficiary*") will be treated for U.S. federal income tax purposes as if they had received, as part of the consideration for their Claims, a payment-in-kind in the form of an undivided interest in the Liquidating Trust Assets, which the Liquidating Trust Beneficiaries then immediately contribute to the Liquidating Trust. Under the Plan and the Liquidating Trust Agreement, the Liquidating Trustee will have the discretion to value the assets of the Liquidating Trust, and each Liquidating Trust Beneficiary will be required by the Plan and the Liquidating Trust Agreement to report any taxable income or loss arising from Consummation of the Plan in a manner consistent with such valuation.

Due to the existence of Disputed Claims, it will be impossible to determine upfront precisely what each Liquidating Trust Beneficiary's ultimate share of the Liquidating Trust's assets will be. Because the Tax Code requires all of the income derived by the Liquidating Trust to be subject to tax on a current basis, the Liquidating Trustee will be required to initially allocate (and subsequently reallocate from time to time) all of the Liquidating Trust's assets and income among the Liquidating Trust Beneficiaries (in such manner as it deems appropriate). The Plan and the Liquidating Trust Agreement will require each Liquidating Trust Beneficiary to report its taxable income and loss each year from the Liquidating Trust in a manner consistent with the methodology adopted by the Liquidating Trustee. Accordingly, a Liquidating Trust Beneficiary may initially or from time to time be treated as having a larger share of the Liquidating Trust's assets, and as having a larger share of the Liquidating Trust's taxable income, than such Liquidating Trust Beneficiary will ultimately derive from the Liquidating Trust. Each affected Holder should consult its own tax advisor about the tax consequences of the Liquidating Trustee's allocation, including the tax consequences to such Holder as Disputed Claims are resolved favorably or unfavorably.

2. <u>Gain or Loss</u>. In general, a Holder of an Allowed Senior Creditor Claim, Allowed Other Secured Claims, and/or an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of any cash and the aggregate fair market value of any other property received by such Holder (other than in respect of such Holder's share of Liquidating Trust Assets) and the aggregate fair market value of such Holder's allocable share of the Liquidating Trust Assets (as discussed above), other than any portion of such amounts allocable to accrued but unpaid interest or OID (as discussed below) and (ii) such Holder's adjusted tax basis in such Claim. The amount and timing of a Holder's gains and losses will be uncertain (due to the existence of Disputed Claims that will affect the amount ultimately received by each Holder), and it is possible that a Holder's loss, if any, may be deferred in its entirety until the amount of such loss becomes fixed.

Where gain or loss is recognized by a Holder in respect of its Allowed Senior Creditor Claim, Allowed Other Secured Claim, or Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss, or ordinary income or loss, will be determined by a number of factors, including the tax status of the Holder, whether the Claim in question constituted a capital asset in the hands of the Holder or was incurred in connection with the conduct by such Holder of a trade or business, and how long it had been held, whether such Claim was acquired at a market discount, and whether and to what extent the

Holder had previously claimed a loss or bad debt deduction in respect of such Claim. Holders should consult their tax advisors with respect to these issues.

In general, a Holder's initial aggregate tax basis in its interest in the Liquidating Trust Assets will equal the fair market value of such interest when received, and the holding period for such interest generally will begin on the day following the receipt of such interest.

3.    Distributions in Discharge of Accrued But Unpaid Interest. As set forth above, pursuant to the Plan, all distributions paid to Holders of Allowed Claims in satisfaction thereof will be allocated, first, to the principal amounts of such Claims (as determined for U.S. federal income tax purposes) and, second, to the portion of such Claims comprising interest (as determined for U.S. federal income tax purposes), if any (but solely to the extent that interest is a portion of such Allowed Claim), including, without limitation, any portion of the Claim representing accrued but unpaid OID or interest; any excess thereafter will be allocated to the remaining portion of such Claims. However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

In general, to the extent that an amount received (whether in cash or other property) by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to that holder as ordinary interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full. However, the IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether a Holder of a Claim under the Plan would be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full. *Each Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid OID and interest for U.S. federal income tax purposes.*

4.    Ownership of Liquidating Trust Interests and Receipt of Distributions; Effect of Disputed Claims. The Plan provides that the Liquidating Trust will be treated for U.S. federal income tax purposes as a "liquidating trust," as defined in Treasury Regulations Section 301.7701-4(d), that will be taxed as a grantor trust owned by the Liquidating Trust Beneficiaries. As noted above, each such Liquidating Trust Beneficiary will be deemed for U.S. federal income tax purposes to have contributed its allocable share of the Liquidating Trust's assets to the Liquidating Trust immediately after the deemed receipt of such assets from the Debtors.

A grantor trust is treated as a pass-through entity for U.S. federal income tax purposes. Thus, if grantor trust treatment applies, no entity-level income tax should be imposed on the Liquidating Trust, and the Liquidating Trust Beneficiaries should be taxed currently on their respective allocable shares of the Liquidating Trust's income or gain, whether or not such income or gain is distributed currently.

Although the Liquidating Trust has been structured with the intention of complying with guidelines established by the IRS in Revenue Procedure 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, it is possible that the IRS could require a different

characterization of the Liquidating Trust, which could result in different and possibly greater tax liability to the Liquidating Trust and/or Holders of Allowed Claims.  No IRS ruling or opinion of counsel has been or will be requested concerning the tax status of the Liquidating Trust.  There can be no assurance that the IRS will not require an alternative characterization of the Liquidating Trust.

As noted above, due to the existence of disputed Claims, the initial allocation (and any subsequent reallocations from time to time) of income and gain of the Liquidating Trust to a particular Liquidating Trust Beneficiary will be made on some type of estimated basis (as determined by the Liquidating Trustee) and may not correspond to the ultimate economic income and gain realized by such Liquidating Trust Beneficiary.

The Liquidating Trustee will file tax returns with the IRS for the Liquidating Trust as a grantor trust in accordance with Treasury Regulations Section 1.671-4(a).  The Liquidating Trust will also send to each Liquidating Trust Beneficiary a separate statement setting forth such Liquidating Trust Beneficiary's allocable share of items of income, gain, loss, deduction, or credit and will instruct the Liquidating Trust Beneficiary that it is required to report such items on such Liquidating Trust Beneficiary's U.S. federal income tax return.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Liquidating Trustee, Holders of Senior Creditor Claims, and Holders of General Unsecured Claims (including any Other Secured Claim Deficiency Claims)) are required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Holders of Claims are the owners and grantors.

In general, any amount a Holder receives as a distribution from the Liquidating Trust (other than possibly as a result of the subsequent disallowance of a Disputed Claim, as noted above) should not result in income to such Holder because such Holder is already regarded for U.S. federal income tax purposes as owning its allocable share of such assets.  *Holders of Senior Creditor Claims and/or General Unsecured Claims (including any Other Secured Claim Deficiency Claims) should consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.*

As and when any Disputed Claims become disallowed, Holders of certain previously-Allowed Senior Creditor Claims and/or General Unsecured Claims (including any Other Secured Claim Deficiency Claims) may, pursuant to the Plan and the Liquidating Trust Agreement, become entitled to an increased share of the proceeds of the Liquidating Trust assets.  For U.S. federal income tax purposes, the "receipt" of such increased share may be treated as additional consideration received in satisfaction of such Holder's Allowed Claim in an amount equal to the fair market value of such increased share at such time (with the potential for the recognition of income or gain at such time).  Under the Tax Code, a portion of such amounts may be treated as imputed interest.  In addition, it is also possible that any loss and a portion of any gain realized by such a Holder in satisfaction of its Allowed Claim may be deferred until such time as such Holder has received its final distribution, if any, from the Liquidating Trust.  Conversely, Holders of Disputed Senior Creditor Claims and/or General Unsecured Claims (including any Disputed Other Secured Claim Deficiency Claim) may realize a loss if and when their Claims become disallowed.  *Holders of Senior Creditor Claims and General Unsecured*

*Claims (including any Other Secured Claim Deficiency Claims) should consult their tax advisors regarding the possible effects of disallowance of any Disputed Claims.*

C.    **Information Reporting and Withholding**

All distributions to Holders of Allowed Claims under the Plan and all distributions from the Liquidating Trust are subject to any applicable withholding (including employment tax withholding, if any).  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28% and scheduled to increase to 31% in 2013).  Backup withholding generally applies if the recipient (i) fails to furnish its social security number or other taxpayer identification number ("*TIN*"), (ii) furnishes an incorrect TIN, (iii) has become subject to backup withholding due to a prior failure to properly report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a U.S. Person that is not subject to backup withholding.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  While these categories are very broad, there are numerous exceptions.  *Holders should consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.*

THE FOREGOING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

VI.    **VOTING PROCEDURES AND REQUIREMENTS**

A.    **Ballots and Voting Deadline**

**IT IS IMPORTANT THAT THE HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2, AND 4 TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR TO REJECT THE PLAN.**  All known Holders of Claims have been sent a Ballot together with the Disclosure Statement (which attaches the Plan as Exhibit A).  Such Holders should read the Ballot, the Disclosure Statement, and the Plan carefully and follow the instructions attached to the Ballot.  Only the Ballot that accompanies the Disclosure Statement should be used.  Copies

of Ballots, other solicitation documents, and related information are available at www.cbhinfo.com.

The Debtors have engaged GCG, Inc. (the *"Claims Agent"*), as their agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **YOUR VOTE MUST BE RECEIVED BY THE CLAIMS AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF [_____ __], 2012.**

**IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING THESE VOTING PROCEDURES, YOU MAY CONTACT THE CLAIMS AGENT AT (877) 398-2187 OR AT EITHER OF THE FOLLOWING ADDRESSES:**

|  |  |
|---|---|
| **if by mail:** | **if by hand delivery or overnight courier:** |
| GCG, Inc. | GCG, Inc. |
| Attn: CB Holding Corp. Ballot Processing | Attn: CB Holding Corp. Ballot Processing |
| PO Box 9587 | 5151 Blazer Parkway, Suite A |
| Dublin, OH 43017-4887 | Dublin, OH 43017 |

B.    **Holders of Claims Entitled to Vote**

Classes 1, 2, and 4 are the only Classes of Claims under the Plan that are Impaired and entitled to vote to accept or to reject the Plan. Each Holder of a Claim in Class 1, 2, or 4 as of the Voting Record Date established by the Debtors for purposes of the solicitation of votes on the Plan may vote to accept or to reject the Plan. To the extent that any creditor entitled to vote has filed duplicate Claims (meaning the Claims are in the same amount, with the same classification, and asserting the same basis of Claim) to be voted in such Class, such creditor would be provided, to the extent possible, with only one Ballot that reflects the vote of only one such Claim.

C.    **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a Chapter 11 plan by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class that cast ballots for acceptance or for rejection of the Chapter 11 plan vote to accept the Chapter 11 plan. Thus, acceptance of the Plan by Class 1, for example, will occur only if at least two-thirds in dollar amount and a majority in number of the Holders of such Class 1 Claims that cast their Ballots vote to accept the Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited, procured, or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

D.    **Voting Procedures**

1.    <u>Holders of Claims in Classes 1, 2, and 4.</u>  All Holders of Claims in Class 1, 2, or 4 that are entitled to vote on the Plan should complete the enclosed Ballot and return it to the Claims Agent, so that it is received by the Claims Agent on or before the Voting Deadline.

*The Debtors may not consider or count, and may disregard, any Ballots received after the Voting Deadline.*

        2.    <u>Tabulation of Votes</u>.  Solely for purposes of voting to accept or to reject the Plan, and not for the purpose of distribution on account of any Claim, each Claim in Class 2 or Class 4 that is not Disputed or otherwise disallowed for voting purposes will be temporarily allowed in an amount equal to the liquidated and non-contingent amount of such Claim indicated on a properly-completed proof of claim, filed prior to the Bar Date (or otherwise deemed timely filed by the Bankruptcy Court), or if no proof of claim has been filed, the known unliquidated, undisputed, and non-contingent amount of such Claim as listed in the Schedules, and with respect to each Claim in Class 1, in the amounts provided by the Administrative Agent (as applicable, in either case, an "*Authorized Voting Amount*").  The vote for any Claim for which the Authorized Voting Amount is equal to $0.00 would not be counted; only those votes related to Claims that have been deemed Allowed will be counted.  In addition, the tabulation of each properly-completed Ballot would reflect such Ballot's aggregate Authorized Voting Amount.

        The Claims Agent will note the date and time of receipt on each individual Ballot received by it and would review each Ballot to determine whether it satisfies the criteria specified herein for validity, including with respect to the following procedures:

    a.    any party holding or acquiring multiple Claims within the same Voting Class will be deemed to be casting a single vote on account of all such Claims in the aggregate amount thereof for purposes of Bankruptcy Code § 1126(c) and will not be deemed to be casting a separate vote on account of each such Claim, and to the extent that any party entitled to vote on the Plan has filed duplicate Claims (meaning that the purported Claims are in the same amount, with the same classification under the Plan, and asserting the same basis for the Claim) to be voted in a Class, such creditor shall, to the extent practicable and possible, be provided only one Ballot that reflects the vote of only one Claim;

    b.    any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class will not be counted;

    c.    all votes must be cast either to accept or to reject the Plan, and votes will not be split;

    d.    to the extent that a creditor has filed a proof of claim that is for an amount that is unliquidated or contingent, the applicable creditor will be deemed to be voting such claim for the amount equal to $1.00 for all purposes with respect to the Plan or the Confirmation Hearing;

    e.    any Ballot that partially rejects and partially accepts the Plan will not be counted;

    f.    any otherwise properly-completed Ballot that either fails to indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, will not be counted;

g.　　except as the Debtors may otherwise agree, a Ballot received by facsimile, e-mail, or any other electronic means will not be counted;

h.　　except as the Debtors may otherwise agree, only Ballots properly-completed and timely received by the Claims Agent will be counted;

i.　　the Debtors may waive any defect in any Ballot at any time, whether before or after the Voting Deadline; provided, however, that the voting report would list all such waivers;

j.　　the Debtors right either to reject any Ballots not in proper form or otherwise to attempt to cure all defective Ballots is reserved;

k.　　any Ballot that is illegible or contains insufficient information to permit identification of the claimant will not be counted;

l.　　except as the Debtors may otherwise agree in their absolute discretion, only Ballots bearing an original signature on the line adjacent to the "Signature:" label in the authorization section therein will be counted; provided, however, that the voting report would list all such Ballots that are not counted;

n.　　whenever a claimant casts more than one Ballot voting the same claim(s) prior to the Voting Deadline, only the last properly-completed Ballot received by the Claims Agent on or prior to the Voting Deadline will be counted;

o.　　if, prior to the Voting Deadline, the Debtors have (i) filed an objection to fully disallow or expunge any Proof of Claim or (ii) scheduled any Claim on its Schedules and Statements as disputed, , for which no Proof of Claim in a liquidated and non-contingent amount has been Filed, the applicable Claimant's vote would not be counted for any purpose with respect to the Plan or the Confirmation Hearing unless and until such claimant obtains an order from the Bankruptcy Court providing otherwise; and

p.　　if, prior to the Voting Deadline, the Debtors have filed an objection seeking to disallow or expunge partially any Proof of Claim that has been filed, the applicable claimant's vote will be counted for all purposes with respect to the Plan or the Confirmation Hearing solely to the extent of the undisputed portion of such claim, unless and until such claimant obtains an order from the Bankruptcy Court providing otherwise.

　　　　3.　　Withdrawal of Ballot.  Any voter that has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Claims Agent before the Voting Deadline.  To be valid, the notice of withdrawal must be (a) signed by the party that signed the Ballot to be revoked and (b) received by the Claims Agent before the Voting Deadline.  The Debtors reserve the right to contest the validity of any such withdrawals.

Any Holder that has delivered a valid Ballot may change its vote by delivering to the Claims Agent a properly-completed subsequent Ballot, so as to be received before the Voting Deadline.  In the case where more than one timely, properly-completed Ballot is received, only the Ballot that bears the latest date will be counted.  The Debtors reserve the right to contest the validity of any such subsequent Ballots.

## VII.    CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code § 1129 are met.  Among the requirements for Confirmation are that the Plan is (i) accepted by all Impaired Classes of Claims entitled to vote (in the manner discussed in the Plan) or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class and as to the Impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, (ii) feasible, and (iii) in the "best interests" of the Holders of Claims and Equity Interests impaired under the Plan.

### A.    No Unfair Discrimination/Fair and Equitable Test

In the event that any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each Impaired Class of Claims that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable".  Because the Holders of Equity Interests in Class 6 will not receive any recovery under the Plan and are, therefore, deemed to have rejected the Plan, the Bankruptcy Court may only confirm the Plan if it "does not discriminate unfairly" and is "fair and equitable" with respect to such Class (and any other Classes that may reject the Plan).

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a Chapter 11 plan.  A Chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair" .

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of what it is (or the Holders are) owed.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- Secured Creditors.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>. Either (i) each holder of an impaired unsecured claim receives or retains under the Chapter 11 plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Chapter 11 plan.

- <u>Equity Interests</u>. Either (i) each interest holder will receive or retain under the Chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the Chapter 11 plan.

These requirements are in addition to other requirements that have been established by case law.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement notwithstanding that Class 6 (Equity Interests) is deemed to reject the Plan because no Class that is junior to Class 6 will receive or retain any property on account of the Claims or Equity Interests in such Class. Because at least one Class of Claims is not being paid in full, the existing Equity Interests can be extinguished. The Debtors believe the same reasoning would apply to any other Class that may reject the Plan.

The Debtors reserve the right to supplement this discussion and file other pleadings or briefs prior to the Confirmation Hearing in the event either Class 1, Class 2, or Class 4 does not vote as a class to accept the Chapter Plan in accordance with the Bankruptcy Code.

B.     **Best-Interests Test**

The Bankruptcy Code requires that, in order for a debtor to confirm a Chapter 11 plan, each holder of an impaired claim or interest either (i) accepts the Chapter 11 plan or (ii) receives or retains under the Chapter 11 plan property of a value, as of the effective date of the Chapter 11 plan, that is not less than the value such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code, especially consider the settlement already reached in these Chapter 11 Cases set forth in the Lenders/Committee Resolution.

The Debtors believe that the Plan satisfies this "best-interests test" in large part because of the costs that would be associated with any liquidation under Chapter 7. The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during these Chapter 11 Cases that could be allowed in the Chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and the Creditors Committee, and costs and expenses of members of the Creditors Committee, as well as other compensation claims. In addition, claims would arise by reason of the breach or rejection of any obligations incurred and any leases or contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases that were not

assigned to a third party.  The foregoing types of claims, costs, expenses, fees, and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition priority and unsecured Claims.

        The Debtors thus submit that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.  Indeed, after consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in these Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (ii) the substantial increases in claims that would be satisfied on a priority basis, the Debtors have determined that Confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtors under Chapter 7.  Specifically, because of, among other things, (i) the increased costs and expenses of liquidation under Chapter 7 arising from any fees payable to a bankruptcy trustee (up to three percent (3%) of total proceeds) and the attorneys and other professionals such trustee might retain, (ii) the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under Chapter 7 and the "fire sale" atmosphere that would prevail, especially in connection with any as yet unsold liquor licenses that could expire or be terminated in Chapter 7, and (iii) the time and expenses that would be incurred in order for any Chapter 7 trustee to acquire the same expertise and familiarity that the Liquidating Trustee (i.e., CRG, which has served as the Debtors' restructuring advisors and provided the Debtors' Chief Restructuring Officer during these Chapter 11 Cases) already possesses, the Debtors believe that the net liquidation proceeds that will be generated by the Liquidating Trustee should exceed those generated in Chapter 7.  Accordingly, the Debtors have determined that Confirmation of the Plan will provide each Holder of a Claim or Equity Interest in an impaired Class with a recovery that is greater than or equal to what such Holder would receive pursuant to a Chapter 7 liquidation of the Debtors.

        Thus, the Debtors believe that the value of any distributions to each Class of Allowed Claims if these Chapter 11 Cases were converted to Chapter 7 cases, would likely be less than the value of distributions under the Plan because such distributions in a Chapter 7 case would not occur for a substantial period of time.  In the event litigation was necessary to resolve claims asserted in a Chapter 7 case, the delay could be prolonged and administrative expenses increased.  Attached hereto as Exhibit B is a hypothetical distribution analysis prepared by the Debtors and CRG.  For the reasons set forth above in this section and in Exhibit B, the Debtors and CRG believe that any recoveries by a Chapter 7 trustee would be lower than those by the Liquidating Trustee under the Plan.  Specifically, they believe that the recoveries by a Chapter 7 Trustee would likely be closer to the "Low End" or "Mid Point" valuations set forth on the hypothetical distribution analysis, while the Liquidating Trustee should be more likely to obtain recoveries consistent with the "Mid Point" or "High End" valuations thereon, a difference of potentially up to $3 million.

      C.      **Feasibility**

Bankruptcy Code § 1129(a)(11) provides that a Chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Because the Plan provides for the liquidation of the Debtors, the Bankruptcy Court should find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing these Chapter 11 Cases. Thus, the Debtors believe that the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.

D.      **Classification of Claims and Equity Interests Under the Plan**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a Chapter 11 plan place each claim or interest into a class with other claims or interests that are "substantially similar". The Plan establishes Classes of Claims and Equity Interests as required by the Bankruptcy Code and summarized in the Plan. Administrative Expense Claims (as well as Professional Fee Claims) and Priority Tax Claims are not classified.

E.      **Confirmation of the Plan If a Class Does Not Accept the Plan**

The Bankruptcy Code contains provisions for confirmation of a Chapter 11 plan, even if it is not accepted by all impaired classes, as long as it is accepted by at least one impaired class of claims. A Chapter 11 plan may be confirmed under the so-called "cramdown" provisions set forth in Bankruptcy Code § 1129(b) if, in addition to satisfying the other requirements for confirmation, the Chapter 11 plan is determined to be "fair and equitable" and "does not discriminate unfairly" with respect to each class of claims or interests that has not accepted the Chapter 11 plan.

The fair and equitable standard, also known as the "absolute-priority rule", requires that a dissenting class receive full compensation for its allowed claim before any junior class receives or retains any property under a Chapter 11 plan. If the holders of any impaired class vote to reject a Chapter 11 plan, it may be confirmed under Bankruptcy Code § 1129(b) if all holders of claims and interests junior to those of the impaired class do not receive or retain any property under the Chapter 11 plan.

Under the Plan, Class 5 (Intercompany Claims) and Class 6 (Equity Interests) are deemed to reject the Plan. However, the Debtors believe that the Plan can be confirmed over the deemed rejection of Classes 5 and 6 because (i) no Class junior to Class 5 or 6 is receiving or retaining any property under the Plan, (ii) no Class of equal rank to Class 5 or 6 is being afforded better treatment than Class 5 or 6, and (iii) the Intercompany Claims in Class 5 and the Equity Interests held by members of Class 6 are valueless, given the amount of Allowed Claims compared to the value of the Debtors' remaining assets.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT

THE REQUIREMENTS OF BANKRUPTCY CODE § 1129(b) HAVE BEEN SATISFIED. The Debtors reserve the right to file supplemental pleadings in the event any of Class 1, Class 2, or Class 4 votes to reject the Plan.

     F.    **Confirmation Hearing**

        Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing to consider confirmation of a Chapter 11 plan under Bankruptcy Code 1129.  The Confirmation Hearing is currently scheduled for [_____ __, 2012 at __:00 __.m.] (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Mary F. Walrath, United States Bankruptcy Court Judge.  The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned confirmation hearing.

        Bankruptcy Code § 1128(b) provides that any party-in-interest may object to confirmation of a Chapter 11 plan.  Any objection to Confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector and the nature and amount of Claims or Equity Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and be filed with the Bankruptcy Court and served upon the Debtors, CB Holding Corp., 1450 Route 22 West, Mountainside, New Jersey 07092, Attn:  Mr. Gary Lembo, with a copy to (a) counsel to the Debtors, Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005, Attn:  Joel H. Levitin, Esq., Stephen J. Gordon, Esq., Richard A. Stieglitz Jr., Esq., and Maya Peleg, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, Esq., Christopher M. Samis, Esq., and Tyler D. Semmelman, Esq.; (b) the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2313, Lockbox 35, Wilmington, Delaware 19801, Attn: Juliet Sarkessian, Esq.; (c) counsel to the Creditors Committee, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 11th Floor, Los Angeles, California 90067, Attn: Jeffrey N. Pomerantz, Esq., and 919 North Market Street, 17th Floor, Wilmington, Delaware 19899-8705, Attn: Bradford J. Sandler, Esq.; and (d) counsel to the Administrative Agent, Vedder Price P.C., 222 N. LaSalle Street, Suite 2600, Chicago, Illinois 60601, Attn: Douglas J. Lipke, Esq., and Jonathan E. Aberman, Esq., so as to be **ACTUALLY RECEIVED** no later than [_____ __,] 2012, at 4:00 p.m. (prevailing Eastern Time).

        Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

        At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of Bankruptcy Code § 1129 have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court may enter the Confirmation Order.

## VIII.   CONCLUSION AND RECOMMENDATION

The Debtors, the Administrative Agent, and the Creditors Committee each believe that Confirmation and Consummation of the Plan are preferable to any of the alternatives described herein and allow for the effectuation of the Lenders/Committee Resolution as well as the Unsecured Creditor Settlement.  The Debtors have also determined that Confirmation and Consummation of the Plan will provide all Creditors holding Allowed Claims with a recovery greater than or equal to what they would receive if the Debtors were liquidated under Chapter 7; any other alternative would cause significant delay and uncertainty, as well as substantial additional administrative costs that would reduce the value of potential recoveries thereunder. Thus, the Debtors, the Administrative Agent, and the Creditors Committee each recommend Confirmation and Consummation of the Plan.

[remainder of page intentionally left blank]

Dated:  January 4, 2012                    CB HOLDING CORP.,

                                           Debtor and Debtor-in-Possession (for itself and the
                                           other Debtors and Debtors-in-Possession)


                                    By:    /s/ Gary Lembo_____
                                           Gary Lembo
                                           Chief Restructuring Officer

## EXHIBIT A

**The Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CB HOLDING CORP., et al.,[1] | ) | Case No. 10-13683 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DEBTORS' MODIFIED FIRST AMENDED JOINT PLAN OF LIQUIDATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The other Debtors, and the last four digits of each of their tax identification numbers, are: 1820 Central Park Avenue Restaurant Corp. (5151); Bugaboo Creek Acquisition, LLC (4629); Bugaboo Creek Holdings, Inc. (0966); Bugaboo Creek of Seekonk, Inc. (1669); CB Holding Corp. (8640); CB VII, Inc. (9120); CB VIII, Inc. (1468); Charlie Brown North (6721); Charlie Brown's Acquisition Corp. (8367); Charlie Brown's at Clifton, Inc. (7309); Charlie Brown's Mark Corp. (3569); Charlie Brown's Montclair, Inc. (4223); Charlie Brown's 1981, Inc. (7781); Charlie Brown's of Allentown, L.L.C. (8420); Charlie Brown's of Alpha, Inc. (9083); Charlie Brown's of Berwyn, LLC (3347); Charlie Brown's of Blackwood, L.L.C. (5698); Charlie Brown's of Bloomsburg, LLC (3326); Charlie Brown's of Brielle, Inc. (8115); Charlie Brown's of Carlstadt, Inc. (6936); Charlie Brown's of Chatham, Inc. (2452); Charlie Brown's of Commack LLC (4851); Charlie Brown's of Denville, Inc. (1422); Charlie Brown's of East Windsor, LLC (2747); Charlie Brown's of Edison, Inc. (8519); Charlie Brown's of Egg Harbor Twp., LLC (none); Charlie Brown's of Franklin, LLC (5232); Charlie Brown's of Garden City, LLC (7440); Charlie Brown's of Hackettstown, L.L.C. (7493); Charlie Brown's of Harrisburg, LLC (1085); Charlie Brown's of Hillsborough, Inc. (0344); Charlie Brown's of Holtsville, LLC (0138); Charlie Brown's of Jackson, LLC (3478); Charlie Brown's of Lacey, L.L.C. (6282); Charlie Brown's of Lakewood, Inc. (0156); Charlie Brown's of Langhorne, LLC (3392); Charlie Brown's of Lynbrook LLC (2772); Charlie Brown's of Maple Shade, Inc. (0404); Charlie Brown's of Matawan, Inc. (8337); Charlie Brown's of Middletown LLC (7565); Charlie Brown's of Oradell, Inc. (0348); Charlie Brown's of Pennsylvania, Inc. (6918); Charlie Brown's of Piscataway, LLC (8285); Charlie Brown's of Reading, LLC (1214); Charlie Brown's of Scranton, LLC (9817); Charlie Brown's of Selinsgrove, LLC (6492); Charlie Brown's of Springfield, LLC (9892); Charlie Brown's of Staten Island, LLC (1936); Charlie Brown's of Tinton Falls, Inc. (6981); Charlie Brown's of Toms River, LLC (5492); Charlie Brown's of Union Township, Inc. (8910); Charlie Brown's of Trexlertown, LLC (6582); Charlie Brown's of Wayne, Inc. (4757); Charlie Brown's of West Windsor, Inc. (0159); Charlie Brown's of Williamsport LLC (8218); Charlie Brown's of Woodbury, Inc. (0601); Charlie Brown's of York, LLC (0980); Charlie Brown's of Yorktown, LLC (7855); Charlie Brown's Restaurant Corp. (7782); Charlie Brown's Steakhouse Fishkill, Inc. (9139); Charlie Brown's Steakhouse Woodbridge, Inc. (1906); Charlie Brown's, Inc. (4776); Jonathan Seagull Property Corp. (7248); Jonathan Seagull, Inc. (9160); The Office at Bridgewater, Inc. (3132); The Office at Cranford, Inc. (3131); The Office at Keyport, Inc. (1507); The Office at Montclair, Inc. (3128); The Office at Morristown, Inc. (3127); The Office at Ridgewood, Inc. (2949); The Office at Summit, Inc. (3126); and What's Your Beef V, Inc. (4719). The Debtors' address is 1450 Route 22 West, Mountainside, NJ 07092.

| CAHILL GORDON & REINDEL LLP | RICHARDS, LAYTON & FINGER, P.A. |
|---|---|
| Joel H. Levitin | Mark D. Collins (No. 2981) |
| Stephen J. Gordon | Christopher M. Samis (No. 4909) |
| Richard A. Stieglitz Jr. | Tyler D. Semmelman (No. 5386) |
| Maya Peleg | One Rodney Square |
| Eighty Pine Street | 920 North King Street |
| New York, New York  10005 | Wilmington, Delaware 19801 |
| Telephone:  (212) 701-3000 | Telephone:  (302) 651-7700 |
| Facsimile:  (212) 269-5420 | Facsimile:  (302) 651-7701 |

*Attorneys for the Debtors and Debtors-in-Possession*

January 4, 2012

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

### ARTICLE I.
### DEFINITIONS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    Rules of Interpretation, Computation of Time, and Governing Law..................................1
B.    Defined Terms ...........................................................................................................2

### ARTICLE II.
### ADMINISTRATIVE CLAIMS; DIP FACILITY CLAIMS; PRIORITY TAX CLAIMS

A.    Administrative Claims ...............................................................................................18
B.    DIP Facility Claims...................................................................................................19
C.    Priority Tax Claims...................................................................................................20

### ARTICLE III.
### CLASSIFICATION AND TREATMENT
### OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.    Summary...................................................................................................................20
B.    Treatment of Claims and Equity Interests ....................................................................21

### ARTICLE IV.
### IMPLEMENTATION OF THE PLAN AND THE LIQUIDATING TRUST

A.    Substantive Consolidation; Resignation of Directors and Managers; Issuance of
        One New Share in CB Holding..................................................................................24
B.    Funding of the Plan Fund to the Liquidating Trustee ....................................................27
C.    The Transfer of the Liquidating Trust Assets to the Liquidating Trust...........................27
D.    The Liquidating Trust ................................................................................................28
E.    Final Administration of the Liquidating Trust...............................................................36
F.    Dissolution of the Debtors; Closing of the CB Holding Chapter 11 Case........................36
G.    Preservation of Rights Regarding Avoidance Actions and of All other Causes of
        Action.....................................................................................................................37
H.    Cancellation of Notes, Instruments, Debentures, and Equity Interests............................39
I.    Dissolution of the Creditors Committee .......................................................................40
J.    Accounting................................................................................................................40
K.    Settlement with Respect to Fees, Costs, and the Plan by and Among the
        Administrative Agent, the Creditors Committee, the Second Lien Noteholders,
        and the Debtors .......................................................................................................40

### ARTICLE V.
### TREATMENT OF DISPUTED CLAIMS

A.    Objections to Claims; Prosecution of Disputed Claims..................................................41

B.   Estimation of Claims................................................................................... 41
C.   Interest and Distributions on Disputed Claims or any Other Claims that Become
     Allowed Claims After the Effective Date...................................................... 42

## ARTICLE VI.
## DISTRIBUTIONS

A.   Means of Cash Payment................................................................................ 42
B.   Delivery of Distributions .............................................................................. 42
C.   Undeliverable Distributions .......................................................................... 42
D.   Withholding and Reporting Requirements ..................................................... 43
E.   Time Bar to Cash Payments.......................................................................... 44
F.   Interest and Late Charges.............................................................................. 44
G.   Fractional Dollars; De Minimis Distributions ............................................... 44
H.   Set-Offs ....................................................................................................... 44
I.   Deadlines for Determining Record Holders of Various Classes of Claims...................... 45
J.   Allocation of Distributions ........................................................................... 45

## ARTICLE VII.
## EXECUTORY CONTRACTS AND SIMILAR MATTERS

A.   Rejection of Executory Contracts ................................................................. 45
B.   Rejection Damages Claim............................................................................. 46
C.   Classification of Claims Related to Executory Contracts................................ 46
D.   Insurance Policies ........................................................................................ 47
E.   Compensation and Benefits Programs ........................................................... 48
F.   Return of Deposits by Utility Companies ...................................................... 48

## ARTICLE VIII.
## ACCEPTANCE OR REJECTION OF THE PLAN

A.   Acceptance by Impaired Classes ................................................................... 49
B.   Elimination of Classes ................................................................................. 49
C.   Nonconsensual Confirmation........................................................................ 49

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND THE EFFECTIVE DATE

A.   Conditions Precedent to the Confirmation Date of the Plan............................ 49
B.   Conditions Precedent to the Effective Date of the Plan.................................. 50
C.   Waiver of Conditions Precedent ................................................................... 50

## ARTICLE X.
## EFFECT OF PLAN CONFIRMATION

A.   Settlement of Claims.................................................................................... 50
B.   General Plan Injunction ............................................................................... 51

C.    Terms of Existing Injunctions or Stays..................................................................... 52
D.    Exculpation ............................................................................................................... 52
E.    Releases by the Debtors and the Estates .................................................................. 53
F.    Releases by the Releasing Parties ........................................................................... 54
G.    Injunction Related to Releases.................................................................................. 55
H.    Limits to Release and Exculpation Provisions........................................................... 55
I.    Indemnification of Debtors' Officers and Directors.................................................... 56

ARTICLE XI.
MISCELLANEOUS

A.    Settlement of Claims and Controversies.................................................................... 56
B.    Payment of Statutory Fees ...................................................................................... 56
C.    Exemption from Securities Laws .............................................................................. 57
D.    Bankruptcy Code § 1146 Exemption ....................................................................... 57
E.    Books and Records ................................................................................................. 57
F.    Privileges as to Certain Causes of Action ................................................................ 58
G.    New Employee Agreements ..................................................................................... 58
H.    Unclaimed Property ................................................................................................. 59
I.    Business Day.......................................................................................................... 59
J.    Severability ............................................................................................................ 59
K.    Conflicts................................................................................................................. 59
L.    Evidence ................................................................................................................ 60
M.    Further Assurances................................................................................................. 60
N.    Notices .................................................................................................................. 60
O.    Filing of Additional Documents ................................................................................ 61
P.    Successors and Assigns.......................................................................................... 61
Q.    Exclusivity Period ................................................................................................... 61
R.    Section Headings .................................................................................................... 61
S.    Further Information.................................................................................................. 61

ARTICLE XII.
RETENTION OF JURISDICTION

ARTICLE XIII.
MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    Modification of Plan ................................................................................................ 64
B.    Revocation, Withdrawal, or Non-Consummation ....................................................... 64

CB Holding Corp. ("*CB Holding*") and the other above-captioned debtors and debtors-in-possession (collectively, and together with CB Holding, the "*Debtors*") hereby propose the following Modified First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a description of, among other things, the Debtors' Sales of their three primary operating divisions pursuant to Bankruptcy Code §§ 363 and 365, other key events that have occurred in their Chapter 11 Cases, and a summary and analysis of the Plan. **All Holders of Claims and Equity Interests are encouraged to review the Disclosure Statement and read the Plan carefully before those Holders eligible to vote on the Plan do so vote**.

## ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

**A.    Rules of Interpretation, Computation of Time, and Governing Law**

1.    For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and neutral gender; (b) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety, rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise provided for in the Plan, the rules of construction set forth in Bankruptcy Code § 102 shall apply; and (h) any term used in capitalized form in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules shall have the meaning assigned to such term in the Bankruptcy Code, the Bankruptcy Rules, and/or the Local Rules, as the case may be.

2.    Except as otherwise specifically set forth in the Plan, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) and/or Local Rule 9006-1 shall apply.

3.    Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture, or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

B.      **Defined Terms**

Unless the context otherwise requires, the following terms shall have the meanings ascribed to them below when used in capitalized form in the Plan:

1.      *Administrative Agent* means Ally Commercial Finance LLC, in its capacities as (i) one of the Pre-Petition Lenders and a participant in the financing provided under the Financing Agreement and (ii) administrative agent and collateral agent to the DIP Lender under the DIP Facility, and all successors and assigns thereof.

2.      *Administrative Claims* means the collective reference to all Claims for costs and expenses of administration of the Chapter 11 Cases with priority under Bankruptcy Code § 507(a)(2), costs and expenses allowed under Bankruptcy Code § 503(b) (including, without limitation, under Bankruptcy Code § 503(b)(9)), the actual and necessary costs and expenses of preserving the respective Estates of the Debtors and operating the respective businesses of the Debtors (prior to the closing of a particular Sale or portion thereof), any indebtedness or obligations incurred or assumed by any of the Debtors pursuant to Bankruptcy Code § 364 or otherwise (other than any DIP Facility Claims), and Professional Fee Claims of the Debtors' and the Creditors Committee's respective Professionals (including, without limitation, the expenses incurred by each member of the Creditors Committee in its capacity as such), in each case to the extent allowed by an order of the Bankruptcy Court under Bankruptcy Code § 330(a) or 331 or otherwise, and any fees or charges assessed against the respective Estates under 28 U.S.C. § 1930; *provided, however, that the Holder of an Administrative Claim (except for an Administrative Claim based upon (i) Professional Fee Claims, the allowance and timing for filing of applications for Professional Fees being governed by Section II.A(b) of the Plan), (ii) DIP Facility Claims, and (iii) fees or charges asserted against the respective Estates under 28 U.S.C. § 1930 must file a request for payment on or before the Administrative Claims Bar Date for such Administrative Claim to be eligible to be considered an Allowed Administrative Claim; provided further, however, that nothing in this Plan or the Confirmation Order shall require the Internal Revenue Service or any state or local taxing authorities to file a post-petition claim or request for payment for any tax obligations that arose after the Petition Date prior to the Administrative Claims Bar Date.*

3.      *Administrative Claims Bar Date* means the deadline for timely filing any Administrative Claims incurred through and including the Confirmation Date, other than DIP Facility Claims, Professional Fee Claims, claims of governmental units for the payment of an expense described in Bankruptcy Code § 503(b)(1)(B) or (C) and the Internal Revenue Service or any state or local taxing authorities for tax obligations that arose after the Petition Date, or fees or charges asserted against the respective Estates under 28 U.S.C. § 1930, *which deadline shall be 4:00 P.M. (prevailing Eastern time) on the date that is 30 days after the Confirmation Date*.

4.      *Affiliate Debtors* means all of the Debtors other than CB Holding.

5.      *Allowance Date* means, with reference to a particular Claim, the date on which such Claim becomes an Allowed Claim; *provided, however, that, if a Claim becomes an*

Allowed Claim pursuant to an order of the Bankruptcy Court, the Allowance Date shall be the date on which such order becomes a Final Order, and if a Claim becomes an Allowed Claim pursuant to the Plan, the Allowance Date shall be the Effective Date.

6.     *Allowed* means, except as otherwise set forth in the Plan, with reference to a Claim:  (a) any Claim against a Debtor that has been listed by such Debtor in the Schedules filed by such Debtor as liquidated in an amount greater than zero dollars ($0.00) and not disputed or contingent and (i) for which no Proof of Claim has been filed in a greater amount and/or (ii) as to which no objection has been interposed by the Claim Objection Deadline; (b) any Claim as to which a Proof of Claim has been timely filed and (i) no objection to the allowance thereof has been interposed by the Claim Objection Deadline, and (ii) such Claim has not (as applicable) been withdrawn, paid in full, or otherwise deemed satisfied in full (pursuant to an order of the Bankruptcy Court or otherwise); (c) any Claim as to which an objection has been filed, and a Final Order has been entered in favor of the respective Claim Holder with respect to all or any portion of such Claim, or any such objection has been settled, waived through payment, or withdrawn; (d) any Claim that has otherwise been allowed by a Final Order; (e) any Claim as to which, upon the lifting of the automatic stay pursuant to Bankruptcy Code § 362, the liability of a Debtor, allowance, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (f) with respect to any Administrative Claim for goods or services provided to the Debtors during the Chapter 11 Cases in the ordinary course of the Debtors' businesses by non-Professionals, such Administrative Claim has not been withdrawn, paid, otherwise satisfied in full (pursuant to an order of the Bankruptcy Court or otherwise in the ordinary course of the Debtors' businesses), or otherwise deemed satisfied in full in the ordinary course of the Debtors' businesses; or (g) any Claim that is expressly deemed an Allowed Claim under the Plan or in the discretion of the Liquidating Trustee (subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement).  Except for the DIP Facility Claims, and unless otherwise ordered by the Bankruptcy Court prior to Confirmation, or as specifically set forth to the contrary in the Plan with respect to any particular Claim, an "Allowed" Claim shall not, for any purpose under the Plan, include (i) any interest on such Claim to the extent accruing or maturing on or after the Petition Date, (ii) punitive or exemplary damages, (iii) any fine, penalty, or forfeiture, or (iv) any Claim relating to any unused vacation pay or time asserted by a former employee of any of the Debtors that is not an Allowed Vacation Claim.

7.     *Allowed Vacation Claim* means any Allowed Claim of a present or former employee of any of the Debtors for or relating to unused vacation pay or time either (i) for which a Proof of Claim was properly Filed on or prior to the Bar Date or (ii) such Claim was listed on the Schedules not as contingent, unliquidated, or disputed.  Any Allowed Vacation Claim shall constitute an Allowed Other Priority Claim for all purposes under the Plan.

8.     *Asset Purchase Agreements* means the respective asset purchase or similar sale agreements (including those for the transfer of liquor licenses or sale of closed restaurant locations) entered into by the Debtors in connection with the Sales, as approved by the Bankruptcy Court pursuant to the Sale Orders.

9.     *Assets* means all of the remaining right, title, and interest of any of the Debtors in and to any and all assets and property, whether tangible, intangible, real, or personal, that constitute property of the Debtors' respective Estates within the purview of Bankruptcy Code § 541, including, without limitation, any and all claims, Causes of Action, and/or rights of the respective Debtors under federal and/or state law; provided, however, that the property sold or to be sold pursuant to the Asset Purchase Agreements and the Sale Orders (to the extent the underlying Sales or applicable portions thereof have closed) shall not constitute Assets.

10.     *Avoidance Actions* means any and all rights to recover or avoid transfers or liens under Chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code § 506(d), 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, or 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not litigation has been commenced as of the Effective Date to prosecute such Avoidance Actions; subject, however, to any releases thereof provided in the Plan, the Confirmation Order, the DIP Facility Order, or any other Final Order of the Bankruptcy Court.

11.     *Ballot* means the form of ballot to be distributed to each Holder of a Claim in Class 1, 2, or 4 (as applicable), on which such Holder is to indicate either an acceptance or a rejection of the Plan.

12.     *Bankruptcy Code* means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time.

13.     *Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware.

14.     *Bankruptcy Rules* are, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended from time to time, and the Federal Rules of Civil Procedure, as amended from time to time, as made applicable to the Chapter 11 Cases.

15.     *Bar Date* means October 10, 2011, the deadline established by the Bankruptcy Court for timely filing Proofs of Claim (including any purported claims under Bankruptcy Code § 503(b)(9)).

16.     *Books and Records* shall have the meaning ascribed thereto in Section XI.E of the Plan.

17.     *Bugaboo Creek* means the Debtors' former operating division known as Bugaboo Creek Steak House.

18.     *Business Day* means any day other than a Saturday, Sunday, "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in Wilmington, Delaware, are authorized or required by law to close.

-4-

19.    *Cash* means legal tender of the United States of America or equivalents thereof.

20.    *Causes of Action* means the Avoidance Actions and all other claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or any Estate against any Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted; provided, however, that Causes of Action shall not include any rights, claims, or causes of action of the Debtors that constitute assets acquired by the applicable Purchasers pursuant to the Asset Purchase Agreements; and subject, however, to any releases provided in the Plan, the Confirmation Order, the DIP Facility Order, or any other Final Order of the Bankruptcy Court.

21.    *CB Holding Chapter 11 Case* means the Chapter 11 Case of CB Holding.

22.    *Chapter 11 Case(s)* means the case(s) commenced under Chapter 11 of the Bankruptcy Code by the Debtor(s) on the Petition Date currently pending before the Bankruptcy Court.

23.    *Charlie Brown's* means the Debtors' former operating division known as Charlie Brown's Steakhouse.

24.    *Chief Restructuring Officer* means Mr. Gary Lembo, a managing director of CRG, in his capacity as the Debtors' Chief Restructuring Officer, and/or any successor in such capacity.

25.    *Claim* means a "claim" (as defined in Bankruptcy Code § 101(5)) against one or more of the Debtors, including, but not limited to, any right to payment from one or more of the Debtors or otherwise relating to or arising from any of the Debtors' Assets, liabilities, businesses, or activities, arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance arising, or with respect to which the obligation giving rise to such right has been incurred, before the Effective Date, if such breach gives rise to a right to payment from one or more of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

26.    *Claim Objection Deadline* means the date that is the later of (i) 60 days after the Effective Date or (ii) 60 days after a Claim is filed, as such deadline may be extended from time to time by the Bankruptcy Court.

27.    *Class* means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

28.     *Compensation and Benefits Programs* means any savings plans, profit-sharing plans, pension or retirement plans (including, but not limited to, any plans qualified under Internal Revenue Code § 401(a)), healthcare plans, disability plans, benefit plans, life, accidental death, and dismemberment insurance, and any similar plans maintained by any of the Debtors for the benefit of any of their employees at any time, but specifically excluding any Insurance Policies and the Vested Insurance Agreements or any collateral or security related thereto.

29.     *Confirmation* means the entry of the Confirmation Order by the Bankruptcy Court, subject to all of the conditions specified in Article IX of the Plan having been satisfied or waived pursuant to Section IX.C of the Plan.

30.     *Confirmation Date* means the date upon which the Confirmation Order is entered on the docket of the Bankruptcy Court.

31.     *Confirmation Hearing* means the hearing held by the Bankruptcy Court, pursuant to Bankruptcy Code § 1128, to consider Confirmation of the Plan, as the same may be adjourned or continued from time to time.

32.     *Confirmation Order* means the order of the Bankruptcy Court confirming the Plan.

33.     *Consummation* means the occurrence of the Effective Date.

34.     *Creditors Committee* means the committee of unsecured creditors appointed in the Chapter 11 Cases by the United States Trustee, pursuant to Bankruptcy Code § 1102, on or about December 1, 2010 (ECF No. 95), as constituted from time to time.

35.     *CRG* means CRG Partners Group, LLC, in its capacity as the Debtors' restructuring advisors and as having provided the Chief Restructuring Officer.

36.     *Debtor Releasees* collectively means:  the Debtors and their respective predecessors, successors, and assigns and each of their current and former officers and directors, employees, stockholders, members, subsidiaries, affiliates, principals, agents, advisors, financial advisors, attorneys, accountants, investment bankers, consultants, underwriters, appraisers, representatives, and other Professionals, in each case in their respective capacities as such, and any Person claimed to be liable derivatively through any such Person, <u>other</u> <u>than</u> Messrs. Michael Mulligan, Russell D'Anton, and Michael D'Anton and their respective family members or relatives or any entity in which they may have an ownership, partnership, shareholder, membership, pecuniary, or other interest and except as otherwise set forth in the Plan.

37.     *Debtors' Releases* shall have the meaning ascribed thereto in Section X.E of the Plan.

38.     *DIP Facility* means the debtor-in-possession financing arrangement and financial accommodations between the Debtors and the DIP Facility Lender, as approved by the Bankruptcy Court pursuant to the terms and conditions set forth in the DIP Facility Order, as the

same has been (and may further be) modified, amended, or supplemented from time to time, together with (a) all of the documents, instruments, and agreements related thereto or entered into in connection therewith and (b) the DIP Facility Order and any subsequent orders of the Bankruptcy Court related thereto.

39.      *DIP Facility Claims* means all Claims of the DIP Facility Lender against the Debtors represented by, related to, arising under, or in connection with the DIP Facility for any outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of all payments made by any of the Debtors to the DIP Facility Lender prior to the Effective Date on account of such Claims (pursuant to the Sale Orders, the DIP Facility Order, any other order of the Bankruptcy Court, or otherwise).

40.      *DIP Facility Lender* means Ally Commercial Finance LLC, in its capacity as the lender under the DIP Facility, and all successors and assigns thereof.

41.      *DIP Facility Order* collectively means (i) the *Final Order (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364,* entered by the Bankruptcy Court on December 13, 2010 (ECF No. 177), and (ii) the *Order Amending Final Order (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364* (ECF No. 177)*,* entered by the Bankruptcy Court on March 9, 2011 (ECF No. 597), as the same may have been amended, modified, or supplemented by subsequent filings of budgets related thereto or otherwise.

42.      *D&O Claims* means the claims against certain of the Debtors' former officers and directors that are not otherwise released pursuant to the Plan (including in Article X of the Plan), including, but not limited to those claims asserted in the complaint filed in <u>Ableco Finance LLC vs. CB Holding Corp., *et al.*</u>, in the Supreme Court of the State of New York, New York County, as Case No. 650437/2010.

43.      *D&O Shared Proceeds* means fifty percent (50%) of the net proceeds (after litigation fees, costs, and expenses actually incurred) of the D&O Claims, including any insurance proceeds or restitution received in connection therewith or otherwise related thereto.

44.      *D&O Resolution Consideration* means the first $1 million of the D&O Shared Proceeds that is distributed to the Holders of Allowed General Unsecured Claims from the Liquidating Trust.

45.      *Disclosure Statement* means the disclosure statement and all supplements and exhibits thereto that relate to the Plan and are approved by the Bankruptcy Court pursuant to Bankruptcy Code § 1125, as the same has been and may be further amended or modified by the Debtors from time to time, pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable orders of the Bankruptcy Court.

46.     *Disputed Claim or Equity Interest* means a Claim or Equity Interest, or any portion thereof:  (i) listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been filed or (ii) that is the subject of an objection or request for estimation Filed by any of the Debtors or the Liquidating Trustee or any other party-in-interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.

47.     *Disputed Claims Reserve* shall have the meaning ascribed thereto in Section IV.D.1(h) of the Plan.

48.     *Dissolution* shall have the meaning ascribed thereto in Section IV.F.(a) of the Plan

49.     *Distribution Record Date* means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Bar Date.

50.     *Effective Date* means the Business Day on which the Plan becomes effective, as provided for in Article IX of the Plan.

51.     *Entity* means a Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint-stock company, a joint venture, an Estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, the United States Trustee, or any other entity.

52.     *Equity Interest* means any interest in any Debtor, including, without limitation, (i) a share or membership interest in a corporation or limited liability corporation, whether or not denominated "stock", "interest", or similar security, and whether or not issued, unissued, authorized, or outstanding, (ii) an interest of a limited partner in a limited partnership, (iii) an interest of a general partner in a general partnership, or (iv) a warrant, option, contract, or right to purchase, sell, or subscribe to a share, security, or interest of a kind specified or similar to those referenced in subsections (i), (ii), or (iii) of this definition, as well as (a) any rights to any dividends or distributions as a result of such ownership, and (b) any and all Claims (1) for damages arising from the rescission of the purchase or sale of any such interest or (2) for reimbursement or contribution allowed under Bankruptcy Code § 502 on account of such Claim, which Claims are subordinated pursuant to Bankruptcy Code § 510.

53.     *Estate(s)* means individually, the estate of each Debtor in the Chapter 11 Cases, and, collectively, the Estates of all of the Debtors in the Chapter 11 Cases, created pursuant to Bankruptcy Code § 541 upon commencement of the Chapter 11 Cases.

54.     *Estate Resolution Consideration* collectively means (1) the Office Resolution Consideration, (2) the Other Assets Resolution Consideration, and (3) the D&O Resolution Consideration.

55.     *Estate Shared Proceeds* collectively means (1) the Office Shared Proceeds, (2) the Sharing Percentage Recovery, and (3) the D&O Shared Proceeds.

56.     *Executory Contract* means any executory contract or unexpired lease, subject to Bankruptcy Code § 365, between any of the Debtors and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to the Plan and/or on or after the Petition Date.  For the avoidance of doubt, the Vested Insurance Agreements and the Insurance Policies shall not be deemed to constitute Executory Contracts for purposes of the Plan or the Confirmation Order.

57.     *File or Filed* means file or filed on the docket of the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

58.     *Financing Agreement* means that certain Agreement, dated as of July 21, 2007 (as amended or modified on February 29, 2008, September 26, 2008, and November 19, 2010), providing for a revolving line of credit and two tranches of term loans, by and among CB Holding Corp., Charlie Brown's Acquisition Corp., Charlie Brown's Inc., Bugaboo Creek Acquisition, LLC, Bugaboo Creek Holdings, Inc., and each subsidiary listed as a borrower on the signature pages thereto, as borrowers; the Pre-Petition Lenders from time to time party thereto, as lenders; Ableco Finance LLC, as the initial collateral agent; Wells Fargo Foothill, Inc., as the initial administrative agent; and GMAC Commercial Finance LLC, as the initial documentation agent, together with all documents, instruments, and agreements (including all intercreditor agreements) related thereto or entered into in connection therewith.

59.     *Final Decree(s)* means the order(s) and/or decree(s) closing the Chapter 11 Cases pursuant to Bankruptcy Rule 3022 or otherwise, which shall be the Confirmation Order for those of the Chapter 11 Cases to be closed on the Effective Date pursuant to Section IV.A(d) of the Plan.

60.     *Final Order* means an order or judgment entered by the Bankruptcy Court or other applicable court that has not been reversed or stayed and as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of *certiorari*, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed, or *certiorari* has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Bankruptcy Code § 502(j), Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules and/or the Local Rules may be, but has not then been, filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

61.     *Forfeited Distributions* means any undeliverable or unclaimed distributions on account of Administrative Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims that are deemed forfeited pursuant to Section VI.C.2 of the Plan.

62. *General Unsecured Claim* means any Claim against any of the Debtors other than a DIP Facility Claim, an Administrative Claim (including any Professional Fees Claims), a Secured Claim (including Senior Creditor Claims and Other Secured Claims), a Priority Tax Claim, an Other Priority Claim, any other Claim entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, an Intercompany Claim, or any Claims that constitute an Equity Interest. Without limiting the generality of the foregoing, General Unsecured Claims shall include Pre-Petition Lenders Deficiency Claims (subject to the terms and conditions of the Plan, including Section III.B.4(b) of the Plan), any Other Secured Claim Deficiency Claim, Rejection Claims and any and all other Claims relating to or arising from any Executory Contract being rejected pursuant to the Plan, and Subordinated Notes Claims. General Unsecured Claims shall not include Second Lien Note Deficiency Claims, which are deemed waived under the Plan in accordance with the Unsecured Creditor Settlement.

63. *Holder* means the owner of any Claim or Equity Interest, as such ownership is reflected on the Debtors' books and records, the Schedules, or any Proof of Claim.

64. *Impaired* means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of Bankruptcy Code § 1124.

65. *Indemnity Amount* shall have the meaning ascribed thereto in Section VIII.I of the Plan.

66. *Initial Distribution Date* means the date to be established by the Debtors and/or the Liquidating Trustee for distributions under the Plan first to be made or such other date as the Bankruptcy Court may order, which shall be no later than 90 days after the Effective Date for Allowed Administrative Claims and Allowed Other Priority Claims, or such later date as the Bankruptcy Court may order.

67. *Insurance Policies* means any and all insurance policies issued to, or entered into by, one or more of the Debtors providing coverage to one or more of the Debtors and/or the Debtors' current or former directors, officers, stockholders, agents, employees, representatives, predecessors, and others for conduct in connection in any way with the Debtors, their assets, liabilities, and/or operations.

68. *Intercompany Claim* means (a) any account reflecting intercompany book entries by one Debtor with respect to any other Debtor, or (b) any Claim that is not reflected in such book entries and is held by a Debtor against any other Debtor, in each case accruing before or after the Petition Date, including, but not limited to, any claim for reimbursement, payment as guarantor or surety, or any claim for contribution or expenses that were allocable between multiple Debtors.

69. *IRS* means the Internal Revenue Service.

70. *Lien* means any lien, security interest, or other charge or encumbrance against, or interest in, property of any kind or any other type of preferential arrangement, easement, right of

way, or other encumbrance on title to property to secure payment of a debt or performance of an obligation.

71.    *Liquidating Trust* means the grantor trust to be created on the Effective Date in accordance with the provisions of Section IV.D of the Plan and the Liquidating Trust Agreement.

72.    *Liquidating Trust Agreement* means the trust agreement that documents the powers, duties, and responsibilities of the Liquidating Trustee, which agreement shall be Filed by the Plan Supplement Filing Date.

73.    *Liquidating Trust Assets* means the Transferred Property on and after the Effective Date and any proceeds thereof held by the Liquidating Trust from time to time.

74.    *Liquidating Trustee* shall have the meaning ascribed thereto in Section IV.D.1(a) of the Plan.

75.    *Liquidating Trust Professionals* shall have the meaning ascribed thereto in Section IV.D.1(f) of the Plan.

76.    *Local Rules* means the Local Bankruptcy Rules for the District of Delaware, effective February 1, 2010, as amended from time to time, and applicable in these Chapter 11 Cases.

77.    *Mountainside Landlord* means ASC Mountainside Realty, LLC, as the landlord under the Mountainside Office Lease, and its successors and assigns thereunder.

78.    *Mountainside Letter Agreement* means that certain letter agreement, dated as of July 20, 2011, by and between Charlie Brown's Acquisition Corp., as tenant, and the Mountainside Landlord, as landlord, pertaining to, among other things, the termination of the Mountainside Office Lease.

79.    *Mountainside Office Lease* means that certain lease by and between Debtor Charlie Brown's Acquisition Corp., as tenant, and the Mountainside Landlord, as landlord, for certain office premises located at 1450 Route 22 West in Mountainside, New Jersey.

80.    *New CB Holding Share* shall have the meaning ascribed thereto in Section IV.A.(c) of the Plan.

81.    *Non-Released Parties* means any Entity that is not a Released Party.

82.    *Notes* collectively means the Second Lien Notes and the Subordinated Notes.

83.    *The Office* means the Debtors' former operating division known as The Office Beer Bar & Grill.

84.    *Office Resolution Consideration* means the first $125,000 of the proceeds from the Office Shared Proceeds that is distributed to the Holders of Allowed General Unsecured Claims from the Liquidating Trust.

85.    *Office Shared Proceeds* means (a) the first $125,000, plus (b) 5% of the net proceeds (after costs of sale) from the Sale of The Office in excess of $2.5 million.

86.    *Other Assets Resolution Consideration* means (a) the first $125,000, plus (b) the first $125,000 of the Sharing Percentage Recovery that is distributed to the Holders of Allowed General Unsecured Claims from the Liquidating Trust.

87.    *Other Priority Claim* means any Claim accorded priority in right of payment under Bankruptcy Code § 507(a), other than a Priority Tax Claim or an Administrative Claim.

88.    *Other Secured Claim* means a Secured Claim other than the Pre-Petition Lender Secured Claims, the Second Lien Notes Secured Claims, and the DIP Facility Claims.

89.    *Other Secured Claim Deficiency Claim* means that portion of the Claim held by the Holder of an Other Secured Claim that exceeds the value of such Holder's interest in the Debtors' interest in such Holder's collateral.

90.    *Oversight Committee* shall have the meaning ascribed thereto in Section IV.D.1(g) of the Plan.

91.    *Person* means a "person" as defined in Bankruptcy Code § 101(41).

92.    *Petition Date* means November 17, 2010.

93.    *Plan* means the *Debtors' Modified First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code,* including, without limitation, any exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be amended, modified, altered, or supplemented from time to time in accordance with the terms and provisions of the Plan or of the Confirmation Order.

94.    *Plan Fund* means an aggregate amount equal to $1,777,000 plus any budgeted amounts not paid prior to the Effective Date or such other amount that may be agreed to by the Debtors, the Administrative Agent, and the Creditors Committee at any time up until the Confirmation Date.  In the event the Debtors, the Administrative Agent, and the Creditors Committee agree prior to the Confirmation Date that the Plan Fund shall be less than such amount, the Debtors shall File a notice indicating such lower amount.

95.    *Plan Supplement* means the supplement to the Plan that contains the form of the Liquidating Trust Agreement and certain related documents, which will be filed on or before the Plan Supplement Filing Date.

96.    *Plan Supplement Filing Date* means the date by which the Plan Supplement and any exhibits or Plan schedules not Filed with the Plan shall be Filed as required by order of the Bankruptcy Court.

97.    *Pre-Petition Lenders* means the lenders under the Financing Agreement.

98.    *Pre-Petition Lenders Claims* means all Claims of the Pre-Petition Lenders against any of the Debtors represented by, related to, arising under, or in connection with the Financing Agreement (including all guaranties issued in connection therewith), for any and all outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of all payments or other distributions made by any of the Debtors to the Pre-Petition Lenders prior to the Effective Date on account of such Claims (pursuant to the Sale Orders, the DIP Facility Order, any other Final Order of the Bankruptcy Court, or otherwise).

99.    *Pre-Petition Lenders Deficiency Claims* means that portion of the Pre-Petition Lenders Claims that are not the Pre-Petition Lenders Secured Claims.

100.    *Pre-Petition Lenders Secured Claims* means that portion of the Pre-Petition Lenders Claims that are Secured Claims.

101.    *Preserved Collateral* means all remaining unliquidated property of the Debtors that they provided as collateral pursuant to the Financing Agreement and/or the related secured credit facility or the DIP Facility; provided, however, the Preserved Collateral shall not include any property that is the subject of any of the Sales or any other sale or transfer approved pursuant to an order of the Bankruptcy Court or with respect to which a motion seeking Bankruptcy Court approval of such sale or transfer is pending as of the Effective Date.

102.    *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in Bankruptcy Code §§ 502(i) and 507(a)(8).

103.    *Privilege* means all attorney-client privileges, work-product protections, common interest, joint defense, and other immunities or protections from disclosure held by the Debtors or other parties, as applicable.

104.    *Professional* means any professional or other Entity that (a) has been retained in the Chapter 11 Cases by a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Code §§ 327, 328, 363, or 1103 or otherwise, including, but not limited to, Cahill Gordon & Reindel LLP; Richards, Layton & Finger, P.A.; Pachulski Stang Ziehl & Jones LLP; Raymond James & Associates, Inc.; Hilco Real Estate, LLC; J.H. Cohn LLP; and CRG Partners Group, LLC, or (b) seeks compensation or reimbursement of expenses in connection with the Chapter 11 Cases, pursuant to Bankruptcy Code § 503(b)(4).

105.    *Professional Fee Claim* means (a) a claim under Bankruptcy Code §§ 327, 328, 330, 331, 363, 503(b), 1103, or 1106 for compensation for services rendered or expenses incurred prior to the Effective Date on the Estates' behalf by a Professional; or (b) a claim under Bankruptcy Code § 503(b)(4) for compensation for professional services rendered.

-13-

106.    *Professional Fee Bar Date* shall have the meaning ascribed thereto in Section II.A.(b) of the Plan.

107.    *Professional Fee Escrows* shall have the meaning ascribed thereto in Section II.A.(b) of the Plan.

108.    *Proof of Claim* means any written statement timely and properly completed and filed in the Chapter 11 Cases, in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and/or any applicable order of the Bankruptcy Court by a Creditor in which such Creditor sets forth the amount purportedly owed and sufficient detail to identify the basis for a Claim.

109.    *Pro Rata* means proportionately, so that with respect to an Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of a particular Allowed Claim to (ii) the amount of that particular Allowed Claim is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class in which the particular Allowed Claim is included to (ii) the amount of all Allowed Claims in that Class.

110.    *Purchaser(s)* means the purchaser(s) under the respective Asset Purchase Agreement(s).

111.    *Rejected Contract Claim Bar Date* means the date that is *30 days after the date of filing and service of a notice of the occurrence of the Effective Date*, which notice shall state the deadline by which Rejection Claims must be filed.

112.    *Rejection Claim* means any Claim for amounts due as a result of the rejection of any Executory Contract pursuant to Bankruptcy Code § 365 that is rejected by the Debtors under Article VII of the Plan, *which Claim must be filed by the Rejected Contract Claim Bar Date*.

113.    *Released Parties* means all Entities, including all Debtor Releasees and all Third-Party Releasees, granted a release by the Debtors in Section X.E of the Plan or by the Releasing Parties in Section X.F of the Plan.

114.    *Releasing Parties* collectively means all Released Parties (including the DIP Facility Lender, the Administrative Agent, the Pre-Petition Lenders, the Creditors Committee, the Second Lien Noteholders, and all other Debtor Releasees and Third-Party Releasees) and each and every other Person that has held, holds, or may hold a Claim or Equity Interest that votes to accept the Plan.

115.    *Sale Closing Date* means the date that all components of a particular Sale or a portion thereof fully closes in accordance with the terms of the applicable Sale Order and Asset Purchase Agreement.

116.    *Sales* collectively means all of the Debtors' sales of assets under the terms of the applicable Sale Orders, including liquor license sales, closed restaurant location sales, and the

-14-

sales of substantially all of the respective assets of The Office, Bugaboo Creek, and Charlie Brown's or any portion thereof.

117.    *Sale Orders* collectively means all of the orders of the Bankruptcy Court granting the Debtors' respective motions seeking approval of Asset Sales pursuant to Bankruptcy Code § 363, including liquor license sales, closed restaurant location sales, and the sales of substantially all of the respective assets of (i) The Office, dated January 20, 2011 (ECF No. 468); (ii) Bugaboo Creek, dated March 11, 2011 (ECF No. 614); and (iii) Charlie Brown's, dated April 11, 2011 (ECF No. 710).

118.    *Schedules* means the respective schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors in accordance with Bankruptcy Code § 521 and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended.

119.    *Second Lien Notes Claims* means all Claims of the Second Lien Noteholders against any of the Debtors represented by, related to, arising under, or in connection with the Second Lien Notes (including all guaranties issued in connection therewith), for any and all outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of all payments or other distributions made by any of the Debtors to the Second Lien Noteholders prior to the Effective Date on account of such Claims.

120.    *Second Lien Notes Deficiency Claims* means that portion of the Second Lien Notes Claims that are not the Second Lien Notes Secured Claims.

121.    *Second Lien Note Issuers* means CB Holding Corp., Charlie Brown's Acquisition Corp., Charlie Brown's Inc., Bugaboo Creek Acquisition, LLC, Bugaboo Creek Holdings, Inc., and each other issuer party to the Second Lien Note Purchase Agreement, in their capacity as the issuers thereunder.

122.    *Second Lien Note Purchase Agreement* means that certain Second Lien Note Purchase Agreement, dated as of September 26, 2008, by and between Trimaran Fund II, L.L.C., Trimaran Parallel Fund II, L.P., Trimaran Capital, L.L.C., CIBC Employee Private Equity Fund (Trimaran) Partners, and CIBC Capital Corp., as the initial note purchasers, and the Second Lien Note Issuers, as issuers, to acquire up to $12.5 million in principal face amount of Senior Subordinated Second Lien Notes, together with all documents, instruments, and agreements related thereto or entered into in connection therewith.

123.    *Second Lien Noteholders* collectively means the Holders of the Second Lien Notes, in whatever capacity.

124.    *Second Lien Notes* means the Senior Subordinated Second Lien Notes due December 21, 2012, issued by the Second Lien Note Issuers under the Second Lien Note Purchase Agreement.

125.    *Second Lien Notes Secured Claims* means that portion (if any) of the Second Lien Notes Claims that are Secured Claims.

126.    *Secured Claim* means all Claims that are secured by a properly-perfected, valid, enforceable, and not otherwise avoidable Lien on property in which an Estate has an interest or that is subject to setoff under Bankruptcy Code § 553, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a) and, if applicable, Bankruptcy Code § 1129(b); provided, however, that if the Holder of a Secured Claim is entitled to and does timely elect application of Bankruptcy Code § 1111(b)(2), then such Holder's entire Claim shall be a Secured Claim to the extent such Claim is Allowed.

127.    *Senior Creditor Claims* collectively means all remaining and outstanding  (a) Pre-Petition Lender Secured Claims and (b) Second Lien Note Secured Claims.

128.    *Sharing Percentage Recovery* means the amount equal to 4% of the net proceeds from the sale or liquidation of the Estates (other than (i) the Sale of The Office, (ii) the D&O Claims, and (iii) Avoidance Actions) in excess of $4 million.

129.    *Subordinated Notes Claims* collectively means all Claims represented by, related to, arising under, or in connection with the Subordinated Notes and any and all guarantees issued with respect thereto.

130.    *Subordinated Notes* means the Senior Subordinated Notes due June 21, 2013, issued by the Subordinated Notes Issuers under the Subordinated Notes Purchase Agreement.

131.    *Subordinated Notes Issuers* means CB Holding Corp., Charlie Brown's Acquisition Corp., Charlie Brown's Inc., Bugaboo Creek Acquisition, LLC, Bugaboo Creek Holdings, Inc., and each other issuer party under the Subordinated Notes Purchase Agreement, in their capacity as the issuers thereunder.

132.    *Subordinated Notes Purchase Agreement* means that certain Note Purchase Agreement, dated as of June 21, 2007 (as amended on February 29, 2008, and on September 26, 2008), by and between Kohlberg Capital Corporation, as purchaser, and the Subordinated Notes Issuers, as issuers, for the purchase of $10 million in principal face amount of Senior Subordinated Notes, together with all documents, instruments, and agreements related thereto or entered into in connection therewith.

133.    *Sysco 503(b)(9) Claims* means any and all Claims of Sysco Corporation and its affiliates against the Estates under Bankruptcy Code § 503(b)(9) (subject to all applicable offsets for Avoidance Actions or other available offsets, affirmative defenses, and any other defenses and objections with respect thereto).

134.    *Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

-16-

135.    *Third-Party Releasees* collectively means:  (a) the Pre-Petition Lenders and the DIP Facility Lender, solely in their respective capacities as such; (b) the Administrative Agent, solely in its capacity as such; (c) the Creditors Committee and the members thereof, solely in their respective capacities as such; (d) the Second Lien Noteholders; (e) with respect to each of the foregoing Persons, and except as otherwise set forth in the Plan, such Person's predecessors, successors, and assigns, and current and former directors, officers, employees, stockholders, members, subsidiaries, affiliates, principals, agents, advisors, financial advisors, attorneys, accountants, investment bankers, consultants, underwriters, appraisers, representatives, and other professionals, in each case in their respective capacities as such; and (f) any Person claimed to be liable derivatively through any Person referred to in clauses (a), (b), (c), (d), or (e) of this definition.

136.    *Transferred Causes of Action* means all Causes of Action, including, but not limited to, D&O Claims, that (i) have not been released in the Plan or pursuant to the Confirmation Order, the DIP Facility Order, or any other order of the Bankruptcy Court and (ii) do not otherwise constitute assets acquired by, or transferred to, any of the Purchasers or any other non-Debtor party prior to the Effective Date and the products and proceeds thereof.

137.    *Transferred Property* means, except as otherwise set forth in the Plan or in the Confirmation Order, (i) any and all Avoidance Actions and other Transferred Causes of Action and any products or proceeds thereof; (ii) the Office Shared Proceeds; (iii) the D&O Shared Proceeds (to the extent available); (iv) the Sharing Percentage Recovery; (v) the Plan Fund; and (vi) all other remaining unliquidated property and Assets of the Debtors or the Estates (including any Preserved Collateral), other than (a) any collateral securing an Other Secured Claim that is to be distributed to the Holder of such Claim in the manner provided in Section III.B.2 of the Plan, (b) any assets that were the subject of any of the Sales or any other sale or transfer approved pursuant to a Final Order of the Bankruptcy Court or was otherwise subject to a motion to sell or transfer pending as of the Effective Date, or (c) any other Assets that were otherwise previously duly transferred, sold, distributed, waived, abandoned, or disposed of as of the Effective Date.

138.    *Unimpaired* means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is not Impaired.

139.    *United States Trustee* means the United States Department of Justice, Office of the United States Trustee for Region 3.

140.    *Unsecured Creditor Settlement* shall have the meaning ascribed thereto in Section IV.K of the Plan.

141.    *Utility Companies* means those Persons who, in connection with the operation of the Debtors' businesses and the Debtors' management of their properties, supplied or provided electricity, water, sewer, telephone, communications, trash collection, and/or other services of this general character to any of the Debtors prior to the Effective Date.

142.   *Vested Insurance Agreements* means those agreements related to Insurance Policies to be set forth in a schedule or exhibit to be included in the Plan Supplement or otherwise filed with the Bankruptcy Court.

143.   *Voting Deadline* means the deadline established by the Bankruptcy Court as the last date to timely submit a Ballot for voting to accept or to reject the Plan.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS; DIP FACILITY CLAIMS; PRIORITY TAX CLAIMS**

**A.    Administrative Claims**

(a)    <u>Non-Professional Fee Administrative Claims</u>.  Other than the Holder of any Claim (including any Claim that could have otherwise potentially constituted an Allowed Administrative Claim against the Debtors but for the terms of any Sale Order, Asset Purchase Agreement, or management or other agreement entered into by the Debtors in connection with a Sale or otherwise) that the applicable Purchaser has agreed to satisfy, and is therefore obligated to pay, under the relevant Sale Order, Asset Purchase Agreement, or management or other agreement, each Holder of any then outstanding Allowed Administrative Expense Claim shall receive from the Plan Fund, or, in the case of any Allowed Sysco 503(b)(9) Claims, from the Estate Shared Proceeds (in each instance as set forth in Section IV.D.2(h)(2)(A) of the Plan), in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim (except to the extent that such Holder has agreed to a less favorable treatment of such Allowed Claim), Cash equal to the amount of such Allowed Claim on the later of (i) the Initial Distribution Date and (ii) the date that is 10 days after the Allowance Date of such Claim; <u>provided</u>, <u>however</u>, and without limiting the applicable Holder's obligation to file a properly-completed Proof of Claim prior to the Administrative Claims Bar Date with respect to any purported unpaid and outstanding Administrative Claim, Allowed Administrative Claims representing obligations incurred in the ordinary course of the Debtors' businesses shall be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements related thereto (including any sale or management agreement entered into in connection with a Sale or otherwise).  Notwithstanding anything to the contrary in the Plan, the applicable Purchaser shall pay or otherwise satisfy any Claim, including any Claim that could have otherwise potentially constituted an Allowed Administrative Claim against the Debtors but for the terms of the applicable Sale Order, Asset Purchase Agreement, or management or other agreement that it has agreed to pay under such order and/or agreement in the time and manner set forth therein or that otherwise became the obligation of a particular Purchaser upon the closing of the underlying Sale (or portion thereof).

(b)    <u>Professional Fee Claims</u>.  All Persons seeking an award by the Bankruptcy Court of Professional Fees shall be required to file their respective final applications for allowance of Professional Fees for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date (the "*Professional Fee Bar Date*") and, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, shall be paid in full from separate escrow accounts funded by a portion of the Plan Fund (in an amount to be determined by the Debtors, the Creditors Committee, and the Administrative Agent) (the "*Professional Fee*

Escrows"), in such amounts as are allowed by the Bankruptcy Court (A) within 10 days of the date upon which the order relating to any such Professional Fee Claim is entered or (B) upon such other terms as may be mutually agreed upon between the Holder of such Claim for Professional Fees and the Debtors.  Unless otherwise expressly set forth in the Plan, a Professional Fee Claim will be Allowed only if:  (i) on or before the Professional Fee Bar Date the entity holding such Professional Fee Claim files with the Court a final fee application and serves the application on counsel to the Debtors, counsel to the Creditors Committee, counsel to the Administrative Agent, the Liquidating Trustee, and the United States Trustee; and (ii) the Bankruptcy Court enters an order allowing the Claim.  *Entities holding Professional Fee Claims that do not timely file and serve a fee application by the Professional Fee Bar Date in the foregoing manner will be forever barred from asserting any such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trust Assets (including the Preserved Collateral), or the respective property thereof.*

Until all Professional Fee Claims have been Allowed, Disallowed, expunged, settled, resolved, or otherwise adjudicated pursuant to a Final Order of the Bankruptcy Court, the funds contained in the Professional Fee Escrows shall not be utilized for any purpose by the Liquidating Trustee or otherwise other than the payment of Allowed Professional Fee Claims. To the extent any funds remain in the Professional Fee Escrows after all Professional Fee Claims have been Allowed, Disallowed, expunged, settled, resolved, or otherwise adjudicated pursuant to a Final Order of the Bankruptcy Court and subsequently paid to the applicable Professional, the Liquidating Trustee may utilize such funds in a manner consistent with the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

In accordance with the Unsecured Creditor Settlement, notwithstanding anything to the contrary set forth in Paragraph 6 of the DIP Facility Order, the Professional Fee Claims of the Professionals retained by the Creditors Committee shall not exceed $250,000 (less amounts previously Allowed and paid to such Professionals in these Chapter 11 Cases).  To the extent the final Allowed Professional Fee Claims of the Professionals retained by the Creditors Committee are less than $250,000, the difference between the ultimately-Allowed amount and $250,000 shall be deemed to constitute Liquidating Trust Assets to be distributed to the beneficiaries of the Liquidating Trust in the manner set forth in the Plan and in the Liquidating Trust Agreement.  To the extent the final Allowed Professional Fee Claims of Professionals retained by the Creditors Committee exceeds $250,000, any such excess over $250,000 shall be paid from the Estate Resolution Consideration.

## B.    DIP Facility Claims

In full and final satisfaction, settlement, and release of, and in exchange for, any Allowed DIP Facility Claims, in accordance with Bankruptcy Code § 1129(a)(9), on the Effective Date, all funds in the possession of the Debtors other than any amounts that have been specifically earmarked and set aside for other purposes in these Chapter 11 Cases (including with respect to the Plan Fund, the Office Shared Proceeds, the Sharing Percentage Recovery, and the D&O Shared Proceeds), that constitute the proceeds of the collateral of the DIP Facility Lender shall be distributed to the Administrative Agent.  The Administrative Agent shall, after funding the

Plan Fund in accordance with Section IV.B of the Plan, distribute, upon reasonable prior notice to the Creditors Committee (to the extent practicable), in accordance with the terms of the DIP Facility Order, the Financing Agreement, the Plan, and the Confirmation Order, to the Holders of the Allowed DIP Facility Claims from (i) all such remaining funds and (ii) all sums previously paid by the Debtors to, or otherwise received by, the Administrative Agent pursuant to any of the DIP Facility Order, one or more of the Sale Orders, or any other applicable order of the Bankruptcy Court, the amount required to satisfy in full all then outstanding Allowed DIP Facility Claims.

In exchange for the foregoing treatment of Allowed DIP Facility Claims, on the Effective Date, any and all outstanding notes issued in connection with the DIP Facility shall be cancelled and shall be deemed terminated and of no force and effect, and except as otherwise set forth in the Plan or as may otherwise be agreed to by the Debtors and the DIP Facility Lender, the DIP Facility Lender shall receive cancellation without draw of any and all outstanding letters of credit issued under the DIP Facility.

## C.    Priority Tax Claims

Other than the Holder of any Claim that the applicable Purchaser has agreed to satisfy, and is therefore obligated to pay, under the relevant Sale Order and/or management or sale agreement, on, or as soon as reasonably practicable after, the latest of the Initial Distribution Date or the date such Priority Tax Claim becomes an Allowed Claim, each Holder of an Allowed Priority Tax Claim as of the Distribution Record Date shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash from the Estate Shared Proceeds equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Debtors and such Holder have agreed upon. Notwithstanding anything to the contrary in the Plan, the applicable Purchaser shall pay or otherwise satisfy any Priority Tax Claim, including any Claim that could have otherwise potentially constituted an Allowed Priority Tax Claim against the Debtors but for the terms of the applicable Sale Order, Asset Purchase Agreement, or management or other agreement that it has agreed to pay under such order and/or agreement in the time and manner set forth therein or that otherwise became the obligation of a particular Purchaser upon the closing of the underlying Sale (or portion thereof).

## ARTICLE III.
## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

## A.    Summary

1.    The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation, and distribution pursuant to the Plan and in accordance with Bankruptcy Code §§ 1122 and 1123(a)(1). A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder or deficiency portion of such Claim or Equity

Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims have not been classified, and the treatment for such unclassified claims is set forth in Article II.

2.    The classification of Claims against and Equity Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| 1 | Senior Creditor Claims | Impaired | Entitled to vote |
| 2 | Other Secured Claims | Impaired | Entitled to vote |
| 3 | Other Priority Claims | Unimpaired | Not entitled to vote -- deemed to accept |
| 4 | General Unsecured Claims | Impaired | Entitled to vote |
| 5 | Intercompany Claims | Impaired | Not entitled to vote -- deemed to reject |
| 6 | Equity Interests | Impaired | Not entitled to vote -- deemed to reject |

**B.    Treatment of Claims and Equity Interests**

1.    <u>Class 1 – Senior Creditor Claims</u>

(a)    Classification:  Class 1 consists of all Senior Creditor Claims.

(b)    Treatment:  On or after the Effective Date, the Administrative Agent shall distribute, in accordance with the DIP Facility Order, the Financing Agreement, the Plan, and the Confirmation Order, all remaining sums (after the payment in full by the Administrative Agent of (i) all Allowed DIP Facility Claims, in the manner set forth in Section II.B of the Plan, and (ii) all amounts required to fully fund the Plan Fund, in the manner set forth in Section IV.B of the Plan) to the Holders of Allowed Pre-Petition Lenders Secured Claims as of the Distribution Record Date, until all Allowed Pre-Petition Lenders Secured Claims have been satisfied in full. To the extent the Allowed Pre-Petition Lenders Secured Claims are not thereby, or have not otherwise previously been, satisfied in full, the Holders of such Claims as of the Distribution Record Date shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Claims, a distribution of, in the aggregate, (1) 96% of the net proceeds (after costs of sale, as determined pursuant to Section IV.D.2(h) of the Plan) from the sale or liquidation of the remaining Preserved Collateral, and (2) all net proceeds realized from the D&O Claims other than the D&O Shared Proceeds, in each instance as and when such net proceeds (as determined pursuant to Section IV.D.2(h) of the Plan) are generated or otherwise become available in the manner provided in the Plan and the Liquidating Trust Agreement, until all such Allowed Claims have been satisfied in full.  Such distributions of proceeds referenced in (1) and (2) in this Section III.B.1(b) of the Plan shall be made by the Liquidating Trustee to the Administrative Agent, for subsequent distribution thereby to the Holders of Allowed Pre-Petition Lenders Secured Claims in the manner set forth in the Financing Agreement.  For the avoidance of doubt,

-21-

all of the Pre-Petition Lenders' pre-petition or post-petition collateral, or the proceeds thereof, which are returned or refunded, including without limitation, Workers Compensation Insurance Policy deposits or any other deposits, or any retainers, once returned or refunded to the Debtors (if prior to the Effective Date) or to the Liquidating Trustee (if on or after the Effective Date), as applicable, shall be paid 100% to the Administrative Agent, for subsequent distribution thereby to the Holders of Allowed Pre-Petition Lenders Secured Claims, until all such Allowed Claims are satisfied in full, in the manner set forth in the Financing Agreement.

(c)       In accordance with the Unsecured Creditor Settlement, the Second Lien Noteholders shall be deemed to have waived any right to a recovery under the Plan or otherwise from the Debtors, the Estates, or the Liquidating Trust on account of the Second Lien Note Claims.

(d)       The Pre-Petition Lenders shall retain any perfected security interests in, and liens upon, the Preserved Collateral from and after the Effective Date in the same order of priority and with the same rights as existed before the Effective Date, without the need for the Pre-Petition Lenders to file UCC financing statements.  Such perfected security interests in, and Liens upon, the Preserved Collateral shall continue to secure the obligations to the Pre-Petition Lenders under the Plan until such time as the Allowed Pre-Petition Lenders Claims have been satisfied in full, or all of the Preserved Collateral has been sold by the Liquidating Trustee in accordance with this Section III.B.1(d), whichever occurs first.  The Pre-Petition Lenders shall release any Liens in connection with any such sales or other dispositions of the Preserved Collateral, provided that (i) the Administrative Agent consents to such sale or other disposition, which consent shall not be unreasonably withheld, (ii) the proper percentage of net proceeds are paid to the Administrative Agent for distribution to the Pre-Petition Lenders in accordance with the Plan, and (iii) the proposed sale is consummated in accordance with, and subject to, the Liquidating Trust Agreement.

(e)       In exchange for the foregoing treatment of Allowed Senior Creditor Claims, on the Effective Date, all outstanding notes issued in connection with the Financing Agreement and the Second Lien Notes shall be cancelled and shall be deemed terminated and of no force and effect, and except as otherwise set forth in the Plan or as may otherwise be agreed to by the Debtors and the Pre-Petition Lenders, the Pre-Petition Lenders shall receive cancellation without draw of any and all outstanding letters of credit issued under the Financing Agreement.

(f)       Voting:  Class 1 is Impaired.  Holders of Allowed Senior Creditor Claims in Class 1 are entitled to vote to accept or to reject the Plan.

2.       Class 2 – Other Secured Claims

(a)       Classification:  Class 2 consists of all Other Secured Claims.

(b)       Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Initial Distribution Date or the date such Claim becomes an

Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim as of the Distribution Record Date shall receive the property securing such Allowed Other Secured Claim.

(c)     Voting:  Class 2 is Impaired.  Holders of Allowed Other Secured Claims in Class 2 are entitled to vote to accept or to reject the Plan.

3.     Class 3 – Other Priority Claims

(a)     Classification: Class 3 consists of all Other Priority Claims.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable or other treatment, on, or as soon as reasonably practicable after, the later of the Initial Distribution Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim (including any Allowed Vacation Claim) as of the Distribution Record Date shall receive in full satisfaction, settlement, and release of, and in exchange for, such Allowed Other Priority Claim, Cash from (i) the Plan Fund or (ii) any other escrows that may be established for the payment of any particular remaining unpaid Allowed Other Priority Claims, equal to the unpaid portion of such Allowed Other Priority Claim.

(c)     Voting:  Class 3 is Unimpaired.  Holders of Allowed Other Priority Claims in Class 3 shall be deemed to have accepted the Plan and thus, are, not entitled to vote to accept or to reject the Plan.

4.     Class 4 – General Unsecured Claims

(a)     Classification: Class 4 consists of all General Unsecured Claims.

(b)     Treatment:  Holders of Allowed General Unsecured Claims, as of the Distribution Record Date, shall receive their Pro Rata share of the Transferred Property (or the proceeds thereof) from the Liquidating Trustee, in the time and manner provided in Article IV in the Plan and in the Liquidating Trust Agreement; provided, however, that the Holders of Allowed General Unsecured Claims shall not be entitled to any Pro Rata distribution of the Plan Fund (notwithstanding the fact that the Transferred Property includes the Plan Fund), and instead, the Plan Fund shall be utilized and/or distributed in the manner set forth in the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement.  Notwithstanding the foregoing, the Estate Resolution Consideration shall not be shared on a Pro Rata basis with the Pre-Petition Lenders as Holders of General Unsecured Claims on account of the Pre-Petition Lenders Deficiency Claims or otherwise, but instead shall be distributed to all other Holders of Allowed General Unsecured Claims in the manner and subject to the limitations set forth in the Plan and in the Liquidating Trust Agreement.

(c)     Voting:  Class 4 is Impaired.  Holders of Allowed General Unsecured Claims in Class 4 are entitled to vote to accept or to reject the Plan.

5.     Class 5 – Intercompany Claims

-23-

(a)      Classification:  Class 5 consists of all Intercompany Claims.

(b)      Treatment:   On the Effective Date, all Intercompany Claims will be reviewed and adjusted or cancelled as the Debtors or the Liquidating Trustee, as applicable, determines is appropriate (by, among other things, releasing, canceling, or waiving such claims). Holders of Intercompany Claims shall not be entitled to participate in any of the distributions on account of Claims under any other Sections of the Plan and shall only be entitled to the treatment provided in this Section of the Plan.

(c)      Voting:  Class 5 is Impaired.  Because Holders of Intercompany Claims will receive no distribution under the Plan, Class 5 shall be deemed to have voted to reject the Plan.

6.      Class 6 – Equity Interests

(a)      Classification:  Class 6 consists of all Equity Interests.

(b)      Treatment:  On the Effective Date, all Equity Interests (including any and all options or rights to exercise warrants or options or to otherwise acquire any Equity Interests) shall be cancelled, deemed terminated, and of no further force and effect, and the Holders of Equity Interests shall not receive or retain any distribution or property on account of such Equity Interests.

(c)      Voting:  Class 6 is Impaired.  Because Holders of Equity Interests will receive no distribution under the Plan, Class 6 shall be deemed to have voted to reject the Plan.

## ARTICLE IV.
## IMPLEMENTATION OF THE PLAN AND THE LIQUIDATING TRUST

**A.      Substantive Consolidation; Resignation of Directors and Managers; Issuance of One New Share in CB Holding**

(a)      Substantive Consolidation of the Estates

The Plan contemplates, and is predicated upon, the entry of an order substantively consolidating the Estates and the Chapter 11 Cases for the purposes of all actions associated with Confirmation and Consummation of the Plan, including voting and distribution.  On and subject to the occurrence of the Effective Date, (1) all remaining assets and liabilities of the Debtors shall be treated as if they were aggregated together, (2) all guaranties of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (3) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (4) all joint obligations of two or more Debtors and all multiple Claims (including any and all multiple Proofs of Claim that were filed by the same party against more than one Debtor asserting the same underlying Claim) against such entities on account of such allegedly joint obligations shall be treated and (to the extent such

Claim is allowable) Allowed only as a single Claim against the consolidated Debtors, and (5) each Claim filed or scheduled in the Chapter 11 Case of any Debtor shall be deemed filed or scheduled against the consolidated Debtors and treated as a single obligation of the consolidated Debtors on and after the Effective Date.  The foregoing substantive consolidation (x) shall not affect the rights of any Holder of any remaining Allowed DIP Facility Claim, Allowed Senior Creditor Claim, or Allowed Other Secured Claim with respect to any collateral securing its Claim (or the priorities of the applicable Holders' respective Liens on such collateral as of the Effective Date), or the terms and implementation of any settlement or any Final Order and the rights and obligations of the parties thereto entered into in connection with the Confirmation of the Plan or otherwise in the Chapter 11 Cases and (y) shall not, and shall not be deemed to, prejudice the Avoidance Actions or any other Causes of Action (subject to the release, waiver, exculpation, and related provisions of the Plan, the Confirmation Order, the DIP Facility Order, and any other order of the Bankruptcy Court), which shall survive entry of the Confirmation Order for the benefit of the Debtors and the Estates, as if there had been no substantive consolidation.

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases, although nothing in the Plan or in the Disclosure Statement shall, or shall be deemed to, prejudice or otherwise affect the Debtors' right to file a separate motion seeking substantive consolidation if they elect to do so in their sole discretion.  If no objection to the substantive consolidation provided for in the Plan is timely filed by the deadline established by the Bankruptcy Court for filing objections to the proposed Confirmation of the Plan, an order approving such substantive consolidation (which may be the Confirmation Order or any other order) may be entered by the Bankruptcy Court.  If any such objections are timely filed and served, a hearing with respect to the proposed substantive consolidation of the Chapter 11 Cases and the objections thereto may be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

Notwithstanding the substantive consolidation called for in the Plan, each and every one of the Debtors shall remain obligated to pay any due and owing quarterly fees to the Office of the Unites States Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed in the manner provided in the Plan, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

      (b)     Resignation of Directors and Managers; Closing of the Affiliate Debtors' Chapter 11 Cases

On the later of the Effective Date and the applicable Sale Closing Date for the Sale or portion thereof, as applicable, of the Assets of a particular Debtor, (1) all the officers, directors, or managers, as the case may be, of each such Debtor shall be deemed to have resigned, except for Edmund Schwartz, Chief Financial Officer, for those Debtors that continue to own any liquor licenses; (2) the Liquidating Trustee shall be appointed the sole director, officer, and/or manager of CB Holding and of the applicable Affiliate Debtors for which all Sales have Closed, until certificates of cancellation, dissolution, or merger for such Debtors shall have been filed in

accordance with Section IV.F(a) of the Plan; and (3) the Chapter 11 Case of the applicable Affiliate Debtor shall be closed without the need for any additional order of the Bankruptcy Court other than the Confirmation Order, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any such Affiliate Debtor shall be brought or otherwise commenced in the CB Holding Chapter 11 Case, in each instance without any other or further action by the stockholders, members, or directors (or other governing body) of any of the Debtors, and any and all remaining Assets of such Affiliate Debtor shall be transferred to CB Holding (other than liquor licenses that cannot be transferred or assigned under applicable law) for further distribution or liquidation in accordance with the terms of the Plan.  The Confirmation Order shall constitute a Final Decree with respect to all of the Debtors whose Chapter 11 Cases are closed pursuant to this Section IV.A.(b), and the Estates of all such Chapter 11 Cases shall be deemed fully administered as of the Effective Date. The Liquidating Trustee and/or his designee (including any employee of, or any other Person that may be engaged by, CRG) and Edmund Schwartz, as applicable, are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, any remaining Sales, and any corporate action required by the Debtors, without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors, as applicable.

(c)    Issuance of the New CB Holding Share

On the Effective Date, one new share of stock in CB Holding (the "*New CB Holding Share*") shall be issued to the Liquidating Trustee, as custodian for the benefit of the Estates.  The Liquidating Trustee shall not sell, transfer, or otherwise dispose of the New CB Holding Share, except as may otherwise be set forth in the Liquidating Trust Agreement.  The New CB Holding Share shall automatically be cancelled on the date CB Holding is dissolved in accordance with Section IV.F of the Plan, without the need for any further action by, or order of, the Bankruptcy Court.

(d)    General Authorization for the Debtors and the Liquidating Trustee to Effectuate the Plan, the Remaining Sales, and Related Transactions

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan or with respect to any remaining Sales involving the corporate structure of, or corporate action by, the Debtors shall be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders, or the Debtors' boards of directors or managers (as applicable).  During the period prior to the Effective Date, the Debtors shall remain debtors-in-possession and shall remain subject to the jurisdiction of the Bankruptcy Court.  The Debtors, the Creditors Committee, the Administrative Agent, and all other parties-in-interest are authorized and directed to take such actions during the period prior to the Effective Date as may be necessary and consistent with the Plan to prepare to effectuate and/or implement the Plan upon the Effective Date.  To the extent the manner of performance is not specified in the Plan or in any Sale Orders, the Debtors and/or the Liquidating Trustee (subject to any Oversight Committee guidance or approval required under the Liquidating Trust

Agreement), as applicable and appropriate, shall have the discretion to carry out and perform all obligations and duties imposed on them, and actions contemplated or authorized, by the Plan, the Confirmation Order, any Plan Document, the Sale Orders, or by law, in any manner they so choose.

In addition, the Debtors (including Edmund Schwartz, Chief Financial Officer, where applicable), as applicable and appropriate, are authorized to take such action during the period on and after the Confirmation Date as may be necessary and consistent with the Plan to effectuate and/or implement the Plan, the Confirmation Order, and the Sale Orders. The Debtors, the Chief Restructuring Officer, and any other individuals serving the Debtors in such capacity on and after the Confirmation Date, as the case may be, and any professionals retained thereby, shall not be liable for actions taken or omitted in such capacity as, or on behalf of, the Debtors or the Estates following the Confirmation Date, except those acts arising out of its or their own willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Debtors or the Estates, except for any actions or inactions involving willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts. Any indemnification claim of the Entities entitled to indemnification hereunder shall be satisfied, first, from any applicable insurance proceeds; second, from the Plan Fund; and, finally, to the extent permitted hereunder, from any Transferred Property (to the extent provided in Section IV.D.2(h)(4) of the Plan).

## B.    Funding of the Plan Fund to the Liquidating Trustee

In accordance with Section II.B. and Section III.B.1(b) of the Plan, on the Effective Date, the Plan Fund shall be funded, and transferred to the Liquidating Trustee, from a combination of funds transferred to the Administrative Agent, funds currently held by the Debtors, including the Estate Shared Proceeds, or funds previously paid by the Debtors to, or otherwise received by, the Administrative Agent pursuant to any of the DIP Facility Order, one or more of the Sale Orders, or any other applicable order of the Bankruptcy Court, in an aggregate amount equal to $1,777,000 plus any budgeted amounts not paid prior to the Effective Date or such other amount that may be agreed to by the Debtors, the Administrative Agent, and the Creditors Committee at any time up until the Confirmation Date. Any such funding by the Administrative Agent of a portion of the Plan Fund shall be the final contribution by the Administrative Agent and the DIP Facility Lender to the Debtors' Estates. The Plan Fund shall be used by the Liquidating Trustee in the manner provided for in the Plan and in the Liquidating Trust Agreement.

## C.    The Transfer of the Liquidating Trust Assets to the Liquidating Trust.

The Liquidating Trust, upon its creation in accordance with Section IV.D of the Plan, shall be funded initially with the Liquidating Trust Assets. Except as otherwise set forth in the Plan (including Section IV.D.2(e) of the Plan), on the Effective Date, subject to any exceptions contained in the Plan and subject to the security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan, the Debtors shall transfer and shall be deemed to have irrevocably transferred the Liquidating Trust Assets (including any remaining

Preserved Collateral) to the Liquidating Trust, for and on behalf of the beneficiaries of the Liquidating Trust in Class 4 (subject to the limitations set forth in Section III.B.4(b) of the Plan) and to the Holders of Allowed Senior Creditor Claims with respect to the Preserved Collateral, with no reversionary interest in the Debtors.  Without limiting the generality of the foregoing, the Debtors shall remit to the Liquidating Trust any sums that constitute the Office Shared Proceeds, the D&O Shared Proceeds, and the Sharing Percentage Recovery that they may receive on and after the Effective Date from the Sales or otherwise.

### D.    The Liquidating Trust

1.    Creation of the Liquidating Trust

(a)    The Liquidating Trust shall be administered by a trustee (the "*Liquidating Trustee*").  The designation and appointment of the Liquidating Trustee shall be effective on the Effective Date, without the need for any further order of the Bankruptcy Court other than the Confirmation Order.

(b)    On the Effective Date or immediately prior thereto, (i) the Liquidating Trust shall be created and established by the execution and delivery of the Liquidating Trust Agreement and any other necessary or appropriate action, subject to the provisions of the Plan, and (ii) all Transferred Property shall be transferred to the Liquidating Trust free of all Liens, Claims, and interests (except those security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan) for the benefit of Holders of Allowed General Unsecured Claims (subject to the limitations set forth in Section III.B.4(b) of the Plan with respect to the Estate Resolution Consideration, and except as otherwise set forth in Section IV.D.2(e) of the Plan with respect to the Avoidance Actions and other Transferred Causes of Action).  The Liquidating Trust shall hold, manage, administer, receive, maintain, reduce to Cash, or otherwise liquidate, sell, monetize, transfer, or abandon the Transferred Property (including any remaining Preserved Collateral) in accordance with, and subject to, the Plan, without the need for any additional Bankruptcy Court order or approval other than the Confirmation Order, and receive, hold, manage, and distribute such liquidated property and the proceeds and products thereof (including all of the Cash that is obtained by the Liquidating Trustee after the Effective Date relating to any of the Transferred Property through the exercise of its power and authority under the Plan or the Liquidating Trust Agreement or otherwise) in accordance with and subject to the terms and provisions of the Plan (including Section III.B.4(b) of the Plan) and the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall utilize and distribute the Plan Fund in the manner set forth in the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement and shall not distribute the Plan Fund to the Holders of Allowed General Unsecured Claims.  As provided in Section IV.E and Section IV.F of the Plan, upon the entry of a Final Decree by Bankruptcy Court with respect to the Chapter 11 Case of CB Holding, the Liquidating Trust shall be dissolved without further action by the Liquidating Trustee or action or order of the Bankruptcy Court.

(c)    As of the Effective Date, the Liquidating Trust shall also have the power and authority to, and be responsible for, among other things (i) winding down the Estates, including, as applicable and appropriate in its discretion, operating (or liquidating and winding up) any

remaining businesses and using and disposing of any remaining property and Assets, in accordance with, and subject to, the Plan and the Liquidating Trust Agreement, that do not constitute Transferred Property, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, other than those restrictions expressly imposed by the Plan, the Liquidating Trust Agreement, the Sale Orders, and the Confirmation Order, (ii) subject to Section IV.D.2(e) of the Plan and any limitations and/or requirements as set forth in the Plan or in the Liquidating Trust Agreement, filing, prosecuting, resolving, and settling in the names of the Debtors, the Estates, and/or the name of the Liquidating Trustee, the Avoidance Actions and all other Transferred Causes of Action (including the D&O Claims), (iii) making distributions to the Holders of remaining Allowed Administrative Claims (including Professional Fees Claims), DIP Facility Claims (if any), Priority Tax Claims, Senior Creditor Claims, Other Secured Claims, and Other Priority Claims in the manner set forth in the Plan, (iv) settling, resolving, and/or objecting to, in the names of the Debtors, the Estates, and/or the name of the Liquidating Trustee, any Disputed Claims, including any Disputed Administrative Claims (including Professional Fees Claims), Priority Tax Claims, Senior Creditor Claims, Other Secured Claims, Other Priority Claims, General Unsecured Claims, and Intercompany Claims in the manner set forth in Article V of the Plan, (v) making distributions to the Holders of Allowed General Unsecured Claims and, to the extent set forth in the Plan (including Section III.B.1(b) of the Plan, to the Holders of Allowed Senior Secured Claims, with respect to the net proceeds from the sale or liquidation of the Preserved Collateral, and (vi) taking all actions necessary or appropriate to enforce the Debtors' and the Estates' rights under the Sale Orders and any other order authorizing a sale or transfer of Assets and any related document and to fulfill, comply with, or otherwise satisfy the Debtors' covenants, agreements, and obligations under any such Sale or other transaction and any related document. The Liquidating Trustee and the Debtors shall also have the power and authority to effectuate the termination of, or otherwise sign any documents in connection with or otherwise relating to, any Compensation and Benefits Program.

(d)     The Liquidating Trustee shall be authorized to take such action during the period on and after the Effective Date as may be necessary and consistent with the Plan to effectuate and/or implement the Plan, the Confirmation Order, and the Sale Orders. Without limiting the generality of the foregoing, the Liquidating Trustee shall, in furtherance of, and consistent with, the purpose of the Plan, but subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement, have the power and authority to (A) take such actions as the Liquidating Trustee may determine to be necessary, desirable, or appropriate to carry out the purpose of, or to perform such other functions as are provided in or contemplated by, the Plan and the Liquidating Trust Agreement, (B) purchase or continue insurance protecting the Debtors, the Liquidating Trustee, their respective representatives, agents, employees, or independent contractors, and the property of the Debtors and the Liquidating Trust, and (C) in accordance with Section IV.F of the Plan, administer the closure of the Chapter 11 Cases of CB Holding and of any other Debtor whose Chapter 11 Case has not yet otherwise closed in accordance with Section IV.A(d) of the Plan. In addition, on and after the Effective Date, the Liquidating Trustee shall (in conjunction with CB Holding and any Debtor whose Chapter 11 Case has not yet otherwise closed in accordance with Section IV.A(d) of the Plan) act to close any remaining Sales or portions thereof and thereafter close the Chapter 11 Cases of the applicable Affiliate

-29-

Debtors, as and when a particular Sale or other transfer of all of such Debtor's Assets has closed pursuant to the terms of the applicable Asset Purchase Agreement or otherwise.  In all circumstances, the Liquidating Trustee shall act in the best interests of the Estates and the beneficiaries of the Liquidating Trust, and in furtherance of the purposes of the Plan and may do so without the need for any notice other than to the Administrative Agent and/or the Oversight Committee to the extent required in the Plan or in the Liquidating Trust Agreement, or for any additional order of the Bankruptcy Court or otherwise other than the Confirmation Order.

(e)       Except as otherwise set forth in Article IV of the Plan (including as set forth in Section IV.D.2(h) of the Plan), all costs and expenses associated with the winding down of the Estates, the administration of the Liquidating Trust, and all other actions referenced in Sections IV.D, IV.E, and IV.F of the Plan shall be the responsibility of, and paid for by, the Liquidating Trustee in accordance with the Plan from the Plan Fund or from any other cash of the Liquidating Trust on hand that does not otherwise constitute Transferred Property or is not to be distributed to any Holder of an Allowed Claim pursuant to the Plan (including any Allowed Pre-Petition Lenders Claims), the DIP Facility Order, the Sale Orders, or any other order of the Bankruptcy Court.  The Liquidating Trustee is authorized to utilize the Plan Fund to perform such functions as are provided in, or contemplated by, the Plan, the Confirmation Order, and/or the Liquidating Trust Agreement; without limiting the generality of the foregoing, the Liquidating Trustee shall be authorized to utilize the Plan Fund (including the Professional Fee Escrows, with respect to Allowed Professional Fee Claims) to, among other things, (i) satisfy all remaining Allowed Administrative Expense Claims (including, without limitation, all Claims for Professional Fees relating to services rendered or reimbursement of expenses incurred through and including the Confirmation Date, but not including any Allowed Sysco 503(b)(9) Claims), prior to any distributions therefrom being made to Holders of General Unsecured Claims, and all post-Confirmation Date and post-Effective Date fees and expenses of the Debtors and the Debtors' and the Creditors Committee's respective Professionals (as applicable) of the type set forth in Section IV.D.1(f) of the Plan; and any and all Allowed Other Priority Claims that were not paid in full on the Initial Distribution Date; (ii) set aside an amount that would be required to distribute to the Holders of Disputed Administrative Expense Claims (other than any Disputed Sysco 503(b)(9) Claims) and Disputed Other Priority Claims if all such Claims are subsequently Allowed, as set forth more fully in Article V of the Plan; (iii) satisfy all of the Debtors' and the Liquidating Trustee's anticipated costs and expenses in connection with their respective obligations under the Plan and the Liquidating Trust Agreement (including an amount required to satisfy obligations to the Liquidating Trust Professionals); and (iv) pay insurance, taxes, and other expenses arising in the ordinary course of business in connection with any of the foregoing.  Subject to any exceptions expressly set forth in the Plan or the Confirmation Order, the Liquidating Trust may pay all such fees, costs, and expenses without Bankruptcy Court approval.  As set forth in Section II.A(a) and Section II.C of the Plan, any Allowed Sysco 503(b)(9) Claims and all Allowed Priority Tax Claims shall be paid from the Estate Shared Proceeds, and to the extent practicable, reserve funds shall be set aside from the Estate Shared Proceeds with respect to all Disputed Sysco 503(b)(9) Claims and Disputed Priority Tax Claims until such Claims are resolved in the manner set forth in Article V of the Plan.

(f)      The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets, subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement.  Subject to any Oversight Committee guidance or approval required under the Liquidating Trust Agreement, the Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers, translators, or other professionals as it may deem necessary (collectively, the "*Liquidating Trust Professionals*"), in its discretion, and (except as otherwise set forth in this Section IV.D.1(f)) to be paid from the Plan Fund, to aid in the performance of its responsibilities pursuant to the terms of the Plan and the Liquidating Trust Agreement, including, without limitation, the liquidation and distribution of the Liquidating Trust Assets.  The Liquidating Trustee's general insolvency counsel shall be Pachulski Stang Ziehl & Jones LLP.  The Liquidating Trustee shall maintain an accounting of such costs and expenses.  It shall not be a requirement that the Liquidating Trustee or any such parties retained by the Liquidating Trust be a "disinterested person" (as such term is defined in Bankruptcy Code § 101(14)), and such retained parties may include Professionals or other Persons that had previously been active in the Chapter 11 Cases on behalf of any Debtor, Creditor, or Equity Interest Holder, the Creditors Committee, or other constituency in the Chapter 11 Cases.  Without limiting the generality of the foregoing, such retained parties may include the Chief Restructuring Officer and any employee of CRG.  The Liquidating Trustee may, without application by any of the Liquidating Trust Professionals to, or approval by, the Bankruptcy Court, pay the Liquidating Trust Professionals' fees that are incurred after the Effective Date.

(g)      The Liquidating Trust Agreement shall provide for the establishment of a Liquidating Trust oversight committee (the "*Oversight Committee*"*)*, which shall consist of three members.  In accordance with the Unsecured Creditor Settlement, two of the initial members of the Oversight Committee shall be designated on or before the Effective Date by the Creditors Committee, and the third initial member shall be designated by the Administrative Agent, and a notice setting forth the names of the members of the Oversight Committee shall be filed with the Bankruptcy Court as part of the Plan Supplement or otherwise prior to the Confirmation Hearing.  The designation of the Oversight Committee shall be effective on the Effective Date, without the need for a further order of the Bankruptcy Court other than the Confirmation Order.  The Oversight Committee shall have the powers and authority set forth in the Liquidating Trust Agreement.

(h)      Except as otherwise set forth in Article II or III of the Plan (including in Section III.B.4(b) of the Plan with respect to the prohibition on making distributions of the Estate Resolution Consideration to the Pre-Petition Lenders) and this Section IV.D, the Liquidating Trustee will distribute to the Holders of Allowed General Unsecured Claims as of the Distribution Record Date on account of their interests in the Liquidating Trust, on a regular basis, all unrestricted Cash on hand (including any Cash received from the applicable Debtors on or after the Effective Date and treating any permissible investment as Cash for purposes of this provision), except such amounts (i) as have been reserved on account of Disputed Claims or are otherwise part of the claims reserve established by the Liquidating Trustee (the "*Disputed Claim Reserve*"), (ii) as are reasonably necessary to maintain the value of the remaining Liquidating Trust Assets during liquidation, (iii) as are necessary to pay reasonable incurred or anticipated

-31-

expenses (including, but not limited to, any taxes imposed on or payable by the Debtors or the Liquidating Trust or otherwise in respect of the Liquidating Trust Assets), or (iv) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a distribution pursuant to this Section IV.D.1(h) if the Liquidating Trustee reasonably determines that the costs and expenses of making such distribution would be excessive compared to the aggregate, net amount of unrestricted Cash available for such distribution (taking into account the above listed exclusions) as would make the distribution impracticable.  The Liquidating Trustee shall also distribute to the Administrative Agent the allocated percentage of the net proceeds from the sale or liquidation of the Preserved Collateral in the manner provided for in Section III.B.1(b) of the Plan.

(i)    For U.S. federal and applicable state and local income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation Section 301.7701-4 and that the trust assets be treated as owned by its beneficiaries.  Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received a distribution of an undivided interest in the Transferred Property in which they have an interest and then contributed such interests to the Liquidating Trust.  The Liquidating Trust Agreement shall (i) state that the primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating and wind-down purposes as provided in the Plan and (ii) contain a fixed or determinable termination date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary or appropriate.  Each such extension must be approved by the Bankruptcy Court within six (6) months before the beginning of the extended term.  In conformity with IRS Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Senior Creditor Claims, and the Holders of General Unsecured Claims) shall be required, for U.S. federal income tax purposes, to treat the Liquidating Trust as a grantor trust of which the Holders of Claims are the owners and grantors.

(j)    The Liquidating Trustee shall file or cause to be filed all U.S. federal and applicable state and local tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4 and, after the Effective Date, all U.S. federal and applicable state and local income tax returns for the Debtors.  The Liquidating Trustee also shall annually send to each known beneficiary of the Liquidating Trust a separate statement regarding such beneficiary's share (as determined from time to time by the Liquidating Trustee in its discretion) of the items of income, gain, loss, deduction, and credit of the Liquidating Trust as relevant for U.S. federal and applicable state and local income tax purposes and shall instruct all such parties that they will be required to use such information in preparing their U.S. federal and applicable state and local income tax returns.  The Liquidating Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(k)     The beneficial interests of the Liquidating Trust shall be nontransferable, and any transfer in violation of this Section IV.D.1(k) of the Plan may be disregarded by the Liquidating Trustee, except with respect to a transfer by will or under laws of descent and distribution; provided, however, such transfer shall not be effective unless and until the Liquidating Trustee receives written notice of such transfer under the applicable law of descent and distribution.

(l)     The Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets, and unless otherwise required by law, all parties (including the Holders of Senior Creditor Claims and General Unsecured Claims) shall be required to use such valuation for all U.S. federal and applicable state and local income tax purposes.  The valuation shall be made available as necessary for tax reporting purposes (on an asset or aggregate basis with respect to Liquidating Trust Assets, as relevant).

2.      The Liquidating Trustee

(a)     In accordance with the Unsecured Creditor Settlement, CRG shall be appointed as the initial Liquidating Trustee.  On the Effective Date, the Liquidating Trustee shall execute the Liquidating Trust Agreement and any other documents necessary to be appointed the Liquidating Trustee.  The Liquidating Trustee, once appointed, shall act as trustee on behalf of the Liquidating Trust to carry out its obligations and exercise its rights in accordance with, and subject to, the Plan, the Confirmation Order, and the Liquidating Trust Agreement.  The Liquidating Trustee may be removed and replaced as provided for in the Liquidating Trust Agreement.

(b)     The Liquidating Trustee and the Liquidating Trust Professionals shall be compensated as set forth in the Plan and the Liquidating Trust Agreement and shall not be required to file fee applications to receive compensation.  *Any objection to the designation of the Liquidating Trustee must be raised at or prior to the Confirmation Hearing or be forever barred. Without the permission of the Bankruptcy Court, no judicial, administrative, arbitration, or other action or proceeding shall be commenced against the Liquidating Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.*  The Liquidating Trustee shall be vested with the rights, powers, and benefits set forth in the Plan, the Confirmation Order, and the Liquidating Trust Agreement, which shall include, without limitation, all rights, powers, and benefits afforded to a "trustee" under Bankruptcy Code §§ 704 and 1106.

(c)     On, or as soon as practicable after, the Effective Date, the Plan Fund shall be deposited in a non-interest-bearing account of the Liquidating Trust for use in the manner set forth in the Plan.  The investment powers of the Liquidating Trustee, other than those reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating and wind-down purposes of the Liquidating Trust, are limited to investing in demand and time deposits.

(d)     Upon any determination by the Liquidating Trustee that it is holding any amount or asset not constituting the Transferred Property or the products or proceeds of Transferred Property, the Liquidating Trustee shall promptly transfer such property either to the Debtors or to

the Administrative Agent (as applicable), or pay such amount to the Administrative Agent for the benefit of the Holders of remaining Allowed Pre-Petition Lenders Claims.

(e)    Subject to the provisions of the Liquidating Trust Agreement and the powers of the Oversight Committee set forth therein, the Liquidating Trustee shall be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, all Avoidance Actions and other Transferred Causes of Action, whether or not such causes of action have been commenced prior to the Effective Date, and shall be substituted as the real party-in-interest in any such action, commenced by or against the Debtors, the Estates, or the Creditors Committee prior to the Effective Date.  In connection therewith, the Liquidating Trustee may act in accordance with its business judgment, without any other or further notice or Bankruptcy Court approval, subject to the provisions of the Liquidating Trust Agreement and the powers of the Oversight Committee set forth therein and in the Plan (including any requirements pertaining to the need for prior Oversight Committee approval before instituting or settling any particular Avoidance Action or other Transferred Cause of Action).  Without limiting the generality of the foregoing, the Liquidating Trustee shall be authorized to seek to recover or otherwise obtain any sums owed to the Debtors or the Estates or any Assets or property of the Debtors or their Estates in the possession or control of any other party.  Notwithstanding the transfer of the Avoidance Actions or any other Transferred Causes of Action to the Liquidating Trust on the Effective Date (to the extent and in the manner provided in the Plan), in the event that the Debtors or the Liquidating Trustee (as applicable) determines that it is necessary or appropriate to utilize any such Avoidance Action or other Transferred Cause of Action as either (i) a defense (including any affirmative defense) or in any other way in connection with any claim asserted against a Debtor under Bankruptcy Code § 503(b)(9) or (ii) as part of an objection or defense (including any affirmative defense) to the Allowance of a Claim under Bankruptcy Code § 502(d) or otherwise, then, as applicable, (1) such Avoidance Action or other Transferred Cause of Action shall not be transferred to the Liquidating Trust on the Effective Date, or (2) to the extent such Avoidance Action or other Transferred Cause of Action has been transferred to the Liquidating Trust on the Effective Date under the Plan and the Confirmation Order, then the Liquidating Trustee shall take all steps as may be necessary or appropriate to transfer or assign such Avoidance Action or other Transferred Cause of Action back to the Estates for such purpose.  The Debtors shall inform the Creditors Committee and the Administrative Agent of any such Avoidance Action or other Transferred Cause of Action that they know prior to the Effective Date will be necessary or appropriate to any such defense or objection and, thus, will not be transferred to the Liquidating Trust.

(f)    Upon the Effective Date and the execution of the Liquidating Trust Agreement, the Liquidating Trustee, in its capacity as the trustee of the Liquidating Trust and not personally, shall be vested with all right, title, and interest in all Liquidating Trust Assets and all rights to enforce any orders of the Bankruptcy Court entered in these Chapter 11 Cases.  From and after the Effective Date, the Liquidating Trustee may dispose of, sell, transfer, liquidate, or abandon the assets of the Liquidating Trust (including the Preserved Collateral) free and clear of (i) all Liens, Claims, interests, or encumbrances, subject to the Plan and the security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan, or (ii) any restrictions of the Bankruptcy Code, Bankruptcy Rules, or Local Rules and without the need

for any or other Bankruptcy Court order or approval or any other order, but it must otherwise act in accordance with the provisions of the Plan, the Confirmation Order, and the Liquidating Trust Agreement (including with respect to any requirements therein regarding the need for prior consultation with, or the approval of, the Oversight Committee).

(g)     The Liquidating Trustee and the Liquidating Trust Professionals shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct, bad faith, actual fraud, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim of the Liquidating Trustee (and the other parties entitled to indemnification hereunder) shall be satisfied, first, from any applicable insurance proceeds; second, from the Plan Fund; and finally, from the remaining Transferred Property.

(h)     In accordance with the Unsecured Creditor Settlement, for purposes of determining the amount of the "net proceeds (after costs of sales)" and "the net proceeds (after litigation fees, costs, and expenses actually incurred)", as both phrases are used in Paragraph 33 of the DIP Facility Order, from all prior Sales and any future sales or other dispositions of the various items that constitute the Transferred Property to be distributed to either the Holders of Allowed Pre-Petition Lenders Deficiency Claims or to Holders of Allowed General Unsecured Claims, certain costs and expenses already incurred or to be incurred in connection therewith shall be allocated and paid as follows:

(1)     50% of the aggregate amount of (A) if, prior to the Effective Date, the Debtors' and the Committee's respective Professionals' fees and expenses, and (B) if on and after the Effective Date, the Liquidating Trustee's professionals' fees and expenses, and all other fees and expenses associated with pursuing the D&O Claims, Avoidance Actions, and other Transferred Causes of Action, to the extent not provided for in the Plan Fund, shall be deducted from the amount of gross proceeds thereof before calculating the net amounts to be distributed on account thereof to the Holders of Allowed General Unsecured Claims pursuant to Section III.B.4(b) of the Plan as part of the Estate Shared Proceeds;

(2)     (A) the payments required to satisfy (i) all Allowed Claims against the Estates under Bankruptcy Code § 503(b)(9), other than the Sysco 503(b)(9) Claims, as set forth on Exhibit C to the Disclosure Statement, and (ii) all Allowed Other Priority Claims, as set forth on Exhibit D to the Disclosure Statement, shall be paid entirely (i.e., 100%) from the Plan Fund, and (B) the payments required to satisfy (i) any Allowed Sysco 503(b)(9) Claims against the Estates (after application of any applicable offsets for Avoidance Actions or other available offsets or defenses, in accordance with Section IV.D.2(e) of the Plan or

otherwise) and (ii) all Allowed Priority Tax Claims shall be paid entirely (i.e., 100%) from the Estate Shared Proceeds; and

(3)    all other costs of the Liquidating Trust (including the fees of the Liquidating Trustee, the Oversight Committee, and all professionals retained or entities employed thereby and any indemnification claims under Section IV.A(d) of the Plan) shall be allocated to, and paid from, the Estate Shared Proceeds.

For the avoidance of doubt, other than as explicitly set forth in the Plan with respect to the Unsecured Creditor Settlement, to the extent there are any conflicts between the Plan and anything contained in Paragraph 33 of the DIP Facility Order, Paragraph 33 of the DIP Facility Order shall govern.

(i)    In the event that the Liquidating Trustee cannot take any action, including, without limitation, the prosecution of any Transferred Cause of Action or the objection to any Claim, by reason of an actual or potential conflict of interest, the Oversight Committee shall be authorized to take any such action(s) in its place and stead, including without limitation, the retention of professionals (which may include professionals retained by the Liquidating Trustee) for such purpose of taking such actions.

E.    **Final Administration of the Liquidating Trust**

Upon the entry of a Final Decree by the Bankruptcy Court closing the CB Holding Chapter 11 Case contemplated in Section IV.F of the Plan, the Liquidating Trust shall be deemed terminated without further notice, and the Liquidating Trustee shall thereupon be forever discharged of, and released from, all power, duties, and responsibilities under the Liquidating Trust Agreement and the Plan.  Every effort shall be made to effectuate such entry no later than the time reasonably necessary to accomplish the Liquidating Trust's purposes as set forth in the Liquidating Trust Agreement and the Plan, and in no event shall the Liquidating Trust continue for more than five (5) years after the date of the creation of the Liquidating Trust, without further order of the Bankruptcy Court.

F.    **Dissolution of the Debtors; Closing of the CB Holding Chapter 11 Case**

(a)    Within 30 days after the later of their completion of any acts required of them by the Plan (including in Section IV.A of the Plan) and the Sale Closing Date of any remaining Sale (or portion thereof) of its Assets, or as soon thereafter as is practicable, each of the Debtors shall be deemed automatically dissolved for all purposes, without the necessity for any other or further actions to be taken by or on behalf of each Debtor, including without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors (the "*Dissolution*") or any compliance with any notice or waiting periods; provided, however, that each Debtor shall file with the office of the applicable Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution or, alternatively, it may be merged with and into another Debtor and file an appropriate certificate of merger.

-36-

(b)     When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by order of the Bankruptcy Court or otherwise resolved or withdrawn in the manner provided for in the Plan, and all of the proceeds of the Liquidating Trust Assets have been distributed in accordance with the Plan (including, without limitation, pursuant to Sections III.B.4(b) and IV.F(c)), all aspects of any remaining Sales have closed, and all Transferred Causes of Action have been prosecuted, settled, resolved, withdrawn, or abandoned, the CB Holding Chapter 11 Case and any other of the Chapter 11 Cases that were not previously closed pursuant to Section IV.A(d) of the Plan shall be closed, and the Liquidating Trustee shall file with the Bankruptcy Court a notice thereof with respect to such Chapter 11 Case(s); provided, however, that nothing in the Plan or the Liquidating Trust Agreement shall prevent the Debtors and the Liquidating Trustee from seeking authority from the Bankruptcy Court at any time prior thereto to close the CB Holding Chapter 11 Case or any other of the Chapter 11 Cases that were not previously closed pursuant to Section IV.A(d) of the Plan.

(c)     Notwithstanding anything to the contrary in Section IV.F(b) of the Plan, if at any time after (i) the Dissolution and (ii) such time as all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by an order or otherwise resolved or withdrawn in the manner provided for in the Plan, the Liquidating Trustee, after consultation with the Administrative Agent and the Oversight Committee and upon the receipt of any approvals required under the Liquidating Trust Agreement, determines that the expense of administering the Liquidating Trust so as to make a further or final distribution to the Holders of Allowed General Unsecured Claims or Allowed Senior Creditor Claims (with respect to the Preserved Collateral) is likely to exceed the value of the assets remaining in the Liquidating Trust or the Preserved Collateral (as applicable), the Liquidating Trustee shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the CB Holding Chapter 11 Case and any other of these Chapter 11 Cases that were not previously closed (if any), (ii) donate any balance to a charitable organization exempt from U.S. federal income tax under Section 501(c)(3) of the Tax Code that is unrelated to any of the Debtors, the Creditors Committee or its members, CRG, the Pre-Petition Lenders, the Holders of the Equity Interests as of the Effective Date, and the Liquidating Trustee, and (iii) close the CB Holding Chapter 11 Case and any of the Chapter 11 Cases that were not previously closed, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of such application shall be required to be given only electronically, to the extent practicable, to those parties that have filed requests for notices in these Chapter 11 Cases and whose electronic addresses then remain current and operating.

## G.     Preservation of Rights Regarding Avoidance Actions and of All other Causes of Action

The Debtors are currently investigating whether to pursue potential Avoidance Actions and other Causes of Action against any parties or Entities.  Under the Plan, the Liquidating Trustee retains all rights of and on behalf of the Debtors and the Liquidating Trust to commence and pursue (subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement) any and all Avoidance Actions and under all other Transferred Causes of Action (under any theory of law, including,

without limitation, the Bankruptcy Code, and in any court or other tribunal, including, without limitation, in an adversary proceeding filed in these Chapter 11 Cases in the Bankruptcy Court) discovered in such investigation to the extent the Liquidating Trustee deems appropriate. Potential Avoidance Actions and other Causes of Action may, but need not, be pursued by the Debtors, prior to the Effective Date, and the Liquidating Trustee may, but need not, pursue the Avoidance Actions and other Transferred Causes of Action after the Effective Date.

Except as may otherwise be provided in Article X of the Plan and the Confirmation Order, the potential Avoidance Actions and other Causes of Action that may be pursued by the Debtors, prior to the Effective Date, and by the Liquidating Trust and the Liquidating Trustee, after the Effective Date, include, without limitation, any Causes of Action, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' businesses or operations, including, without limitation, the following: possible claims against vendors, landlords, sublessees, assignees, customers, or suppliers for warranty, indemnity, back charge/set-off issues, overpayment, or duplicate payment issues, and collections/accounts receivable matters; deposits, rebates, refunds, sales incentives, or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other Entity; claims against landlords, sublessees, and assignees arising from the various leases, subleases, and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance, and other similar charges; financial reporting; environmental and product liability matters; actions against insurance carriers relating to coverage, indemnity, or other matters; counterclaims and defenses relating to any Claims or other obligations; contract or tort claims that may exist or subsequently arise; and any and all Avoidance Actions pursuant to any applicable section of the Bankruptcy Code arising from any transaction involving or concerning the Debtors; provided, however, *that neither the Debtors nor the Liquidating Trustee nor any other party may pursue any Causes of Action that have been waived, relinquished, released, compromised, abandoned, transferred, or settled pursuant to the Plan, the DIP Facility Order, the Sale Orders, or any other Final Order of the Bankruptcy Court.*

Unless a claim against a Creditor or other Entity or Avoidance Action or other Cause of Action is expressly waived, relinquished, released, compromised, abandoned, transferred, or settled in the Plan, the Sale Orders, the DIP Facility Order, or any other order of the Bankruptcy Court, the Debtors expressly reserve such claim or Avoidance Action or other Cause of Action for later enforcement by the Debtors, prior to the Effective Date, or by the Liquidating Trust, thereafter (including, without limitation, claims and Avoidance Actions and other Causes of Action that may be set forth in the Plan Supplement or not specifically identified or that the Debtors may presently be unaware of or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those which the Debtors now believe to exist), and therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such claims, Avoidance Actions, or other Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan Supplement, the Plan, the Confirmation Order, or any other document Filed in the Chapter 11

Cases, except where such claims or Avoidance Actions or other Causes of Action have been expressly waived, relinquished, released, compromised, abandoned, transferred, or settled in the Plan, the Confirmation Order, the DIP Facility Order, or any other order of the Bankruptcy Court. In addition, the Liquidating Trust and the Liquidating Trustee expressly reserve the right to pursue or adopt any claim, crossclaim, or counterclaims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions of the Plan, the DIP Facility Order, the Sale Orders, or any Final Order.

**The Debtors and the Liquidating Trustee do not intend, and it should not be assumed that because any existing or potential Avoidance Actions or other Causes of Action may not have yet been pursued by the Debtors or are not set forth specifically in the Plan or expressly preserved in the Disclosure Statement, the Plan Supplement, the Confirmation Order, any other document Filed in the Chapter 11 Cases, or otherwise, that any such Avoidance Actions or other Causes of Action have been or are deemed to be waived or released.**

**H.    Cancellation of Notes, Instruments, Debentures, and Equity Interests**

1.    On the Effective Date, all Notes and all other notes, instruments, debentures, certificates, stock certificates, Liens, mortgages, deeds of trust, pledges, security interests, and other documents evidencing Claims and all Equity Interests in any of the Debtors (including, without limitation, the DIP Agreement, the Financing Agreement, the Subordinated Notes Purchase Agreement, and the Second Lien Note Purchase Agreement) shall be cancelled and deemed terminated, released, and of no force and effect and surrendered (regardless of whether such notes, instruments, debentures, certificates, or other documents are in fact surrendered for cancellation to the appropriate indenture trustee, agent, or other such Person) and shall instead represent only the right to participate in the distributions contemplated by the Plan, if any. **On the Effective Date, any indentures or other agreements relating to any of the Notes or any other notes to which any Debtor is a party shall be deemed cancelled as permitted by Bankruptcy Code § 1123(a)(5).**

2.    Except as may otherwise be set forth in the Plan, all distributions under the Plan on account of any Allowed DIP Facility Claims or Allowed Pre-Petition Lenders Claims shall be made by the Debtors or the Liquidating Trustee (on account of the Pre-Petition Lenders Deficiency Claims or with respect to the distribution of net proceeds from the sale or other disposition, liquidation, or monetization of Preserved Collateral, in the manner set forth in Section III.B.1(b) of the Plan) to the Administrative Agent, for further distribution to the Holders of the Allowed DIP Facility Claims or Allowed Pre-Petition Lenders Claims (as applicable) as of the Distribution Record Date. All distributions, if any, under the Plan on account of the Allowed Subordinated Notes Claims shall be made by the Liquidating Trustee to the administrative agent for the Subordinated Notes, for further distribution to the Holders of the Allowed Subordinated Notes Claims as of the Distribution Record Date in accordance with the Subordinated Notes Purchase Agreement and in accordance with, and subject to, any subordination provisions set forth therein or in any separate, applicable subordination agreement. *Upon the delivery of the*

*foregoing distributions, if any, to the applicable agents or similar parties, the Debtors and the Liquidating Trustee shall be released of all liability and responsibility with respect to their obligations relating to such distributions.*

## I.    Dissolution of the Creditors Committee

On the first (1st) Business Date following the Effective Date, and provided the Liquidating Trust has become effective as provided under the Plan, the Creditors Committee shall be dissolved, and the Creditors Committee and its members shall be released and discharged from the rights and duties arising from or related to the Chapter 11 Cases, and the retention or employment of the Creditors Committee's Professionals shall terminate, except with respect to final applications for Professional Fee Claims.  After the Effective Date, the Professionals retained by the Creditors Committee and the members thereof shall only be entitled to compensation or reimbursement of expenses or fees for any services rendered or expenses incurred in their capacity as such after the Effective Date that exclusively relate to the prosecution of any final applications by such Professionals or Creditors Committee members for allowance of Professional Fees and reimbursement of expenses (as applicable) pending on the Effective Date or timely filed after the Effective Date as provided for in the Plan.

## J.    Accounting

Except as otherwise set forth in the Plan, the Liquidating Trust Agreement, or the Confirmation Order, the Liquidating Trustee will establish a separate bank account for the Plan Fund and for any and all other reserves or funds maintained by the Debtors or the Liquidating Trustee, as the case may be, in connection with the distribution of funds on account of Allowed Claims or their other respective functions under the Plan, the Confirmation Order, or the Liquidating Trust Agreement (as the case may be).

## K.    Settlement with Respect to Fees, Costs, and the Plan by and Among the Administrative Agent, the Creditors Committee, the Second Lien Noteholders, and the Debtors

As set forth further in the Plan (including, without limitation, in Sections II.A(b), III.B.1(c), IV.D.1(a), IV.D.1(g), IV.D.2(h), X.D, X.E, and X.F of the Plan), the Plan incorporates and implements a further compromise and settlement reached by and among (i) the Administrative Agent, (ii) the Creditors Committee, (iii) the Second Lien Noteholders, and (iv) the Debtors (the "*Unsecured Creditor Settlement*").  As a result of the Unsecured Creditor Settlement, the Creditors Committee, the Administrative Agent, and the Second Lien Noteholders have agreed to support and recommend the confirmation of the Plan, and shall not object to (or support any party in objecting to) the Plan or to any provisions thereof.

## ARTICLE V.
## TREATMENT OF DISPUTED CLAIMS

**A.     Objections to Claims; Prosecution of Disputed Claims**

1.     Except as otherwise set forth in the Plan, the Confirmation Order, the DIP Facility Order, the Sale Orders, or any other order of the Bankruptcy Court, (1) prior to the Effective Date, the Debtors may object to any Claims, and (2) on and after the Effective Date, the Liquidating Trustee may object (and shall take over, and continue prosecuting and settling or otherwise resolving, any outstanding objections of the Debtors) to the allowance of any Claims (subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).   All objections by either the Debtors or the Liquidating Trustee, as the case may be, shall be litigated to Final Order; provided, however, that, as set forth above in Article IV of the Plan and in the Liquidating Trust Agreement, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, shall have the authority and sole discretion to file, settle, compromise, or withdraw any objections to Claims, in each instance without the need to obtain the approval of the Bankruptcy Court (but subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).

2.     Any objections to Claims must be filed by the Claim Objection Deadline.   Claim objections and, as applicable, any settlement thereof shall be dealt with as the Debtors or the Liquidating Trustee, as the case may be, in its discretion, deems appropriate (in the case of the Liquidating Trustee, subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).   Further, (a) the Debtors, prior to the Effective date, and (b) the Liquidating Trustee, on and after the Effective Date, shall have the sole and complete discretion to decide not to review and/or to object to proofs of General Unsecured Claims or any other Claims, in each instance to the extent they believe that such review and/or objection would be uneconomical or not otherwise warranted under the circumstances (but in the case of the Liquidating Trustee, subject to any consultation obligations and the receipt of any approvals by the Oversight Committee required under the Liquidating Trust Agreement).

3.     Unless otherwise provided by the Plan or the Liquidating Trust Agreement, no Bankruptcy Court approval shall be required in order for the Debtors or the Liquidating Trustee (as applicable) to settle and/or compromise any Claim, objection to Claim, cause of action, or right to payment of or against the Debtors, the Estates, or the Liquidating Trust.

**B.     Estimation of Claims**

Prior to the Effective Date, the Debtors, or on or after the Effective Date, the Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claims, pursuant to Bankruptcy Code § 502(c) or otherwise, regardless of whether the Debtors or the Liquidating Trustee previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any

Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of Bankruptcy Code § 502(j), in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, and the amount so estimated shall constitute the maximum allowable amount of such Claim, the Debtors or the Liquidating Trustee (as applicable) may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by as set forth in the Plan or by any other mechanism approved by the Bankruptcy Court.

**C.      Interest and Distributions on Disputed Claims or any Other Claims that Become Allowed Claims After the Effective Date**

No interest shall accrue or be due or paid by the Debtors or the Liquidating Trustee on any Disputed Claim that later becomes an Allowed Claim or on any other Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, or with respect to any distribution to the Holders thereof. All distributions with respect to any such Claims as and when they become Allowed shall be deemed to have been made on the Effective Date. No distribution shall be made with respect to all or any portion of any Claim, a portion of which or all of which is a Disputed Claim, pending the entire resolution thereof.

**ARTICLE VI.**
**DISTRIBUTIONS**

**A.      Means of Cash Payment**

Cash payments made pursuant to the Plan shall be in U.S. dollars and, at the option and in the sole discretion of the Debtors or the Liquidating Trustee (as applicable), be made by (a) checks drawn on or (b) wire transfers from a domestic bank selected by the Debtors or the Liquidating Trustee (as applicable). Cash payments to foreign creditors may be made, at the option of the Debtors or the Liquidating Trustee (as applicable), in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**B.      Delivery of Distributions**

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided in the Plan, distributions and deliveries to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules, unless superseded by the address set forth on a timely-filed and properly-completed proof of claim or some other writing Filed with the Bankruptcy Court and served upon the Liquidating Trustee.

**C.      Undeliverable Distributions**

1.      *Holding of Undeliverable Distributions*

-42-

If any distribution pursuant to the Plan to any Holder is returned to the Liquidating Trustee or the Debtors (as applicable) as undeliverable, no further distributions shall be made to such Holder unless and until the Liquidating Trustee is notified by such Holder, in writing, of such Holder's then-current address.  Upon such an occurrence, to the extent it is possible to make a subsequent distribution at that time, the appropriate distribution shall be made as soon as reasonably practicable after such distribution has become deliverable.  All Entities ultimately receiving previously-undeliverable Cash shall not be entitled to any interest or other accruals of any kind with respect thereto.  Nothing contained in the Plan, the Confirmation Order, or the Liquidating Trust Agreement shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

2.    *Failure to Claim Undeliverable Distributions*

*Any Holder of an Allowed Claim entitled to an undeliverable or unclaimed distribution that does not provide notice of such Holder's correct address to the Liquidating Trustee within the later of six (6) months after (i) the Effective Date or (ii) the date of the initial attempted distribution made by the Debtors or the Liquidating Trustee (as applicable) to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution or any other distribution, and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution or any other distribution against any of the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust.*  In such cases, the Forfeited Distributions shall be distributed in accordance with the terms of the Plan and/or the Liquidating Trust Agreement (as applicable).

**D.    Withholding and Reporting Requirements**

In connection with the Plan and all distributions thereunder, the Debtors and the Liquidating Trustee (as applicable) shall comply with all applicable tax withholding and reporting requirements imposed by any U.S. federal, state, or local or non-U.S. taxing authority, all distributions hereunder shall be subject to any such withholding and reporting requirements, and any amounts withheld shall be deemed for all purposes of the Plan to have been distributed to the Person in respect of whom such withholding was made.  The Debtors and the Liquidating Trustee (as applicable) shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) the Debtors and the Liquidating Trustee reserve the option, in their discretion, not to make a distribution to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Debtors or the Liquidating Trustee (as applicable) for the payment and satisfaction of such tax obligations or has, to the Debtors' or Liquidating Trustee's satisfaction, established an exemption therefrom.  Any distributions to be made pursuant to the Plan shall, pending the implementation of such withholding and reporting requirements, be treated as undeliverable pursuant to Section VI.C.2 of the Plan.  The Liquidating Trustee shall request (in writing) from

-43-

each beneficiary of the Liquidating Trust (1) a properly-completed IRS Form W-9 or substitute Form W-9 or (2) an applicable Form W-8. *Any beneficiary of the Liquidating Trust that does not provide a completed Form W-9 or an applicable Form W-8 within the date that is 45 days of the date of such written request sent by the Liquidating Trustee shall have its Claim disallowed for all purposes in these Chapter 11 Cases*, and such response deadline and the effect of non-compliance therewith shall be included in the written request.

### E.    Time Bar to Cash Payments

Checks issued by the Liquidating Trustee or the Debtors (as applicable) on account of Allowed Claims shall be null and void if not negotiated within the date that is 90 days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Liquidating Trustee or the Debtors (as applicable) by the Holder of the Allowed Claim.  Any claim relating to such voided check shall be made on or before the later of:  (i) six months after the Effective Date; or (ii) 180 days after the date of issuance of such check.  After such date, all claims relating to such voided checks shall be discharged and forever barred, and the Liquidating Trustee or the Debtors (as applicable) shall treat all such moneys as Forfeited Distributions.

### F.    Interest and Late Charges

Unless otherwise required by applicable law or as otherwise set forth in the Plan, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim, provided, however, that the DIP Facility Lender is entitled to interest at the rates set forth in the DIP Facility on the terms set forth in the DIP Facility Order up until April 21, 2011.  Except as expressly stated in the Plan or allowed by a Final Order of the Bankruptcy Court, no late charge is to be allowed on any Claim subsequent to the Petition Date.

### G.    Fractional Dollars; *De Minimis* Distributions

Notwithstanding anything contained in the Plan to the contrary, payments of fractions of dollars shall not be made.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.  The Liquidating Trustee and the Debtors (as applicable) shall not make any payment of less than $50 on account of any Allowed Claim, unless a specific request therefor is made in writing to the Liquidating Trustee on or before 90 days after the Effective Date.

### H.    Set-Offs

Consistent with applicable law, the Debtors and the Liquidating Trustee may, but shall not be required to, set-off against any Allowed Claim and the distributions to be made pursuant to the Plan on account on account of such Claim (before any distribution is made on account thereof), any claims, rights, and causes of action of any nature that the Debtors, the Estates, or the Liquidating Trust may hold against the Holder of such Allowed Claim (unless such claims, rights, and causes of action have been released by the Debtors pursuant to the releases contained

in Article X in the Plan, the Confirmation Order, the DIP Facility Order, or any other Final Order); provided, however, that neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust of any such claims, rights, and Causes of Action that the Debtors, the Estates, or the Liquidating Trust may possess against such Holder; and provided, further, however, that the Holder of the applicable Allowed Claim against which the Debtors or the Liquidating Trustee seeks to exercise set-off may file an objection or other motion in the Bankruptcy Court challenging such set-off.

I.      **Deadlines for Determining Record Holders of Various Classes of Claims**

At the close of business on the Distribution Record Date, the respective transfer records for the DIP Facility, the Financing Agreement, the Second Lien Notes, the Subordinated Notes, and the Equity Interests shall be closed, and there shall be no further changes in the record holders of the respective Administrative Expense Claims, DIP Facility Claims, Priority Tax Claims, Senior Creditor Claims, Other Secured Claims, General Unsecured Claims, Other Priority Claims, or the Equity Interests after such date. *None of the Debtors, the Liquidating Trustee, any disbursing agent or transfer agent retained thereby or Liquidating Trust Professional, nor the Administrative Agent or the indenture trustees for the Second Lien Notes or the Subordinated Notes shall (as applicable) have any obligation to recognize any transfer of the applicable Claims or Equity Interests, any notes or other securities issued in connection with either the DIP Facility, the Financing Agreement, the Second Lien Notes, the Subordinated Notes, or any of the Equity Interests occurring after the Distribution Record Date, and such parties shall be entitled, instead, to recognize and deal for all purposes hereunder, the Confirmation Order, and the Liquidating Trust Agreement with only those record holders of such Claims, Equity Interests, notes, or other securities (as applicable) as of the close of business on the Distribution Record Date.*

J.      **Allocation of Distributions**

All distributions paid to Holders of Allowed Claims in satisfaction thereof pursuant to the Plan shall be allocated, first, to the principal amounts of such Claims (as determined for U.S. federal income tax purposes) and, second, to the portion of such Claims comprising interest (as determined for U.S. federal income tax purposes), if any (but solely to the extent that interest is a portion of such Allowed Claim), including, without limitation, any portion of the Claim representing accrued original issue discount or accrued but unpaid interest; any excess thereafter shall be allocated to the remaining portion of such Claims.

**ARTICLE VII.**
**EXECUTORY CONTRACTS AND SIMILAR MATTERS**

A.      **Rejection of Executory Contracts**

Any Executory Contracts that (i) have not expired or been terminated by their own terms on or prior to the Effective Date, (ii) have not been assumed, assumed and assigned, rejected, or deemed rejected and terminated pursuant to a Sale Order, any other order of the Bankruptcy

Court, or letter agreement (including the Mountainside Letter Agreement) by and between the applicable Debtor and non-Debtor party thereto prior to the Confirmation Date, or (iii) are not the subject of a motion by the Debtors to either assume and assign or to reject such Executory Contract that is pending on the Confirmation Date, shall be deemed rejected by the Debtors as of the Confirmation Date, subject to the occurrence of the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections of such Executory Contracts pursuant to Bankruptcy Code §§ 365(a) and 1123 or otherwise.

Without limiting the generality of the foregoing, in accordance with the Mountainside Letter Agreement, the Mountainside Office Lease shall hereby be deemed rejected and terminated *nunc pro tunc* to August 31, 2011, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection by the Debtors and termination of the Mountainside Office Lease (effective as of August 31, 2011) pursuant to Bankruptcy Code §§ 365(a) and 1123.

## B.       Rejection Damages Claim

Each entity that is a party to an Executory Contract that is rejected as of the Confirmation Date pursuant to the Plan and the Confirmation Order shall be entitled to file, not later than the Rejected Contract Claim Bar Date, a Proof of Claim for damages alleged to have been suffered due to such rejection or in any other way relating to or arising from such Executory Contract; provided, however that the opportunity afforded an Entity whose Executory Contract is rejected as of the Confirmation Date pursuant to the Plan and the Confirmation Order to file a Proof of Claim shall in no way apply to Entities that were required to assert a claim on account of an Executory Contract that was previously or otherwise rejected by the Debtors by a prior or other bar date that was established by a separate order of the Bankruptcy Court, which such other bar date shall remain unaffected by the Plan and the Confirmation Order. *Any Entity that has a Claim for (i) damages as a result of the rejection of an Executory Contract pursuant to this Article of the Plan or (ii) that in any way relates to, or arises from an Executory Contract being rejected hereby, that in either instance does not file a Proof of Claim in accordance with the terms and provisions of the Plan with the Bankruptcy Court (and serve such Proof of Claim upon the Liquidating Trustee) shall be forever barred from asserting that Claim against, and such Claim shall be unenforceable against, the Debtors or the Liquidating Trust, and the Debtors and Liquidating Trust shall have no obligation to pay the same.*

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, in accordance with the Mountainside Letter Agreement, the Mountainside Landlord shall have no claims or right to assert any such claims against any of the Debtors or the Estates related to any time after August 31, 2011, with respect to the Mountainside Lease.

## C.       Classification of Claims Related to Executory Contracts

All Rejection Claims and any other Claim against any of the Debtors that in any way relates to, or arises from, any Executory Contract being rejected pursuant to this Article VII of the Plan shall, to the extent it is an Allowed Claim, be treated in the manner provided for in Bankruptcy Code §§ 365 and 502.  The Debtors, the Estates, the Liquidating Trustee, and all

other parties-in-interest in these Chapter 11 Cases reserve the right to object or otherwise assert any defenses with respect to any such Claim.

## D.    Insurance Policies

Nothing in the Plan, the Disclosure Statement, or the Confirmation Order alters the rights and obligations of the Debtors and the Debtors' insurers (and third-party claims administrators) under any Insurance Policies or Vested Insurance Agreements or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies and the Vested Insurance Agreements.

For the avoidance of doubt, all of the Debtors' rights and any third party's rights under any Insurance Policy and Vested Insurance Agreement to which the Debtors may be beneficiaries, including any directors and officers liability insurance policy, shall vest with the Liquidating Trust for the benefit of the Estates and all of the beneficiaries of such policies; and the Liquidating Trustee and/or the Debtors shall not take any action that would impair or alter the coverage currently in place for the Debtors' current or former directors and officers under any directors and officers liability insurance and/or similar policies, as such coverage shall remain in full force and effect for benefit of such directors and officers and for the Estates for the duration and term of all such policies.  The Debtors and the Liquidating Trust shall have no monetary obligations with respect to the Insurance Policies and the Vested Insurance Agreements other than with respect to any General Unsecured Claims and/or Other Secured Claims (as applicable, and to the extent set forth in the subsequent sentence) properly and timely asserted in the Chapter 11 Cases, to the extent that such Claims are Allowed.  Specifically, to the extent that a Claim of an insurer (or third-party administrator) is properly secured by virtue of such party's having previously been granted collateral (including letters of credit), such Claim shall continue to be secured by and to the extent of such collateral and shall be deemed to be (a) an Other Secured Claim in accordance with the Plan and Bankruptcy Code § 506(a) and shall be treated as Class 2 Claims under the Plan, provided that any excess collateral shall be returned to the Debtors or the Liquidating Trustee, as applicable, in accordance with the Insurance Policies and the Vested Insurance Agreements or court order (to be further distributed in the manner set forth in Section III.B.1(b) of the Plan) and (b) to the extent of any collateral deficiency, a General Unsecured Claim to be treated as a Class 4 Claim under the Plan, in each case subject to the filing of a Proof of Claim therefor and the Allowance thereof.

Any injunction set forth in the Plan and the automatic stay of Bankruptcy Code § 362(a), if and to the extent applicable, shall be lifted, without further order of the Bankruptcy Court, to permit (a) claimants with valid outstanding workers' compensation claims that are covered by any of the Insurance Policies or the Vested Insurance Agreements to undertake any actions that are necessary in order to proceed with their claims under such Insurance Policies or Vested Insurance Agreements and thereafter solely to collect thereon from any third party other than the Debtors, the Liquidating Trust, the Liquidating Trustee, or the Estates, (b) the applicable insurers and/or third-party administrators to administer, handle, defend, settle, and/or pay all workers' compensation claims arising under the Insurance Policies and the costs related thereto without further order of the Bankruptcy Court, (c) the applicable insurers and/or third-party

administrators to draw upon paid loss deposit funds and/or other collateral for payments of the claims, costs, and expenses described in subclauses (b) and (d) of this paragraph, in accordance with the applicable Insurance Policies and the Vested Insurance Agreements, and (d) all applicable insurers and third-party administrators to pay claims and/or defense costs and expenses related to claims arising under any Insurance Policies (other than with respect to workers' compensation claims, which are, for the avoidance of doubt, addressed in subclauses (a) and (c) of this paragraph), provided that such payments are permitted under the terms and conditions of such Insurance Policies or Vested Insurance Agreements; provided, however, that defense attorneys or claimants shall not be permitted to recover from both the Liquidating Trust and the applicable insurer or third-party administrator on account of the same claim.

### E.    Compensation and Benefits Programs

Except as otherwise expressly provided under the Plan or the Confirmation Order, all Compensation and Benefits Programs, to the extent (i) not previously or otherwise terminated and/or cancelled by the Debtors prior to the Confirmation Date and/or (ii) not the subject of a motion by the Debtors to reject or to otherwise cancel or terminate such program that is pending on the Confirmation Date, shall, on the Confirmation Date but subject to the occurrence of the Effective Date, be cancelled and deemed terminated and/or rejected and of no force or effect as of the Confirmation Date or any applicable prior termination and/or cancellation date, pursuant to the provisions of Bankruptcy Code §§ 365 and 1123, or otherwise, and the Debtors and/or the Liquidating Trustee, as applicable, are authorized and empowered to take all actions necessary to effectuate any such termination, cancellation, and/or rejection, and all third parties are authorized and directed to rely on this Section VII.D of the Plan in connection therewith.  For the avoidance of doubt, the Insurance Policies and the Vested Insurance Agreements shall not constitute a Compensation and Benefits Programs and shall not otherwise be terminated on the Effective Date under this Section VII.E of the Plan.

### F.    Return of Deposits by Utility Companies

Except to the extent the Debtors have previously agreed in writing (after having provided notice thereof to the Creditors Committee and the Administrative Agent) that a Utility Company may apply all or a portion of a deposit held thereby against any amounts owed by the Debtors thereto, all Utility Companies shall be required to return to the Liquidating Trustee all deposits previously provided by any of the Debtors within 30 days after the Effective Date (and the Debtors shall provide notice of this requirement to all Utility Companies as soon as practicable following the occurrence of the Effective Date, which notice may be part of the general notice of occurrence of the Effective Date for these Chapter 11 Cases).  Such returned deposits shall constitute Transferred Property to be administered and utilized by the Liquidating Trustee in the manner set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee shall be authorized to take any and all actions to enforce this provision.

## ARTICLE VIII.
## ACCEPTANCE OR REJECTION OF THE PLAN

### A.      Acceptance by Impaired Classes

An Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in the Class actually voting on the Plan have voted to accept the Plan, in each case not counting the vote of any Holder designated under Bankruptcy Code § 1126(e).

### B.      Elimination of Classes

Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed not included in the Plan for purposes of (i) voting to accept or to reject the Plan and (ii) determining whether such Class has voted to accept or to reject the Plan under Bankruptcy Code § 1129(a)(8).

### C.      Nonconsensual Confirmation

A court may confirm a Chapter 11 plan over the dissent of, or deemed rejection by, any Impaired Class of Claims or Equity Interests if all of the requirements for consensual confirmation under Bankruptcy Code § 1129(a), other than Bankruptcy Code § 1129(a)(8), and for nonconsensual confirmation under Bankruptcy Code § 1129(b), have been satisfied.  In the event that any Impaired Class of Claims or Equity Interests fails to vote to accept the Plan, or is deemed to reject the Plan pursuant to Bankruptcy Code § 1126(g), in accordance with Bankruptcy Code § 1129(a), the Debtors reserve the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code § 1129(b), (ii) amend the Plan, or (iii) withdraw the Plan and take any other action they deem necessary or appropriate in their discretion in the Chapter 11 Cases.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND THE EFFECTIVE DATE

### A.      Conditions Precedent to the Confirmation Date of the Plan

The occurrence of the Confirmation Date shall be subject to satisfaction of the following conditions precedent:

1.      The Confirmation Order, the provisions of which are nonseverable and mutually independent, is entered in form and substance reasonably satisfactory to the Debtors, the Administrative Agent, and the Creditors Committee.

2.      All provisions, terms, and conditions of the Plan are approved in the Confirmation Order or in another order of the Bankruptcy Court.

3.      The Debtors obtain authority to take all actions necessary or appropriate to enter into, implement, and consummate the Plan and other agreements or documents created in connection with, or as contemplated by, the Plan.

**B.      Conditions Precedent to the Effective Date of the Plan**

The occurrence of the Effective Date and the Consummation of the Plan are subject to satisfaction of the following conditions precedent:

1.      The Confirmation Order, as entered by the Bankruptcy Court, shall be a Final Order in full force and effect with no stay thereof then in effect.

2.      All actions, documents, and agreements necessary or appropriate to implement the Plan, including the Liquidating Trust Agreement, shall have been effected or executed.

3.      The Plan Fund shall have been established and funded in the manner set forth in the Plan, in accordance with the terms of the Plan and the Liquidating Trust Agreement, respectively (as applicable).

**C.      Waiver of Conditions Precedent**

To the extent legally permissible, any of the conditions precedent in this Article IX of the Plan may be waived, in whole or in part, by the Debtors (in consultation with the Administrative Agent and the Creditors Committee).  Any such waiver of a condition precedent may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than proceeding as if such condition did not exist.  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights.  Upon the waiver of any conditions to the Effective Date set forth in this Article IX of the Plan, and subject to the satisfaction in full of each of the remaining conditions set forth in this Article IX, the Plan shall become effective in accordance with its terms, without any notice to third parties or any other formal action.

**ARTICLE X.**
**EFFECT OF PLAN CONFIRMATION**

**A.      Settlement of Claims**

Except as otherwise expressly set forth in the Plan or in the Confirmation Order, the classification and/or manner of satisfying all Claims and Equity Interests, and the respective distributions and treatments hereunder, shall take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and subordination rights relating thereto, whether arising under general

principles of equitable subordination, Bankruptcy Code § 510, contractual agreement, the DIP Facility Order (with respect to the Other Assets Resolution Consideration), or otherwise, and any and all such rights are not settled, compromised, or released pursuant to the Plan.

**B.    General Plan Injunction**

**Except as may otherwise be provided in the Plan or in the Confirmation Order, upon the occurrence of the Effective Date, the rights afforded and the payments and distributions to be made under the Plan shall be in complete exchange for, and in full and unconditional settlement, satisfaction, and release of, any and all existing debts, Claims, and Equity Interests of any kind, nature, or description whatsoever against the Debtors or any of the Debtors' Assets or other property and shall effect a full and complete release and termination of all Liens, security interests, or other Claims, Equity Interests, interests, or encumbrances upon all of the Debtors' Assets and property except for the security interests and Liens preserved in favor of the Pre-Petition Lenders pursuant to Section III.B.(1)(d) of the Plan.  No Creditor or Equity Interest Holder of the Debtors nor any other Person may receive any distribution from the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or their respective Assets or seek recourse against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or any of their respective Assets, except for those distributions expressly provided for under the Plan.  All Persons are precluded from asserting against any property that is to be distributed under the terms of the Plan any Claims, obligations, rights, Causes of Action, liabilities, Liens, or Equity Interests based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other than to the extent expressly provided for in the Plan or the Confirmation Order, whether or not (a) a Proof of Claim or proof of Equity Interest based upon such debt or Equity Interest (as applicable) is filed or deemed filed under Bankruptcy Code § 501; (b) a Claim or Equity Interest based upon such debt or Equity Interest (as applicable) is allowed under Bankruptcy Code § 502; or (c) the Holder of a Claim or Equity Interest based upon such debt or Equity Interest (as applicable) has voted to accept the Plan or is deemed to have accepted the Plan under Bankruptcy Code § 1126(f).  *All Holders of Liens, Claims, and/or Equity Interests arising prior to the Effective Date shall be permanently barred and enjoined from asserting against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or their respective Assets any of the following actions on account of such Claim or Equity Interest: (a) commencing or continuing in any manner any action or other proceeding on account of such Lien, Claim, or Equity Interest against property to be distributed under the terms of the Plan or the property of any of the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, Lien, or order against any of the property to be distributed under the terms of the Plan or the property of any of the Debtors, the Liquidating Trustee, or the Liquidating Trust, other than as permitted under subclause (a) of this sentence; (c) creating, perfecting, or enforcing any Lien, claim, or encumbrance against any property to be distributed under the terms of the Plan or the property of any of the Debtors, the Liquidating Trustee, or the Liquidating Trust; (d) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any*

-51-

*obligation due the Debtors, the Liquidating Trustee, the Liquidating Trust, or any of their respective Assets or any other property of the Debtors or the Liquidating Trust, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Confirmation Order, and the Liquidating Trust Agreement.*

**C.    Terms of Existing Injunctions or Stays**

Unless otherwise provided in the Plan, all injunctions and stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 105, 362, and 525, and otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. *The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to the Plan.*

**D.    Exculpation**

***NEITHER THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, THE CREDITORS COMMITTEE AND ITS MEMBERS SOLELY IN THEIR CAPACITIES AS MEMBERS OF THE CREDITORS COMMITTEE AND NOT IN ANY OTHER CAPACITY, THE ADMINISTRATIVE AGENT, THE PRE-PETITION LENDERS, THE DIP FACILITY LENDER, THE SECOND LIEN NOTEHOLDERS, NOR ANY OF THEIR RESPECTIVE PRESENT OR FORMER OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, EMPLOYEES, ADVISORS, PROFESSIONALS, ATTORNEYS, OR AGENTS ACTING IN SUCH CAPACITY OR THEIR RESPECTIVE AFFILIATES, SHALL HAVE OR INCUR ANY LIABILITY (WHETHER ARISING UNDER CONTRACT, TORT, OR FEDERAL OR STATE SECURITIES OR EMPLOYMENT AND/OR LABOR LAWS OR REGULATIONS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, NOW EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE) TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, THE DEBTORS, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, OR ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST, OR ANY OTHER PARTY-IN-INTEREST IN THESE CHAPTER 11 CASES, OR ANY OF THEIR RESPECTIVE AGENTS, SHAREHOLDERS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, PROFESSIONALS, ATTORNEYS, OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY PRE-PETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN OR ANY OTHER TRANSACTION, EVENT, OR OCCURRENCE IN ANY WAY CONNECTED WITH, ARISING FROM, OR RELATING TO (A) THE DEBTORS, (B) THE CHAPTER 11 CASES OR THE COMMENCEMENT OR ADMINISTRATION THEREOF, (C) THE DISCLOSURE STATEMENT, THE PLAN (EITHER PRIOR TO CONFIRMATION OR APPROVAL OF SAME OR AS THE SAME MAY BE CONFIRMED OR OTHERWISE APPROVED BY THE BANKRUPTCY COURT), INCLUDING THE NEGOTIATION AND FORMULATION THEREOF, OR ANY ORDERS***

*OF THE BANKRUPTCY COURT RELATED THERETO (INCLUDING THE CONFIRMATION ORDER), AND THE DOCUMENTS NECESSARY TO EFFECTUATE THE PLAN (INCLUDING THE LIQUIDATING TRUST AGREEMENT) OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, (D) THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN AND THE RELEASES AND WAIVERS PROVIDED FOR IN THE PLAN, (E) THE IMPLEMENTATION AND ADMINISTRATION OF THE PLAN AND THE LIQUIDATING TRUST, (F) THE DISTRIBUTION OF PROPERTY UNDER THE PLAN (INCLUDING WITH RESPECT TO THE PRESERVED COLLATERAL), (G) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE LIQUIDATING TRUST, OR THE CHAPTER 11 CASES, (H) THE SALES, INCLUDING THE NEGOTIATION AND CONSUMMATION THEREOF, AND THE SALE ORDERS, OR (I) ANY OTHER ORDER OF THE BANKRUPTCY COURT ENTERED IN THE CHAPTER 11 CASES, EXCEPT FOR ANY LIABILITY ARISING FROM CONDUCT CONSTITUTING FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER.*

**E.    Releases by the Debtors and the Estates**

*NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE CONFIRMATION DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE DEBTORS, THE LIQUIDATING TRUSTEE AND THE LIQUIDATING TRUST, OR ANY OTHER PARTY ACTING ON BEHALF OF THE ESTATES SHALL NOT RECEIVE OR OTHERWISE BE ENTITLED TO ASSERT ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES (INCLUDING THE WAIVER OF THE SECOND LIEN NOTE CLAIMS AND OTHERWISE PURSUANT TO THE UNSECURED CREDITOR SETTLEMENT), THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING:  (1) THE SATISFACTION AND RELEASE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID AND TRANSACTIONS UNDERTAKEN (INCLUDING THE CREATION AND FUNDING OF THE LIQUIDATING TRUST) PURSUANT HERETO; (2) THE UNSECURED CREDITOR SETTLEMENT; AND (3) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, PROFESSIONALS, ATTORNEYS, SHAREHOLDERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE PLAN AND THE LIQUIDATING TRUST AND THE ASSOCIATED TRANSACTIONS CONTEMPLATED HEREBY AND BY THE LIQUIDATING TRUST AGREEMENT, EACH OF THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL RELEASE TO EACH RELEASED PARTY (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FULLY RELEASED BY THE DEBTORS AND THE ESTATES) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING OR OTHERWISE*

***ASSERTABLE AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE ESTATES, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (DERIVATIVELY OR OTHERWISE) ON BEHALF OR IN THE NAME OF ANY OF THE DEBTORS OR ANY OF THE ESTATES;*** PROVIDED, HOWEVER, THAT NOTHING IN THE PLAN SHALL RELEASE OR BE DEEMED TO RELEASE LIABILITY OF ANY PERSON ARISING FROM CONDUCT CONSTITUTING FRAUD OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

Notwithstanding anything contained in the Plan to the contrary, the Plan does not release the D&O Claims or any Avoidance Actions or any other Causes of Action, whether direct, derivative, or otherwise, that the Debtors, the Estates, or the Liquidating Trustee have or may have now or in the future solely to the extent that any such claims or actions are against any Non-Released Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' releases provided for in this Section X.E (the "*Debtors' Releases*"), which include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' Releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties (including the waiver of the Second Lien Note Claims and otherwise pursuant to the Unsecured Creditor Settlement); (2) a good-faith settlement and compromise of the claims released by the Debtors hereby; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Equity Interests; (4) fair, equitable, and reasonable under the circumstances of these Chapter 11 Cases; (5) given and made after due notice and an opportunity for a hearing; *and (6) a bar to any of the Debtors' or the Liquidating Trustee's asserting any claim or cause of action released pursuant to this Section X.E.*

## F.      Releases by the Releasing Parties

***NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE CONFIRMATION DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS ALSO A THIRD-PARTY RELEASEE) SHALL PROVIDE A FULL RELEASE (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO ALL OF THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING OR OTHERWISE ASSERTABLE AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR***

*EMPLOYMENT AND/OR LABOR LAWS OR REGULATIONS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THE ESTATES, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN.* **NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE PLAN DOES NOT RELEASE THE D&O CLAIMS OR ANY CLAIMS, AVOIDANCE ACTIONS, OR OTHER CAUSES OF ACTION, WHETHER DIRECT, DERIVATIVE, OR OTHERWISE, THAT THE RELEASING PARTIES MAY HAVE NOW OR IN THE FUTURE AGAINST ANY NON-RELEASED PARTIES, OR ANY LIABILITY OF ANY PERSON ARISING FROM CONDUCT CONSTITUTING FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided for in this Section X.F, which include by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties (including the waiver of the Second Lien Note Claims and otherwise pursuant to the Unsecured Creditor Settlement); (2) a good-faith settlement and compromise of the claims released in this Section X.F; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Equity Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and an opportunity for a hearing; *(6) a bar to any of the Releasing Parties' asserting any claim released pursuant to this Section X.F; and (7) be deemed to have been entered into consensually, by virtue of the applicable Releasing Party's having voted to accept the Plan.*

**ALL RELEASING PARTIES SHALL BE FOREVER PRECLUDED FROM ASSERTING ANY OF THE CLAIMS RELEASED PURSUANT TO THIS SECTION X.F AGAINST ANY OF THE RELEASED PARTIES OR ANY OF THE RELEASED PARTIES' RESPECTIVE ASSETS. TO THE EXTENT THAT ANY RELEASING PARTY RECEIVES MONETARY DAMAGES FROM ANY RELEASED PARTY ON ACCOUNT OF ANY CLAIM RELEASED PURSUANT TO THIS SECTION X.F, SUCH RELEASING PARTY HEREBY ASSIGNS ALL OF ITS RIGHT, TITLE, AND INTEREST IN AND TO SUCH RECOVERY TO THE RELEASED PARTIES AGAINST WHOM SUCH MONEY IS RECOVERED.**

G.      **Injunction Related to Releases**.

**The Confirmation Order will enjoin, and shall be deemed to enjoin, permanently the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the Plan (including the releases set forth in this Article X).**

H.      **Limits to Release and Exculpation Provisions**

Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, nothing in the Plan (including anything set forth in Article X of the Plan) shall or shall be

deemed to (i) constitute a release, discharge, or waiver by any Debtor, Estate, Releasing Party, the Liquidating Trustee, the Liquidating Trust, or any other Person of, or (ii) impose any injunction against the enforcement of, any claim or cause of action or any potential claim or cause of action against Messrs. Michael Mulligan, Russell D'Anton, or Michael D'Anton and their respective family members or relatives or any entity in which they may have an ownership, partnership, shareholder, membership, pecuniary, or other interest.  In addition, nothing in the Plan or the Confirmation Order shall or shall be deemed to constitute a release, discharge, or waiver by (i) any Professional of any Professional Fee Claim against the Debtors, the Estates, or any other party or (ii) any of the Pre-Petition Lenders of any claim or cause of action that any of them may have against any other Pre-Petition Lender.

**I.      Indemnification of Debtors' Officers and Directors.**

Pursuant to an indemnity agreement to be executed between the Debtors and the Administrative Agent in form and substance acceptable to the parties thereto, the Administrative Agent shall indemnify and hold harmless all officers and directors of any of the Debtors serving as of October 1, 2010, or at any time thereafter, in an aggregate amount of up to $500,000 (the "*Indemnity Amount*"), with respect to all costs of defense, settlements, and/or payments upon any judgments that may be entered against any such parties, in connection with certain causes of action, claims, liabilities, losses, expenses, and damages asserted against any such officer or director on account of, or otherwise arising out of or in connection with their relationship with the Debtors.

**ARTICLE XI.**
**MISCELLANEOUS**

**A.      Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good-faith compromise of all claims or controversies relating to the contractual, legal, and other rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account thereof.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this compromise and settlement of all such claims or controversies, and the Bankruptcy Court's finding that such compromise and settlement is in the best interests of the Debtors, the Estates, and Holders of Claims and Equity Interests, a proper exercise of the Debtors' business judgment, and is fair, equitable, and reasonable.  The entry of the Confirmation Order shall also constitute the Bankruptcy Court's approval of the Unsecured Creditor Settlement.

**B.      Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date, to the extent required by applicable law, or, if not required to be paid on or prior to the Effective Date, by the Debtors or the Liquidating Trustee as soon as practicable following the

Effective Date, as and when such fees become due and payable in accordance with applicable law.

## C.    Exemption from Securities Laws

The creation or issuance of (i) any beneficial interests in the Liquidating Trust to the Holders of Allowed General Unsecured Claims or otherwise under the Plan and (ii) the New CB Holding Share, to the extent, if any, either of such interests constitute "securities" under applicable law, in each instance satisfies the requirements of Bankruptcy Code § 1145, and therefore, such creation or issuance shall be exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer or sale of securities.

## D.    Bankruptcy Code § 1146 Exemption

Pursuant to Bankruptcy Code § 1146(a), (a) the creation, modification, consolidation, or recording of any mortgage, deed of trust, lien, pledge, or other security interest; (b) the making, recording, or assignment of any lease or sublease; or (c) the making, recording, or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan and the remaining Sales or portions thereof that have not closed as of the Confirmation Date, including, without limitation, any merger agreements; assignments; agreements of consolidation, restructuring, disposition, liquidation, or dissolution; deeds; bills of sale; and transfers of tangible property by the Debtors or the Liquidating Trustee, shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax, or other similar tax. Any transfers from the Debtors to the Liquidating Trust or any other Person (including any Purchaser) following the Confirmation Date or by the Liquidating Trust to a creditor or other Entity or otherwise pursuant to the Plan, the Sale Orders, the Confirmation Order, any other order of the Bankruptcy Court, or the Liquidating Trust Agreement shall not be subject to any such taxes, and all appropriate state or local governmental officials or agents are hereby and by the Confirmation Order directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Any of the foregoing sales or transactions taken or closing on or after the Confirmation Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

## E.    Books and Records

On the Effective Date, the Debtors' books and records (excluding any electronic mail or other correspondence among the Debtors and their counsel subject to Privilege other than those referred to in Section XI.F of the Plan) (the "*Books and Records*") shall be transferred to the Liquidating Trust, except to the extent any such Books and Records were transferred to the various Purchasers under the respective Asset Purchase Agreements.  With respect to the Books and Records that were transferred to a Purchaser under an Asset Purchase Agreement, such Purchaser shall provide the Liquidating Trustee and the Debtors reasonable access to the Books and Records in the manner provided in the applicable Asset Purchase Agreement to enable the

Liquidating Trustee and the Debtors to carry out their respective duties under the Liquidating Trust Agreement or otherwise under the Plan (as applicable).

With respect to all other Books and Records retained by the Debtors after the Confirmation Date, the Liquidating Trustee shall be free, in its discretion, upon prior notice to the Administrative Agent, to abandon, destroy, or otherwise dispose of any such Books and Records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further court order; provided, however, that in the Liquidating Trustee's discretion, these Books and Records so retained may otherwise be destroyed or disposed of beginning six (6) months after the Effective Date, notwithstanding any applicable laws, rules, or regulations that potentially would have required the Debtors to retain such Books and Records for longer.  The Liquidating Trustee shall also be free, in its discretion, upon prior notice the Administrative Agent, and in compliance with applicable non-bankruptcy law, to abandon, destroy, or otherwise dispose of all Books and Records previously transferred thereto by the Debtors in accordance with this Section XI.E, without the need for any other or further court order.

## F.        Privileges as to Certain Causes of Action

Privileges relating solely to any existing Avoidance Actions or other Transferred Causes of Action pursued, investigated, or considered by the Debtors prior to the Confirmation Date (not otherwise resolved) shall be transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust.  The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and entitled to assert such Privileges.  No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information, or communications subject to attorney-client privileges, work product protections or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtors.  The Liquidating Trustee shall reserve the right to request other materials that may be subject to Privilege for appropriate reasons, but representatives of the Debtors and the Debtors' Professionals shall maintain the ability to oppose any such request on any grounds or to seek compensation in connection with such production, with any disputes to be decided by the Bankruptcy Court.

## G.        New Employee Agreements

The Debtors and the Liquidating Trustee are authorized to negotiate employment, consulting, or similar contracts or arrangements with any current or former employees or officers of the Debtors or any Professionals, to the extent necessary, beneficial, or appropriate to wind down the Estates or otherwise fulfill their respective duties and responsibilities under the Plan or the Liquidating Trust Agreement (as applicable).   To the extent the Debtors and/or the Liquidating Trustee, as applicable, enter into any such arrangements with any current officers of the Debtors, such parties would remain and continue as officers, until such time as their services are no longer needed by the Debtors and/or the Liquidating Trustee, as applicable.

## H.       Unclaimed Property

Notwithstanding any local, state, federal, or other laws or regulations regarding unclaimed property or escheatment of property, all funds or other property possessed by the Debtors or the Liquidating Trust on and after the Effective Date (including any unclaimed pay checks; any unclaimed or returned distributions or other benefits under any Compensation and Benefits Program or otherwise; or customer gift, club, or similar cards in connection with any customer promotion, similar activity, or otherwise that is unclaimed, unutilized, returned, or unredeemed (as the case may be) or otherwise remaining outstanding), in each case subject to escheatment or potentially subject to escheatment, as of the Effective Date, shall be treated as property of the Debtors under the Plan, and shall accordingly be deemed transferred to, vested with, and become the property of the Debtors or the Liquidating Trust (as applicable) to be either destroyed and of no force and effect or held and distributed pursuant to the terms of the Plan, in each case free and clear of any such laws or regulations.  *No local, state, federal, or other regulatory or other administrative agency may assert any claims or causes of action against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, and/or any of the Debtors' or the Liquidating Trustee's respective officers, directors, employees, agents, or professionals with respect to any such funds or other property that is the subject of this Section XI.H, and such agencies are hereby enjoined and estopped from doing so.*

## I.       Business Day

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## J.       Severability

The provisions of the Plan shall not be severable, unless such severance is agreed to by the Debtors, and such severance would constitute a permissible modification of the Plan pursuant to Bankruptcy Code § 1127.

## K.       Conflicts

Except as expressly set forth in the Plan or in the Confirmation Order, to the extent that any provision of the Disclosure Statement conflict with or are in any way inconsistent with the terms of the Plan, the Plan shall govern and control; and to the extent that any provision of the Disclosure Statement, the Plan, the Liquidating Trust Agreement, or the Confirmation Order (or any exhibits, schedules, appendices, supplements, or amendments to the foregoing) or any other order referenced in the Plan conflict with or are in any way inconsistent with the respective terms thereof, the Confirmation Order shall govern and control.

## L.    Evidence

In the event the Plan shall not take effect or be consummated for whatever reason, nothing here shall constitute an admission or denial with respect to whether any of the Claims or Liens held by the Holders of any Claims or Equity Interests are (a) entitled to Allowance or Disallowance, (b) Secured or not Secured, (c) entitled to priority treatment under the Bankruptcy Code or otherwise, (d) liable to subordination, or (e) liable for any claims or Causes of Action, including but not limited to claims under Bankruptcy Code §§ 506, 510, 522, 542, 543, 544, 545, 547, 548, 549, and/or 550.

## M.    Further Assurances

The Debtors, the Creditors Committee, the Administrative Agent, the Pre-Petition Lenders, the DIP Facility Lender, the Liquidating Trustee, all Holders of Claims receiving distributions under the Plan, all beneficiaries of the Liquidating Trust, and all other parties-in-interest shall, from time to time, prepare, execute, and deliver agreements or documents and take other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Liquidating Trust Agreement (as applicable).

## N.    Notices

All notices, requests, and demands required by the Plan to be effective shall be in writing, including by facsimile transmission or electronic mail and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered to all of the following, or in the case of notice by facsimile transmission or electronic mail, when received by all of the following, addressed as follows or to such other addresses as Filed with the Bankruptcy Court:

**To the Debtors:**

Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, New York  10005
Attn:  Joel H. Levitin, Stephen J. Gordon,
Richard A. Stieglitz Jr., and Maya Peleg
Telephone:  (212) 701-3000
Facsimile:  (212) 369-5420

Richards, Layton & Finger, P.A.
One Rodney Square,
920 North King Street
Wilmington, Delaware  19801
Attn:  Mark D. Collins, Christopher
M. Samis, and Tyler D. Semmelman
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

**To the Administrative Agent:**

Vedder Price P.C.
222 N. LaSalle Street, Suite 2600
Chicago, Illinois  60601
Attn:  Douglas J. Lipke and Jonathan E.
Aberman
Telephone:  (312) 609-7500

-60-

Facsimile:  (312) 609-5005

**To the Official Committee of
Unsecured Creditors:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California  90067
Attn:  Jeffrey N. Pomerantz
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington,  Delaware   19899-8705
(courier 19801)
Attn:  Bradford J. Sandler
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

**O.       Filing of Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan or that are otherwise contemplated by the Plan.

**P.       Successors and Assigns**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**Q.       Exclusivity Period**

The Debtors shall retain the exclusive rights under Bankruptcy Code § 1121 to amend or modify the Plan and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

**R.       Section Headings**

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

**S.       Further Information**

Requests for further information regarding the Debtors should be directed to counsel to the Debtors as set forth on the cover page hereof and herein.

**ARTICLE XII.
RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the

Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the intents and purposes of the Plan and the Liquidating Trust Agreement are carried out.    The Bankruptcy Court shall also retain and have exclusive jurisdiction after the Effective Date over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases, the Plan, the Confirmation Order, or the Liquidating Trust Agreement, or that otherwise relates to any of the following:

1.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Confirmation Order, the Liquidating Trust Agreement, and the Sale Orders and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan and the Liquidating Trust;

2.    to determine any and all motions, adversary proceedings (including all Avoidance Actions and all other Causes of Action, regardless of whether such action is pending or has otherwise been commenced or instituted as of the Effective Date), applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by Debtors, the Liquidating Trustee, or the Liquidating Trust after the Effective Date, including, without limitation, among others, any claims or causes of action against Sysco Corporation and all related entities, and any other claims or causes of action, whether actual or hypothetical, as disclosed in the Plan Supplement; provided, however, that the Debtors, the Liquidating Trust, and the Liquidating Trustee reserve the right to commence collection actions, actions to recover receivables, and other similar actions in any and all other appropriate jurisdictions;

3.    to ensure that distributions to Holders of Allowed Claims are accomplished as provided for in the Plan and in the Liquidating Trust Agreement;

4.    to hear and determine any objections to Claims or Equity Interests Filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or Secured or unsecured or priority or non-priority status of any Claim, in whole or in part, and any related proceedings, judicial, quasi-judicial, regulatory, administrative, or other;

5.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

6.    to issue such orders in aid of execution of the Plan and the Sales, to the extent authorized by Bankruptcy Code § 1142;

7.      to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

8.      to hear and determine all applications for awards of Professional Fees or other compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

9.      to hear and determine disputes arising in connection with or relating to the Plan or the Liquidating Trust or the interpretation, implementation, or enforcement of the Plan or the Liquidating Trust Agreement (including to enforce the release, injunction, and exculpation provisions set forth in Article X of the Plan) whether explicitly referenced in the Plan or not of any Entity's obligations incurred in connection with or released, enjoined, and/or exculpated under the Plan;

10.     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan (including with respect to the release and exculpation provisions set forth in Article X of the Plan), the Sale Orders, and the Liquidating Trust Agreement, including, without limitation, with respect to any asserted Claim for unused vacation pay or time and any related proceedings, judicial, quasi-judicial, regulatory, administrative, or other;

11.     to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Liquidating Trust, the Liquidating Trust Agreement, the Confirmation Order, the Sales, the Sale Orders, the Asset Purchase Agreements, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement to be executed in connection with the Plan or the Liquidating Trust;

12.     to hear and determine matters concerning state, local, or federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146;

13.     to hear and determine any disputes or other matters arising in connection with the interpretation, implementation, consummation, or enforcement of all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered pursuant to the Plan and/or in any way in connection with the Chapter 11 Cases; and

14.     to hear any other matter or for any purpose specified in the Disclosure Statement, the Confirmation Order, the Plan, the Liquidating Trust Agreement, or any other document entered into in connection with any of the foregoing.

# ARTICLE XIII.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.    Modification of Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order (with the consent of the Creditors Committee and the Administrative Agent in the event such amendment or modification would materially affect either of their respective substantive rights, which consent may not unreasonably be withheld); provided, however, that in the event they make any material amendments to the Plan prior to the Confirmation Hearing, the Debtors will file a motion or other pleading with the Bankruptcy Court requesting that the Bankruptcy Court find that no resolicitation of votes with respect to the Plan is required.  Upon the entry of the Confirmation Order, the Debtors (or, after the Effective Date, the Liquidating Trustee) may, after notice and a hearing, amend or modify the Plan, in accordance with Bankruptcy Code § 1127(b), remedy any defect or omission, or reconcile any inconsistency in the Plan or the Liquidating Trust Agreement, in such manner as may be necessary to carry out the purpose and intent of the Plan.  A Holder of a Claim that has voted to accept the Plan shall be deemed to have voted to accept the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder, and the votes of each Class for or against the Plan shall be counted and used in connection with the modified plan.

### B.    Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent or different plans (in consultation with the Administrative Agent and the Creditors Committee).  If the Debtors revoke or withdraw the Plan, or if (1) the Confirmation Order shall not have become a Final Order or is otherwise vacated for any reason, or (2) the Effective Date shall not otherwise have occurred within 180 days of the Confirmation Date, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan or the Disclosure statement, and no acts taken in preparation for the Consummation of the Plan, shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or the Estates, (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any Debtor Releasees, or (iv) constitute a release of any Causes of Action possessed or maintained by the Debtors or the Estates.

Dated:  January 4, 2012                    Respectfully submitted,


                                           CB HOLDING CORP.
                                           On behalf of itself and all of the Affiliate Debtors


                                           By: /s/ Gary Lembo
                                                Name:  Gary Lembo
                                                Title:  Chief Restructuring Officer


                                           Debtors and Debtors-in-Possession

## **EXHIBIT B**

**Hypothetical Distribution Analysis**

**CB Holding Corp.**
**Hypothetical Distribution Analysis**
<u>Chapter 7 Scenario</u>

<u>Note</u>:  As described further in the Disclosure Statement, substantially all of the Debtors' assets have been sold and the proceeds thereof are already in the possession of the Debtors or the Administrative Agent, leaving only the proceeds of future liquor license sales, certain contingent recoveries through avoidance actions and litigation, and potential recovery of certain deposits and rebates, as the only remaining assets of the Debtors.  All references to "future" below refer to after the Effective Date.   For the purpose of this hypothetical distribution analysis the following other assumptions are made: (i)  assets currently under contract for sale, including liquor licenses, are not included in future recoveries (as those amounts are included in "Cash Available for Creditors") and (ii) various rebates that will be obtained before the Effective Date are not included.  All litigation recoveries are speculative and ultimately unknown and should not be relied upon by parties when voting on the Plan. Under the DIP Facility Order the only unencumbered assets in a Chapter 7 are Avoidance Actions.  The following numbers take into account the satisfaction of all allowed claims under the DIP Facility.

| | Estimated Claim Amounts | Hypothetical Chapter 7 Scenario | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low End | Low Recovery % | Mid Point | Mid Recovery % | High End | High Recovery % |
| **Cash Available for Creditors** | | $ 16,579,826 | | $ 16,579,826 | | $ 16,579,826 | |
| **Future Potential Sale Proceeds, Refunds, Rebates  and  Recoveries** | | | | | | | |
| Future Potential  Liquor License Sale Proceeds | | $       - | | $     82,500 | | $     165,000 | |
| Future Potential Rebates or Refunds | | $       - | | $    800,000 | | $  1,600,000 | |
| Future Potential Recovery from Avoidance Actions or other litigation | | $       - | | $    600,000 | | $  1,200,000 | |
| **Total Future Potential Sale Proceeds, Refunds, Rebates  and  Recoveries** | | $       - | | $  1,482,500 | | $  2,965,000 | |
| **Total Cash and Sales Proceeds Available For Distribution** | | $ 16,579,826 | | $ 18,062,326 | | $ 19,544,826 | |
| **Liquidation Costs** | | | | | | | |
| Less Estimated Payment to Chapter 7 Trustee and its Professionals (ie., 3% of Total Proceeds) | | $  (497,395) | | $  (541,870) | | $  (586,345) | |
| **Net Liquidation Proceeds** | | $ 16,082,431 | | $ 17,520,456 | | $ 18,958,481 | |
| Less Payment to Secured Lenders | $ 73,000,000 | $ 14,916,431 | 20% | $ 15,754,456 | 22% | $ 16,592,481 | 23% |
| Less Payment of Chapter 11 Administrative Claims | $     272,000 | $    272,000 | 100% | $    272,000 | 100% | $    272,000 | 100% |
| Less Payment of 503(b)(9) Claims | $     678,000 | $    678,000 | 100% | $    678,000 | 100% | $    678,000 | 100% |
| Less Payment of Priority Unsecured Claims (including any Priority Tax Claims) | $     432,000 | $    216,000 | 50% | $    432,000 | 100% | $    432,000 | 100% |
| Less Payment to General Unsecured Creditors | $120,000,000 | $       - | 0.0% | $    384,000 | 0.3% | $    984,000 | 0.8% |
| **Total Proceeds Distribution** | | $ 16,082,431 | | $ 17,520,456 | | $ 18,958,481 | |

**CB Holding Corp.**
**Hypothetical Distribution Analysis**
**Chapter 11 Scenario**

| | Estimated Claim Amounts | Chapter 11 Scenario | | | | | |
|---|---|---|---|---|---|---|---|
| | | Low End | Low Recovery % | Mid Point | Mid Recovery % | High End | High Recovery % |
| **Cash Available for Creditors** | | $ 16,579,826 | | $ 16,579,826 | | $ 16,579,826 | |
| **Future Potential Sale Proceeds, Refunds, Rebates  and  Recoveries** | | | | | | | |
| Future Potential  Liquor License Sale Proceeds | | $          - | | $       82,500 | | $       165,000 | |
| Future Potential Rebates or Refunds | | $          - | | $     800,000 | | $    1,600,000 | |
| Future Potential Recovery from Avoidance Actions or other litigation | | $          - | | $     600,000 | | $    1,200,000 | |
| **Sale Proceeds** | | $          - | | $   1,482,500 | | $    2,965,000 | |
| **Total Cash and Sales Proceeds Available For Distribution** | | $ 16,579,826 | | $ 18,062,326 | | $ 19,544,826 | |
| **Liquidation Costs** | | | | | | | |
| Less Estimated Payment to Liquidation Trustee and its Professionals | | $   (250,000) | | $   (250,000) | | $   (250,000) | |
| **Net Liquidation Proceeds** | | $ 16,329,826 | | $ 17,812,326 | | $ 19,294,826 | |
| Less Payment to Secured Lenders | $ 73,000,000 | $ 14,802,826 | 20% | $ 15,685,326 | 21% | $ 16,567,826 | 23% |
| Less Payment of Chapter 11 Administrative Claims | $      272,000 | $      272,000 | 100% | $      272,000 | 100% | $      272,000 | 100% |
| Less Payment of 503(b)(9) Claims | $      678,000 | $      678,000 | 100% | $      678,000 | 100% | $      678,000 | 100% |
| Less Payment of Priority Unsecured Claims (including any Priority Tax Claims) | $      432,000 | $      432,000 | 100% | $      432,000 | 100% | $      432,000 | 100% |
| Less Payment to General Unsecured Creditors | $120,000,000 | $      145,000 | 0.1% | $      745,000 | 0.6% | $    1,345,000 | 1.1% |
| **Total Proceeds Distribution** | | $ 16,329,826 | | $ 17,812,326 | | $ 19,294,826 | |

**<u>EXHIBIT C</u>**

**Schedule of Anticipated Allowed 503(b)(9) Claims other than Sysco 503(b)(9) Claims**

**CB HOLDING Corp. *et al***
Exhibit C: 503(b)(9) Claims

| Claim# | Date Filed | Creditor Name | Amount |
|--------|-----------|---------------|--------|
| 529 | 04/25/11 | BUCKHEAD BEEF COMPANY | $3,145.28 |
| 2070 | 10/08/11 | ELLIS COFFEE COMPANY | $1,172.76 |
| 81 | 12/11/10 | GREAT STATE BEVERAGES GREAT STATE | $132.35 |
| 581 | 05/27/11 | M TUCKER CO INC | $1,244.82 |
| 582 | 05/27/11 | M TUCKER CO INC | $3,195.81 |
| 583 | 05/27/11 | M TUCKER CO INC | $2,961.02 |
| 584 | 05/27/11 | M TUCKER CO INC | $997.00 |
| 585 | 05/27/11 | M TUCKER CO INC | $613.76 |
| 586 | 05/27/11 | M TUCKER CO INC | $1,276.84 |
| 588 | 05/27/11 | M TUCKER CO INC | $1,180.29 |
| 592 | 05/27/11 | M TUCKER CO INC | $3,225.69 |
| 593 | 05/27/11 | M TUCKER CO INC | $1,038.49 |
| 594 | 05/27/11 | M TUCKER CO INC | $1,186.27 |
| 596 | 05/27/11 | M TUCKER CO INC | $1,614.70 |
| 597 | 05/27/11 | M TUCKER CO INC | $1,217.71 |
| 598 | 05/27/11 | M TUCKER CO INC | $1,351.13 |
| 599 | 05/27/11 | M TUCKER CO INC | $1,215.11 |
| 600 | 05/27/11 | M TUCKER CO INC | $474.95 |
| 601 | 05/27/11 | M TUCKER CO INC | $555.90 |
| 602 | 05/27/11 | M TUCKER CO INC | $1,829.53 |
| 603 | 05/27/11 | M TUCKER CO INC | $892.51 |
| 604 | 05/27/11 | M TUCKER CO INC | $1,086.03 |
| 605 | 05/27/11 | M TUCKER CO INC | $2,085.83 |
| 606 | 05/27/11 | M TUCKER CO INC | $1,899.25 |
| 607 | 05/27/11 | M TUCKER CO INC | $1,735.95 |
| 609 | 05/27/11 | M TUCKER CO INC | $1,389.50 |
| 610 | 05/27/11 | M TUCKER CO INC | $2,776.88 |
| 611 | 05/27/11 | M TUCKER CO INC | $1,449.46 |
| 612 | 05/27/11 | M TUCKER CO INC | $1,278.82 |
| 613 | 05/27/11 | M TUCKER CO INC | $1,478.23 |
| 614 | 05/27/11 | M TUCKER CO INC | $1,176.43 |
| 615 | 05/27/11 | M TUCKER CO INC | $1,080.97 |
| 616 | 05/27/11 | M TUCKER CO INC | $1,658.30 |
| 617 | 05/27/11 | M TUCKER CO INC | $780.66 |
| 618 | 05/27/11 | M TUCKER CO INC | $1,223.39 |
| 619 | 05/27/11 | M TUCKER CO INC | $1,239.76 |
| 620 | 05/27/11 | M TUCKER CO INC | $1,614.34 |
| 621 | 05/27/11 | M TUCKER CO INC | $1,531.04 |
| 622 | 05/27/11 | M TUCKER CO INC | $1,198.07 |
| 623 | 05/27/11 | M TUCKER CO INC | $1,546.28 |
| 624 | 05/27/11 | M TUCKER CO INC | $997.95 |
| 625 | 05/27/11 | M TUCKER CO INC | $973.02 |
| 626 | 05/27/11 | M TUCKER CO INC | $684.04 |
| 627 | 05/27/11 | M TUCKER CO INC | $999.11 |
| 628 | 05/27/11 | M TUCKER CO INC | $2,874.83 |
| 629 | 05/27/11 | M TUCKER CO INC | $1,610.45 |
| 630 | 05/27/11 | M TUCKER CO INC | $1,202.23 |
| 631 | 05/27/11 | M TUCKER CO INC | $1,016.07 |
| 632 | 05/27/11 | M TUCKER CO INC | $1,107.80 |

**CB HOLDING Corp. *et al***
Exhibit C: 503(b)(9) Claims

| Claim# | Date Filed | Creditor Name | Amount |
|---|---|---|---|
| 633 | 05/27/11 | M TUCKER CO INC | $1,209.71 |
| 634 | 05/27/11 | M TUCKER CO INC | $750.75 |
| 635 | 05/27/11 | M TUCKER CO INC | $1,060.93 |
| 636 | 05/27/11 | M TUCKER CO INC | $2,829.94 |
| 637 | 05/27/11 | M TUCKER CO INC | $1,471.85 |
| 638 | 05/27/11 | M TUCKER CO INC | $983.74 |
| 639 | 05/27/11 | M TUCKER CO INC | $666.11 |
| 640 | 05/27/11 | M TUCKER CO INC | $1,439.48 |
| 641 | 05/27/11 | M TUCKER CO INC | $992.99 |
| 642 | 05/27/11 | M TUCKER CO INC | $1,474.20 |
| 110 | 12/14/10 | MORGAN LINEN SERVICE | $385.84 |
| 648 | 06/07/11 | SEASHORE FRUIT & PRODUCE CO., INC. | $2,985.26 |
| 649 | 06/07/11 | COSTA FRUIT & PRODUCE CO. | $7,280.16 |
| 67 | 12/09/10 | AMERICAN FRUIT & VEGETABLE CO INC. | $883.20 |
| 644 | 06/07/11 | TARANTINO FOODS, LLC | $236.25 |
| 647 | 06/07/11 | ROYAL FOOD SERVICE, INC. | $0.00 |
| 1937 | 10/07/11 | CALIP DAIRIES | $6,191.82 |
| 2071 | 10/08/11 | FRAN KENNEDY COFFEE CO. | $1,347.67 |
| 37 | 12/04/10 | W A BEAN & SONS INC | $1,061.39 |
| 2550 | 10/10/11 | BOTTLING GROUP LLC DBA PEPSI BEVERAGE CO | $17,493.97 |
| 139 | 12/20/10 | HELIUM PLUS, LLC | $960.00 |
| 645 | 06/07/11 | J. KINGS FOOD SERVICE PROFESSIONALS, INC | $2,511.30 |
| 646 | 06/07/11 | POCONO PRODUCE CO., INC. | $598.08 |
| 512 | 04/07/11 | STANDING OVATIONS | $241.98 |
|  |  | OTHER CLAIMS BEING RESEARCHED | $81,110.14 |
|  |  | **TOTAL 503(b)(9) Claims:** | **$206,383.37** |

## **EXHIBIT D**

**List of Anticipated Allowed Other Priority Claims**

**CB HOLDING Corp.** *et al*
<u>Exhibit D: Priority Claims</u>

| Creditor Name | Amount |
|---|---|
| **<u>Employee Related Claims</u>** | |
| Abajian, Lorraine M. | $385.70 |
| Analco, Crecensio | $658.00 |
| Arenas, Martha | $977.76 |
| Baird, Kristopher | $1,500.00 |
| Barnett, Josephine Anna | $200.00 |
| Burns, Michael F. | $555.95 |
| Cervantes, Felipe | $694.00 |
| Chen, Chun Lin | $570.50 |
| Chen, Shu Min | $1,578.10 |
| Dunleavy, John J. | $3,127.69 |
| Fiorey, Sarah | $569.00 |
| Greatorex, Spencer | $715.00 |
| Hines, Peter | $1,514.42 |
| Hoagland, Paul | $2,858.00 |
| Hollingshead, Danny | $826.00 |
| Jaicks, Bryan | $7,290.98 |
| James, Jacqueline | $393.00 |
| Keegan, Peggy | $1,015.00 |
| Liu, Mei | $396.00 |
| Luscombe, Samantha E. | $36.19 |
| Madirira, Joseph | $4,119.00 |
| Mangas, Brian | $1,592.96 |
| Martin, Christine | $1,624.51 |
| Mcnulty, Pamela | $1,531.25 |
| Morella, Joseph Carmen | $2,128.00 |
| Munoz, Jorge | $627.00 |
| Murray, Kevin A. | $3,861.05 |
| Neff, Ellen | $2,362.50 |
| Nieva, Gustavo | $1,575.00 |
| Pierson, William | $1,148.38 |
| Prestel, Eric | $2,867.26 |
| Pu, Felipe | $837.00 |
| Pucylowski, Jeffrey | $13,188.12 |
| Russoniello, Jennifer | $3,112.52 |
| Sarmiento, Luis | $630.00 |
| Segerstrom, Sherrie | $1,615.00 |
| Sepulveda, Luis | $809.00 |
| Shurak, Heather A. | $985.99 |
| Starr, Holly Ann | $2,230.30 |
| Vanderveer, Roberta | $389.89 |
| Waldron, Alice | $4,483.52 |
| Wylie, Albert | $449.00 |
| Other claims being researched | $4,176.93 |
| **Total Employee Related Priority Claims:** | **$82,205.47** |

**CB HOLDING Corp.** *et al*
Exhibit D: Priority Claims

| Creditor Name | Amount |
|---|---|
| **Tax Claims** | |
| ALPHA BOROUGH TAX COLLECTOR | $5,056.00 |
| BOROUGH OF ALPHA | $8,383.00 |
| BOROUGH OF MATAWAN | $4,235.00 |
| BOROUGH OF OLD TAPPAN | $1,970.00 |
| BOROUGH OF TENAFLY | $11,609.00 |
| BOROUGH OF TINTON FALLS | $1,620.00 |
| CITY OF FAYETTEVILLE | $139.00 |
| CITY OF METHUEN - W & S | $2,392.00 |
| CITY OF NEWNAN | $1,914.02 |
| CITY OF PEABODY | $4,740.32 |
| CITY OF SOUTH PORTLAND | $1,482.67 |
| CITY OF WARWICK TAX COLLECTOR | $5,168.32 |
| COMMISSIONER OF TAXATION & FIN | $450.00 |
| COWETA CTY TAX COMMISSIONER | $14,243.17 |
| FAYETTE CTY TAX COMMISSIONER | $3,192.68 |
| HIGHLAND PARK BOROUGH | $12,249.00 |
| HILLSBOROUGH TOWNSHIP | $5,989.00 |
| LACEY TOWNSHIP TAX COLLECTOR | $11,016.00 |
| MARGARET COUSLER, TAX COLLECTR | $18,551.00 |
| MIDDLETOWN TOWNSHIP | $768.00 |
| PISCATAWAY TWSP TAX OFFICE | $1,015.00 |
| TOWN OF BEDFORD | $6,330.00 |
| TOWN OF DEDHAM | $1,583.00 |
| TOWN OF FRAMINGHAM | $20,510.00 |
| TOWN OF HACKETTSTOWN | $12,588.00 |
| TOWN OF MANCHESTER | $6,346.00 |
| TOWN OF PLYMOUTH | $437.00 |
| TOWN OF SHREWSBURY | $66.00 |
| TOWN OF WATERTOWN | $531.00 |
| TOWN OF WESTFIELD TAX COLLECTR | $9,544.00 |
| TOWNSHIP OF DENVILLE | $1,668.00 |
| TOWNSHIP OF FAIRFIELD | $4,744.00 |
| TOWNSHIP OF FAIRFIELD | $4,440.00 |
| TOWNSHIP OF FRANKLIN | $16,305.00 |
| TOWNSHIP OF GLOUCESTER | $8,629.00 |
| TOWNSHIP OF GREEN BROOK | $7,926.00 |
| TOWNSHIP OF LAKEWOOD | $2,543.40 |
| TOWNSHIP OF UNION | $7,664.00 |
| TOWNSHIP OF WAYNE | $3,800.00 |
| SPRINGETTSBURY TOWNSHIP | $3,404.28 |
| TOWN OF SEEKONK | $2,487.69 |
| TOWN OF SEEKONK | $2,578.33 |
| COBB COUNTY TAX COMMISSIONER | $3,629.88 |
| CITY OF PHILADELPHIA | $8,918.27 |
| CITY OF PHILADELPHIA | $28,844.46 |
| DEDHAM WESTWOOD WATER DISTRICT | $1,519.41 |
| DEPARTMENT OF THE TREASURY - IRS | $20,763.73 |
| FULTON COUNTY TAX COMMISSIONER | $1,570.51 |
| GWINNETT CITY TAX COMM | $2,288.29 |

**CB HOLDING Corp.** *et al*
<u>Exhibit D: Priority Claims</u>

| Creditor Name | Amount |
|---|---|
| NEW YORK STATE DEPARTMENT OF TAXATION | $20.08 |
| NEW YORK STATE DEPARTMENT OF TAXATION | $1,032.25 |
| SOUTH WHITEHALL TOWNSHIP | $1,903.23 |
| STATE OF DELAWARE | $217.81 |
| STATE OF NEW JERSEY | $1,826.84 |
| STATE OF NEW YORK | $10,662.29 |
| STATE OF NEW YORK DEPARTMENT OF LABOR | $2,555.85 |
| STATE OF NEW YORK DEPARTMENT OF LABOR | $10,662.29 |
| VILLAGE OF FISHKILL | $5,371.96 |
| OTHER CLAIMS BEING RESEARCHED | $7,824.48 |
| **Total Tax Related Priority Claims:** | **$349,919.51** |